UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: _____

HYUNDAI MOTOR AMERICA
CORPORATION, a foreign corporation

       Plaintiff,

v.

NORTH AMERICAN AUTOMOTIVE SERVICES, INC.,
an Illinois Corporation,  EFN WEST PALM MOTOR SALES,
LLC, an Illinois Limited Liability Company; GENE KHAYTIN,
a North Carolina Resident; ERNIE REVUELTA, a Florida
Resident; EDWARD NAPLETON, JR., an Illinois Resident,
JOHN DOES, and RICHARD ROES,

       Defendants.

_____/

### HYUNDAI MOTOR AMERICA CORPORATION'S COMPLAINT

Plaintiff, HYUNDAI MOTOR AMERICA CORPORATION ("HMA"), by and through its undersigned counsel, files this Complaint against Defendants NORTH AMERICAN AUTOMOTIVE SERVICES, INC., EFN WEST PALM MOTOR SALES, LLC, GENE KHAYTIN, ERNIE REVUELTA, EDWARD NAPLETON, JR., JOHN DOES, and RICHARD ROES, and states as follows:

### JURISDICTION, VENUE, PARTIES

1.  This is an action for damages in excess of seventy-five thousand dollars ($75,000.00).

2.  At all relevant times, HMA is incorporated under the laws of the State of California, has its principal place of business in California, and is authorized to do business in the State of Florida. HMA is a citizen of California.

3.  Defendant North American Automotive Services, Inc. is a privately-owned conglomerate that operates 74 motor vehicle franchises under the fictitious name Napleton Automotive Group ("NAG").  *See*   https://www.ednapleton.com/ed-napleton-auto-group-history.htm.   NAG   is registered to do business in Florida.

4.   At all relevant times, Defendant EFN West Palm Motor Sales, LLC is an Illinois Limited Liability Company that operates an authorized Hyundai dealership d/b/a Napleton's Hyundai ("Napleton's #121).  Napleton's #121 is registered to do business in Florida.

5.   At all relevant times, Defendant GENE KHAYTIN, is *sui juris*, a citizen of the State of North Carolina, and former general manager of Napleton's #121.

6.   At all relevant times, Defendant ERNIE REVUELTA, is *sui juris*, a citizen of the State of Florida, and service manager of Napleton's #121.

7.   At all relevant times, EDWARD "EDDIE" NAPLETON, JR., is *sui juris*, a citizen of the State of Illinois, the director of operations for the Napleton Automotive Group, the regional manager for Napleton dealerships in Southeast Florida, and responsible for oversight of Napleton's #121.

8.   Pursuant to section 48.193, Florida Statutes, Defendants submitted themselves to the jurisdiction of this Court by committing tortious acts within the State of Florida.  Defendants registered to do business in Florida and/or conducted substantial, ongoing business in Florida. The suit arises from the Defendants' contacts with the State of Florida.  Defendants purposefully availed themselves of the privilege of conducting activities in the State of Florida, thus invoking the benefit of Florida's law.  Further, the exercise of jurisdiction comports with the traditional notions of fair play and substantial justice.

9.   Under section 47.011 Florida Statutes, one or more defendants reside in Palm Beach County and these causes of action accrued in Palm Beach County.  Therefore, venue is proper in Palm Beach County, Florida.  This Court has diversity jurisdiction under 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and it is between citizens of different states.  HMA is a deemed a citizen of the State of California and, upon information and belief, Defendants are all citizens of the states of Florida, Illinois, and North Carolina.

23475311v2

10. This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1331 because the lawsuit raises a substantial federal question under the federal Racketeer Influenced and Corrupt Organizations (RICO) Act.

## FACTUAL BACKGROUND

### HMA, Hyundai Vehicles, and Their Warranties

11. At all relevant times, HMA is the distributor of Hyundai motor vehicles in the United States, including Hyundai Sonatas and Hyundai Santa Fe vehicles. HMA distributes Hyundai motor vehicles through a network of independent dealers, one of which is Napleton's #121.

12. During the relevant time period, new Hyundai Sonata and Santa Fe vehicles sold in America were covered by several warranties, including the "Hyundai New Vehicle Limited Warranty" for 5 years/60,000 miles and the "Hyundai Powertrain Warranty Limited Warranty" for 10 years/100,000 miles for the original purchaser of the vehicle. *See e.g.* Exhibit A ("2012 Owner's Handbook & Warranty Information").

13. The Hyundai New Vehicle Limited Warranty ("Warranty") provides for the "[r]epair or replacement of any component originally manufactured or installed by [Hyundai] that is found to be defective in material or workmanship under normal use and maintenance" subject to the other exclusions. *See* Exhibit A, p. 18 ("WHAT IS COVERED.")

14. The Warranty does not cover damage from neglect or abuse. The Warranty states:

WHAT IS NOT COVERED…

- Damage or failure resulting from:

    - Negligence of proper maintenance as required in the Owner's Manual.
    - Misuse, abuse, accident, theft, water/flooding or fire.
    - Use of improper or insufficient fuel, fluids or lubricants…
    - Modifications, alterations, tampering or improper repair.

*See* Exhibit A, pp. 19-20 ("WHAT IS NOT COVERED.")

23475311v2

15. The Hyundai Powertrain Limited Warranty ("Powertrain Warranty") provides for the "[r]epair or replacement of powertrain components listed above, originally manufactured or installed by [Hyundai] that are found to be defective in material or factory workmanship under normal use and maintenance, except any item specifically referred to in the section 'What is Not Covered.'" *See* Exhibit A, p. 21 ("WHAT IS COVERED…").

16. The Powertrain Warranty also states that the "'Owner's Responsibilities' and 'Obtaining Warranty service' are the same as specified under the Hyundai New Vehicle Limited Warranty." *See* Exhibit A, p. 21 ("WHAT IS COVERED…").

17. Like the Warranty, the Powertrain Warranty does not cover damage from neglect or abuse. *See* Exhibit A, p. 21 ("WHAT IS NOT COVERED…")

### Recall Campaign for Hyundai Sonata and Santa Fe Vehicles

18. HMA is involved in safety recalls and service campaigns involving Hyundai vehicles in the United States.

19. Beginning in 2015, HMA recalled certain model year 2011-2012 Hyundai Sonatas to address a manufacturing issue that could lead to bearing wear and engine failure for 2011-2012 Hyundai Sonatas with the Theta II 2.0 liter or 2.4 liter Gasoline Direction Injection engine. *See* Exhibit B ("Important Information About Engine Care for Your Sonata.") *See also* Technical Service Bulletin (Recall Campaign 132), attached as Exhibit C.

20. In June 2017, HMA expanded the recall to include certain model year 2013-2014 Hyundai Sonatas and Santa Fe Sport vehicles with the Theta II 2.0 liter or 2.4 liter Gasoline Direction Injection engine. *See* Technical Service Bulletin (Recall Campaign 162), attached as Exhibit D.

21. In 2018 and 2019, HMA updated Recall Campaigns 132 and 162. *See* Technical Service Bulletin No. 18-01-007-1, attached as Exhibit E; Technical Service Bulletin No. 19-01-011H, attached as Exhibit F; Technical Service Bulletin No. 19-01-002H-4 (adding certain model year

4

2019 Sonata, Sante Fe, Tucson and Veloster N vehicles), attached as Exhibit G; and Technical Service Bulletin 19-01-006H-4, attached as Exhibit H.

22. Like all consumer recall programs, the HMA recalls were issued to protect consumer safety and to reimburse Hyundai customers for legitimate damage to their vehicles because of the engine issues. The recalls were publicized to Hyundai customers through recall campaigns ("Recall Campaign").

23. Under the terms of the Recall Campaign, HMA agreed to conduct safety inspections on affected Sonata and Santa Fe vehicles that were presented by then-current owners and lessees and, if necessary, replace the engine assembly in model year 2011-2014 and 2019 Hyundai Sonata and Santa Fe vehicles, which were found to be damaged, as described in the Recall Campaign.

24. In an effort to assist consumers facing legitimate problems, HMA's Recall Campaign also extended the Powertrain Warranty beyond the initial 10 years/100,000 miles and extended warranty protection beyond original owners.  HMA specifically advised consumers in the Recall Campaign notice that:

> Hyundai has extended the Powertrain Warranty for the engine short block assembly to 10 years/120,000 miles from the date of first use for both original and subsequent owners of the vehicle. The extension of the Powertrain Warranty for the short block assembly covers cost of an inspection of the engine short block and all repair costs.

*See* Exhibit B.

25. The Recall Campaign notice also explained that lack of proper vehicle maintenance may contribute to engine wear and damage and emphasized the importance of proper vehicle maintenance. *See* Exhibit B.

26. Although the Recall Campaign emphasized the importance of documentation, to allow a wider group of legitimately injured consumers to take advantage of the recall, HMA relaxed its

5

typical requirement that owners present copies of maintenance records in order to participate in the recall.

27. HMA's goodwill gesture in extending warranty coverage beyond original vehicle owners, however, would soon be exploited by Defendants for improper economic gain by NAG and Napleton's #121.

28. In order to be reimbursed and compensated for providing repairs to customers with vehicles subject to the extended warranty, Hyundai dealerships, including Napleton's # 121, would submit information about warranty repairs to HMA through an online internet "portal" and would then receive funds for the warranty repair from HMA.  These funds were submitted by HMA to such dealerships through online transfers between bank accounts.

29. At least as far back as 2016, Defendants began buying up Hyundai Sonata and Santa Fe vehicles from auction houses.  Defendants would then present fraudulent warranty claims about these vehicles to HMA through the internet portal described above.

30. In doing so, however, Defendants ignored the warranty disclaimers and limitations and took advantage of a consumer program designed to assist vehicles owners with legitimate engine performance issues.  Defendants misrepresented the condition of these vehicles; presented vehicles with excessive damage (*i.e.*, they were not roadworthy or were in inoperable condition); misrepresented the actual value and/or actual purchaser of these vehicles; and presented vehicles with supposed failed engines when the prior owners never had any issue with the operation or function of the engine. All of this was done as part of a pattern to deceive and defraud HMA and to profit from HMA's goal of helping real consumers with legitimate engine problems covered by the Recall Campaign.

31.  Through investigation, HMA has now learned that many of the vehicles presented by Defendants with failed engines never had an engine problem before they reached Defendants' gained ownership or control of the Hyundai vehicles.

23475311v2

32. Defendants engaged in a course of improper and fraudulent conduct that included altering the condition of the engine to ensure the vehicles qualified for warranty coverage.

**Napleton Automotive Group Executives Discover Engine Inventory Scheme at Napleton's #121**

33.  In mid to late 2017, NAG discovered that the parts inventory at Napleton's #121 showed an unusually high number of vehicle engines that should have been used for warranty replacements.

34. NAG sent representatives from its Chicago headquarters to investigate the discrepancy in the parts inventory at Napleton's #121.

35. At that time, NAG discovered that KHAYTIN, REVUALTA, and possibly others engaged in the following scheme:

     a.  KHAYTIN, REVAULATA and others acting in concert with them were reporting fictitious Hyundai engine warranty repairs to HMA

     b.  HMA, not knowing the repair was fictitious, would reimburse Napleton #121 for the fictitious repair and provide a replacement engine.

     c.  Napleton #121 received the replacement engines, but rather than putting the replacement engines into the vehicles under warranty, Naplton #121 would  put the replacement engines into its inventory.

36. The scheme was evidenced by Napleton #121's unusually high parts inventory.

37. The scheme allowed Napleton's #121 to both collect for the fictitious repair monies from HMA and book the parts inventory as annual profit.  In 2017 alone, this scheme yielded approximately $180,000 in profits to Napleton's #121 which allowed Napleton's #121 to show higher profits than other than the other Napleton dealerships.

38. After discovering this scheme, NAG executives, including Paul McCaskill, Jill Brotherton, Bruce Ethridge and Edward Napleton, Sr. met with KHAYTIN, REVUALTA, NAPLETON JR., and possibly others and ordered them to cease and desist employing the fraudulent scheme.

23475311v2

However, NAG and Napleton's #121 concealed this fraudulent scheme from Hyundai and, despite knowledge of these fraudulent activities, knowingly and intentionally retained the profits of this scheme in Napleton Automotive Group.

39. After the scheme was uncovered, NAPLETON JR. advised KHAYTIN that he should be kept informed of any such fraudulent schemes so that NAPLETON JR. could protect KHAYTIN from disciplinary action.

40. As explained in detail below, NAPLETON JR., KHAYTIN, and the other Defendants continued to work together to defraud HMA.

**The Exploitation of the Extended Warranty and Recall Campaign**

41. In mid-2017, the general manager of Napleton's North Palm Auto Park, Inc. d/b/a Napleton's Northlake Auto Park (Napleton's #123), Mark Eddleman, learned that Defendants were engaged in a fraudulent scheme to deliberately damage and/or alter engines in Hyundai vehicles for the purpose of  fraudulently collecting warranty funds from HMA.

42. As the regional manager; NAPLETON JR. also oversees the operations of Napleton's #123.

43. Eddleman initially learned of the fraudulent scheme through the service manager of Napleton's #123, Robb Minier.  Defendant REVUELTA explicitly described the scheme to Minier who, in turn, described the scheme to Eddleman.

44. KHAYTIN, REVUELTA, and service managers and employees deliberately damaged or altered the engines for the sole purpose of profiting, both individually and for Napelton's #121, from the consumer recall campaign.  In doing so, Defendants greatly increased the likelihood that HMA would repurchase the vehicle and not attempt replacement of the engine assembly.

45. Through Napleton's #121, KHAYTIN directed the purchase of numerous model year 2011-2014 and 2019 Hyundai Sonata and Santa Fe vehicles that had functioning engines when Napleton's #121 purchased them.

46. KHAYTIN purchased these vehicles from auction houses, including Manheim's Remarketing, Inc. d/b/a Manheim Palm Beach.

47. Manheim Palm Beach operates a "Hyundai Lane" in which fleet and other Hyundai used vehicles are sold at auction.

48. KHAYTIN purchased Hyundai vehicles from the "Hyundai Lane", and then Defendants would then intentionally "blow" the engines of said vehicles.

49. Defendants began this scheme in 2016 and have continued it through the present.

50. For example, one such vehicle is a 2015 Sonata, VIN 5NPE24AF4FH196398, that was purchased by Napleton's #121 from Manheim in 2019. It had low mileage when purchased, (30,244) and was in excellent condition, rated by Manheim as 4.5 on a scale of up to 5.0. Thirteen days after purchase from Manheim this vehicle was submitted to HMA for engine replacement. It had collected a total of two additional miles and now had a seized engine. The warranty records indicated that a customer stated that the car shut off during a test drive.

51. Another example is a 2014 Sonata, VIN 5NPEC4AB4EH853614 that was purchased by Napleton's #121 from Manheim in 2017. It had low mileage when purchased, (28,974) and was in excellent condition, rated by Manheim as 4.4 on a scale of up to 5.0. Two days after purchase from Manheim this vehicle was submitted to HMA for engine replacement. It had collected a total of NO additional miles and now had a seized engine. The warranty records indicated that the car shut off during a test drive.

52. KHAYTIN and REVUELTA worked with current and former service technicians at Napleton's #121 and current and former executives, officers, employees, and consultants of Napleton Automotive Group to intentionally damage the engines of these and other vehicles.

53. NAG had a policy for its dealerships, including Napleton's #121, to report inventory of used vehicles at the dealership and to write-off used vehicles that were at the dealership for longer than 60 days. As a result of Defendants' fraudulent scheme to purchase recalled Hyundai

vehicles, Napleton's #121 had an unusually high number of used vehicles at its dealership, including numerous Hyundai vehicles subject to the Recall that were being held for longer than 60 days.  As a part of the scheme and conspiracy NAPLETON JR., repeatedly approved the inventory overrun knowing that the vehicles would be used as part of the fraudulent engine-blowing scheme by which his dealership was profiting.

54.  Unbeknownst to HMA, Defendants continued the fraudulent scheme and by January 2019, Defendants were destroying as many as 22 engines in a month. In January 2019, REUVELTA openly discussed the fraudulent scheme with the service manager of Napleton's #123, Robb Minier. REUVELTA told Minier that Defendants would not be detected by HMA because HMA had a "fail rate" for Theta II engines and Defendants were careful to stay under HMA's fail rate.

55. On or about January 31, 2019, Minier exchanged text messages with Eddleman regarding the fraudulent scheme by Defendants. The exchange is revealing and confirms both the fictitious repair scheme concealed from HMA in 2017 and the active damaging of vehicle by Defendants. Minier states, "They are buying auction cars. Yes, and burning up a lot. I had lunch with Ernie [Revuelta] yesterday he blew up 22 this month." Eddleman responded, "Geez! That's freaking 200K. I thought at one time he was not actually installing some & and building parts inventory anyways just continue to play it safe. That could bite them 1 day." Minier responded, "Correct that's what they got busted for and got in trouble. For claiming them and not doing them." Copies of text messages are attached as Exhibit I.

56.  HMA paid for numerous engine replacements for vehicles from Napleton's #121 under the terms of the recall unaware of the deliberate damage done by Defendants.

57.  Thereafter, NAPLETON JR. encouraged Eddleman to engage in a similar scheme at Napleton's #123 to increase the dealer's profitability. However, Eddleman refused.

**Wrongful Termination Complaint by Mark Eddleman Publicly Reveals Defendants' Fraud**

58. On or about April 23, 2020, Eddleman filed a complaint against NAPLETON JR., Napleton's #123, and others for whistleblower retaliation, tortious interference, and negligent retention arising out of their termination of Eddleman. *See* Complaint, 15th Judicial Circuit, Case No. 502020CA004581XXXXMB, attached as Exhibit J.

59. According to Eddleman's Complaint, in February 2019, NAPLETON JR. had been charged with an August 2018 sexual battery on a helpless person.[1] (*Id*. at ¶ 4).

60. Eddleman further alleges that in August 2018, NAPLETON JR. confessed to him that he raped the victim, a NAG trainer, described the event in "disturbing detail," and confessed that the victim was unconscious the entire time. (*Id*. at ¶ 5.)

61. Eddleman further alleges that NAPLETON JR. pressured Eddleman to lie to criminal investigators about NAPLETON JR.'s interactions with the victim and to "forget" about NAPLETON JR.'s confession.   (*Id*. at ¶¶ 6-8).

62. After NAPLETON JR. was charged, NAPLETON JR. threatened Eddleman with termination if he did not falsely testify.  After Eddleman refused, he alleges he was "summarily terminated." (*Id*. at ¶¶ 8-9).

63. As a result of Eddleman's Complaint, for the first time, HMA became aware of the fraudulent engine warranty scheme perpetrated by Defendants and coconspirators on HMA.

64. Eddleman's Complaint alleges the defendants "encouraged him to engage in certain frauds that they carried out to bolster the Napleton's #121's overall profitability, including warranty fraud and consumer fraud.   (*Id*. at ¶ 3).   More specifically, Eddleman's Complaint alleges:

     1.   Warranty Fraud against Hyundai

---

[1] *See* criminal complaint, *State of Florida v. Edward Napleton, Jr.*, 15th Judicial Circuit, Case No. 50-2019-CF-000941-AXXX-MB.  The victim also filed a civil lawsuit against NAPLETON JR. and others.  *See Jane Doe v. Edward Napleton, Jr.*, 15th Judicial Circuit, Case No. 50-2019-CA-008289-XXXX-MB.

40.   For instance, Defendants and NAG [Napleton Automotive Group] Executive-1 [KHAYTIN] engaged in a large-scale warranty fraud against Hyundai.  In 2017 and 2018, according to its website, Hyundai recalled more than one million Santa Fe and Sonata vehicles in order to address a manufacturing issue that could lead to engine failure. Defendants and NAG Executive-1 [KHAYTIN] engaged in a scheme to defraud Hyundai based on the manufacturing issued Hyundai had announced.

41.   First, Defendants and NAG Executive-1 [KHAYTIN] would have NAG purchase at auction used versions of the Hyundai models that were subject to the recall.  Then, once NAG brought the purchased vehicles onto its premises, NAG would intentionally "blow" the engines of those vehicles by emptying their oil and running them at high RPMs until the engines malfunctioned.

42.  At that point, NAG would submit fraudulent requests for Hyundai to pay for the supposed manufacturing defects pursuant to the recall. NAG would receive approximately $7,000 per "blown" engine, including the new engine and service fee.

43.   But this scheme was not limited to vehicles that NAG had purchased at auction; NAG would carry out the scheme to applicable Hyundai models that had been traded in by customers or brought in for service, as well.  All told, NAG was "blowing" over 20 Hyundai engines every month, making this a multimillion-dollar fraud against Hyundai.

44.  Eddie Napleton, Jr. encouraged Plaintiff [Eddleman] to engage in this practice in order to bolster the productivity of the Hyundai dealership Plaintiff ran.  Plaintiff declined.

(*Id*. at ¶¶ 40-44).

### Count I: Fraud
### (KHAYTIN, REVUELTA, NAPLETON JR.)

65. HMA repeats and realleges paragraphs 1-64, as if fully set forth herein.

66.  KHAYTIN, REVUELTA, NAPLETON JR., JOHN DOES, and RICHARD ROES perpetrated a scheme to defraud HMA.

67. KHAYTIN purchased the Hyundai vehicles described above through Napleton's #121.

68.  REUVELTA and current and former service technicians then deliberately damaged the engines rendering them inoperable.

23475311v2

69.  REUVELTA and current and former service technicians also deliberately damaged the engines of vehicles taken in trade, or at the end of leases, as well as customer-owned vehicles brought in for repair, to make it falsely appear that an engine failure had occurred.

70. KHAYTIN and REUVELTA, with NAPLETON JR.'S and other current and former executives, officers, employees, and consultants encouragement and approval, then presented the vehicles to HMA, falsely representing they were covered under the Recall Warranty and omitting the fact that Defendants themselves had damaged the vehicles.

71. KHAYTIN and REUVELTA, and NAPLETON JR. and other current and former executives, officers, employees, and consultants made misrepresentations and/or omissions of fact regarding deliberate damage to the engines of these Hyundai vehicles.

72. KHAYTIN and REUVELTA, and NAPLETON JR. and  also made misrepresentations and/or omissions of facts regarding the actual purchase price and/or actual purchaser of the vehicles.

73.  KHAYTIN and REUVELTA, NAPLETON JR. and other knew that these statements and/or omissions were false at the time the statements were made, and that HMA was ignorant of any undisclosed facts and the fraudulent scheme that was being implemented.

74. KHAYTIN and REUVELTA, NAPLETON JR. and other current and former executives, officers, employees, and consultants intended that HMA rely on their misrepresentations and omission of material facts to treat the Hyundai vehicles under the Recall Warranty, and provide warranty reimbursement under  the  Recall  Warranty,  including in  some  instances  replacing the  engine  assemblies  or repurchasing the vehicle.

75. HMA justifiably and  reasonably relied  upon  Defendants' misrepresentations and/or omissions of fact and acted on them by providing warranty reimbursement, including replacement of engine assemblies, or repurchasing the vehicles.

13

76. HMA paid a significant amount of money in reasonable reliance on Defendants' misrepresentations and/or omissions of facts.

77. HMA has suffered significant monetary damages as a result of Defendants misrepresentations and/or omissions of facts.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against KHAYTIN and REUVELTA, NAPLETON JR. and RICHARD ROES for compensatory damages, punitive damages, pre and post judgment interest, costs, and such other relief as this Court may deem appropriate.

### Count II – Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)
### (All Defendants)

78. HMA repeats and realleges paragraphs 1-64 as if fully set forth herein.

79. The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., imposes liability upon "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, [who] conduct[s] or participate[s] directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…." 18 U.S.C. § 1962(c).

80. RICO was designed to prevent the illicit infiltration of legitimate business enterprises.

81. Defendants perpetrated a fraudulent scheme in which HMA was the intended target, whereby they purposefully damaged engines of Hyundai vehicles purchased, traded or repaired through Napleton's #121, and fraudulently presented to HMA for coverage under the Recall and Warranty. Defendants—knowing that the warranty did not cover vehicles that were intentionally damaged—intentionally, knowingly and willfully presented HMA with fraudulent claims for their coverage.

82. Defendants also deliberately damaged the engines of vehicles taken in trade, or at the end of leases, as well as customer-owned vehicles brought in for repair, to make it falsely appear that an engine failure had occurred.

83. Defendants' fraudulent presentation of Hyundai vehicles as covered under the Recall and Warranty caused HMA injury because HMA paid to repair or reimburse Napleton's #121 for Hyundai vehicles that the Warranty did not cover.

84. Since at least 2016, and continuing through the present, Defendants formed an enterprise, as that term is defined in 18 U.S.C. § 1961(4), to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(1), that affects interstate commerce.

85. At all relevant times, Defendants were and remain employed by and/or associated with the enterprise.

86. The pattern of racketeering activity in which the enterprise conducts and participates is the purchase, sale, and transport of vehicles, for purposes of submitting (and so submitting), through the internet, private mail carriers, commercial mail carriers, wires, and/or other electronic means, fraudulent warranty claims to HMA, and receiving payment from HMA for these fraudulent warranty claims, as described above.

87. Defendants, by and through their fraudulent activities and wrongful conduct, willfully and with actual knowledge, agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity for the purposes of intentionally defrauding HMA since at least 2016. Defendants, willfully and with actual knowledge, conducted and participated in the affairs of the enterprise by purchasing and deliberately damaging Hyundai vehicles before transporting them to independent Hyundai dealers for evaluation intending for HMA to perform unjustified warranty work, including replacement of engine assemblies, or repurchase of the vehicles, which included use of

the United States Postal Service, private or commercial mail carriers, wires or electronic means, to deliver and transmit to conduct the scheme.

88. Pursuant to and in furtherance of the fraudulent scheme, Defendants willfully and with actual knowledge committed multiple acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, over a one-year time period spanning from at least as early as 2017 to 2020. These acts include purchasing and deliberately damaging Hyundai vehicles and making false misrepresentations and/or omission of facts, which were reasonably relied upon by HMA, using the United States Postal Service, private or commercial mail carriers, and/or wires or electronic means.

89. These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c) because they were related to the same scheme to enrich the Defendants and the enterprise at the expense of HMA through the fraudulent misrepresentations and/or omission of facts of vehicles for coverage under HMA's warranty program that did not meet the warranty requirements.

90. It is likely that Defendants' criminal conduct will continue, with respect to this scheme and potentially others. Defendants have maintained its fraudulent position that HMA owes Napleton's #121 coverage under the Recall and Warranty for other Hyundai vehicles that HMA has not provided because of its investigation into this matter. Additionally, upon information and belief, Defendants have engaged in similar schemes in connection with other unrelated recalls in the automotive industry in the past. If Defendants are not stopped, it is likely that their improper and fraudulent abuse of product recalls for their own unlawful gain will continue.

91. Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c).

92. As a direct and proximate result of the racketeering activities of Defendants and violations of 18 U.S.C. § 1962(c), HMA has been injured in its business and property as a result of paying Napleton's #121 and paying for evaluation of Hyundai vehicles for warranty work deliberately damaged by Defendants.

WHEREFORE, Hyundai Motor America demands judgment in its favor and against Defendants for monetary damages, treble damages, costs, attorneys' fees, pre and post judgment interest, an order preventing and restraining Defendants from further violations of 18 U.S.C. § 1962(c), and such other relief deemed just and appropriate.

### Count III – Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (d)
### (All Defendants)

93. HMA repeats and realleges paragraph 1 - 64, as if fully set forth herein.

94. By engaging in the conduct set forth herein, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Defendants willfully and with actual knowledge, agreed to and conspired to defraud HMA by purchasing and deliberately damaging Hyundai vehicles before transporting them to Napleton's #121 for evaluation intending for HMA to perform unjustified warranty work, including replacement of engine assemblies, or repurchasing the vehicles, through the use of the United States Postal Service, private or commercial mail carriers, and/or wires or electronic means.

95. Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further their fraudulent scheme. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

96. As a direct and proximate result of the racketeering activities of Defendants, the overt acts committed in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), HMA has been injured in its business and property as a result of paying Napleton's #121 and paying for evaluation of Hyundai vehicles for warranty work deliberately damaged by Defendants.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against Defendants for monetary damages, treble damages, pre and post judgment interest, costs, attorneys' fees, an order preventing and restraining Defendants from further violations of 18 U.S.C. § 1962(d), and such other relief deemed just and appropriate.

### Count IV: Violation of Florida Deceptive and Unfair Trade Practiced Act (FDUTPA), Fla. Stat. § 501.201 *et seq.* (KHAYTIN, REVUELTA, NAPLETON JR.)

97. HMA repeats and realleges paragraph 1 - 64, as if fully set forth herein.

98. Section 501.203(7) Florida Statutes defines "Consumer," as any "…business; firm; association; joint venture; partnership; …corporation, any commercial entity, however denominated." HMA is a "consumer" as defined by the statute.

99. Section 501.203(8) Florida Statues defines "Trade or Commerce" as, "[T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, whether situated. "Trade or Commerce" shall include the conduct of any trade or commerce, however, denominated, including any nonprofit or not-for-profit person or activity."

100. Defendants' and Napleton #121's have engaged in "Trade or Commerce" within the meaning of Section 501.203(8) Florida Statues.

101. Defendants' engaged in unfair or deceptive acts or practices, or unconscionable acts or practices, in the conduct of trade or commerce, including but not limited to falsely

18

representing the Hyundai vehicles were covered under the Recall Warranty and omitting the fact that Defendants themselves had damaged the vehicles.  Defendants also made misrepresentations and/or omissions of fact regarding deliberate damage to the Hyundai vehicles' engines and the actual purchase price and/or actual purchaser of the vehicles.

102. As a proximate result of Defendants' unfair and deceptive acts or practices, and unconscionable acts and practices, HMA has suffered actual damages for which it is entitled to relief, and has incurred attorneys' fees which are recoverable under the statute.

WHEREFORE, HMA demands actual damages, pre and post-judgment interest, an award of attorneys' fees based upon section 501.2105 Florida Statutes, taxable costs, and any other relief deemed just and proper.

### Count V: Tortious Interference with a Contract and Business Relationship
### (KHAYTIN, REVUELTA, NAPLETON JR.)

103. HMA repeats and realleges paragraph 1 - 64, as if fully set forth herein.

104. HMA has a business relationship and Dealer Sales and Service Agreement with Napleton's #121 under which HMA has legal rights.

105. Defendants are aware of HMA's business relationship and Dealer Sales and Service Agreement with Napleton's #121.

106. Defendants intentionally and unjustifiably interfered with HMA's business relationship and Agreement with Napleton's #121.

107. More specifically, the Agreement is subject to immediate termination where the dealer submits to HMA "(i) false claims for reimbursement, sales incentives, refunds rebates or credits, (ii) false financial information, sales reports or other data required by HMA; or (iii) false statements relating to predelivery preparation, testing, warranties, servicing, repairing, or maintenance required by HMA."

108. Additionally, HMA's Dealer Sales and Service Agreement with Napleton's #121 requires Napleton #121 to comply with the Hyundai Warranty Policy and Procedures Manual. Defendants intentionally and unjustifiably caused Napleton's #121 to violate the Manual.

109. HMA has been damaged as a result of Defendants' interference.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against Defendants for compensatory damages, pre and post judgement interest, costs, and such other relief as this Court may deem appropriate.

## Count VI: Civil Conspiracy
### (KHAYTIN, REVUELTA, NAPLETON JR.,)

110. HMA repeats and realleges paragraph 1 - 64, as if fully set forth herein.

111. Defendants agreed to enter into a conspiracy to commit an unlawful act by defrauding HMA by intentionally destroying engines of Hyundai vehicles and submitting fraudulent warranty claims to HMA.

112. Defendants committed overt acts in pursuance of the conspiracy by purchasing Hyundai vehicles for the purpose of intentionally damaging their engines, submitting fraudulent warranty claims for said vehicles.

113. HMA has been damaged as a result of the Defendants' acts performed pursuant to the conspiracy.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against Defendants for compensatory damages, punitive damages, pre and post judgment interest, costs, and such other relief as this Court may deem appropriate.

## COUNT VII:  Unjust Enrichment
### (KHAYTIN, REVUELTA, NAPLETON JR.)

114. HMA repeats and realleges the allegations in paragraphs 1 - 64, as if fully set forth herein.

115. HMA paid Napleton's #121 for claims that were not covered by the Recall and the Warranty.

23475311v2

116.   Napleton's #121 accepted and retained the Recall and Warranty claim payments made by HMA, even though it had knowledge the claims were not covered by the Recall and the Warranty.

117. Napleton's #121 profits during the fiscal years 2017-2020 were artificially inflated due to the Recall and Warranty claim payments made by HMA for fraudulent Recall and Warranty claims submitted by Napleton's #121.

118. Upon information and belief, Defendants KHAYTIN and REVUELTA, received bonuses they were not entitled to receive based on the Napleton's #121 inflated profits.

119. Upon information and belief, Defendant NAPLETON JR. received distributions, dividends and/or bonuses he was not entitled to receive based on Napleton's #121 inflated profits.

120. Napleton's #121, and in turn Defendants, have been unjustly enriched to the detriment of HMA.

121. The circumstances are such that it would be unjust for Defendants to retain the benefit conferred on them by HMA.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against Defendants Khaytin, Revuelta and Napleton Jr. for compensatory damages, pre and post judgment interest, costs, and such as relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Hyundai Motor America Corporation hereby demands trial by jury on all issues so triable.

Respectfully submitted this 17th day of November, 2020.

By:   */s/ Robert J. Rudock*
Robert J. Rudock., Esq. (FB#365157)
Bob.Rudock@bowmanandbrooke.com
Loren W. Fender, Esq. (FB#553921)
lfender@bowmanandbrooke.com

23475311v2

**Bowman and Brooke, LLP**
Two Alhambra Plaza - Suite 800
Miami, FL  33134-5214
Tel: (305) 995-5600
Fax: (305) 995-6100

*And*

James Andrew Bertron, Jr. (Fla Bar No. 982849)
andy.bertron@nelsonmullins.com
Ginger Barry Boyd (Fla Bar No. 294550)
ginger.boyd@nelsonmullins.com
**Nelson Mullins Broad & Cassel**
215 S. Monroe Street, Suite 400
Tallahassee, FL 32301
Tel. 850-907-2507
Fax. 850-681-9792

*Attorneys for Plaintiff,*
*Hyundai Motor America Corporation*

23475311v2