### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

CASE NO: 20-82102-CV-MIDDLEBROOKS

HYUNDAI MOTOR AMERICA
CORPORATION,

      Plaintiff,

v.

NORTH AMERICAN AUTOMOTIVE
SERVICES, INC., et al.,

      Defendants.

_____/

### <u>ORDER ON MOTION TO DISMISS</u>

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss, filed on December 24, 2020. (DE 17). The Motion is fully briefed. (DE 28; DE 31). For the following reasons, the Motion is granted in part and denied in part.

### I.    BACKGROUND

This lawsuit arises from Defendants' alleged "fraudulent scheme to deliberately damage and/or alter engines in Hyundai vehicles for the purpose of fraudulently collecting warranty funds from [Plaintiff]." (*See* DE 1 at ¶ 41). Plaintiff Hyundai Motor America Corporation brought this action against Defendant North American Automotive Services, Inc., an entity "that operates 74 motor vehicle franchises under the fictitious name Napleton Automotive Group" ("Napleton"); Defendant EFN West Palm Motor Sales, LLC, an entity that operates a Hyundai dealership (the "Dealership"); Defendant Gene Khaytin, the former general manager of the Dealership; Defendant Ernie Revuelta, the service manager of the Dealership; and Defendant Edward Napleton, Jr., the director of operations of Napleton and regional manager of its dealerships in Southeast Florida

(which includes overseeing the Dealership). (*See id.* at ¶¶ 3–7).[1] The Complaint brings seven counts, including (1) fraud against the individual Defendants; (2) violation of section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants; (3) violation of section 1962(d) of RICO against all Defendants; (4) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") against the individual Defendants; (5) tortious interference against the individual Defendants; (6) civil conspiracy against the individual Defendants; and (7) unjust enrichment against the individual Defendants. (DE 1 at ¶¶ 65–121).

Plaintiff distributes Hyundai motor vehicles in the United States through independent dealers, including the Dealership. (*Id.* at ¶ 11). In 2015, Plaintiff began a recall campaign for certain Hyundai models relating to issues that could lead to engine failure, and it later expanded the campaign to include additional Hyundai models. (*Id.* at ¶¶ 19–21). This campaign also involved extending a certain warranty beyond original year/mile limits and beyond original owners. (*Id.* at ¶ 24). "In order to be reimbursed and compensated for providing repairs to customers with vehicles subject to the extended warranty, Hyundai dealerships, including [the Dealership], would submit information about warranty repairs to [Plaintiff] through an online internet 'portal' and would then receive funds for the warranty repair from [Plaintiff]. These funds were submitted by [Plaintiff] to such dealerships through online transfers between bank accounts." (*Id.* at ¶ 28).

---

[1] Plaintiff also names Defendants John Does and Richard Roes in the Complaint but fails to provide any other identifying information regarding those Defendants. And the only allegation as to those Defendants provides: "KHAYTIN, REVUELTA, NAPLETON JR., JOHN DOES, and RICHARD ROES perpetrated a scheme to defraud [Plaintiff]." (*Id.* at ¶ 66). However, "fictitious-party pleading is not permitted in federal court[,]" unless "the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (citations omitted). Because the allegations in the Complaint do not support the application of this exception, I will *sua sponte* dismiss Plaintiff's claims against those Defendants.

Plaintiff alleges that, "[a]t least as far back as 2016," Defendants began buying the Hyundai models at issue from auction houses and submitting fraudulent warranty claims through the online portal. (*Id.* at ¶ 29). Plaintiff claims that Defendants, in so doing, misrepresented the condition and the actual value and/or purchaser of the vehicles, submitted claims for vehicles with excessive damage, "and presented vehicles with supposed failed engines when the prior owners never had any issue with the operation or function of the engine"—all in an attempt to defraud Plaintiff. (*Id.* at ¶ 30). Plaintiff also alleges that many of the vehicles that were the subject of Defendants' claims had never had an engine problem prior to being in Defendants' ownership or control and that Defendants altered the condition of the engines to obtain warranty coverage. (*Id.* at ¶¶ 31–32).

More specifically, Plaintiff alleges that Defendants Gene Khaytin and Ernie Revuelta, among others, "deliberately damaged or altered the engines for the sole purpose of profiting, both individually and for [the Dealership], from the consumer recall campaign." (*Id.* at ¶ 44). Defendant Gene Khaytin purchased Hyundai vehicles with functioning engines on behalf of the Dealership, and "Defendants would then intentionally 'blow' the engines." (*Id.* at ¶¶ 45, 48). Plaintiff offers two examples, one vehicle purchased by the Dealership in 2017 and another in 2019 that had low mileage and were in excellent condition when purchased, which were the subject of such claims; the first was submitted for an engine replacement two days after it was purchased and with zero additional miles since the purchase date and the second thirteen days after it was purchased and with two additional miles since the purchase date, both on the basis that the vehicle had a seized engine and "shut off during a test drive." (*Id.* at ¶¶ 50–51). Defendant Edward Napleton, Jr., also "repeatedly approved . . . [used vehicle] inventory overrun" at the Dealership to further the scheme. (*See id.* at ¶ 53). And in telling an employee at another dealership about the scheme, Defendant Ernie Revuelta stated that they stay under the engine "fail rate" to avoid detection. (*Id.* at ¶ 54).

In 2017, Napleton discovered that the Dealership had "an unusually high number of vehicle engines that should have been used for warranty replacements." (*Id.* at ¶ 33). It sent representatives to investigate, at which time it found out that Defendants Gene Khaytin and Ernie Revuelta, among others, were submitting fraudulent warranty claims to Plaintiff and putting the replacement engines sent by Plaintiff into its inventory rather than replacing the engines in the vehicles. (*Id.* at ¶¶ 34–35). As a result, the Dealership was able to "collect for the fictitious repair monies" and "book the parts inventory as annual profit," resulting in around $180,000 in profits in 2017. (*Id.* at ¶ 37).

Therefore, Napleton executives met with the individual Defendants "and ordered them to cease and desist employing the fraudulent scheme." (*Id.* at ¶ 38). However, Plaintiff alleges that Napleton and the Dealership concealed this scheme from Plaintiff and intentionally retained the profits from the scheme despite knowledge of its fraudulent nature. (*Id.*). Defendant Edward Napleton, Jr., later requested that Defendant Gene Khaytin keep him informed of such schemes so that he could protect Defendant Gene Khaytin from any disciplinary action. (*Id.* at ¶ 39). Also in 2017, Mark Eddleman, the general manager of another Napleton dealership (which was overseen by Defendant Edward Napleton, Jr.) learned of the scheme. (*Id.* at ¶¶ 41–42). Defendant Ernie Revuelta "explicitly described the scheme to" the service manager of Mark Eddleman's dealership who then described it to Mark Eddleman, and Defendant Edward Napleton, Jr., encouraged Mark Eddleman to engage in the same scheme at his dealership. (*Id.* at ¶¶ 43, 57). In 2019, that service manager texted Mark Eddleman: "They are buying auction cars. Yes, and burning up a lot. I had lunch with Ernie [Revuelta] yesterday he blew up 22 this month. . . . [T]hat's what they got busted for and got in trouble. For claiming them and not doing them." (*Id.* at ¶ 55). Plaintiff claims, apparently on that basis, that the scheme has continued from 2016 to the present. (*Id.* at ¶ 49).

Defendants seek dismissal with prejudice of the Complaint on various grounds. (DE 17).

## II.     LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the allegations in a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing legal sufficiency, courts are bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). That is, "a complaint must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and accept as true all of the plaintiff's factual allegations. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "[A] formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (citation omitted). "Factual allegations must be enough to raise [the plaintiff's] right to relief above the speculative level[.]" *Id.* (citation omitted).

## III.     DISCUSSION

Defendants seek dismissal of each count of the Complaint, citing the following grounds.

### A.  Fraud (Count I)

Count I alleges a fraud claim against the individual Defendants. The elements of fraudulent misrepresentation include "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (emphasis in original) (citation omitted).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The purpose of this rule is to alert defendants to the "precise misconduct with which they are charged" and avoid "spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citation omitted); *see Friedlander v. Nims*, 755 F.2d 810, 813 n.3 (11th Cir. 1985) (stating that Rule 9(b) serves "to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed" (citation omitted)). "[U]nder Rule 9(b), the Plaintiffs must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (citation omitted). Additionally, "in a case involving multiple defendants . . . 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Id.* at 1381 (alteration in original) (citations omitted).

"Rule 9(b) must not be read to abrogate rule 8, however, and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broader policy of notice pleading." *Friedlander*, 755 F.2d at 813 n.3 (citations omitted). "Allegations of date, time or place satisfy the Rule 9(b) requirement that the *circumstances* of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988) (emphasis in original) (citations omitted). "[A] plaintiff is not expected to actually *prove* his allegations" to avoid dismissal. *U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1313 (11th Cir. 2002) (emphasis in original). And this requirement may be relaxed "in appropriate circumstances to aid those alleging prolonged multi-act schemes," in which case the

plaintiff would be required "to allege at least some examples of actual false claims to lay a complete foundation for the rest of [the plaintiff's] allegations." *Id.* at 1314 n.25 (citation omitted).

In its Complaint, Plaintiff plausibly alleges that the individual Defendants engaged in a prolonged, multi-act fraudulent scheme, and thus I am persuaded by Plaintiff's assertion that the particularity requirement should be relaxed such that Plaintiff need only allege some examples of the allegedly fraudulent warranty claims. The Complaint identifies two specific examples of such claims. Plaintiff alleges that two vehicles (one purchased in 2017 and the other in 2019) were the subject of warranty claims submitted to Plaintiff for an engine replacement (the first two days after it was purchased and with zero additional miles since the purchase date and the second thirteen days after it was purchased and with two additional miles since the purchase date) on the basis that the vehicles had seized engines and "shut off during a test drive," despite the vehicles having low mileage and being in excellent condition when they were purchased. (DE 1 at ¶¶ 50–51).

Accepting Plaintiff's factual allegations as true, which I am required to do at this stage, Defendants Gene Khaytin and Ernie Revuelta had at least taken part in the intentional damaging of these vehicles' engines. (*See id.* at ¶ 52). Therefore, the Complaint allegations plausibly support Plaintiff's assertion that it was misleading to represent in these claims that the vehicles simply shut off during a test drive while omitting that the engines of the vehicles were intentionally damaged.

Nevertheless, Defendants call into question whether Plaintiff alleged those examples with the requisite particularity. Specifically, Defendants argue that "Plaintiff alleges that the Individual Defendants collectively engaged in fraudulent warranty submissions yet fails to precisely identify what statements were made, the time and place of each statement and the person making it, and the content of such statements." (DE 17 at 21–22). After careful consideration of the unique facts of this case and the relevant law, I find that Plaintiff has fulfilled the purpose of Rule 9(b).

First, I am satisfied that the Complaint sufficiently identifies the misrepresentations made and the content of the same by explaining that the two vehicles at issue were (1) purchased by the Dealership and (2) the subject of warranty claims submitted to Plaintiff for an engine replacement, providing the VIN of each vehicle, and alleging that the claims stated that the vehicles had shut off during a test drive without mentioning that Defendants had intentionally damaged the engines of those vehicles. This information puts the individual Defendants on notice of the precise misconduct with which they are charged with respect to these vehicles because Defendants are provided with identifying information about the vehicles and the representations that they made about the engine failure of those vehicles. Further, the Complaint alleges the place of the statement in that it alleges that the warranty claims at issue are submitted to Plaintiff via an online portal.

Although it is a close call, I also find that Plaintiff alleges the time of the misrepresentations and the person responsible for the same with enough particularity to meet the Rule 9(b) standard. The Complaint does not provide the exact date of the claims; however, it does allege the year of each purchase and explain that the claims were submitted shortly after the purchases (two and thirteen days, respectively). With the purpose of Rule 9(b) in mind—that is, to notify Defendants of the precise misconduct alleged—I find that Plaintiff has provided enough information regarding the timing of the claims to accomplish that purpose, particularly in light of the fact that Plaintiff provided information such as the VIN of the vehicles and the content of the claims which will allow Defendants to identify the exact warranty claims that these examples are referencing and then use those claims in order to respond to Plaintiff's allegations. Finally, I recognize that the Complaint does not expressly allege which employee submitted these specific claims to Plaintiff. However, given the particular circumstances at issue, it is of no consequence which of the Dealership's employees submitted these specific claims when it comes to fulfilling the purpose of

Rule 9(b). That is because Plaintiff has alerted each individual Defendant to the precise nature of his alleged participation in this scheme by alleging that Defendant Gene Khaytin purchased the Hyundai models at issue; Defendants Gene Khaytin and Ernie Revuelta deliberately damaged the engines; and Defendant Edward Napleton, Jr., facilitated the expansion of the Dealership's used vehicle inventory for use in the scheme. Therefore, it is reasonable to infer from Plaintiff's allegations that the individual Defendants all played a role in the eventual submission of the allegedly fraudulent warranty claims even if they did not click "submit" through the online portal.

With the information provided by Plaintiff, Defendants should be capable of formulating a defense, as they are on notice of their role in the alleged fraudulent scheme and the circumstances of the scheme are outlined. Accordingly, I will deny Defendants' Motion as it relates to Count I.

### B.  RICO Claims (Counts II and III)

In Count II, Plaintiff alleges that all Defendants violated section 1962(c) of RICO.[2] In Count III, Plaintiff alleges that all Defendants conspired to do so. Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). "To recover, a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (citation omitted). Further, the plaintiff must establish "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Id.* (citation omitted).

---

[2] "Any person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c).

"[T]he RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citation omitted).

Defendants argue that Count II of the Complaint fails to plausibly allege (1) a RICO enterprise and (2) a pattern of (3) racketeering activity including at least two racketeering acts. As such, they assert that Count III (the RICO conspiracy claim) must also be dismissed.

### 1.  Napleton and the Dealership

Prior to reaching those arguments, I will address Defendants' assertion that the Complaint fails to sufficiently allege that Napleton and the Dealership had a role in the scheme. Defendants argue that "the Complaint actually alleges that . . . [those] Defendants <u>tried to stop</u> any fraudulent scheme." (DE 17 at 11 (emphasis in original)).[3] According to the Complaint, after Napleton discovered the fraudulent scheme, Napleton executives met with the individual Defendants "and ordered them to cease and desist employing the fraudulent scheme." (DE 1 at ¶ 38). The Complaint alleges that Napleton and the Dealership thereafter concealed this scheme from Plaintiff and intentionally retained the profits from the scheme despite knowledge of its fraudulent nature. (*Id.*).

With respect to the Dealership, I find Defendants' argument unavailing. The Complaint alleges that Defendant Gene Khaytin purchased the Hyundai models at issue *on behalf of* the Dealership, and that *the Dealership* would submit warranty claims to Plaintiff via the online portal. (*See id.* at ¶¶ 28, 45). It further claims that "[s]ince at least 2016, and continuing through the present, Defendants formed an enterprise" and that "[a]t all relevant times, Defendants were and

---

[3] Defendants also argue that absent allegations that those Defendants had a duty to disclose the scheme, the "mail and wire fraud [RICO] claims cannot be based on any purported nondisclosure." (*Id.*). This argument appears to be misplaced. "Nondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose, either by statute or otherwise." *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002) (citations omitted). However, the Complaint does not appear to allege that Napleton and the Dealership's nondisclosure of the scheme was a separate instance of mail or wire fraud.

remain employed by and/or associated with the enterprise." (*Id.* at ¶¶ 84–85). Viewing these allegations together, the Complaint sufficiently alleges that the Dealership was involved in the scheme since the beginning—in that it was acting through its agents, Defendants Gene Khaytin and Ernie Revuelta.[4] Thus, I decline to dismiss Count II against the Dealership on such grounds.

As for Napleton, however, I am persuaded by Defendants' argument. "[T]o 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs. . . . RICO liability is not limited to those with primary responsibility for the enterprise's affairs[] . . . [or] to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original) (footnote omitted). Therefore, "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Id.* at 185.

With respect to the fraudulent scheme, the Complaint makes the following allegations that are unique to Napleton's alleged role: "In mid to late 2017," Napleton discovered that the Dealership had "an unusually high number of vehicle engines that should have been used for warranty replacements." (DE 1 at ¶ 33). It therefore sent representatives to investigate, at which time it found out that Defendants Gene Khaytin and Ernie Revuelta, among others, were submitting fraudulent warranty claims to Plaintiff and putting the replacement engines sent by Plaintiff into its inventory rather than replacing the engines in the vehicles. (*Id.* at ¶¶ 34–35). As a result, Napleton executives met with the individual Defendants "and ordered them to cease and desist employing the fraudulent scheme." (*Id.* at ¶ 38). However, Napleton and the Dealership

---

[4] Plaintiff confirms that this is its theory as to the Dealership in its Response. (*See* DE 28 at 6).

allegedly concealed this scheme from Plaintiff and intentionally retained the profits from the scheme despite knowledge of its fraudulent nature. (*Id.*).[5]

Therefore, despite Plaintiff's assertions that *Defendants* formed an enterprise since at least 2016 and that *Defendants* were at all relevant times employed by or associated with the enterprise, and remain so (*see* DE 1 at ¶¶ 84–85), the factual allegations unique to Napleton do not support such conclusions with respect to Napleton. Moreover, I find that those minimal allegations do not plausibly support the inference that Napleton participated in the operation or management of the enterprise itself in that it had some part in *directing* the enterprise's affairs. As such, I will dismiss without prejudice the claims brought against Napleton. In any Amended Complaint, Plaintiff may attempt to clarify its theory of liability as to Napleton, if any viable theory exists, and support it with clear factual allegations.

### 2.  Pattern of Racketeering Activity

Additionally, Defendants assert that Count II fails to state a RICO claim because the Complaint does not sufficiently allege (1) a pattern of (2) racketeering activity.

### a.  Predicate Acts

"[A]bsent any valid predicate acts, the [plaintiff] cannot state a claim for RICO violations." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1068 (11th Cir. 2007) (citation omitted).

---

[5] While the Complaint includes an excerpt of Mark Eddleman's complaint from a separate action which makes specific allegations as to Napleton, the Complaint does not expressly adopt those allegations. (*See id.* at ¶ 64). And although Plaintiff's Response attempts to link certain Complaint allegations solely regarding Defendant Edward Napleton, Jr. (Napleton's director of operations) to Napleton (*see* DE 28 at 7), I am bound by the Complaint allegations in considering this Motion. That is, the Complaint did not clearly allege the theory that Napleton was acting through Defendant Edward Napleton, Jr., as a part of this scheme. Rather, based upon the allegations that Napleton executives told the individual Defendants to end the scheme and thereafter Defendant Edward Napleton, Jr., requested that Defendant Gene Khaytin keep him informed of such schemes so that he could protect Defendant Gene Khaytin from any disciplinary action, the Complaint appears to support the theory that Defendant Edward Napleton, Jr., acted independently of Napleton.

"'Racketeering activity' is defined to include such predicate acts as mail and wire fraud. . . . 'Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme.'" *Am. Dental Ass'n*, 605 F.3d at 1290 (citations omitted). Because Plaintiff's RICO claims are based solely upon the predicate acts of mail and wire fraud, its allegations in support of the claims must comply with Rule 9(b). *See id.* at 1291. The allegations that support Plaintiff's fraud claim are the same as those that support the RICO claims. Thus, in addition to alleging the "who, what, when, where, and how" of the alleged fraud, *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted), "the complaint should inform each defendant of the nature of his alleged participation in the fraud" rather than "lump[] together all of the defendants in [its] allegations of fraud." *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) (citation omitted).

Defendants first take issue with the Complaint's "bald assertions that all 'Defendants' acted 'willfully, and with actual knowledge'" and suggest that Plaintiff has not "allege[d] specific facts that plausibly show each Defendant acted with the requisite criminal intent." (DE 17 at 11). At the outset, I note that to the extent that Defendants intended to argue that Plaintiff cannot generally allege the intent of Defendants, that assertion is incorrect. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Moreover, the intent of each individual Defendant and the Dealership can be plausibly inferred from Plaintiff's above-mentioned allegations as to the role of each of those Defendants in the alleged scheme.

Defendants also repeat their Rule 9(b) arguments in the context of the RICO claims. I have already found that Plaintiff has alleged fraud with the requisite particularity as to each individual Defendant. For the same reasons, I find that the Dealership is likewise on notice of its alleged role in this scheme such that it should be capable of formulating a defense to the claims brought against

13

it with the information provided by Plaintiff. Therefore, Defendants' Motion is denied with respect to Plaintiff's predicate acts allegations regarding the individual Defendants and the Dealership.

However, as I have explained in detail above, I find Plaintiff's allegations insufficient with respect to Napleton's alleged role in the scheme. Plaintiff's theory as to how Napleton is connected to and/or may be held responsible for the two specific example predicate acts is vague. Therefore, in any Amended Complaint, Plaintiff may attempt to cure these deficiencies as to Napleton.

### b.  Pattern

Next, Defendants argue that Plaintiff has failed to sufficiently allege a *pattern* of predicate acts. "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original) (citations omitted). Defendants contend that the Complaint fails to establish the continuity element. (DE 17 at 12). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Jackson*, 372 F.3d at 1265 (citation omitted).

At this stage, I find Plaintiff's allegations to be sufficient to plausibly allege closed-ended continuity with respect to the individual Defendants and the Dealership.[6] "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* (citation omitted). Although "no court has unequivocally declared a minimum period of time that can be considered 'substantial,'" *id.* at 1266,

---

[6] Because of the above-mentioned deficiencies with respect to the allegations against Napleton, I am unable at this time to meaningfully engage in a continuity analysis as it relates to Napleton.

the Eleventh Circuit has "held that <u>nine months</u> is not a substantial enough timeframe in this context," *Cisneros*, 972 F.3d at 1219 (emphasis in original) (citing *Jackson*, 372 F.3d at 1267).

Here, the Complaint provides two examples of allegedly fraudulent warranty claims; it explains that one was submitted two days after the vehicle at issue was purchased at some point in 2017 and the other thirteen days after the vehicle at issue was purchased at some point in 2019. (*See* DE 1 at ¶¶ 50–51). Therefore, accepting those allegations as true, the two example predicate acts occurred *at least* one year apart—the first vehicle could have been purchased on December 31, 2017, meaning the claim was submitted on January 2, 2018, and the second vehicle could have been purchased on January 1, 2019, meaning that the claim was submitted on January 14, 2019. Moreover, I have already found that the Complaint sufficiently alleges the role of each individual Defendant and the Dealership in this scheme, and it also adequately alleges that those Defendants were participating in the scheme at that time. In light of the fact that the Eleventh Circuit has not set a bright-line minimum period of time that would be considered substantial but has noted that nine months is not substantial enough, I find that the Complaint allegations setting forth at least a one-year period between the predicate acts are sufficient to plausibly allege continuity.

In so finding, I note that Defendants are correct that "in cases . . . where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Jackson*, 372 F.3d at 1267 (citations omitted). I have considered that the Complaint alleges only one overarching fraudulent scheme that involves only one victim. However, the Complaint allegations read together indicate that the scheme was extensive in that it lasted for several years and involved a great deal of fraudulent warranty claims. (*See e.g.*, DE 1 at ¶ 55). And Defendants do not set forth a reasonable argument as to why the goal of the scheme should be considered

discrete. In fact, the Complaint does not allege that this scheme involved merely isolated incidents of fraud; rather, although it sets forth two specific examples of fraudulent warranty claims, it alleges that the scheme yielded around $180,000 in profits to the Dealership in 2017 alone. (*See id.* at ¶ 37). Therefore, given the widespread nature of the alleged fraud, I am not persuaded that the Complaint should be dismissed simply because it alleges only one scheme against one victim.

### 3. Enterprise

As for the enterprise element, Defendants first argue that Plaintiff does not sufficiently allege the existence of an enterprise that is separate from the racketeering activity given that "Plaintiff never alleges that [the] purported 'enterprise' engaged in any conduct other than the predicate acts of mail or wire fraud themselves." (DE 17 at 17). This argument is unconvincing.

An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Boyle v. United States*, 556 U.S. 938, 947 (2009) (footnote and citation omitted); *see also id.* ("[I]f the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. . . . [E]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" (citation omitted)). "For example, suppose that several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates . . . . Proof of these patterns would not be enough to show that the individuals were members of an enterprise." *Id.* at 947 n.4. That is not the type of circumstance at issue here. Instead, the current Complaint allegations plausibly allege that the Dealership

16

(through Defendants Gene Khaytin and Ernie Revuelta) and Defendant Edward Napleton, Jr. (Napleton's director of operations) worked together in furtherance of a collective scheme, each with a specific role: Defendant Gene Khaytin purchased the Hyundai models at issue on behalf of the Dealership; Defendants Gene Khaytin and Ernie Revuelta deliberately damaged the engines; Defendant Edward Napleton, Jr., facilitated the expansion of the Dealership's used vehicle inventory for use in the scheme; and then the Dealership, acting through its agents, submitted the fraudulent warranty claims. Accepting as true the Complaint allegations, these were clearly not independent acts without coordination. Thus, I reject this argument for dismissal.

Next, Defendants argue that Plaintiff fails to allege that Defendants are distinct from the enterprise. "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The Parties appear to agree that the Complaint attempts to allege an "association-in-fact" enterprise between Napleton, the Dealership, and the individual Defendants. (*See* DE 17 at 17; DE 28 at 12).

"An associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (citation omitted). It "must have three 'structural features': (1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Id.* (citation omitted). Importantly, however, "in an association-in-fact enterprise, a defendant corporation cannot be distinct for RICO purposes from its own officers, agents, and employees when those individuals are operating in their official capacities for the corporation." *Ray*, 836 F.3d at 1355; *see also Cisneros*, 972 F.3d at 1215 ("[A] person cannot conspire with itself. . . . Thus, 'plaintiffs may not plead the existence of

a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation.'" (citations omitted)). "Because every corporation acts through its own employees as a matter of course, allowing such pleadings to go forward would turn every claim of corporate fraud into a RICO violation." *Ray*, 836 F.3d at 1357 (citation omitted).

At this juncture, without amended allegations as to Napleton, I am unable to meaningfully engage in an analysis of the distinctiveness requirement. In general, Plaintiff's theory appears to be that the Dealership acted through its agents (Defendants Gene Khaytin and Ernie Revuelta) in carrying out this fraudulent scheme. Therefore, if Plaintiff is ultimately only able to adequately allege that the individual Defendants and the Dealership were involved in this scheme, I would need to determine whether the involvement of Defendant Edward Napleton, Jr. (Napleton's director of operations) acting independently of Napleton establishes the requisite distinctiveness. However, if Plaintiff can cure its allegations with respect to Napleton to allege that it was a part of the enterprise (in that it was acting through Defendant Edward Napleton, Jr.), that would require a determination of whether, for RICO purposes, the distinctiveness requirement can be met when the enterprise is comprised only of a parent corporation (Napleton) and its subsidiary (the Dealership)—a question that the Eleventh Circuit has not yet directly decided. *See United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1276 n.7 (11th Cir. 2000) ("As this case does not involve wholly-owned subsidiaries conducting a pattern of racketeering activity through an enterprise comprised only of themselves and the parent corporation, we take no position on this question.").

Until Plaintiff attempts to clarify the role of Napleton in the alleged fraudulent scheme or, alternatively, abandons its claims against Napleton, I cannot determine the nature of the enterprise at issue and, as a result, whether the distinctiveness requirement is met as to that enterprise. Therefore, I will dismiss Count II and Count III (the RICO conspiracy claim) without prejudice.

### C.  Remaining State Law Claims

### 1. FDUTPA (Count IV)

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "[A]ny person who has suffered losses as a result of a violation may commence a private action to recover actual damages, attorney's fees, and costs." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (citing Fla. Stat. § 501.211(2)). FDUTPA must be construed liberally to, *inter alia*, "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *See* Fla. Stat. § 501.202(2).

Count IV asserts a FDUTPA claim against the individual Defendants. "A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015) (citation omitted). The Florida Supreme Court "has defined an 'unfair practice' as 'one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to *consumers*[]' and "has defined 'deception' as 'a representation, omission, or practice that is likely to mislead the *consumer* acting reasonably in the circumstances, to the *consumer's detriment*.'" *Id.* at 169 (emphasis in original) (citation omitted). Importantly, "[a]lthough these definitions discuss harm in the context of consumers, neither definition requires that the entity has to be a consumer to have standing to bring a FDUTPA claim." *Id.* As such, a claimant need not be a consumer to bring a FDUTPA claim, but the claimant nevertheless "would have to prove that *there was an injury or detriment to consumers* in order to satisfy all of the elements of a FDUTPA claim[.]" *Id.* (emphasis in original).

In part, Defendants argue that "the alleged conduct is not regulated under FDUTPA" and therefore Count IV must be dismissed. (DE 17 at 22; *see* DE 31 at 9). Based upon the allegations in Count IV, I find that Plaintiff's FDUTPA theory can be summarized as follows: Plaintiff began a recall campaign for certain Hyundai models relating to issues that could lead to engine failure, and as part of the campaign, Plaintiff extended a certain warranty beyond original owners. Then, as part of a scheme to fraudulently collect warranty funds from Plaintiff, Defendant Gene Khaytin purchased the Hyundai models at issue on behalf of the Dealership; Defendants Gene Khaytin and Ernie Revuelta deliberately damaged the engines; and Defendant Edward Napleton, Jr., facilitated the expansion of the Dealership's used vehicle inventory for use in the scheme. These actions culminated in the Dealership's submission of fraudulent warranty claims to Plaintiff for replacement engines and warranty service reimbursements. The Complaint asserts that such conduct constituted "unfair or deceptive acts or practices, or unconscionable acts or practices, in the conduct of trade or commerce," and that Plaintiff was injured as a result. (DE 1 at ¶¶ 101–02).

FDUTPA prohibits such practices "in the conduct of any trade or commerce." *See* Fla. Stat. § 501.204(1). "'Trade or commerce' means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." *Id.* § 501.203(8). In causing the Dealership to submit warranty claims, the individual Defendants did not advertise, provide, offer, or distribute any good, service, property, article, commodity, or thing of value. Nor did they solicit anything; rather it was Plaintiff, through its recall campaign, that expressly *offered* the replacement engines and warranty service reimbursements for qualifying vehicles.

Moreover, although the individual Defendants allegedly took advantage of that recall campaign, and thus obtained replacement engines and warranty service reimbursements that the Dealership was not entitled to, Plaintiff cannot satisfy all of the elements of its FDUTPA claim on its present theory because it has not alleged an injury or detriment to consumers. *See Caribbean Cruise Line, Inc.*, 169 So. 3d at 169. The only harm alleged in Count IV is that suffered by Plaintiff. (*See* DE 1 at ¶ 102). Plaintiff alleges that Defendant Gene Khaytin (on behalf of the Dealership) purchased the vehicles that were the subject of the warranty claims. Therefore, in terms of the relationship between Plaintiff and Defendants, the Dealership (and the individual Defendants acting through/for the Dealership) *were the consumers* submitting warranty claims relating to the vehicles that they purchased from Plaintiff. Simply because the Dealership also engages in trade or commerce in its daily business activities does not convert this into a viable FDUTPA theory.

Accordingly, I find that Plaintiff has not stated a FDUTPA claim against the individual Defendants under the theory set forth in Count IV. Out of an abundance of caution, I will dismiss Count IV without prejudice.

### 2. Tortious Interference (Count V)

In Count V, Plaintiff alleges that the individual Defendants intentionally and unjustifiably interfered with Plaintiff's business relationship and "Dealer Sales and Service Agreement" with the Dealership when they caused the Dealership to breach that agreement by submitting fraudulent warranty claims. (*See id.* at ¶¶ 103–09). "Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to

the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).

"For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999) (citations omitted). Defendants thus argue that Count V must be dismissed because the individual Defendants were not strangers to the Dealership's relationship with Plaintiff. However, as Plaintiff correctly points out, "the 'privilege to interfere' enjoyed by an officer or employee of a contracting party is not absolute[;]" rather, it "is destroyed where an employee acts solely with ulterior purposes, without an honest belief that his actions would benefit the employer, and the employee's conduct concerning the contract or business relationship is not in the employer's best interest." *Salit*, 742 So. 2d at 386 (citations omitted).

After accepting as true Plaintiff's allegations as to the individual Defendants' misconduct, and assuming that Plaintiff alleged this claim as an alternative to the theory that the Dealership acted through the individual Defendants, Defendants cannot reasonably argue at this stage that the individual Defendants' alleged submission of fraudulent warranty claims was motivated by anything other than ulterior purposes or that they submitted the claims with an honest belief that it would benefit the Dealership or be in the Dealership's best interest in the long run. As such, I reject Defendants' argument, and their Motion to Dismiss is thus denied with respect to Count V.

### 3. Civil Conspiracy (Count VI)

Count VI asserts a civil conspiracy claim against the individual Defendants. Defendants seek dismissal of Count VI solely on the following basis: "Claims that are 'inextricably linked' to dismissed claims must also be dismissed. . . . The civil conspiracy claim relies on the same alleged facts as [Plaintiff's] other claims. This claim should therefore be dismissed along with the rest of

the claims." (DE 17 at 25). Because I have not dismissed all of Plaintiff's other claims, Defendants'

sole argument with respect to the civil conspiracy claim fails.

### 4. Unjust Enrichment (Count VII)

Finally, Count VII asserts an unjust enrichment claim against the individual Defendants.

Under Florida law, "[t]he elements of a cause of action for unjust enrichment are: (1) plaintiff has

conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts

and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable

for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Hillman*

*Const. Corp. v. Wainer*, 636 So. 2d 576, 577 (Fla. 4th DCA 1994) (citation omitted).

Defendants argue, *inter alia*, that Count VII must be dismissed because it does not allege

that Plaintiff directly conferred a benefit on the individual Defendants. (DE 17 at 24). Count VII

alleges that each individual Defendant received bonuses, distributions, and/or dividends that he

was not entitled to as a result of the Dealership's "inflated profits" from the scheme. (DE 1 at ¶¶

117–19). Plaintiff's Response cites to several district court orders for the proposition that "[s]imply

because the benefit conferred by Plaintiff did not pass 'directly' from Plaintiff to Defendants, but

instead passes through a third party, does not preclude an unjust enrichment claim." (DE 28 at 20).

"[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to

the defendant." *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017) (citation omitted); *see also Peoples*

*Nat. Bank of Com. v. First Union Nat. Bank of Fla., N.A.*, 667 So. 2d 876, 879 (Fla. 3d DCA 1996)

(affirming dismissal with prejudice of an unjust enrichment claim where the plaintiff "could not

and did not allege that it had directly conferred a benefit on the defendants"). The district court

orders cited by Plaintiff acknowledge this, while further clarifying that "the mere fact that there

has been no direct contact between a defendant and the plaintiff does not preclude a finding that

the defendant received a direct benefit from that plaintiff." *See, e.g.*, *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980, at *9 (S.D. Fla. Sept. 19, 2011) (citations omitted).

Even so, Plaintiff cannot satisfy the direct benefit element of its unjust enrichment claim under the facts at issue here. The Complaint alleges that Plaintiff directly conferred a benefit on the Dealership by paying it for fraudulent warranty claims and that the Dealership's profits "were artificially inflated" as a result, which in turn led to the Dealership paying bonuses, distributions, and/or dividends to the individual Defendants that they were not entitled to because of those inflated profits. Even if the individual Defendants' bonuses, distributions, and/or dividends can be traced to the Dealership's inflated profits from the fraudulent scheme such that those Defendants actually retained a portion of the warranty payments that Plaintiff made to the Dealership, there is no reasonable way to construe such a benefit as *direct*. There is no allegation whatsoever that Plaintiff directly conferred a benefit on the individual Defendants, only that the individual Defendants received a derivative benefit through the Dealership as a result of its inflated profits.

Accordingly, Plaintiff has failed to state an unjust enrichment claim. *See Johnson v. Catamaran Health Sols., LLC*, 687 F. App'x 825, 830 (11th Cir. 2017) (affirming the district court's dismissal with prejudice of an unjust enrichment claim where the plaintiffs "conferred (at best) an indirect benefit on" the defendant, explaining that the plaintiffs thus could not "satisfy the first element of an unjust enrichment case"). I will therefore dismiss Count VII.

Further, because any amendment would be futile, I will dismiss Count VII with prejudice. *See Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed . . . ." (citation omitted)). Specifically, I have found that Plaintiff's theory of unjust enrichment is insufficient under the facts

of this case, and Plaintiff does not assert in its Response that it could change its theory of liability in an amended complaint. As such, any amended complaint would still be properly dismissed.

## IV.     CONCLUSION

Based upon the foregoing, it is **ORDERED AND ADJUDGED** that:

(1)   Defendants' Motion to Dismiss (DE 17) is **GRANTED IN PART AND DENIED IN PART**. The Motion is granted to the extent that it seeks dismissal of Counts II, III, IV and VII of the Complaint. Although I will dismiss Count VII with prejudice, I decline to dismiss Counts II, III, and IV with prejudice, as Defendants request. The remainder of Defendants' Motion to Dismiss is denied.

(2)   Counts II, III, and IV of the Complaint are **DISMISSED WITHOUT PREJUDICE**.

(3)   Count VII of the Complaint is **DISMISSED WITH PREJUDICE**.

(4)   If Plaintiff intends to file an Amended Complaint to attempt to cure the deficiencies identified in this Order, Plaintiff must do so **on or before June 4, 2021**.

(5)   Plaintiff's claims against Defendants John Does and Richard Roes are **DISMISSED**, and the Clerk of Court shall **TERMINATE** them as defendants in this matter.

**SIGNED** in Chambers at West Palm Beach, Florida, this 25th day of May, 2021.

Donald M. Middlebrooks
United States District Judge

cc:     Counsel of Record