## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:20-cv-82102-DMM

HYUNDAI MOTOR AMERICA
CORPORATION,

     Plaintiff,

v.

NORTH AMERICAN AUTOMOTIVE
SERVICES, INC., an Illinois corporation,
EFN WEST PALM MOTOR SALES, LLC,
an Illinois limited liability corporation; GENE
KHAYTIN, an individual; ERNESTO
REVUELTA, an individual; EDWARD W.
NAPLETON, an individual; GEOVANNY
PELAYO, an individual;
JORGE RUIZ, an individual; and, ROBB
MINIER, an  individual,

     Defendants.

_____/

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff, HYUNDAI MOTOR AMERICA CORPORATION, by and through

its undersigned counsel, pursuant to the Court's June 11, 2021, Order granting

Plaintiff leave to amend and file this Second Amended Complaint (DE 142), files

this Second Amended Complaint against Defendants NORTH AMERICAN

AUTOMOTIVE SERVICES, INC., an Illinois corporation; EFN WEST PALM

MOTOR SALES, LLC, an Illinois limited liability corporation; GENE KHAYTIN,

an individual; ERNESTO REVUELTA, an individual; EDWARD W. NAPLETON, an individual; GEOVANNY PELAYO, an individual; JORGE RUIZ, an individual; and, ROBB MINIER, an individual and states as follows:

## JURISDICTION, VENUE, PARTIES

1.     This is an action for damages in excess of seventy-five thousand dollars ($75,000.00).

2.     Plaintiff, HYUNDAI MOTOR AMERICA CORPORATION ("HMA"),  is incorporated under the laws of the State of California, has its principal place of business in California, and is authorized to do business in the State of Florida.  HMA is a citizen of California.

3.     Defendant NORTH AMERICAN AUTOMOTIVE SERVICES, INC. ("Napleton") is an Illinois for-profit corporation whose principal place of business is in Illinois.  Napleton is a citizen of Illinois, but is authorized to conduct business in the State of Florida.

4.     Defendant EFN WEST PALM MOTOR SALES, LLC (the "Dealership") is an Illinois limited liability corporation that operates an authorized Hyundai dealership under the fictitious name Napleton's Hyundai.  HMA identifies the Dealership as FL 121.  Although the Dealership is located in West Palm Beach, Florida, none of the Members of the Dealership are citizens of the state of Florida. The Dealership is authorized to conduct business in the State of Florida.

5.      Defendant, GENE KHAYTIN, is *sui juris*, a citizen of the State of North Carolina, and a former General Manager of the Dealership.

6.      Defendant, ERNESTO "ERNIE" REVUELTA, is *sui juris*, a citizen of the State of Florida, and is the Service Manager of the Dealership.

7.      Defendant, EDWARD W. NAPLETON ("EDDIE NAPLETON"), is *sui juris*, a citizen of the State of Illinois, is a Director of Napleton, and is responsible for oversight of the Dealership.

8.      Defendant, GEOVANNY PELAYO, is *sui juris*, a citizen of the State of Florida, and is a Service Advisor at the Dealership.

9.      Defendant, JORGE RUIZ is *sui juris*, a citizen of the State of Florida, and is a Service Technician at the Dealership.

10.      Defendant, ROBB MINIER, is *sui juris*, a citizen of the State of Florida, and was a Service Manager at a Hyundai dealership owned by Napleton before he was promoted to his current role as the fixed operations director for the collection of Napleton dealerships, including a Hyundai dealership, at Napleton's North Lake campus.

11.      This Court has original jurisdiction over this action pursuant to 18 U.S.C. § 1331 because the action arises under federal law.

12.     This Court also has original jurisdiction over this action pursuant to 18 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different States.

13.     Pursuant to 28 U.S.C. § 1391 and Sections 47.011 and 48.193, Fla. Stat., the non-resident Defendants submitted themselves to the jurisdiction of this Court by committing tortious acts within West Palm Beach, Palm Beach County, Florida.  All of the Defendants have had substantial and continuous contact with the State of Florida and have conducted on-going business within the State of Florida at all relevant times hereto.

### FACTUAL BACKGROUND

**HMA, Hyundai Sonatas and Santa Fes, and Their Warranties**

14.     HMA is the distributor of Hyundai motor vehicles in the United States, including Hyundai Sonatas and Santa Fes. HMA distributes Hyundai motor vehicles through a network of independent dealers, one of which is the Dealership.

15.     During the relevant time period, new Hyundai Sonata and Santa Fe vehicles sold in America were covered by several warranties, including the "Hyundai New Vehicle Limited Warranty" for 5 years/60,000 miles and the "Hyundai Powertrain Warranty Limited Warranty" for 10 years/100,000 miles for the original purchaser of the vehicle. *See e.g.* Exhibit A ("2012 Owner's Handbook & Warranty Information").

4

16.     The Hyundai New Vehicle Limited Warranty ("Warranty") provides for the "[r]epair or replacement of any component originally manufactured or installed by [Hyundai] that is found to be defective in material or workmanship under normal use and maintenance" subject to the other exclusions.  *See* Exhibit A, p. 18 ("WHAT IS COVERED.")

17.     The Warranty does not cover damage from neglect or abuse.  The Warranty states

WHAT IS NOT COVERED…

- Damage or failure resulting from:

    - Negligence of proper maintenance as required in the Owner's Manual.
    - Misuse, abuse, accident, theft, water/flooding or fire.
    - Use of improper or insufficient fuel, fluids or lubricants…
    - Modifications, alterations, tampering or improper repair.

*See* Exhibit A, pp. 19-20 ("WHAT IS NOT COVERED.")

18.     The Hyundai Powertrain Limited Warranty ("Powertrain Warranty") provides for the "[r]epair or replacement of powertrain components listed above, originally manufactured or installed by [Hyundai] that are found to be defective in material or factory workmanship under normal use and maintenance, except any item specifically referred to in the section 'What is Not Covered.'" *See* Exhibit A, p. 21 ("WHAT IS COVERED…").

5

19.     The Powertrain Warranty also states that the "'Owner's Responsibilities' and 'Obtaining Warranty service' are the same as specified under the Hyundai New Vehicle Limited Warranty."   *See* Exhibit A, p. 21 ("WHAT IS COVERED…").

20.     Like the Warranty, the Powertrain Warranty does not cover damage from neglect or abuse.  *See* Exhibit A, p. 21 ("WHAT IS NOT COVERED…")

**Recall Campaign for Hyundai Sonatas and Santa Fe Vehicles**

21.     HMA is involved in safety recalls and service campaigns involving Hyundai vehicles in the United States.

22.     Beginning in 2015, HMA recalled certain model year 2011-2012 Hyundai Sonatas to address a manufacturing issue that could lead to bearing wear and engine failure for 2011-2012 Hyundai Sonatas with the Theta II 2.0 liter or 2.4 liter Gasoline Direction Injection engine.  *See* Exhibit B ("Important Information About Engine Care for Your Sonata."); *see also* Technical Service Bulletin (Recall Campaign 132) attached as Exhibit C.

23.     In June of 2017, HMA expanded the recall to include certain model year 2013-2014 Hyundai Sonatas and Santa Fe Sport vehicles with the Theta II 2.0 liter or 2.4 liter Gasoline Direction Injection engine.  *See* Technical Service Bulletin (Recall Campaign 162) attached as Exhibit D.

24.     In 2018 and 2019, HMA updated Recall Campaigns 132 and 162. *See* Technical Service Bulletin No. 18-01-007-1 attached as Exhibit E; Technical Service Bulletin No. 19-01-011H attached as Exhibit F; Technical Service Bulletin No. 19-01-002H-4 (adding certain modal year 2019 Sonata, Santa Fe, Tucson and Veloster N vehicles) attached as Exhibit G; and Technical Service Bulletin No. 19-01-006H-4 attached as Exhibit H.

25.     Like all consumer recall programs, the HMA recalls were issued to protect consumer safety and to reimburse Hyundai customers for legitimate damage to their vehicles because of the engine issues. The recalls were publicized to Hyundai customers through recall campaigns ("Recall Campaign").

26.     Under the terms of the Recall Campaign, HMA agreed to conduct safety inspections on affected vehicles that were presented by then-current owners and lessees and, if necessary, to replace the engine assembly in model year 2011-2014 and 2019 Hyundai Sonata and Santa Fe vehicles, which were found to be damaged, as described in the Recall Campaign.

27.     In an effort to assist consumers facing legitimate problems, HMA's Recall Campaign also extended the Powertrain Warranty beyond the initial 10 years/100,000 miles and extended warranty protection beyond original owners. HMA specifically advised consumers in the Recall Campaign notice that:

> Hyundai has extended the Powertrain Warranty for the engine short block assembly to 10 years/120,000 miles from the date of first use for both original and subsequent owners of the vehicle. The extension of the Powertrain Warranty for the short block assembly covers cost of an inspection of the engine short block and all repair costs.

*See* Exhibit B.

28.   The Recall Campaign notice also explained that the lack of proper vehicle maintenance may contribute to engine wear and damage and emphasized the importance of proper vehicle maintenance. *See* Exhibit B.

29.   Although the Recall Campaign emphasized the importance of documentation, to allow a wider group of legitimately injured consumers to take advantage of the recall, HMA relaxed its typical requirement that owners present copies of maintenance records in order to participate in the recall.

30.   HMA's goodwill gesture in extending warranty coverage beyond original vehicle owners, however, would soon be exploited by Defendants for improper economic gain.

### Napleton and Its Relationship to the Dealership

31.   Napleton does not own the Dealership and the Dealership is not a subsidiary of any parent companies.

32.     Napleton and the Dealership do, however, have a common ownership structure.  The majority of the Napleton stock is held by two Trusts.  The same two Trusts hold the majority membership interest in the Dealership.

33.     The Settlor of the Trusts is Edward F. Napleton, the dealer principal for the Dealership.  Edward F. Napleton is a beneficiary of the Trusts that hold the majority of the Napleton stock and the majority membership interest in the Dealership.

34.     Edward F. Napleton has overall management oversight for both Napleton and the Dealership.

35.     EDDIE NAPLETON is the son of Edward F. Napleton and is a beneficiary of the two Trusts that holds the majority of the Napleton stock and the majority membership interest in the Dealership.

36.     Napleton provides consulting services to the Dealership, and forty-seven other dealerships whose majority ownership interest is held by Edward F. Napleton or his Trusts.  The purpose of the consulting services provided by Napleton is to maximize the profits realized by the Dealership, and the forty-seven other dealerships whose majority ownership interest is held by Edward F. Napleton or his Trusts.  A portion of the sales price for each car sold, $125 per car, is paid by the Dealership to Napleton as compensation for the consulting services.  The Dealership

also pays a markup of 1.27 percent on the floor plan interest to Napleton.  No other amounts are paid to Napleton for the consulting services provided.

37.     Napleton began providing consulting services to the Dealership in 2005 after Edward F. Napleton purchased the Dealership.  Napleton has continuously provided consulting services to the Dealership from 2005 to the present date.

38.     Napleton's consulting services include maximizing the profits and distributions at each of the 48 dealerships owned by Edward F. Napleton and/or his Trusts.  To this end, the General Managers at each of the 48 dealerships report to Napleton.

39.     As part of the consulting services provided by Napleton, the Dealership electronically transmits its claims for any warranty repairs it performs under the Recall Campaign to Napleton.  Napleton, in turn, submits the warranty claims to HMA through an online internet "portal."  HMA then pays the Dealership directly for the warranty repair work performed via an electronic wire transfer to the Dealership's bank account.  This has been the practice and procedure since the inception of the Recall Campaign.

### The Dealership's Fraudulent Scheme

40.     The Dealership's Service Technicians are paid a flat rate based on the hours produced.  Accordingly, the more hours the service technicians spend performing work, the more money they can earn.

41.     Upon information and belief, multiple Service Technicians were involved in the fraudulent scheme. One example of a Service Technician involved in the scheme is RUIZ who worked at the Dealership.

42.     The Service Advisors who work under REVUELTA in the Service Department are paid a salary and receive a commission based on a percentage of the gross of the repairs paid for by customers, the repairs paid for under a warranty or recall program, and the repair work done for the Dealership.

43.     Upon information and belief, multiple Service Advisors were involved in the fraudulent scheme. One example of a Service Advisor involved in the scheme is PELAYO.

44.     As the Service Manager of the Dealership, REVUELTA is paid a salary and receives a monthly commission based on a percentage of the gross profit for his department's service and parts sales.

45.     As the General Manager of the Dealership, KHAYTIN was paid a salary and received a monthly commission based on the entire Dealership's net profit.

46.     Based on the manner in which the Dealership paid the Service Department employees, the more warranty repair work that a Service Technician performs increases not only the Service Technician's pay, but also the Service

Advisor's commission, the Service Manager's commission and the General Manager's commission.

47.     Service Advisors at the Dealership direct work to the Service Technicians and often direct work to specific Service Technicians that they trust.

48.     Service Advisors at the Dealership identify vehicles that might qualify for engine repairs under the Recall Campaign based on their make and model.

49.     Once a vehicle was identified as potentially eligible under the Recall Campaign, the Service Advisor assigns a specific Service Technician to perform the necessary tests to obtain prior authorization to perform an engine replacement under the Recall Campaign.

50.     In some cases, the Service Technicians do not perform the tests prescribed by HMA, but instead drain the oil out of the vehicle as though they were performing an oil change.  After draining the oil, the Service Technician drives the car out of the service area so that the Service Technician can floor the accelerator while the vehicle is in park.  This causes the engine to seize up.  After the engine seizes, the Service Technician pours a small amount of oil into the engine giving the impression that the engine seized while it was fully lubricated.

51.     In other cases, the Service Technicians provide false documentation to substantiate a request for pre-authorization to perform an engine replacement under the Recall Campaign.  As an example, the Dealership keeps oil pans taken from cars

subject to the Recall Campaign that contain metal shavings in the Service Department workshop.  If the Service Technician is unable to locate metal shavings in an oil pan removed from a car, which would indicate that an engine repair was not necessary, the Service Technician will photograph the oil pan taken off another car that contains metal shavings to submit with an authorization request to perform an engine replacement on a vehicle that shows no signs of engine damage.

52.     Service Technicians also alter the condition of engines to ensure the vehicles qualify for warranty coverage under the Recall Campaign.

53.     The Dealership, through KHAYTIN, also began buying used Hyundai Sonata and Santa Fe vehicles from auction houses, including Manheim's Remarketing, Inc. d/b/a Manheim Palm Beach, for the model years that qualified for the Recall Campaign as far back as 2016.

54.     Manheim Palm Beach operates a "Hyundai Lane" in which fleet and other Hyundai used vehicles are sold at auction.

55.     KHAYTIN purchased numerous model year 2011-2014 Hyundai Sonatas from the "Hyundai Lane" that had functioning engines when he purchased them.

56.     Once KHAYTIN delivered the vehicles to the Dealership, the Service Technicians, at the direction of REVUELTA, would intentionally "blow" the engines by draining the oil and running the engine until it failed, as described above.

13

57.     One such vehicle is a 2015 Sonata, VIN 5NPE24AF4FH196398, that the Dealership purchased from Manheim in 2019.  It had low mileage when purchased (30,244) and was in excellent condition, rated by Manheim as 4.5 on a scale of up to 5.0. Thirteen days after purchase from Manheim this vehicle was submitted to HMA for engine replacement.  The vehicle collected a total of two additional miles after the purchase before the Dealership submitted a pre-authorization request to replace the engine because the engine seized. The warranty records indicate that the car shut off during a test drive.  PELAYO was the Service Advisor who prepared the repair order and RUIZ was the Service Technician who performed the work.

58.     Another example is a 2014 Sonata, VIN 5NPEC4AB4EH853614, that was purchased by the Dealership from Manheim in 2017. It had low mileage when purchased (28,974) and was in excellent condition, rated by Manheim as 4.4 on a scale of up to 5.0. Two days after purchase from Manheim a pre-authorization request for this vehicle was submitted to HMA for an engine replacement. The vehicle collected NO additional miles and now had a seized engine. The warranty records indicate that the car shut off during a test drive.  PELAYO was the Service Advisor who prepared the repair order and RUIZ was the Service Technician who performed the work.

59.    In order to obtain authorization to perform repairs under the Recall Campaign for these vehicles, the Dealership would misrepresent the condition of the vehicles; presented vehicles with excessive damage (*i.e.*, stated they were not roadworthy or were in inoperable condition); misrepresented the actual value and/or actual purchaser of these vehicles; and presented vehicles with supposed failed engines when the prior owners never had any issue with the operation or function of the engine.

60.    The Dealership ignored the warranty disclaimers and limitations and took advantage of a consumer program designed to assist vehicles owners with legitimate engine performance issues.  All of this was done as part of a pattern and practice to deceive and defraud HMA and to profit from HMA's goal of helping real consumers with legitimate engine problems covered by the Recall Campaign.

61.    Many of the vehicles presented by Defendants to HMA as having failed engines never had an engine problem before the Dealership gained ownership or control of the vehicles.

**Napleton Discovers Fraudulent Scheme at the Dealership**

62.    In mid to late 2017, Napleton discovered discrepancies related to the parts inventory at the Dealership.  Napleton identified an unusually high number of vehicle engines in the Dealership's inventory that should have been used for warranty replacements.

15

63.     Through an investigation, Napleton became aware that the Dealership submitted warranty claims to HMA indicating repairs were completed, knowing that the repairs had not, in fact, been performed.

64.     Specifically, the Dealership was submitting warranty claims for engine replacements under the Recall Campaign that were not performed.  This resulted in HMA sending the Dealership engines which were put into the Dealership's inventory, not into customer's vehicles.

65.     Napleton sent representatives from its Chicago headquarters to investigate the discrepancies by interviewing the employees at the Dealership, including KHAYTIN and REVUELTA.

66.     After confirming that KHAYTIN and REVUELTA were misrepresenting that repairs were completed in an effort to obtain commission payments they were not entitled to receive, Napleton reprimanded them and ordered them to cease and desist employing the fraudulent scheme.

67.     However, Napleton concealed this fraudulent scheme from HMA.  As part of concealing this from HMA, Napleton reprimanded KHAYTIN and REVUELTA not for submitting false warranty claims, but instead for booking the repair for accounting purposes even though the repair order was still open. Napleton reframed the fraud as KHAYTIN and REVUELTA engaging in a scheme to pre-book revenue, which inflated the gross monthly sales, resulting in

16

KHAYTIN, REVUELTA, and PELAYO receiving commissions for engine replacements that had not yet been earned because the repairs were not completed.

68.    Edward F. Napleton, Bruce Etheridge, Jill Brotherton, and other executives at Napleton, including EDDIE NAPLETON, became aware of the fraudulent scheme as a result of Napleton's investigation.

69.    In addition to its failure to notify HMA, Napleton has participated in a cover-up of this scheme, as evidenced by written communications between its executives stating that the sooner "we take over processing and officially 'discover' what was going on with those claims the better."

70.    After the scheme was discovered, EDDIE NAPLETON, the Napleton executive who oversaw the operations of the Dealership on behalf of Napleton, advised KHAYTIN that he should be kept informed of any such schemes so that he could protect KHAYTIN from disciplinary action and conceal the scheme.

71.    As an example of the manner in which EDDIE NAPLETON assisted with concealing the fraudulent scheme, the Dealership was required to comply with Napleton's policy to report inventory of used vehicles at the Dealership and to write-off used vehicles that were at the Dealership for longer than 60 days.  The Dealership had an unusually high number of used vehicles in its inventory as it was purchasing used vehicles that met the make and model years parameters of the Recall Campaign. EDDIE NAPLETON repeatedly approved requests submitted by KHAYTIN for an

exception to the used car inventory policy when the Dealership's inventory exceeded the 60 day limit knowing that the used vehicles were part of the fraudulent engine-blowing scheme by which the Dealership, and its employees, were profiting.

72.   EDDIE NAPLETON also benefitted from the fraudulent engine-blowing scheme as a beneficiary of the Trusts holding the majority membership interest in the Dealership.

73.   As detailed further below, EDDIE NAPLETON, KHAYTIN, REVUELTA, PELAYO and RUIZ continued to work together to defraud HMA.

74.   Unbeknownst to HMA, Defendants continued the fraudulent scheme throughout 2017, 2018 and by January of 2019 were destroying as many as 22 engines in a month.

**Other Dealerships Learn About the Fraud**

75.   Napleton provided consulting services for another Hyundai dealership in South Florida referred to by HMA as FL 123.  Edward F. Napleton, or his Trusts, own the majority ownership interest in FL 123.

76.   The operations of FL 123 were also overseen by EDDIE NAPLETON on behalf of Napleton.

77.   In mid-2017, during Napleton's investigation into the Dealership's parts inventory, the General Manager of FL 123, Mark Eddleman, became aware of the Dealership's fraudulent scheme to deliberately damage and/or alter engines in

Hyundai vehicles for the purpose of fraudulently collecting warranty funds from HMA through the Service Manager, MINIER.   The information provided by MINIER was confirmed by Napleton executives EDDIE NAPLETON and Jill Brotherton.

78.     REVUELTA explicitly described the scheme to MINIER, who in turn described the scheme to Eddleman.

79.     In January 2019, REVUELTA openly discussed the fraudulent scheme with MINIER.  REVUELTA told MINIER that Defendants' scheme would not be detected by HMA because HMA had a "fail rate" for Theta II engines and Defendants were careful to stay under HMA's fail rate.

80.     On or about January 31, 2019, MINIER exchanged text messages with Eddleman regarding Defendants' fraudulent scheme. The exchange is revealing and confirms both the fictitious repair scheme concealed from HMA in 2017 and the active damaging of vehicle by Defendants. MINIER states, "They are buying auction cars. Yes, and burning up a lot. I had lunch with Ernie [Revuelta] yesterday he blew up 22 this month." Eddleman responded, "Geez! That's freaking 200K. I thought at one time he was not actually installing some & and building parts inventory anyways just continue to play it safe. That could bite them 1 day." MINIER responded, "Correct that's what they got busted for and got in trouble. For

claiming them and not doing them." Copies of the text messages are attached as Exhibit I.

81.     HMA paid for numerous warranty claims submitted by the Dealership under the Recall Campaign unaware the repairs were for deliberate damage done by Defendants.

82.     EDDIE NAPLETON encouraged Eddleman to engage in a similar scheme at FL 123 to increase the dealer's profitability.

83.     Like KHAYTIN, Eddleman received a salary, plus commission based on the net profit of FL 123.

84.     Like REVUELTA, MINIER received a salary, plus commission, based on the service and parts sales at FL 123.

85.     Ultimately, MINIER, as the Service Manager of FL 123, engaged in warranty fraud by having Service Technicians at FL 123 intentionally running engines in Hyundai vehicles until they failed and by submitting false documentation to HMA.

86.     When Napleton became aware of MINIER's fraud, he was not formally reprimanded, or terminated.  Napleton merely instructed him to cease and desist.

87.     Napleton concealed MINIER's fraud from HMA.

88.    MINIER concealed his knowledge of the Dealership's fraud from HMA.

89.    MINIER's concealment of the Dealership's fraud from HMA allowed him to continue profiting from the fraud he was committing at FL 123.

**HMA Learns of Fraud from Eddleman's Wrongful Termination Complaint**

90.    On or about April 23, 2020, Eddleman filed a complaint against EDDIE NAPLETON, FL 123, and others for whistleblower retaliation, tortious interference, and negligent retention arising out of their termination of Eddleman. *See* Complaint, 15TH Judicial Circuit Court Case No. 502020CA004581XXXXMB, attached as Exhibit J.

91.    According to Eddleman's Complaint, in February 2019, EDDIE NAPLETON was charged with an August 2018 sexual battery on a helpless person.[1] (*Id*. at ¶ 4).

92.    Eddleman further alleges that in August 2018, EDDIE NAPLETON confessed to him that he raped the victim, a Napleton trainer, described the event in "disturbing detail," and confessed that the victim was unconscious the entire time. (*Id*. at ¶ 5.)

---

[1] *See* criminal complaint, *State of Florida v. Edward Napleton, Jr.*, 15th Judicial Circuit, Case No. 50-2019-CF-000941-AXXX-MB.   The victim also filed a civil lawsuit against EDDIE NAPLETON and others.  *See Jane Doe v. Edward Napleton, Jr.*, 15th Judicial Circuit, Case No. 50-2019-CA-008289-XXXX-MB.

93.     Eddleman further alleges that EDDIE NAPLETON pressured Eddleman to lie to criminal investigators about EDDIE NAPLETON's interactions with the victim and to "forget" about EDDIE NAPLETON's confession.   (*Id*. at ¶¶ 6-8).

94.     After EDDIE NAPLETON was charged, EDDIE NAPLETON threatened Eddleman with termination if he did not falsely testify.  After Eddleman refused, he alleges he was "summarily terminated." (*Id*. at ¶¶ 8-9).

95.     As a result of Eddleman's Complaint, for the first time, HMA became aware of the fraudulent engine warranty scheme perpetrated by Defendants and co-conspirators on HMA.

96.     Eddleman's Complaint alleges the Defendants "encouraged him to engage in certain frauds that they carried out to bolster the Napleton's #121's overall profitability, including warranty fraud and consumer fraud."  (*Id*. at ¶ 3). More specifically, Eddleman's Complaint alleges:

1. Warranty Fraud against Hyundai

> 40.     For instance, Defendants and NAG [Napleton Automotive Group] Executive-1 [KHAYTIN] engaged in a large-scale warranty fraud against Hyundai.  In 2017 and 2018, according to its website, Hyundai recalled more than one million Santa Fe and Sonata vehicles in order to address a manufacturing issue that could lead to engine failure. Defendants and NAG Executive-1 [KHAYTIN] engaged in a scheme to defraud Hyundai based on the manufacturing issued Hyundai had announced.

41. First, Defendants and NAG Executive-1 [KHAYTIN] would have NAG purchase at auction used versions of the Hyundai models that were subject to the recall. Then, once NAG brought the purchased vehicles onto its premises, NAG would intentionally "blow" the engines of those vehicles by emptying their oil and running them at high RPMs until the engines malfunctioned.

42. At that point, NAG would submit fraudulent requests for Hyundai to pay for the supposed manufacturing defects pursuant to the recall. NAG would receive approximately $7,000 per "blown" engine, including the new engine and service fee.

43. But this scheme was not limited to vehicles that NAG had purchased at auction; NAG would carry out the scheme to applicable Hyundai models that had been traded in by customers or brought in for service, as well. All told, NAG was "blowing" over 20 Hyundai engines every month, making this a multimillion-dollar fraud against Hyundai.

44. Eddie Napleton, Jr. encouraged Plaintiff [Eddleman] to engage in this practice in order to bolster the productivity of the Hyundai dealership Plaintiff ran. Plaintiff declined.

(*Id*. at ¶¶ 40-44).

## Count I: Fraud
### (KHAYTIN, REVUELTA, EDDIE NAPLETON, PELAYO, RUIZ AND MINER)

97. HMA repeats and realleges paragraphs 1-96, as if fully set forth herein.

98. Defendants KHAYTIN, REVUELTA, EDDIE NAPLETON, PELAYO, RUIZ and MINER perpetrated a scheme to defraud HMA.

99. As detailed, in part, above, KHAYTIN purchased the Hyundai vehicles described above through the Dealership.

23

100.   REVUELTA, through the Service Advisors and Technicians, including RUIZ and PELAYO, then deliberately damaged the engines purchased by KHAYTIN rendering them inoperable.

101.   Based on a review of the preauthorization requests and the repair orders submitted to HMA, PELAYO assigned specific vehicles to RUIZ.

102.   RUIZ, with the knowledge and consent of PELAYO, REVUELTA, KHAYTIN and EDDIE NAPLETON, deliberately damaged the engines of vehicles taken in trade, or at the end of leases, as well as customer-owned vehicles brought in for repair, to make it falsely appear that an engine failure had occurred.

103.   The Dealership, through Napleton, at the direction of KHAYTIN and REVUELTA, with EDDIE NAPLETON's encouragement and approval, then presented the vehicles to HMA, falsely representing they were covered under the Recall Warranty and omitting the fact that Defendants themselves had damaged the vehicles.

104.   MINIER, with EDDIE NAPLETON's encouragement and approval, also presented warranty claims to HMA, through Napleton, falsely representing they were covered under the Recall Warranty and omitting the fact that the Service Technicians, at MINIER's direction, damaged the vehicles.

105.   Upon information and belief, MINIER has also actively engaged in a cover-up of his knowledge of the fraud conducted at the Dealership so as to hinder

HMA's ability to learn the full extent of this warranty fraud, which thereby enabled MINIER to continue profiting from the fraud he was conducting at FL 123.

106.   Defendants made misrepresentations and/or omissions of fact regarding deliberate damage to the engines of these Hyundai vehicles.

107.   Defendants also made misrepresentations and/or omissions of facts regarding the actual purchase price and/or actual purchaser of the vehicles.

108.   Defendants knew that these statements and/or omissions were false at the time the statements were made, and that HMA was ignorant of any undisclosed facts and the fraudulent scheme that was being implemented.

109.   Defendants intended that HMA rely on their misrepresentations and omission of material facts to reimburse them for warranty repairs to the Hyundai vehicles under the Recall Campaign, and provide warranty reimbursements under the Recall Campaign, including replacing the engine assemblies.

110.   HMA justifiably and reasonably relied upon Defendants' misrepresentations and/or omissions of fact and acted on them by providing warranty reimbursements for the replacement of engine assemblies.

111.   HMA paid a significant amount of money in reasonable reliance on Defendants' misrepresentations and/or omissions of facts.

112.   HMA has suffered significant monetary damages as a result of Defendants misrepresentations and/or omissions of facts.

113.   In addition to monetary relief, HMA is entitled to equitable relief in the form of restitution or disgorgement.

114.   Due to the difficulty in identifying each specific fraudulent claim, HMA has not reached a conclusion as to the total number, or the specific identification of, each fraudulent claim.

115.   Defendants, by way of their expert, have acknowledged this difficulty in identifying each instance of fraud.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against Defendants KHAYTIN, REVUELTA, EDDIE NAPLETON, PELAYO, RUIZ and MINER for equitable relief, including restitution or disgorgement, monetary damages, punitive damages, pre and post judgment interest, costs, and such other relief as this Court may deem appropriate.

## Count II – Violation of Racketeer Influenced and
## Corrupt Organizations Act, 18 U.S.C. § 1962(c)
**(All Defendants)**

116.   HMA repeats and realleges paragraphs 1-96 as if fully set forth herein.

117.   The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., imposes liability upon "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, [who] conduct[s] or participate[s] directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…." 18 U.S.C. § 1962(c).

118.   RICO was designed to prevent the illicit infiltration of legitimate business enterprises.

119.   Defendants perpetrated a fraudulent scheme in which HMA was the intended target, whereby they purposefully damaged engines of Hyundai vehicles purchased, traded or repaired through the Dealership, and had Napleton electronically submit the fraudulent warranty claims to HMA for reimbursement under the Recall Campaign. Defendants—knowing that the Recall Campaign did not cover vehicles that were intentionally damaged—intentionally, knowingly and willfully presented HMA with fraudulent claims for coverage.

120.   Defendants also deliberately damaged the engines of vehicle taken in trade, or at the end of leases, as well as customer-owned vehicles brought in for repair, to make it falsely appear that an engine failure had occurred.

121.   Defendants' fraudulent presentation of Hyundai vehicles as covered under the Recall Warranty caused HMA injury because HMA paid to repair or reimburse the Dealership for repairs to Hyundai vehicles that the Recall Campaign did not cover.

122.   Beginning in, or prior to, 2016, and continuing through the present date, Defendants formed an enterprise, as that term is defined in 18 U.S.C. §1961(4), to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(1), that affects interstate commerce.

123.   At all relevant times, Defendants were, and remain, employed by and/or associated with the enterprise.

124.   Napleton participated in and advanced this scheme by both submitting fraudulent warranty claims to HMA through the online portal, by failing to notify HMA when it learned that fraudulent claims were being submitted, and, upon information and belief, participating in an effort both before and during this litigation to conceal the fraud and to hinder HMA's access to information that would enable it to learn the full extent of the scheme.

125.   The pattern of racketeering activity in which the enterprise conducts and participates is the purchase, sale and transport of vehicles, for purposes of submitting (and so submitting), through the internet, by wire, or through other electronic means, fraudulent warranty claims to HMA and receiving payment from HMA for these fraudulent warranty claims, and concealing these fraudulent warranty claims, as described above.

126.   Defendants, by and through their fraudulent activities and wrongful conduct, willfully and with actual knowledge, agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity for the purposes of intentionally defrauding HMA since at least 2016. Defendants, willfully and with actual knowledge, conducted and participated in the affairs of the enterprise by purchasing and deliberately damaging Hyundai vehicles before transporting them to independent Hyundai dealers for evaluation intending for HMA to perform unjustified warranty work, including replacement of engine assemblies, which included the use of private or commercial mail carriers, wires and/or other electronic means, to deliver and transmit to conduct the scheme.

127.   Pursuant to and in furtherance of the fraudulent scheme, Defendants willfully and with actual knowledge committed multiple acts of wire fraud in violation of 18 U.S.C. § 1343, over a one-year time period spanning from at least as early as 2016 to 2020. These acts include purchasing and deliberately damaging

Hyundai vehicles and making false misrepresentations and/or omission of facts, which were reasonably relied upon by HMA, using wires or other electronic means.

128.   These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c) because they were related to the same scheme to enrich the Defendants and the enterprise at the expense of HMA through the fraudulent misrepresentations and/or omission of facts of vehicles for coverage under HMA's warranty program that did not meet the warranty requirements.

129.   It is likely that Defendants' criminal conduct will continue, with respect to this scheme and potentially others. Defendants have maintained its fraudulent position that HMA owes the Dealership coverage under the Recall Campaign for other Hyundai vehicles that HMA has not provided because of its investigation into this matter. Additionally, upon information and belief Defendants have engaged in similar schemes in connection with other unrelated recalls in the automotive industry in the past. If Defendants are not stopped, it is likely that their improper and fraudulent abuse of product recalls for their own unlawful gain will continue.

130.   Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c).

131.  As a direct and proximate result of the racketeering activities of Defendants and violations of 18 U.S.C. § 1962(c), HMA has been injured in its business and property as a result of paying the Dealership and paying for evaluation of Hyundai vehicles for warranty work deliberately damaged by Defendants.

132.  HMA is entitled to equitable relief, in the form of restitution and/or disgorgement, in addition to compensatory damages.

133.  HMA has been required to retain the undersigned counsel, and has incurred attorneys' fees and costs, to prosecute this action.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against all Defendants for monetary damages, including treble damages, punitive damages, pre and post judgment interest, costs, and attorneys' fees; equitable relief, including an order preventing and restraining Defendants from further violations of 18 U.S.C. § 1962(c) and restitution and/or disgorgement; and, such other relief deemed just and appropriate.

### Count III – Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (d) (All Defendants)

134.  HMA repeats and realleges paragraph 1 – 96 and 117 - 130, as if fully set forth herein.

135.   By engaging in the conduct set forth herein, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Defendants willfully and with actual knowledge, agreed to and conspired to defraud HMA by purchasing and deliberately damaging Hyundai vehicles before transporting them to the Dealership for evaluation intending for HMA to perform unjustified warranty work, including replacement of engine assemblies, or repurchasing the vehicles, through the use of private or commercial mail carriers, and/or wires or electronic means.

136.   Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further their fraudulent scheme. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

137.   As a direct and proximate result of the racketeering activities of Defendants, the overt acts committed in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), HMA has been injured in its business and property as a result of paying the Dealership and paying for evaluation of Hyundai vehicles for warranty work on engines deliberately damaged by Defendants.

138.   HMA is entitled to equitable relief, in the form of restitution and/or disgorgement, in addition to compensatory damages.

139.   HMA has been required to retain the undersigned counsel, and has incurred attorneys' fees and costs, to prosecute this action.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against all Defendants for monetary damages, including treble damages, punitive damages, pre and post judgment interest, costs, and attorneys' fees; equitable relief, including an order preventing and restraining Defendants from further violations of 18 U.S.C. § 1962(d) and restitution and/or disgorgement; and, such other relief deemed just and appropriate.

## Count V: Tortious Interference with a Contract and Business Relationship
### (KHAYTIN, REVUELTA, EDDIE NAPLETON, PELAYO, RUIZ AND MINER)

140.   HMA repeats and realleges paragraph 1 - 96, as if fully set forth herein.

141.   HMA has a business relationship and Dealer Sales and Service Agreement with the Dealership under which HMA has legal rights.

142.   Defendants   KHAYTIN,   REVUELTA,   EDDIE   NAPLETON, PELAYO, RUIZ and MINER are aware of HMA's business relationship and Dealer Sales and Service Agreement with the Dealership.

143.   Defendants intentionally and unjustifiably interfered with HMA's business relationship and Agreement with the Dealership.

144.   More specifically, the Agreement is subject to immediate termination when the dealer submits to HMA "(i) false claims for reimbursement, sales

incentives, refunds rebates or credits, (ii) false financial information, sales reports or other data required by HMA; or (iii) false statements relating to predelivery preparation, testing, warranties, servicing, repairing, or maintenance required by HMA."

145.    Additionally, HMA's Dealer Sales and Service Agreement with the Dealership requires the Dealership to comply with the Hyundai Warranty Policy and Procedures Manual. Defendants intentionally and unjustifiably caused the Dealership to violate the Manual.

146.    HMA has been damaged as a result of Defendants' interference.

147.    HMA is entitled to equitable relief, in the form of restitution and/or disgorgement, in addition to compensatory damages.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its favor and against Defendants KHAYTIN, REVUELTA, EDDIE NAPLETON, PELAYO, RUIZ and MINER for monetary damages, punitive damages, pre and post judgment interest, costs, and attorneys' fees; equitable relief, including restitution and/or disgorgement; and, such other relief deemed just and appropriate.

<u>**Count VI: Civil Conspiracy**</u>
**(KHAYTIN, REVUELTA, EDDIE NAPLETON,**
**PELAYO, RUIZ and MINER)**

148.   HMA repeats and realleges paragraph 1 - 96, as if fully set forth herein.

149.   Defendants   KHAYTIN,   REVUELTA,   EDDIE   NAPLETON,
PELAYO, RUIZ and MINER agreed to enter into a conspiracy to commit an
unlawful act by defrauding HMA by intentionally destroying engines of Hyundai
vehicles and submitting fraudulent warranty claims to HMA.

150.   Defendants committed overt acts in pursuance of the conspiracy by
purchasing Hyundai vehicles for the purpose of intentionally damaging their
engines, submitting fraudulent warranty claims for said vehicles.

151.   HMA has been damaged as a result of the Defendants' acts performed
pursuant to the conspiracy.

152.   HMA is entitled to equitable relief, in the form restitution and/or
disgorgement, in addition to compensatory damages.

WHEREFORE, Plaintiff Hyundai Motor America demands judgment in its
favor and against Defendants KHAYTIN, REVUELTA, EDDIE NAPLETON,
PELAYO, RUIZ and MINER for monetary damages, punitive damages, pre and post
judgment interest, costs, and attorneys' fees; equitable relief, including restitution
and/or disgorgement; and, such other relief deemed just and appropriate.

## **DEMAND FOR JURY TRIAL**

Hyundai Motor America Corporation hereby demands trial by jury on all

issues so triable.

Respectfully submitted this 14th day of June, 2021.

By:   */s/ Ginger Barry Boyd*
Loren W. Fender, Esq.
(Fla Bar No.553921)
loren.fender@bowmanandbrooke.com
**Bowman and Brooke LLP**
Two Alhambra Plaza, Suite 800
Miami, FL 33134-5214
Tel: (305) 995-5600
Fax: (305) 995-6100

Joel H. Smith (*pro hac vice*)
joel.smith@bowmanandbrooke.com
Kevin J. Malloy, Esq. (*pro hac vice*)
kevin.malloy@bowmanandbrooke.com
**Bowman and Brooke LLP**
1441 Main Street, Suite 1200
Columbia, SC 29201-2897
Tel. (803) 726-7420
Fax: (803) 726-7421

James Andrew Bertron, Jr.
(Fla Bar No. 982849)
andy.bertron@nelsonmullins.com
Ginger Barry Boyd
(Fla Bar No. 294550)
ginger.boyd@nelsonmullins.com
**Nelson Mullins Broad & Cassel**
215 S. Monroe Street, Suite 400
Tallahassee, FL 32301
Tel. (850) 681-6810
Fax: (850) 681-9792

and

Samuel Keith Hutto (pro hac vice)
keith.hutto@nelsonmullins.com
**Nelson Mullins Riley & Scarborough LLP**
151 Meeting Street
Charleston, SC 29401
Tel. (843) 534.4575
Fax. (843) 722.8700

*Attorneys for Plaintiff,*
*Hyundai Motor America Corporation*