Filing # 106635665 E-Filed 04/23/2020 04:03:22 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

Case No.

MARK EDDLEMAN,

     Plaintiff,

vs.

EDWARD NAPLETON JR., EDWARD
NAPLETON SR., NAPLETON'S NORTH
PALM AUTO PARK, INC., OAK HILL
DEALER SERVICES, INC.,

     Defendants.

_____/

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff Mark Eddleman ("Plaintiff") hereby sues Edward Napleton Jr. ("Eddie Napleton Jr." or "Napleton Jr."), Edward Napleton Sr. ("Ed Napleton Sr." or "Napleton Sr."), Napleton's North Palm Auto Park, Inc. ("Napleton Automotive Group" or "NAG"), and Oak Hill Dealer Services, Inc. ("Oak Hill" and, together with Eddie Napleton Jr., Ed Napleton Sr., and Napleton Automotive Group, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.    This is an action for whistleblower retaliation, tortious interference, negligent retention, and more arising out of Defendants' termination of Plaintiff because of Plaintiff's refusal to participate in Defendants' unlawful conduct. Indeed, the last straw that resulted in Plaintiff's termination was Plaintiff's refusal to cover up the rape of a female employee by Defendant Eddie Napleton Jr., the president-in-waiting of Defendant Napleton Automotive Group and the son of the company's current president, Defendant Ed Napleton Sr.

2.      Napleton Automotive Group is a large company that owns and operates over 60 automobile dealerships in seven different states.  During his three years as a high-level executive at the company, Plaintiff had a sterling track record of performance.  Plaintiff was considered one of the company's top general managers, generating record performance for three separate dealerships in Palm Beach County.  As a result of his success he was in line to assume a more expansive leadership role in Florida.

3.      Additionally, Plaintiff was an ethical executive.  During Plaintiff's time at Napleton Automotive Group, Defendants encouraged him to engage in certain frauds that they carried out to bolster the company's overall profitability, including warranty fraud and consumer fraud.  But Plaintiff refused to engage in those unlawful practices at his dealerships, despite their open acceptance at the company.  Plaintiff's stellar performance—including his record numbers and complete turnaround of several failing dealerships—was done the right way.

4.      In February 2019, the State of Florida charged Defendant Eddie Napleton Jr. with sexual battery on a helpless person.  *See State of Florida v. Edward W. Napleton*, Case No. 50-2019-CF-000941.  Palm Beach County prosecutors allege that during a Napleton Automotive Group conference in August 2018, Napleton Jr. let himself into the hotel room of a female employee and raped her while she was unconscious.  Prosecutors allege that there is hotel video footage of some of the events alleged, and that DNA evidence corroborates the State's charges.  The case is pending.

5.      The day after the rape in August 2018, approximately six months before prosecutors filed charges, Eddie Napleton Jr. confessed to Plaintiff.  The two worked closely together and, at that point, considered each other friends and confidantes.  Napleton Jr. explained to Plaintiff in disturbing detail how he had sexual intercourse with the victim while she lay unconscious on the

hotel bed in a pool of her own urine.  He was far from remorseful, telling Plaintiff that if the victim had been conscious, she would have "let me fuck her anyway."

6.      Months later, as the authorities were closing in on criminal charges against Eddie Napleton Jr., he began exerting pressure on Plaintiff to lie to criminal investigators.  Specifically, Napleton Jr. wanted Plaintiff to lie about having observed the victim make sexual advances towards Napleton Jr. on the night of the rape, and to misrepresent that the victim had a history of making sexual advances towards Napleton Jr.  But that was not true.

7.      More important, Eddie Napleton Jr. instructed Plaintiff *not* to divulge his confession if approached by investigators; instead, Napleton Jr. wanted Plaintiff to tell investigators a false, concocted story that he is relying on in his defense.  In short, he wanted Plaintiff to obstruct justice and commit perjury.

8.      In early February 2019, the situation came to a head.  Defendant Eddie Napleton Jr. had been notified that he would be criminally charged.  Napleton Jr. called Plaintiff and forcefully repeated his illicit request that Plaintiff falsely testify and that he "forget" all about the confession.  Napleton Jr. threatened that if Plaintiff did not comply, Plaintiff could "get the fuck out" of the company and that they could "have someone else sitting at [Plaintiff's] desk."  At the same time, Napleton Jr. tried to induce Plaintiff's compliance by promising a better bonus package at year's end.

9.      Plaintiff refused to engage in this conspiracy to obstruct justice and commit perjury. In retaliation, Plaintiff was summarily terminated by Defendants from a position where he was earning approximately $1 million annually and slated to earn over $10 million in the period from 2019 to 2023.  Defendants did not even bother to provide Plaintiff with a pretextual explanation for his termination.

10.     Defendant Napleton Automotive Group has publicly backed Defendant Eddie Napleton Jr. in his criminal proceeding, putting out a press release immediately after Napleton Jr.'s arrest stating that the company "fully support[s] Eddie as he fights to clear his name in court and trust[s] that justice will prevail."

11.     Meanwhile, despite his track record of performance, Plaintiff—who left a lucrative executive-level position in Arkansas for his position at Napleton Automotive Group and who recently had a newborn son—has been unable to find new employment in the automotive industry, a close-knit industry in which Napleton Automotive Group has tremendous influence.  Plaintiff has sustained over $10 million in damages due to Defendants' actions.

12.     This action seeks to hold Defendants accountable for their gross misconduct— terminating a highly-compensated, high-performing executive for refusing to participate in their unlawful corporate practices and then refusing to conspire with them to obstruct a criminal proceeding into a brutal sexual battery by Napleton Automotive Group's next president.

## PARTIES, JURISDICTION, AND VENUE

13.     Plaintiff Mark Eddleman is *sui juris* and is a resident of the State of Florida. Plaintiff, age 45, has worked as a general manager and executive in the automotive sales industry for approximately 20 years.  Prior to his joining Napleton Automotive Group, Plaintiff was a high-level executive at automotive companies, where he managed and operated numerous dealerships and had a proven track record of turning around and improving sales and profitability.  Plaintiff is considered one of the top managers in the automotive industry.

14.     Defendant Edward Napleton Jr. is *sui juris* and is a resident of the State of Illinois. Napleton Jr. is the director of operations for Napleton Automotive Group.  As noted, Napleton Jr. has been charged with sexual assault of one of the company's employees.  The case is pending in

the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County. *See State of Florida v. Edward W. Napleton*, Case No. 50-2019-CF-000941.

15.     Defendant Edward Napleton Sr. is *sui juris* and is a resident of the State of Florida. Napleton Sr. is the president of Napleton Automotive Group, and he remains involved in its day-to-day operations.

16.     Defendant Napleton's North Palm Auto Park, Inc. is an Illinois corporation with its principal place of business in Lake Park, Florida. Napleton Automotive Group is a family-owned company, operating over 60 auto dealerships in seven different states. The company states on its website that the "Napleton Family name has become synonymous with excellence and teamwork," and that it is "one of the most forward-thinking dealership groups in the country."

17.     Defendant Oak Hill Dealer Services, Inc. is an Illinois corporation. Oak Hill is an affiliate of Napleton Automotive Group, and its president is Defendant Ed Napleton Sr.

18.     This Court has jurisdiction over this action as Plaintiff seeks damages in excess of $30,000.00, exclusive of interest, costs, and fees.

19.     Venue is proper in this Court as one or more of Defendants reside in Palm Beach County and the events underlying Plaintiff's claims occurred in Palm Beach County.

**FACTUAL ALLEGATIONS**

**A.     Plaintiff Is Recruited to Join Defendant Napleton Automotive Group**

20.     Plaintiff joined Napleton Automotive Group in 2016. Before that, Plaintiff was the chief operating officer of an automotive group in Arkansas, where for three years he operated 21 franchises in 14 different locations throughout the state. During those three years, Plaintiff helped the group more than triple its earnings.

5

21.     In 2015, Edward Napleton Sr., the patriarch of the Napleton family and the current president of NAG, recruited Plaintiff to join NAG. Specifically, Napleton Sr. recruited Plaintiff to be the general manager of NAG's Chrysler Dodge Jeep, Ram ("Chrysler") and Hyundai/Genesis ("Hyundai") dealerships in Palm Beach County.

22.     The Palm Beach County area is the crown jewel of NAG's car dealership empire. Ed Napleton Sr. sold Plaintiff on uprooting his life in Arkansas (where Plaintiff was already successfully established) and relocating to Palm Beach by explaining that NAG would offer opportunities for increased compensation, in addition to opportunities for advancement within the NAG network.

23.     During in-person meetings where they discussed Plaintiff's potential employment, Ed Napleton Sr. communicated to Plaintiff that if he relocated to Palm Beach and joined NAG, Napleton Sr. would guarantee Plaintiff an annual compensation of $1 million—the same annual compensation Plaintiff was earning at the time in Arkansas—and that Plaintiff would be making over $2.5 million a year very quickly.

24.     Significantly, Ed Napleton Sr. also sold Plaintiff on the prospect of one day taking over all of NAG's Florida dealerships. Napleton Sr. told Plaintiff that his son Eddie Napleton Jr., who at the time was running NAG's dealerships in Florida and Georgia, was being groomed to be NAG's next president. The plan was for Napleton Jr. to "rotate" through Palm Beach for a period of one to two years, after which he would return to NAG's headquarters in Chicago to replace his father as president. At that time, Plaintiff would be in line to take over NAG's Florida dealerships.

25.     With these inducements in mind, Plaintiff entered into an oral agreement to join NAG. Plaintiff started in or around March 2016 as the general manager of NAG's Chrysler and Hyundai dealerships in Palm Beach County.

**B.**   **Plaintiff Becomes a Superlative Manager for Defendant Napleton Automotive Group**

26.   Upon joining NAG, Plaintiff began working directly with Eddie Napleton Jr., who was also based out of Palm Beach.

27.   Plaintiff immediately demonstrated the superior managerial skills that had made him a highly coveted recruit. The Hyundai dealership was losing approximately $190,000 a month when Plaintiff arrived. Under Plaintiff's management, however, the dealership became profitable within just four months. By the end of 2017, Plaintiff had completely turned the dealership around, converting it into a store with over $2 million in annual profits—the largest year-over-year financial turnaround across all of NAG's dealerships. Plaintiff was able to immediately improve the financial performance of the Chrysler dealership, as well.

28.   Not surprisingly, Defendants took notice of Plaintiff's skills and the exceptional results he generated, and they expanded his role accordingly. In September 2017, Defendants had Plaintiff take over as general manager of NAG's Kia-branded dealership in Palm Beach. This made Plaintiff the general manager of three of NAG's dealerships in Palm Beach. Defendants also named Plaintiff the manager of the Napleton body shop in Palm Beach.

29.   Similar to NAG's Hyundai dealership, NAG's Kia dealership was losing money before Plaintiff took over—experiencing over $70,000 in monthly losses. Under Plaintiff's management, within one month the Kia dealership was operating at a profit. In fact, in 2018, NAG recognized Plaintiff for achieving the top financial turnaround out of any dealership in NAG's expansive network.

30.   Overall, under Plaintiff's leadership his three dealerships achieved record financial results in 2018, with approximately $10 million in aggregate profits.

31.    Seeing that they had a star executive, NAG continued to bestow additional responsibilities on Plaintiff. For example, NAG requested that Plaintiff build and operate NAG's centralized business development center in Palm Beach. This center had approximately 50 sales agents who assisted with sales and marketing for 18 NAG dealerships throughout Florida and elsewhere. Plaintiff was charged with managing the center and ensuring its efficient operation in service of those dealerships. Plaintiff also was assigned to manage a NAG regional corporate office in the same location.

32.    Plaintiff's expanded portfolio across one of NAG's prized regions made him one of the company's most successful and recognizable executives. Indeed, Plaintiff was made the spokesperson for NAG's Palm Beach stores, appearing in NAG's commercials and advertisements.

33.    Plaintiff was NAG's second highest paid general manager across the entire country, and he wielded significant influence in the company, answering only to Ed Napleton Sr. and Eddie Napleton Jr.

34.    Although Plaintiff was a NAG employee, the company paid Plaintiff through its affiliate, Defendant Oak Hill, for certain portions of his compensation that were based on commissions for the sale of warranties and other products and services in connection with the NAG dealerships Plaintiff managed.

35.    Consistent with Ed Napleton Sr.'s representations and inducements, Plaintiff's successful performance, and Plaintiff's increased scope of responsibilities, Plaintiff's compensation was slated to increase substantially over time. Plaintiff's compensation from 2019 to 2023 for running the three NAG dealerships was to be in excess of $10 million, not including any potential compensation increases resulting from further promotions.

8

36.     As Plaintiff was promoted between 2016 and 2018, so was Eddie Napleton Jr.  In early 2018, Napleton Jr. was named NAG's nationwide director of operations.

37.     Plaintiff and Eddie Napleton Jr. developed a close friendship over time.  The two spent time together socially and grew to confide in one another.

C.      **Plaintiff Observes Serious Misconduct by Defendants and Refuses to Participate**

38.     From March 2016 through the end of his employment at NAG in February 2019, Plaintiff became aware of serious misconduct by NAG—warranty fraud, consumer fraud, sexual harassment, hush-money payments, and other illicit behavior.   Depending on the conduct, Defendants would either participate in the conduct or else condone the conduct and cover it up.

39.     Much of the unlawful conduct at NAG was carried out by and through the general manager of the NAG Hyundai dealership in West Palm Beach ("NAG Executive-1").   NAG Executive-1 was known throughout the NAG network for his willingness to cross legal and ethical lines in order to increase profits.

1.   *Warranty Fraud against Hyundai*

40.     For instance, Defendants and NAG Executive-1 engaged in a large-scale warranty fraud against Hyundai.  In 2017 and 2018, according to its website, Hyundai recalled more than one million Santa Fe and Sonata vehicles in order to address a manufacturing issue that could lead to engine failure.   Defendants and NAG Executive-1 engaged in a scheme to defraud Hyundai based on the manufacturing issue Hyundai had announced.

41.     First, Defendants and NAG Executive-1 would have NAG purchase at auction used versions of the Hyundai models that were subject to the recall.   Then, once NAG brought the purchased vehicles onto its premises, NAG would intentionally "blow" the engines of those vehicles by emptying their oil and running them at high RPMs until the engines malfunctioned.

42.     At that point, NAG would submit fraudulent requests for Hyundai to pay for the supposed manufacturing defects pursuant to the recall. NAG would receive approximately $7,000 per "blown" engine, including the new engine and service fee.

43.     But this scheme was not limited to vehicles that NAG had purchased at auction; NAG would carry out the scheme to applicable Hyundai models that had been traded in by customers or brought in for service, as well. All told, NAG was "blowing" over 20 Hyundai engines every month, making this a multimillion-dollar fraud against Hyundai.

44.     Eddie Napleton Jr. encouraged Plaintiff to engage in this practice in order to bolster the productivity of the Hyundai dealership Plaintiff ran. Plaintiff declined.

    **2.  *Consumer Fraud***

45.     Defendants and NAG Executive-1 also engaged in a large-scale fraud against NAG's consumers. Under Florida Statute § 501.976, auto dealerships are prohibited from adding certain fees or charges to the cash price of a vehicle listed for sale, and must include all fees or charges that must be paid by the customer in any advertised price. Violations of this statute are considered "deceptive" practices under Florida's Deceptive and Unfair Trade Practices Act.

46.     Defendants serially violated this law. As a matter of practice, NAG's Hyundai dealership in West Palm Beach advertises its vehicles at very low prices. Once customers are at the dealership, however, Defendants will add unfounded fees and charges to the actual sales price for those vehicles.

47.     For example, Defendants will charge an additional $1,999 "certified fee" for the sale of a certified used car—a fee that is not disclosed in NAG's advertisements. Defendants will also charge a so-called "Napleton Advantage Fee," which is completely unfounded and illusory. Defendants will add these fees and charges to the sales price at the time of the sale—in order to

defraud customers they have enticed to the dealership through false advertisements promoting fake low prices.

48.     Defendants charge these unfounded and illusory fees to over 100 customers every month.  This is yet another multimillion-dollar fraud carried out by Defendants.

49.     As with NAG's warranty fraud, Eddie Napleton Jr. encouraged Plaintiff to engage in this unlawful practice.  Indeed, Napleton Jr. urged Plaintiff to "be more like" NAG Executive-1.  And yet again, Plaintiff declined.  Plaintiff had no intention of breaking the law in order to enrich NAG at the expense of others.

### 3. *Sexual Harassment and Hush Money Cover-Ups*

50.     In addition to the frauds that were carried out to bolster the profitability of NAG's dealerships, it was widely known amongst senior executives at the company—including Defendants Ed Napleton Sr. and Eddie Napleton Jr.—that NAG Executive-1 had sexually harassed several female employees at his dealership.  Indeed, at least four female NAG employees have brought sexual harassment claims against NAG Executive-1 in recent years.

51.     NAG has a formal "*Policy Against Harassment*."  NAG's policy defines "harassment" as including, among other conduct, "sexual advances, requests for sexual favors, unwelcome or offensive touching and other verbal, graphic, or physical conduct of a sexual nature."  [**Exhibit A**].  The policy provides that any allegations will be "thoroughly investigated."  "The Ed Napleton Automotive Group does not and will not tolerate harassment of our employees," the policy states, and as such any "violation of this policy will subject an employee to disciplinary action up to and including immediate discharge."

52.     But far from subjecting NAG Executive-1 to "disciplinary action" for his conduct, NAG had a pattern and practice of simply paying his victims hundreds of thousands of dollars in

11

exchange for non-disclosure agreements. Defendants refused to terminate NAG Executive-1 because, through his fraudulent conduct, he was generating substantial profits for NAG. One NAG employee *was* terminated, however, for blowing the whistle on the situation.

53.     Given Defendants' history of subordinating NAG's sexual harassment policy and the well-being of NAG's employees whenever Defendants found it to be in their interest, perhaps it should have come as no surprise that Defendants again acted in this manner when the company's president-in-waiting, Eddie Napleton Jr, violated the company's policy in the worst possible way in the summer of 2018.

**D.      Defendant Eddie Napleton Jr. Rapes Jane Doe and Confesses to Plaintiff**

**1.   *NAG's Annual Corporate Retreat in Palm Beach in August 2018***

54.     Plaintiff met Jane Doe in or around July 2018. Jane Doe worked as a service trainer for NAG until the day she was raped by Defendant Eddie Napleton Jr. the following month.

55.     On August 7 and 8, 2018, NAG hosted its annual corporate retreat in Palm Beach. Corporate executives from Chicago and general managers from more than 20 dealerships across the southeastern United States attended the conference, which took place at a West Palm Beach Marriott (the "Marriott").

56.     On Tuesday, August 7, 2018, Ed Napleton Sr. and Eddie Napleton Jr. visited Plaintiff at the Kia dealership to congratulate Plaintiff on his strong performance throughout the year.

57.     That night, NAG hosted a dinner for the conference participants at Morton's Steakhouse in Palm Beach. Approximately 50 of NAG's senior management attended the dinner. Ed Napleton Sr. was there, sitting at a table next to Ms. Doe.

NOT A CERTIFIED COPY

58.     Plaintiff sat at a different table.  From his table, Plaintiff observed Eddie Napleton Jr. having several drinks.

59.     Knowing he had to conduct a presentation at a partners' meeting at the conference the following morning, Plaintiff enjoyed his dinner and left the restaurant around 9:00 p.m. Although Eddie Napleton Jr. also had to present the following morning, he stayed behind when Plaintiff left.

### 2. *Defendant Eddie Napleton Jr.'s Confession*

60.     Early the following morning, at approximately 7:30 a.m. on Wednesday, August 8, 2018, Defendant Eddie Napleton Jr. called Plaintiff.  Something was wrong.  Napleton Jr. told Plaintiff that his "life [was] over" and that he had "fucked up this time."  He pleaded with Plaintiff, who was on his way to the Marriott for the presentation, to take his place and "lead the way" at the meeting.

61.     Eddie Napleton Jr. was with his father, Ed Napleton Sr., at the meeting when Plaintiff arrived.  Napleton Sr. spoke for a few minutes and then quickly left, with Napleton Jr. and NAG's General Counsel, Les Stracher, at his side.

62.     Rumors began to swirl.  Jane Doe was not at the meeting and was said to be in the hospital.  Police filled the hotel lobby.  Eddie Napleton Jr's sister leaned in close to Plaintiff and whispered that "things [were] weird."  Plaintiff sent Napleton Jr. a text, asking why he had left the meeting so abruptly.  Napleton Jr. responded that his "stomach [was] upset."  **[Exhibit B]**

63.     The next day, Thursday, August 9, 2018, Plaintiff returned to his office at the Chrysler dealership in Palm Beach.  Eddie Napleton Jr. texted Plaintiff and asked that Plaintiff pick him up at his father's house.  Napleton Jr. said he "need[ed] to get out of the house" to "talk."

NOT A CERTIFIED COPY

64. When Plaintiff arrived at Ed Napleton Sr.'s house, Eddie Napleton Jr. was clearly distraught. In the car, Napleton Jr. shared with Plaintiff what had happened at the conference on Tuesday night and Wednesday morning.

65. According to Defendant Eddie Napleton Jr., after the dinner at Morton's Steakhouse on Tuesday, August 7, 2018, a group of NAG executives and employees went to Rocco's Tacos & Tequila Bar on Clematis Street. Jane Doe sat on Napleton Jr.'s lap at the bar and Napleton Jr. kissed her in front of the group. The group later returned to the Marriott and continued to drink at the hotel bar.

66. At the Marriott hotel bar, Jane Doe had become severely intoxicated and was showing visible signs of serious intoxication. A NAG executive obtained a room for her at the Marriott ("NAG Executive-2"). Eddie Napleton Jr. explained to Plaintiff during their conversation that the purpose of getting the room was for Napleton Jr. to have sex with Jane Doe.

67. NAG Executive-2 got Jane Doe "set up" in the hotel room. He returned to the hotel lobby. Soon after, however, Jane Doe stumbled out of her room and fell to the floor in the middle of the hallway. A hotel employee found her and placed her in a wheelchair, and some time later NAG Executive-2 helped a hotel staff identify Jane Doe and place her back in the hotel room.

68. Eddie Napleton Jr. and NAG Executive-2 continued to have drinks at the Marriott hotel bar. Napleton Jr. then called the victim on her cellular phone, but she did not answer.

69. Eventually, Eddie Napleton Jr. requested that NAG Executive-2 provide him with the room key to Jane Doe's room. NAG Executive-2 gave it to him.

70. As he recounted to Plaintiff, Defendant Eddie Napleton Jr. then slipped into Jane Doe's hotel room. He saw Jane Doe unconscious on the bed. She was "passed out" and covered

NOT A CERTIFIED COPY

in her own urine.  He pulled her pants off and raped her repeatedly.  Jane Doe was unconscious the entire time.  Napleton Jr. emerged from the room later that morning.

71.     In his conversation with Plaintiff, Eddie Napleton Jr. said that he "tore that ass up for a few hours," possibly referencing that he had anally raped the victim, as well.

72.     Eddie Napleton Jr. then wanted to discuss with Plaintiff the possible "defenses" he could use if he was investigated or criminally charged.  Napleton Jr. suggested that he would fabricate a story where he fell asleep in the bed alongside the victim, and that it was not until the following morning—once she was awake—that they had consensual sexual intercourse.

73.     After confessing to Plaintiff, Eddie Napleton Jr. wanted to see "what was going on" at the Marriott, the scene of the crime, so Plaintiff took him to the hotel during their car ride on August 9, 2018.

74.     Plaintiff and Napleton Jr. had breakfast at the Marriott hotel café.  Napleton Jr. wondered aloud whether he should tell his wife about what had occurred.  He also asked Plaintiff whether he thought that $500,000 would "make this go away" and whether Plaintiff was willing to speak with Jane Doe about resolving the matter through a financial payoff.  Plaintiff did not respond to these inquiries and evaded the questions.

75.     After breakfast, they drove back to the dealership, where Napleton Jr. dropped off Plaintiff and kept the car for the day.  During that car trip, Napleton Jr. rationalized the assault on Jane Doe by saying "that stupid bitch" would have "let me fuck her anyway."

**E.     Defendant Eddie Napleton Jr. Instructs Plaintiff to Lie to Criminal Investigators**

76.     The West Palm Beach Police Department (the "Police Department") immediately launched an investigation into the rape.  Within a week or so, Defendant Eddie Napleton Jr. sent

Plaintiff a text message instructing him to not tell anyone about their conversation on August 9, 2018: "[D]on't say anything to anyone[.]"  [**Exhibit C**]

77.    In September 2018, Plaintiff sponsored a golf tournament for the Palm Beach County Sheriff (the "Sheriff"). Eddie Napleton Jr. reached out to Plaintiff to ask that Plaintiff "run interference" with the Sheriff.  That is, Napleton Jr. wanted Plaintiff to convince the Sheriff to tell the Police Department to "back off" its investigation into Napleton Jr.  Plaintiff would not do that.

78.    In late 2018, Eddie Napleton Jr.'s behavior grew increasingly erratic, paranoid, and controlling.  Napleton Jr. asked Plaintiff to have "loyal" NAG employees tell investigators that they had seen Jane Doe flirting with him on other occasions prior to the night of August 7, 2018.

79.    Eddie Napleton Jr. asked Plaintiff to lie to investigators about their conversations.  "[I]f the cops approach you," Napleton Jr. said, "do not tell them what we talked about" on August 9, 2018.  He also repeatedly requested that Plaintiff lie to investigators and say that he observed Jane Doe "coming on" to Napleton Jr.

80.    In or around late January 2019, Defendant Eddie Napleton Jr. learned that he would be criminally charged.  Napleton Jr. called Plaintiff, who was at the office at the time.  He asked Plaintiff to go into the office, close the door, and put him on speaker phone.  "I'm being indicted," Napleton Jr. said, "I just got the phone call."

81.    Eddie Napleton Jr. proceeded to ask Plaintiff whether anyone had talked to him yet, and whether he was a "team player."  Napleton Jr. continued, saying, "I'm really going to need you on our team.  We have 15-20 witnesses who are all solid company guys."

82.    Eddie Napleton Jr. then requested that Plaintiff falsely testify that he personally observed Jane Doe make sexual advances toward Napleton Jr. on the night of August 7, 2018.

Napleton Jr. also said that Plaintiff needed to "forget" everything they had discussed on August 9, 2018.

83.     Plaintiff tried to evade Eddie Napleton Jr.'s requests, saying he did not want to get involved.  Napleton Jr. responded by calling Plaintiff a "selfish son of a bitch."  Napleton Jr. told Plaintiff that "if you do this, when your bonus is redone, it will be very favorable for you."

84.     When Plaintiff reiterated that he did not want to get involved and conveyed in no uncertain terms that he would not be complying with Eddie Napleton Jr.'s instructions, Napleton Jr. told Plaintiff that he could "get the fuck out."  Screaming into the phone, Napleton Jr. told Plaintiff "we can have someone else sitting at your desk."

85.     By the following day, Plaintiff's access to NAG's computer network had been restricted.

**F.     Defendants Terminate Plaintiff in Retaliation for His Unwillingness to Obstruct Justice**

86.     Within several days of Defendant Eddie Napleton Jr. making these demands of Plaintiff, the Napleton family held an "emergency" family meeting to discuss concerns about how the news of the imminent criminal charges would impact NAG's business in Florida and elsewhere.  Shortly thereafter, in or around the first week of February 2019, NAG announced that Plaintiff had "resigned" from his position with the company, effective immediately.

87.     Plaintiff, however, had not resigned.  Plaintiff emailed Eddie Napleton Jr. shortly after NAG's announcement to communicate that he intended to continue working.  But in addition to Defendants blocking Plaintiff's access to the NAG computer network, when Plaintiff showed up at his office NAG's human resources representative told Plaintiff to "get the fuck off the property."  Thus, although Plaintiff had not resigned, he *had* been fired.

88.   Plaintiff then texted twenty of his colleagues:

Getting lots of texts I'm no longer with the company.  I did not resign nor quit, this information coming from corporate is inaccurate. . . . Thank you all for all you've done to support me over my tenure!  It's been a true pleasure to be able to work side by side with each and every one of you and all others not on this group text. We'll all be in touch soon!

**[Exhibit D]**

89.   On or about February 4, 2019, news of the rape broke.  Defendant Eddie Napleton Jr. was arrested and charged with sexual battery on a helpless person, in violation of Florida Statute § 794.011.

90.   According to state prosecutors, as shown on video surveillance from the hotel, Jane Doe was in an unconscious state when Defendant Eddie Napleton Jr. entered her room after midnight on August 8, 2018.  A DNA test revealed that his semen was found on her body.

91.   CBS and ABC stations reported that police accused Eddie Napleton Jr. of "rap[ing] an unconscious woman at a West Palm Beach Fla., hotel last August," and that his "DNA was found on the victim's body."  The alarming news was out.

92.   Defendant NAG, however, was not interested in seeing or hearing about any of the evidence.  Instead, NAG summarily proclaimed Eddie Napleton Jr.'s innocence:

Our company has strict policies and procedures in place to protect the safety and well-being of all employees.  In this case, no policy or law was violated.  We fully support Eddie as he fights to clear his name in court and trust that justice will prevail.

*See, e.g., ABC7 Chicago*, "Edward Napleton Jr., son of Napleton Auto Group president, allegedly had sex with unconscious woman, policy say,"  February 4, 2019, *available at* https://abc7chicago.com/son-of-napleton-auto-group-president-allegedly-had-sex-with-unconscious-woman-police-say/5120938/; *Automotive News*, "Son of Napleton Auto Group

18

president charged with sexual battery in Florida," February 6, 2019, *available at* https://www.autonews.com/dealers/son-napleton-auto-group-president-charged-sexual-battery-florida. [**Exhibit E**]

93.     It was specifically Plaintiff's steadfast refusal to corroborate this narrative that, in large measure, led to his dismissal.

94.     Only one person at NAG had the authority to fire Plaintiff:  Defendant Ed Napleton Sr.

95.     By this time, Ed Napleton Sr. had realized his son, Eddie Napleton Jr., was a threat to the business.  Napleton Sr. knew that his son had raped Jane Doe, as charged.  In fact, upon information and belief, Napleton Sr. already had received emails from his son in which his son had accepted personal financial responsibility for the incident.

96.     However, Ed Napleton Sr. had been aware that his son was a dangerous, loose cannon even before the rape.  Napleton Sr. knew that his son had encouraged "blowing up" automobile engines to defraud manufacturers.  He also knew that his son was prone to other offensive conduct—as one example, Napleton Jr. had recently expressed in writing his belief that the "Sunshine State," a prized region for Chicago-based NAG, was "full of Jews and hillbillies."

97.     But none of this mattered to Ed Napleton Sr.  Eddie Napleton Jr. was his own flesh and blood, a member of the Napleton family.  Plaintiff, on the other hand, was not.  And by now Plaintiff had demonstrated, time and time again, that he was not willing to lie or break the law for Defendants' benefit.

98.     So, Defendant Ed Napleton Sr. gave the order to fire Plaintiff.  Knowing Eddie Napleton Jr. was about to be charged criminally, Napleton Sr. decided NAG would go on the

offensive.  It would accuse the rape victim, Jane Doe, of being a liar.  The company would purge any senior executives who had not fallen in line, namely, Plaintiff.

99.    And so, at the same time it was firing Plaintiff, NAG issued a statement to the press in which it summarily announced "no policy or law was violated" and [w]e fully support Eddie as he fights to clear his name in court[.]"

100.    Plaintiff's termination was a direct result of his unwillingness to lie to investigators, commit perjury, obstruct justice, and engage in other wrongdoing on behalf of Defendants.  After over 20 years in the automotive industry, Plaintiff had been cast aside.

101.    Plaintiff has been unable to find new employment and lost the salary and benefits he was earning at NAG—despite his superb track record as an automotive executive—only because he would not conspire with Defendants.  In fact, because he was a recognizable spokesperson for NAG and was featured in NAG's advertisements, Plaintiff's losses have been compounded by significant reputational harm that has resulted from being recognized by much of the Palm Beach community as the face of the company at the very time Napleton Jr.'s misdeeds went public.

102.    Moreover, Plaintiff is still owed approximately $250,000 from NAG and Oak Hill, amounts comprised of unpaid salary and commissions that Plaintiff earned prior to his unlawful termination.

103.    Plaintiff has retained undersigned counsel and is required to pay them a reasonable fee.

## COUNT I

**Section 448.102, Fla. Stat., Florida Private Whistleblower Act**
**Against Defendant Napleton Automotive Group**

104. Plaintiff incorporates Paragraphs 1 through 103 as though fully set forth herein.

105. Defendant Napleton Automotive Group is a firm, partnership, institution, corporation, or association that employs ten or more persons.

106. Plaintiff engaged in statutorily protected activity when he objected to and refused to participate in Napleton Automotive Group's unlawful activities and practices. Plaintiff's protected activity included his refusal to participate in the frauds perpetrated by the company and his refusal to lie to police investigators and commit perjury about his knowledge of Defendant Eddie Napleton Jr.'s rape of Jane Doe.

107. Napleton Automotive Group's manufacturers' fraud and consumer fraud were known and encouraged by the company's senior executives.

108. Further, Napleton Automotive Group condoned and ratified Eddie Napleton Jr.'s demand that Plaintiff lie to police investigators and commit perjury. As Napleton Jr. was the company's director of operations, one of the most senior-level executives at the company, his directives were made on behalf of the company.

109. Napleton Automotive Group's ratification is also evidenced by the company's pattern and practice of covering up incidents of sexual harassment, contrary to its own internal harassment policy, in order to protect favored executives and avoid negative publicity and its financial impact. Napleton Jr.'s demand that Plaintiff lie and commit perjury were in furtherance of this pattern and practice, as it is consistent with the company's declaration of Napleton Jr.'s innocence immediately following his arrest.

21

110.    As a direct cause and result of Plaintiff's objections and refusals, Napleton Automotive Group terminated Plaintiff's employment.

111.    Napleton Automotive Group's actions would discourage a reasonable employee from engaging in similar protected activity.

112.    Napleton Automotive Group's decision to terminate Plaintiff's employment has caused Plaintiff to suffer millions of dollars in damages.  Plaintiff was a trusted executive at Napleton Automotive Group whose salary and benefits were approximately $1 million per year, and who was slated to earn over $10 million from 2019 to 2023.

113.    Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

## COUNT II

### Tortious Interference with Business Relationship
### Against Defendant Eddie Napleton Jr.

114.    Plaintiff incorporates Paragraphs 1 through 103 as though fully set forth herein.

115.    Defendant Eddie Napleton Jr. had actual knowledge of Plaintiff's business relationship with Napleton Automotive Group.

116.    Acting solely out of malice toward Plaintiff, Eddie Napleton Jr. interfered with Plaintiff's business relationship with Napleton Automotive Group in retaliation and retribution for Plaintiff's refusal to lie to police investigators and commit perjury about Napleton Jr.'s rape of Jane Doe.

117.    Specifically, Eddie Napleton Jr. announced that Plaintiff had "resigned" from Napleton Automotive Group, even though Napleton Jr. knew that Plaintiff had not resigned and had no intention of resigning.

118.    Eddie Napleton Jr. also caused Plaintiff to be blocked from accessing the company's servers—making it impossible for Plaintiff to perform his job functions—and had company employees direct Plaintiff to leave the premises.

119.    Eddie Napleton Jr.'s conduct was not motivated by a good faith belief that his conduct would be in the company's best interest.

120.    Eddie Napleton Jr.'s conduct, which directly caused and resulted in Plaintiff's termination, constituted a direct and unjustified interference with Plaintiff's business relationship with Napleton Automotive Group.

121.    As a result of Eddie Napleton Jr.'s conduct, Plaintiff has suffered millions of dollars in damages.  Plaintiff was a trusted executive at Napleton Automotive Group whose salary and benefits were approximately $1 million per year, and who was slated to earn over $10 million from 2019 to 2023.

122.    Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

**COUNT III**

**Tortious Interference with Business Relationship
Against Defendant Ed Napleton Sr.**

123.    Plaintiff incorporates Paragraphs 1 through 103 as though fully set forth herein.

124.    Defendant Ed Napleton Sr. had actual knowledge of Plaintiff's business relationship with Napleton Automotive Group.

125.    Acting solely out of malice toward Plaintiff, Ed Napleton Sr. interfered with Plaintiff's business relationship with Napleton Automotive Group in retaliation and retribution for Plaintiff's refusal to lie to police investigators and commit perjury in order to cover up Defendant Eddie Napleton Jr.'s rape of Jane Doe.

23

126.    Specifically, Ed Napleton Sr. directed and approved of measures that caused and resulted in Plaintiff's termination, including the announcement that Plaintiff had "resigned" from Napleton Automotive Group, and the restriction that was placed on Plaintiff's access to the company's servers—making it impossible for Plaintiff to perform his job functions.

127.    Ed Napleton Sr.'s conduct was not motivated by a good faith belief that the conduct would be in the company's best interest.

128.    Ed Napleton Sr.'s conduct constituted a direct and unjustified interference with Plaintiff's business relationship with Napleton Automotive Group.

129.    As a result of Ed Napleton Sr.'s conduct, Plaintiff has suffered millions of dollars in damages.  Plaintiff was a trusted executive at Napleton Automotive Group whose salary and benefits were approximately $1 million per year, and who was slated to earn over $10 million from 2019 to 2023.

130.    Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

**Count IV**

**Civil Conspiracy to Tortiously Interfere with Business Relations
Against Napleton Automotive Group, Ed Napleton Sr., and Eddie Napleton Jr.**

131.    Plaintiff incorporates Paragraphs 1 through 103 as though fully set forth herein.

132.    Defendants Napleton Automotive Group, Ed Napleton Sr., and Eddie Napleton Jr. conspired to interfere with Plaintiff's business relationship with Napleton Automotive Group in retaliation and retribution for Plaintiff's refusal to lie to police investigators, commit perjury, defraud manufacturers, and defraud Florida consumers.

133.    Defendants had actual knowledge of Plaintiff's business relationship with Napleton Automotive Group.

134.    Defendants took overt acts in furtherance of their conspiracy, including announcing that Plaintiff had "resigned" from Napleton Automotive Group and blocking Plaintiff's access to the company's servers.

135.    Ed Napleton Sr. and Eddie Napleton Jr. had a personal stake in the conspiracy that was separate and distinct from Napleton Automotive Group's interests, as they were concerned with preserving Napleton Jr.'s liberty by covering up the crimes he had committed.

136.    As a result of Defendants' conduct, Plaintiff has suffered millions of dollars in damages.

137.    Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

**COUNT V**

**Negligent Retention and Supervision**
**Against Defendants Napleton Automotive Group and Ed Napleton Sr.**

138.    Plaintiff incorporates Paragraphs 1 through 103 as though fully set forth herein.

139.    Defendants Napleton Automotive Group and Ed Napleton Sr. were on notice of Defendant Eddie Napleton Jr.'s harmful and wrongful propensities, including the fraudulent practices that Napleton Jr. encouraged and implemented, the allegations against Napleton Jr. relating to his rape of Jane Doe (which occurred at a work function), and Napleton Jr.'s instructions that Plaintiff lie to police investigators and commit perjury.

140.    Napleton Automotive Group and Ed Napleton Sr. were required to exercise due diligence and conduct an appropriate investigation of Eddie Napleton Jr. at the time they learned of Napleton Jr.'s propensities.  However, they failed to conduct such an investigation.

141.    Had Napleton Automotive Group and Ed Napleton Sr. conducted an appropriate investigation, the investigation would have confirmed Eddie Napleton Jr.'s harmful and wrongful

propensities, shown that those propensities were likely to continue, and demonstrated that Napleton Jr. was unsuited for the specific duties assigned to him at that time or for employment with the company generally.

142.    Napleton Automotive Group and Ed Napleton Sr. owed Plaintiff, in particular, a duty of care because they knew that Plaintiff was in the zone of foreseeable risks created by Eddie Napleton Jr.  They knew, for example, that Plaintiff and Napleton Jr. would be required to work together on a day-to-day basis, including sharing an office, managing car dealerships across Florida, and attending work functions together.

143.    Napleton Automotive Group's and Ed Napleton Sr.'s decision to retain Eddie Napleton Jr. as an employee and in his position was unreasonable given the information they knew or should have known.

144.    Plaintiff was damaged as a proximate cause of the unreasonable decision to retain Eddie Napleton Jr. as an employee and in his position, as Napleton Jr.'s foreseeable conduct as alleged in Paragraphs 114 to 122 constituted a direct and unjustified interference with Plaintiff's business relationship with the company.

145.    Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

### COUNT VI

**Promissory Estoppel**
**Against Ed Napleton Sr.**

146.    Plaintiff incorporates Paragraphs 1 through 103 as though fully set forth herein.

147.    Defendant Ed Napleton Sr. induced Plaintiff to leave his lucrative position as chief operating officer of an automotive company in Arkansas and join Napleton Automotive Group by

promising Plaintiff opportunities for increased compensation and advancement within the company.

148.    Ed Napleton Sr.'s promises were definite in nature, as he promised Plaintiff annual compensation of $1 million, that Plaintiff would soon be making annual compensation of over $2.5 million, and that successful performance would put Plaintiff in line to take over NAG's Florida dealerships within two years.

149.    Plaintiff reasonably relied upon Ed Napleton Sr.'s promises, moving from Arkansas to Palm Beach at great expense in order to avail himself of the opportunities that Napleton Sr. had promised.

150.    Despite Plaintiff's successful management of Napleton Automotive Group dealerships—including record numbers and a complete turnaround of several failing dealerships—Ed Napleton Sr. deprived Plaintiff of the opportunities he had promised Plaintiff.  Napleton Sr. did so through his own wrongdoing and without a good faith basis.

151.    Plaintiff has suffered damages by relying upon Napleton Sr.'s promises to his detriment.

152.    Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

### COUNT VII

**Intentional Infliction of Emotional Distress**
**Against Defendants Napleton Automotive Group, Ed Napleton Sr., and Eddie Napleton Jr.**

153.    Plaintiff incorporates Paragraphs 1 through 103 as though fully set forth herein.

154.    Defendants Napleton Automotive Group, Ed Napleton Sr., and Eddie Napleton Jr. engaged in extreme and outrageous conduct with the intent to cause Plaintiff severe emotional distress.

155.    Defendants' attempts to conceal the brutal rape of Jane Doe by insisting that Plaintiff lie to investigators and commit perjury—and then terminating Plaintiff's employment upon his refusal to comply—were so outrageous in character and extreme in degree as to go beyond all bounds of decency, and are atrocious and utterly intolerable in a civilized community.

156.    Plaintiff's was damaged by severe emotional distress that was a direct consequence, and intended result, of Defendants' outrageous conduct.

157.    Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

## COUNT VIII

### Breach of Contract
### Against Defendants Napleton Automotive Group and Oak Hill Dealer Services

158.    Plaintiff incorporates Paragraphs 1 through 103 as though fully set forth herein.

159.    Defendant Ed Napleton Sr., acting within the scope of his employment, offered a job to Plaintiff on behalf of Defendant Napleton Automotive Group in exchange for annual compensation starting at approximately $1 million per year.

160.    Plaintiff accepted the offer and performed pursuant to the terms of the parties' oral agreement from in or around March 2016 until the time he was terminated in or around February 2019.

161.    During the course of Plaintiff's employment, Napleton Automotive Group paid Plaintiff through its affiliate, Defendant Oak Hill, for certain portions of Plaintiff's compensation that were based on commissions Plaintiff had earned.

162.    Napleton Automotive Group and Oak Hill breached the parties' agreement by failing to pay Plaintiff amounts owed for work Plaintiff actually performed and commissions Plaintiff actually earned under their agreement.

28

163.     Plaintiff has been damaged as a result of these breaches by Napleton Automotive Group and Oak Hill.

164.     Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.  Awarding Plaintiff damages, including, but not limited to, compensatory and consequential damages;

B.  Awarding contractual, prejudgment, and post-judgment interest;

C.  Awarding costs and disbursements incurred as a result of this action;

D.  Awarding Plaintiff such further relief as the Court deems just and proper.

Dated this 23rd day of April, 2020.

Respectfully submitted,

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**

2 South Biscayne Boulevard, Suite 1750
Miami, Florida 33131
Telephone: (305) 400-4260
Facsimile: (866) 780-8355

/s/   Daniel Rashbaum

Daniel Rashbaum, Esq.
Fla. Bar. No. 75084
drashbaum@mnrlawfirm.com
Michael A. Pineiro, Esq.
Fla. Bar. No. 041897
mpineiro@mnrlawfirm.com
Jason L. Mays, Esq.
Fla. Bar No. 106495

*Counsel for Plaintiff*



# EXHIBIT A

# ED NAPLETON DEALERSHIP GROUP

## POLICY AGAINST HARASSMENT

The Ed Napleton Automotive Group does not and will not tolerate harassment of our employees. The term "harassment" includes, but is not limited to slurs, jokes and other verbal, graphic or physical conduct relating to an individual's race, color, sex, religion, national origin, citizenship, age, handicap or sexual orientation. "Harassment" also includes sexual advances, requests for sexual favors, unwelcome or offensive touching and other verbal, graphic or physical conduct of a sexual nature.

VIOLATION OF THIS POLICY WILL SUBJECT AN EMPLOYEE TO DISCIPLINARY ACTION UP TO AND INCLUDING IMMEDIATE DISCHARGE.

If you feel that you are being harassed in any way by another employee or by a customer or vendor, you should make your feelings known to your supervisor immediately. The matter will be thoroughly investigated, and where appropriate, disciplinary action will be taken. If you do not feel that you can discuss the matter with your supervisor or if you are not satisfied with the way your complaint has been handled please contact Corporate Human Resources. You will not be penalized in any way for reporting such conduct concerning yourself or another person.

Do not assume that the company is aware of your problem. It is your responsibility to bring your complaints and concerns to our attention so that we can help resolve them.

_____
Employee Signature

_____
Date

# EXHIBIT B

NOT A CERTIFIED COPY

5:31

**New iMessage**          Cancel

To: Eddie Napleton Jr

Wed, Aug 8, 2:05 PM

You okay?

All good how r u

I'm good. Just checking on you

Stomach upset

Ok let me know if you need anything

Thu, Aug 9, 8:45 AM

Unfortunately the time has come to go to the Vet hospital. I'm at work today until prob 2 then I need to go home get Jamie & the little one & go do it. Won't be available later today after that & may not be back until tomorrow around 10-11am or so. Other than that I'm here if you need anything at all

  iMessage 

NOT A CERTIFIED COPY

5:31

New iMessage          Cancel

To: Eddie Napleton Jr

Thu, Aug 9, 8:45 AM

Unfortunately the time has come to go to the Vet hospital. I'm at work today until prob 2 then I need to go home get Jamie & the little one & go do it. Won't be available later today after that & may not be back until tomorrow around 10-11am or so. Other than that I'm here if you need anything at all

Ok thanks

Are you bringing me back or do I need someone to follow & wait for me?

Bringing back

6 mins away

Thu, Aug 9, 12:33 PM

Anything that gets to me I'll let you know so you can decide

  iMessage 

NOT A CERTIFIED COPY



# EXHIBIT C

5:30

New iMessage          Cancel

To: Eddie Napleton Jr

> call him with quote then $5k over internet etc I don't have any other details but I'll assist if I can

Look at trades call Peter

Contact     📄  >

Mon, Aug 13, 6:34 PM

> Called Wolf, working on Peter & no show reports for all 3 edits on my desk to review

> Dept's

Wed, Aug 15, 9:54 AM

I'm going into a workout class right now be done in an hour don't say anything to anyone till we talk

> Ok

Wed, Aug 15, 1:10 PM

iMessage



# EXHIBIT D



1:06

20 People ⌄

audio    FaceTime    info

Text Message
Today 1:02 PM

Getting lots of texts I'm no longer with the company. I did not resign nor quit, this information coming from corporate is inaccurate however going forward I'll be having my attorney handle all comments from here on. I'm missing a lot of contacts so please spread the word. Thank you all for all you've done to support me over my tenure! It's been a true pleasure to be able to work side by side with each & everyone of you and all others not on this group text. We'll all be in touch soon!

Text Message

NOT A CERTIFIED COPY

# EXHIBIT E



# Edward Napleton Jr., son of Napleton Auto Group president, allegedly had sex with unconscious woman, police say

Monday, February 4, 2019

An heir to a Chicago area auto dealer group is accused of having sex with an unconscious woman in a Florida hotel room.

Edward Napleton Jr., whose family owns Napleton Auto Group, appeared in court on Monday after he was charged with sexual battery stemming from an incident in August.

Surveillance video from a West Palm Beach hotel showed a woman falling to the ground outside her room.

Hotel staff returned her to her room, but about an hour later, police said Napleton entered the room and stayed there for about six hours.

Forensic tests showed Napleton's DNA was found on the victim's body.

The Napleton Auto Group says it fully supports Ed Napleton and that he did nothing wrong. In a statement, they said: "Our company has strict policies and procedures in place to protect the safety and well-

NOT A CERTIFIED COPY

being of all employees. In this case, no policy or law was violated. We fully support Eddie as he fights to clear his name in court and trust that justice will prevail."



# Automotive News

February 06, 2019 05:59 PM

## Son of Napleton Auto Group president charged with sexual battery in Florida

DANIELLE SZATKOWSKI   ✉

dszatkowski@crain.com

According to a police report, forensics tests showed DNA of Edward Napleton Jr. on the victim's body.

Edward Napleton Jr., a manager at Napleton Automotive Group and son of company President Ed Napleton, was arrested this week in Florida and charged with sexual battery related to an incident in August, according to local media reports.

CBS12 News reported that police said Napleton Jr., 39, raped an unconscious woman at a West Palm Beach, Fla., hotel last August. Napleton Jr., of Hinsdale, Ill., was booked in jail Sunday and released on bond Monday after being charged with sexual battery on a helpless person.

According to a West Palm Beach, Fla., police department report posted on CBS12 News, a 33-year-old woman contacted authorities about an alleged assault after waking up naked in bed Aug. 8 at the Marriott hotel. She told police she was in town for a work-related function and had a couple of glasses of wine at a local restaurant the previous night before waking up at the hotel. Hotel surveillance video showed Napleton Jr. with her, the police report said.

Napleton Jr.'s lawyer, Richard Lubin, told the TV station outside of court Monday that Napleton Jr. "vehemently denies" guilt in the case. Lubin did not immediately return a message left at his office Wednesday morning.



According to the police report, the woman identified Napleton Jr. and another man in the hotel video to police. The video showed the woman being dragged by her feet into a hotel room by the two men after falling. Napleton Jr. and the other man entered the room and were there for about 30 seconds before leaving, the report said.

Video surveillance then showed the woman exit her room and fall again in the hallway, the report said. Hotel staff members said they found the

PALM BEACH COUNTY
SHERIFF'S OFFICE

Edward Napleton Jr.

woman unconscious and returned her to her room in a wheelchair.

According to the police report, the hotel staff gave one of the men a key to the woman's room around 1:20 a.m. Afterward, video footage showed both men walking to the woman's room. The report said Napleton Jr. entered the room just after 1:30 a.m. and left six hours later.

Forensics tests identified Napleton Jr.'s DNA on the woman's body, the police report said.

Napleton Automotive Group provided a statement to *Automotive News* Wednesday that read: "Our company has strict policies and procedures in place to protect the safety and well-being of all employees. In this case, no policy or law was violated. We fully support Eddie as he fights to clear his name in court and trust that justice will prevail."

Napleton Automotive didn't say whether the woman was an employee.

Napleton Automotive Group, of Oakbrook Terrace, Ill., ranks No. 26 on the *Automotive News* list of the top 150 dealership groups with 27,900 new vehicles retailed in 2017. On its website, the company says it operates more than 60 locations in seven states: Florida, Georgia, Illinois, Indiana, Missouri, Pennsylvania and Wisconsin.

Inline Play

**Source URL:** *https://www.autonews.com/dealers/son-napleton-auto-group-president-charged-sexual-battery-florida*

NOT A CERTIFIED COPY