IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 20-82102-Civ-Middlebrooks/Matthewman

HYUNDAI MOTOR AMERICA CORPORATION,

    Plaintiff,

v.

NORTH AMERICAN AUTOMOTIVE SERVICES,
INC., EFN WEST PALM MOTOR SALES, LLC,
GENE KHAYTIN, ERNIE REVUELTA, EDWARD W.
NAPLETON, GEOVANNY PELAYO, JORGE RUIZ,
and ROBB MINIER,

    Defendants.

_____/

FILED BY _____ KJZ _____ D.C.

Jul 22, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SPOLIATION SANCTIONS [DE 113]**

**THIS CAUSE** is before the Court upon Defendants' Motion for Sanctions for Spoliation of Evidence [DE 113]. Plaintiff has responded in opposition [DE 153], and Defendants have replied [DE 157]. This motion has been referred to the undersigned for resolution [DE 155].

Pursuant to a prior Court Order [DE 158], the parties filed a Joint Statement containing stipulated facts and a timeline of relevant events [DE 168] together with supporting exhibits [DE 162, DE 167]. Defendants subsequently filed a Notice of Supporting Supplemental Authority [DE 169]. In addition, the Court held a motion hearing via Zoom videoconference on July 13, 2021 [DE 171, DE 172]. No witnesses testified at the hearing and counsel advised the Court that the parties are relying solely upon the documentary evidence of record in support of their respective arguments for and against a finding of spoliation. Having carefully considered all relevant filings, argument of counsel, and being otherwise fully advised,

1

Defendants' Motion for Sanctions for Spoliation of Evidence [DE 113] is **GRANTED IN PART AND DENIED IN PART** as follows.

## I.       <u>BACKGROUND</u>

This lawsuit stems from Defendants' alleged "fraudulent scheme to deliberately damage and/or alter engines in Hyundai vehicles for the purpose of fraudulently collecting warranty funds from [Plaintiff] through the Service Manager [Defendant Robb] MINIER." [DE 144 at ¶ 77]. Trial is presently set to commence on August 30, 2021 [DE 141]. In this background section, the Court first identifies the parties, then the claims, and lastly the facts alleged in support of those claims.

First, the parties. Plaintiff Hyundai Motor America Corporation distributes Hyundai motor vehicles in the United States through a network of independent dealers [DE 144 at ¶ 14]. Plaintiff has sued Defendant EFN West Palm Motor Sales, LLC—an entity that operates an authorized Hyundai dealership located in West Palm Beach and identified by Plaintiff as "FL 121" ("Napleton #121"); Defendant North American Automotive Services, Inc.—an entity that "provides consulting services" to Napleton #121 and 47, other dealerships whose majority ownership interest is held by Defendant Edward F. Napleton or his Trusts ("Napleton"); Defendant Gene Khaytin—a former general manager at Napleton #121; Defendant Ernesto "Ernie" Revuelta—a service manager at Napleton #121; Defendant Edward W. Napleton—a "Director of Napleton" who is "responsible for oversight" of Napleton #121; Defendant Geovanny Pelayo—a service advisor at Napleton #121; Defendant Jorge Ruiz—a service technician at Napleton #121; and Defendant Robb Minier—a former service manager at another Napleton-owned Hyundai dealership who is now the fixed operations director for the collection of Napleton dealerships [*Id.* at ¶¶ 3–10, 36].

Second, the claims.  The operative Second Amended Complaint alleges five counts: (1) fraud against the individual Defendants; (2) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against all Defendants; (3) violation of RICO section 1962(d) against all Defendants; (4) tortious interference against the individual Defendants; and (5) civil conspiracy against the individual Defendants[1] [*Id.* at ¶¶ 97-152].

Third, the alleged facts as set forth in the Second Amended Complaint.  Beginning in 2015, Plaintiff recalled certain Hyundai Sonatas and Santa Fe vehicles equipped with Theta II engines to address a manufacturing issue that could lead to engine failure [*Id.* at ¶¶ 21-23]. This recall involved extending a certain warranty beyond original year/mile limits and beyond original owners [*Id.* at ¶ 27].  Under the recall, Plaintiff would reimburse dealers like Napleton #121 for repairing or replacing Theta II engines in affected vehicles [*Id.* at ¶¶ 26, 39].  Plaintiff alleges that, "as far back as 2016," Defendants began buying the Hyundai models at issue from auction houses and submitting fraudulent warranty claims for reimbursement [*Id.* at ¶¶ 53-56]. Plaintiff claims that the scheme involved multiple managers, service advisors, and service technicians at Napleton #121 [*Id.* at ¶¶ 40-48].

Under the scheme, Defendants would misrepresent the condition, actual value and/or purchaser of recall-eligible vehicles, submit claims for vehicles with excessive damage, and present "vehicles with supposed failed engines when the prior owners never had any issue with the operation or function of the engine"—all in a concerted effort to defraud Plaintiff [*Id.* at ¶ 59].  Defendants would also flag recall-eligible vehicles and "intentionally 'blow' the engines by draining the oil and running the engine until it failed" [*Id.* at ¶¶ 49-56].  Plaintiff identifies

---

[1] The Second Amended Complaint mistakenly labels the tortious interference and civil conspiracy claims as "Count V" and "Count VI."  However, as there are only five alleged counts in total, these final two counts should be labeled Count IV and Count V, respectively.

two vehicles involved in the scheme, both of which had low mileage and were in excellent condition when purchased by Napleton #121; the first was submitted for an engine replacement two days after it was purchased and with no additional miles since the purchase date, and the second was submitted thirteen days after it was purchased and with two additional miles since the purchase date. Both were submitted on the basis that the vehicle had a seized engine and "shut off during a test drive" [*Id.* at ¶¶ 57-58].

In mid to late 2017, after learning about the scheme, Napleton took affirmative steps to conceal the scheme and several Defendants "continued to work together to defraud [Plaintiff]" including by "destroying as many as 22 engines in a month" by January of 2019 [*Id.* at ¶¶ 62-74].

In 2017, Mark Eddleman, the general manager of another Napleton dealership identified as "FL 123" (which was also overseen by Defendant Edward Napleton, Jr.) first learned of the scheme, which continued for years later according to Plaintiff [*Id.* at ¶¶ 75-89]. On April 23, 2020, Mark Eddleman filed a complaint against his Napleton #123 dealership for whistleblower retaliation, tortious interference, and negligent retention arising out of his termination [*Id.* at ¶ 90]. The filing of Eddleman's complaint was when Plaintiff first "became aware of the fraudulent engine warranty scheme" [*Id.* at ¶ 95]. From there, this lawsuit followed.

## II.  PARTY CONTENTIONS AND STIPULATED FACTS

### A.  *Defendants' Motion for Spoliation Sanctions*

All Defendants now jointly move for spoliation sanctions against Plaintiff, arguing that Plaintiff unjustifiably failed to preserve hundreds of Theta II engines that are the subject of Plaintiff's claims.  According to Defendants, of the hundreds of engines they returned to

Plaintiff over the years since the start of the recall, only eight engines were preserved for analysis.  Of those eight engines, Plaintiff's own expert James W. Smith concluded that six failed due to a valid recall condition whereas two "may have" failed due to intentional damage.

Defendants assert that all three spoliation prongs are present, *i.e.* Plaintiff possessed the missing engines, Plaintiff had a duty to preserve the engines, and the engines would have been crucial evidence proving or disproving that the engines were intentionally damaged. Defendants argue that Plaintiff's failure to preserve the engines has prejudiced Defendants by denying them access to critical physical evidence that would refute Plaintiff's claims. Moreover, Defendants assert circumstantial evidence of bad faith exists here where Plaintiff took inadequate steps to preserve the engines even though Plaintiff knew or should have known that it was under a duty to preserve this critical physical evidence.  Defendants thus seek spoliation sanctions consisting of "(1) an adverse inference that the missing engines would have shown no evidence of intentional damage, and (2) a jury instruction that there is no physical evidence that Defendants intentionally damaged a single engine." [DE 113 at 15].

### B.    *Plaintiff's Response in Opposition*

Plaintiff counters that Defendants have not established spoliation, much less bad faith spoliation resulting in prejudice.  First, Plaintiff asserts that prejudice is absent because, even if the parties and their experts inspected every single returned Theta II engine, the experts agree that the physical evidence on these engines is not dispositive on the issue of whether they were intentionally blown.  Plaintiff asserts also that the available expert engine analysis "is only part of the evidence in this case; the majority of the evidence of Defendants' fraud scheme comes from testimony and statements of persons with knowledge" about the scheme [DE 153 at 6].

Second, Plaintiff argues that Defendants have no direct or circumstantial evidence of bad faith by Plaintiff.  Plaintiff explains that it does not normally retain returned engines in the ordinary course of business.  Rather, returned engines are sent to an independent affiliate located in Mexico that Plaintiff does not control, which remanufactures those engines for use as replacements in other vehicles that have experienced legitimate Theta II engine failures. Plaintiff claims that without showing any affirmative act by Plaintiff to lose or destroy the engines at issue, Defendants fail "to demonstrate [Plaintiff] acted in bad faith, plain and simple." [*Id.* at 9].  On the contrary, Plaintiff continues, "the uncontroverted record evidence demonstrates that the non-preservation was far from the type of 'bad faith' behavior that warrants sanctions, but rather as a result of mistakes or miscommunication." [*Id.*].

### C.   *Defendants' Reply*

In reply, Defendants maintain that Plaintiff's failure to preserve hundreds of returned Theta II engines, which constitute critical physical evidence in this case, has placed Defendants in the "impossible situation" of "being forced to somehow prove [Defendants] didn't do something when [Plaintiff] has lost or destroyed any potentially exculpatory evidence." [DE 157 at 8].  Defendants contend that, contrary to Plaintiff's arguments, the evidence shows that Plaintiff maintained sole control over the returned engines and thus had the full ability to preserve them as evidence.  Defendants point to Plaintiff's central reliance on expert and Rule (30)(b)(6) testimony concerning visual inspections of the available eight engines as proof of the critical importance of the hundreds of missing engines.  Defendants rely principally on the Eleventh Circuit case of *Flury v. Daimler Chryslter Corp.*, 427 F.3d 939 (11th Cir. 2005) as being "[d]irectly on point" and argue that, like *Flury*, Plaintiff's spoliation has deprived Defendants of the ability to defend against Plaintiff's claims as "it is hard to fathom what

6

evidence could possibly be more crucial to this case than the engines themselves." [DE 157 at 11].

### D.    _Stipulated Facts and Timeline of Relevant Events_

The parties agree on the following stipulated facts and relevant timeline.  Both Plaintiff and Hyundai Translead, Inc. ("Translead") are wholly owned subsidiaries of parent corporation Hyundai Motor Company ("HMC") [DE 168 ¶¶ 1-2].  Translead operates three manufacturing facilities in Tijuana, Mexico [DE 157-2].  A significant portion of the failed engines returned to Plaintiff are shipped to Translead to be used for parts in remanufacturing [DE 113-9 at 26]. Napleton #121 returned 917 failed Theta II engines to Plaintiff from September 2015 to April 2021 [DE 113-2].  Of these 917 engines, 281 were returned by Napleton #121 after Mr. Eddleman's lawsuit was filed [DE 113-2].

Plaintiff contracts with Hyundai Mobis America, a wholly owned subsidiary of Korean entity Hyundai Mobis Co., Ltd., for its parts logistics operations, which includes transporting engines from dealerships [DE 167-1 ¶¶ 9, 10-11]. Hyundai Mobis America contracts with YRC Freight to pick up and transport Theta II engines that have been removed by dealerships [_Id._ at ¶ 11].  YRC Freight transports these engines to one of its warehouses and, from there, the engines are transported to a Translead remanufacturing plant in Mexico [_Id._].  According to bills of lading on YRC Freight letterhead, engines were shipped from Napleton #121 to a "Hyundai Reman Parts" facility in Carrolton, Texas [DE 162-1].  The bills of lading list Plaintiff as the invoicee with an address in Overland Park, Kansas [_Id._].

On April 23, 2020, Mark Eddleman filed a complaint alleging that certain Defendants (specifically, Edward W. Napleton and Gene Khaytin) were involved in a scheme to intentionally "blow" Theta II engines to claim warranty money from Plaintiff for repairs [DE

144-10].  Eddleman's complaint references Defendant North American Automotive Services, Inc. ("NAG") as a participant in the alleged fraud scheme [*Id.*].  According to the Second Amended Complaint in this lawsuit, "[a]s a result of Eddleman's Complaint, for the first time, [Plaintiff] became aware of the fraudulent engine warranty scheme perpetrated by Defendants and coconspirators on [Plaintiff]" [DE 144 ¶ 95].

Twelve days after Eddleman filed his Complaint, on May 5, 2020, a reporter contacted Jose Muñoz (Plaintiff's CEO and HMC's Global COO) and described the Eddleman lawsuit as alleging "massive fraud in the multi millions against Hyundai." [DE 113-4].  On May 11, 2020, Plaintiff retained outside counsel to lead a "warranty fraud investigation against Napleton." [DE 113-10 at 308:7-18].  On May 28, 2020, Plaintiff's outside counsel retained James W. Smith of Exponent, for consulting services related to the "Hyundai-Napleton" project [DE 157-13].

On June 9, 2020, Alex (Youngshick) Kim, who held the title of Plaintiff's Executive Coordinator, Legal/Audit/US SO, requested by email that engines obtained from Napleton-owned Hyundai and Kia dealerships, including Napleton #121, and in possession of Hyundai Translead and YRC Freight be "officially preserved until notified" [DE 167-2 at 6-7].  The email had specific instructions directed at both Translead ("Engine cores collected by the dealer are prohibited from disassembling the engine for regeneration and cause investigation before further notice, and the collection is preserved") and YRC ("The dealer's collection engine is stored separately in YRC before further notice, and HT transportation is prohibited.") [*Id.*].

In June 2020, James W. Smith, who later became Plaintiff's testifying expert, traveled to the Hyundai facility in Chino, California, where he inspected eight engines that had been returned from Napleton #121 [DE 157-3 at 114:22-25, 180:8-18].  These eight engines had been shipped fully assembled from Translead's facility in Mexico to the Hyundai facility in Chino,

where they were then disassembled by either Translead or Hyundai technicians [DE 162-2 at

117:23- 118:1, 120:16-121:2]. The eight engines are identified as follows:

| VIN | MODEL YEAR | MODEL | SEND BACK DATE |
|---|---|---|---|
| 5XYZT3LB5FG272169 | 2015 | Santa Fe Sport | 11-19-2019 |
| 5NEP24AFXFH188113 | 2015 | Sonata | 11-19-2019 |
| 5XYZT3LB8DG116138 | 2013 | Santa Fe Sport | 12-9-2019 |
| 5NPEB4AC0DH600963 | 2013 | Sonata | 1-30-2020 |
| 5NPEC4AC1EH930576 | 2014 | Sonata | 12-9-2019 |
| 5NPEC4AB2EH848783 | 2014 | Sonata | 2-12-2020 |
| 5XYZU3LB6EG142445 | 2014 | Santa Fe Sport | 1-14-2020 |

[DE 113-2 and DE 113-9 at 26, Table 3].

On July 14, 2020, Jose Muñoz (Plaintiff's CEO and HMC's Global COO) asked

Plaintiff executive Rob Grafton via email to set up an "extraordinary meeting" with key

personnel and counsel to discuss the Napleton matter [DE 113-6].  Mr. Grafton told Mr. Muñoz

in that email exchange that "I have no doubt there is a HMC agenda in play and there is a race

to judgment on the Napleton decision before all the investigative facts have been secured . . .

We have 1 shot at Napleton and if not managed correctly Napleton survives with all his stores."

[*Id.*].

On July 22, 2020, the "extraordinary meeting" was held and, at the end of the meeting,

Jose Muñoz authorized the filing of this lawsuit against Defendants in his capacity as Plaintiff's

CEO [DE 157-14 at ¶ 7]. On November 17, 2020, Plaintiff commenced this action [DE 1].  On

December 15, 2020, Plaintiff served Napleton #121's registered agent with the Summons and

Complaint [DE 20].

On January 29, 2021, Defendants served their Rule 26 Initial Disclosures on Plaintiff, which identified "car engines sent to Plaintiff by Defendants as part of warranty or recall audits or for other purposes" as a category of evidence [DE 162-3 at 6 (#4)].   On January 29, 2021, Defendants served their First Request for Production of Documents on Plaintiff, specifically requesting that Plaintiff "[m]ake available for inspection all engines that you purport Defendants damaged as part of any alleged fraudulent scheme against Hyundai." [DE 162-4 at 16 (RFP #61)].

On March 11, 2021, six days after receiving Plaintiff's expert report [DE 113- 9], which, among other things, analyzed the eight preserved Theta II engines, Defendants served a Rule 34 Request for Inspection for all engines returned by Napleton #121 [DE 157-17].  On May 17, 2021, the last day of discovery, Plaintiff responded to this request, stating that "[a]ll engines in the possession of [Plaintiff], or its experts, have been made available for inspection." [DE 157-18].

Of the 917 failed engines returned by Napleton #121 to Plaintiff, only eight were preserved and made available for examination by Defendants in this lawsuit [DE 113-9 at 26; DE 113-10 at 123:8-25].  According to the sworn declaration of one of Plaintiff's many attorneys of record, Kevin J. Malloy, "[i]t was Plaintiff and its counsel's understanding at the time this lawsuit was initiated that the engines returned from the Defendant Dealership after the date of Mr. Kim's [June 9, 2020] email were being preserved, and we continued to believe that until June 15, 2021, when we learned that they had not been." [DE 167-2 at ¶ 6].

At the motion hearing held on July 13, 2021, counsel for all parties agreed to the following additional stipulated facts.  For the roughly five-month period from the date Mr. Kim sent his internal preservation email on June 9, 2020, through the commencement of this lawsuit

on November 17, 2020, a total of 144 engines were returned from Napleton #121 to Plaintiff. None of these 144 engines were preserved or ever made available to Defendants for inspection as part of this lawsuit.  The eight engines identified above that were preserved were all returned by Napleton #121 to Plaintiff prior to the date of Mr. Kim's preservation email.

### III.    LAW ON SPOLIATION OF NON-ESI EVIDENCE

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Gaff v. Baja Marine Corp.,* 310 F. App'x 298, 301 (11th Cir. 2009).  In a diversity action such as the instant case, federal law governs the evidentiary matter of spoliation sanctions.  *Tesoriero v. Carnival Corp.,* 965 F.3d 1170, 1184 (11th Cir. 2020); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944, 949 (11th Cir. 2005).  Although federal law governs, "the Court may look to state law for guidance to the extent that it is consistent with federal law."  *Penick v. Harbor Freight Tools USA, Inc.,* 481 F. Supp. 3d 1286, 1291 (S.D. Fla. Aug. 19, 2020) (Bloom, D.J.) (quoting *Wilson v. Wal-Mart Stores, Inc.*, 2008 WL 4642596, at *2 (M.D. Fla. Oct. 17, 2008)).

A district court has "broad discretion" to impose spoliation sanctions, which derives "from the court's inherent power to manage its own affairs" and "achieve the orderly and expeditious disposition of cases."  *Flury*, 427 F.3d at 944.  In this Circuit, spoliation sanctions may include: "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation which raises a resumption against the spoliator."  *Id.* at 945. "[S]anctions for discovery abuses are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process."  *Id.* at 944.

As the instant matter involves the alleged spoliation of physical evidence as opposed to electronically stored information ("ESI"), the Court is guided by the fundamental principles of

spoliation sanctions jurisprudence in non-ESI cases.[2]   The primary Eleventh Circuit cases dealing with spoliation of physical evidence are *Bashir v. Amtrak*, 119 F.3d 929 (11th Cir. 1997) (per curiam); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005); *Graff v. Baja Marine Corp.*, 310 Fed. Appx. 298 (11th Cir. 2009); *Mann v. Taser Int'l, Inc*., 588 F.3d 1291 (11th Cir. 2009); and *Tesoriero v. Carnival Corp.*, 965 F.3d 1170 (11th Cir. 2020).

As a starting point, the moving party, Defendants here, carry the burden of proof. *Penick*, 481 F.Supp.3d at 1291.   To establish spoliation, Defendants must initially prove three foundational elements:   (1) that the missing evidence existed at one time; (2) that the alleged spoliator had a duty to preserve the evidence; and (3) that the evidence was crucial to the movant being able to prove its prima facie case or defense.   *Id.* at 1291-92; *see also Sanz v. Wells Fargo Bank*, 2021 WL 2530257, at *3 (S.D. Fla. June 21, 2021) (Goodman, M.J.); *QBE Ins. Corp. v. Jorda Enter., Inc.*, 280 F.R.D. 694, 696 (S.D. Fla. 2012) (Goodman, M.J.).   Importantly, even if the above three elements are met, "[a] party's failure to preserve evidence rises to the level of sanctionable spoliation 'only where the absences of that evidence is predicated on bad faith,' such as where a party purposely loses or destroys relevant evidence." *Penick*, 481 F. Supp. 3d at 1292 (citations omitted).   Yet, exactly what constitutes bad faith in the spoliation context and how a court is supposed to determine bad faith has been the subject of much discussion and seems to have evolved over the years in the Eleventh Circuit.

---

[2] Federal Rule of Civil Procedure 37(e) expressly governs claims for failure to preserve ESI.   This rule does not apply here, where the issue is the alleged failure to preserve non-ESI evidence, *i.e.* the Theta II engines. *See, EEOC v. GMRI, Inc*., 2017 WL 5068372, at *2 (S.D. Fla. Nov. 1, 2017) (Goodman, M.J.) (applying Rule 37(e) to alleged spoliation of emails and Eleventh Circuit common law to alleged spoliation of paper documents); *Living Color Enter., Inc. v. New Era Aquaculture, Ltd*., 2016 WL 1105297, n. 2 (S.D. Fla. Mar. 22, 2016) (Matthewman, M.J.) ("Newly amended Rule 37(e) specifically relates to ESI and not to non-ESI such as tangible documents or evidence").

In *Bashir*, the Eleventh Circuit held that the unexplained absence of a train's speed record tape did not warrant an adverse inference that the train was traveling at an excessive speed when it struck and killed a pedestrian. *Bashir*, 119 F.3d at 931. The *Bashir* court held "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir*, 119 F.3d at 931.

*Bashir* was followed by *Flury*, which reversed a district court's order denying a spoliation sanction even though there was no evidence that the spoliating party acted with malice. *Flury*, 427 F.3d at 946-47. *Flury* involved a plaintiff's claims that he was injured when his vehicle's airbags did not inflate during a crash. *Id.* at 940. The plaintiff there ignored a letter sent by the defendant manufacturer requesting the location of the vehicle for inspection "and allowed the vehicle to be sold for salvage without notification to defendant of its planned removal." *Id.* at 941-42, 945. The *Flury* court found bad faith evident and spoliation sanctions warranted. *Id.* at 941-47. In determining the appropriateness of a spoliation sanction, *Flury* held that a court must consider: (1) if the defendant was prejudiced as a result of the destruction of the evidence; (2) if the prejudice could be cured; (3) the practical importance of the evidence; (4) if the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded. *Id.* at 945. The *Flury* court stated that "a jury instruction on spoliation of evidence which raises a presumption against the spoliator" is a potential sanction that can be imposed after considering these factors. *Id.*

*Flury* was followed by *Graff*, which stated that to determine whether spoliation sanctions are warranted, "a court **must** consider the factors identified in *Flury*." *Graff,* 310 Fed. Appx. at 301 (emphasis added). In *Graff*, the Eleventh Circuit affirmed the exclusion of tensile test results as a spoliation sanction where plaintiffs destructively tested a portion of

critical evidence without notifying the defendant manufacturers, finding that "[e]ven if the plaintiffs did not act with malice when they spoliated evidence, the plaintiffs were the more culpable party and caused the manufacturers substantial prejudice." *Id.* at 302 (citing *Flury*, 427 F.3d at 946).

Approximately ten months after *Graff*, the Eleventh Circuit in *Mann*, cited both *Bashir* and *Flury* and stated, "[w]hile this Court does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference." *Mann*, 588 F.3d at 1310.  Therefore, *Mann* affirmed a district court's decision to not draw an adverse inference against defendants where plaintiffs presented five instances of alleged spoliation but "present[ed] no evidence that any party acted in bad faith regarding any of the instances." *Id.*

As thereafter observed by the Honorable Kenneth A. Marra, "[d]istrict courts in this circuit have struggled with how to follow *Bashir* and *Flury* simultaneously, which are both binding." *Austrum v. Fed. Cleaning Contractors, Inc.*, 149 F.Supp.3d 1343, 1349-1350 (S.D. Fla. Jan. 8, 2016) (Marra, D.J.). As noted in *Austrum*, it appears that the "imprecise use" of the phrase "bad faith" is "largely responsible for the confusion among district courts in this circuit, even after *Mann*. 'Bad faith' is an often inconsistently used phrase that has different meanings in different legal contexts." *Id*. at 1350 (citations omitted).  In deciding to impose spoliation sanctions in *Austrum,* Judge Marra concluded that in the spoliation context, "*Flury* clarifies 'bad faith' is defined by culpability and resulting prejudice. While malice is, of course, relevant to the degree of a spoliating party's culpability, malice is not required for a finding of bad faith in this context." *Id*. at 1350-51(citation omitted).  Judge Marra went on to state:

> Following *Mann*, the Court also reads *Bashir* and *Flury* harmoniously. A court imposing sanctions for spoliation must consider all the factors identified in

*Flury.* The *Flury* court stated that all factors **must** be considered, but it did not address whether any factor was required to be found against the spoliating party for a court to impose an adverse inference. Consistent with *Bashir*, however, the 'bad faith' factor must be present to impose an adverse inference. But consistent with *Flury*, bad faith in this context does not require malice and is defined by weighing 'the degree of the spoliator's culpability against the prejudice to the opposing party'. *Flury,* 427 F.3d at 946. Furthermore, the spoliator's degree of culpability must be more than mere negligence. *Mann*, 588 F.3d at 1310.

*Austrum*, 149 F.Supp.3d at 1351.

More recently, in *Penick*, the Honorable Beth Bloom followed *Austrum* in deciding that an adverse jury instruction was appropriate in a products liability case where a plaintiff disposed of the gas generator which allegedly exploded and caused his injuries. *Penick,* 481 F. Supp. 3d at 1295-96. In *Penick,* while not finding that plaintiff specifically intended to harm the defendant or impede the lawsuit by disposing of the generator, Judge Bloom found that circumstantial evidence of bad faith was present and merited an adverse jury instruction. *Id.* In so finding, Judge Bloom noted that where direct evidence of bad faith is unavailable, in this Circuit, the moving party may establish bad faith through circumstantial evidence where all the following factors are present: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue; (2) the spoliating party took an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator. *Id.* at 1292 (citing *Calixto v. Watson Bowman Acme Corp.*, 2009 WL 3823390, at *16 (S.D. Fla. Nov. 16, 2009) (Rosenbaum, M.J.) ("in this Circuit, bad faith may be found on circumstantial evidence where all of the [aforementioned] hallmarks are present")).

Over eleven years after its decision in *Mann*, the Eleventh Circuit decided *Tesoriero*, which involved a cruise line passenger plaintiff's claim that Carnival spoliated evidence by

disposing of her broken cabin chair. *Tesoriero*, 965 F.3d at 1183-87.  There, plaintiff sought an adverse inference instruction that Carnival had notice of the chair's defect, which inference would have defeated Carnival's motion for summary judgment. *Id*. at 1183.  In affirming the district court's denial of spoliation sanctions, the *Tesoriero* majority stated that nothing in the record indicated that Carnival disposed of the chair in a manner inconsistent with its policies, and further stated that unlike the plaintiff in *Flury*, Carnival was not "fully aware" of plaintiff's desire to further inspect the chair.  The *Tesoriero* majority cited *Flury* with approval, stating that in *Flury* "bad faith was evident, and spoliation sanctions were appropriate."  *Id.* at 1185.

In discussing the line between negligence and bad faith, the *Tesoriero* court stated that it "would have little trouble affirming sanctions against Carnival if the factual circumstances were slightly different."  *Id.* at 1186.  For instance, "if Tesoriero's arm had been visibly fractured, it would be hard for Carnival to convince us that the decision not to report the injury to security was reasonable, or in keeping with its ordinary policy."  *Id.*  "Similarly, if there were any evidence that Tesoriero requested that the chair be preserved, we would be highly skeptical of a subsequent claim that the chair was disposed of pursuant to a routine policy."  *Id.* According to the *Tesoriero* court, in both of these alternative scenarios, "the inference that the chair was destroyed to hide adverse evidence would be much stronger than it is here."  *Id.* Perhaps indicative of the difficulty courts face when deciding between mere negligence and bad faith in the spoliation context, a strong dissent was lodged.  *Id.* at 1187-97. (Rosenbaum, C.J., dissenting).

With the above case law in mind, the Court now turns to Defendants' spoliation motion.

IV.    **ANALYSIS**

      *A.*    ***The Three Foundational Elements for Spoliation are Indisputably Met***

      As Judge Bloom noted in *Penick*, a party moving for spoliation sanctions must first demonstrate three "foundational elements" to establish spoliation. *Penick*, 481 F. Supp. 3d at 1293. In this regard, at the hearing, Plaintiff conceded that Defendants have established the three foundational elements for spoliation. Upon review of the undisputed evidence, the Court agrees.

      First, the Theta II engines at issue clearly existed at one time. The undisputed evidence shows that Napleton #121 returned 917 Theta II engines to Plaintiff from September 2015, the year the recall began, to April 2021. Of these 917 engines, 281 engines were returned to Plaintiff after Mr. Eddleman filed his whistleblower lawsuit in April 2020, which is when Plaintiff contends it first learned of the alleged warranty fraud scheme. From the date Mr. Kim, in his capacity as "Executive Coordinator, Legal/Audit/US" and in-house counsel for Plaintiff, sent the internal preservation email on June 9, 2020, through the commencement of this lawsuit on November 17, 2020, Napleton #121 returned a total of 144 engines to Plaintiff. Thus, the 144 engines existed, and all parties agree that none of these 144 engines were preserved as required after Plaintiff's duty to preserve arose on June 9, 2020. The eight preserved engines were returned to Plaintiff before its duty to preserve arose as the engines have return dates from four to seven months prior to the date of Mr. Kim's preservation email.[3]

      Second, Plaintiff knew it had a duty to preserve the engines at least as of June 9, 2020, the date Mr. Kim sent his preservation email. Upon learning of the fraud scheme alleged in the

---

[3] According to the stipulated facts, of the eight preserved engines, three were returned on November 19, 2019, whereas one was returned on February 12, 2020. The remaining four engines were returned on dates in between these two dates [DE 168 at 4].

Eddleman lawsuit, Plaintiff immediately retained experienced counsel and experts to investigate.  At this point, Plaintiff was on notice of claims of alleged warranty fraud caused by intentional damage being done to Theta II engines by individuals working at Hyundai dealerships located in South Florida, including Napleton #121.  After further investigation, on June 9, 2020, Plaintiff's Legal Coordinator and in-house counsel Mr. Kim sent an internal preservation email with instructions that the engines obtained from all Napleton-owned Hyundai and Kia dealerships, including Napleton #121, in the possession of Translead and YRC Freight be "officially preserved" until further notice [DE 167-2 at 6, 7].  At the hearing, Plaintiff's counsel admitted that Plaintiff had an obligation to preserve the 144 engines and failed to do so.

Third, the 144 engines returned from Defendants after Mr. Kim's email constitute critical evidence in this litigation. At the hearing, Plaintiff's counsel admitted that the 144 engines were evidence but argued they were "not crucial evidence." The Court agrees that the 144 engines were evidence as acknowledged by Plaintiff, but also further finds, as argued by Defendants, that they were, in fact, "crucial evidence."  Without question, by the date of Mr. Kim's preservation email on June 9, 2020, it was patently obvious that the returned Theta II engines would play a central role as evidence in any ensuing lawsuit.  Plaintiff alleges a vast conspiracy among multiple individual and corporate Defendants to defraud Plaintiff by intentionally damaging or "blowing" Theta II engines to fraudulently collect warranty funds. The 144 returned Theta II engines are essential and crucial physical evidence that did not get preserved despite Plaintiff's clear duty to preserve those engines on and after June 9, 2020.

Thus, as Defendants have established the three foundational elements for spoliation, the Court will now address the issue of bad faith.

**B.**      **_Bad Faith_**

To warrant spoliation sanctions, Defendants must establish bad faith destruction or loss of the non-preserved engines by either direct or circumstantial evidence.  Because the record contains no direct evidence of bad faith, the Court focuses its analysis on whether circumstantial evidence supports a finding of bad faith spoliation.

As discussed in Section III above, courts in this district interpret "bad faith" in the spoliation context to not require a showing of malice or ill-will, but rather conduct evidencing more than mere negligence.  *See, e.g.*, *Austrum*,  149 F. Supp. 3d at 1350–51 (Marra, D.J.) (in the spoliation context, "bad faith . . . does not require malice and is defined by weighing 'the degree of the spoliator's culpability against the prejudice to the opposing party.'  Furthermore, the spoliator's degree of culpability must be more than mere negligence"); *Penick*, 481 F. Supp. 3d at 1294 (Bloom, D.J.) (finding each circumstantial evidence factor established as the generator at issue once existed and was material to the proof or defense of a claim at issue in this case; plaintiff engaged in an affirmative act causing the generator to be lost while he knew or should have known of his duty to preserve the evidence; plaintiff's scrapping of the generator cannot be credibly explained as not involving bad faith as that term is construed in the spoliation context; and plaintiff fails to offer an excuse that places fault on anyone else or otherwise sets forth a valid reason to destroy the generator); *Bos. Boat III*, 310 F.R.D. at 514 ("Because the Eleventh Circuit's decision in *Green Leaf Nursery [v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292 (11th Cir. 2003)] did not include 'intentional' in its definition of the destruction of evidence requirement for spoliation, the Undersigned will not include that requirement in the analysis."); *Schultze v. 2K Clevelander, LLC*, 2018 WL 4859071, at *6 (S.D. Fla. Oct. 4, 2018) (Louis, M.J.) (bad faith spoliation existed even though defendant's destruction of documents

was "systematic and regular"); *Long v. Celebrity Cruises, Inc.*, 2013 WL 12092088, at *7 (S.D. Fla. July 31, 2013) (Torres, M.J.) (partially granting motion for sanctions based on spoliation of evidence, and explaining that "'bad faith' is not limited to acts of malice or willful intent. In the Eleventh Circuit, in a variety of contexts bad faith is deemed to exist in either a case of intentional misconduct or reckless disregard of the consequences"); *Graff*, 310 F. App'x at 302 (approving spoliation sanctions because "[e]ven if the plaintiffs did not act with malice when they spoliated evidence, the plaintiffs were the more culpable party and caused the manufacturers substantial prejudice").

In this Circuit, the moving party may establish bad faith through circumstantial evidence where the following four hallmarks are present:  (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue; (2) the spoliating party took an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.  *Penick,* 481 F. Supp. 3d at 1292 (citing *Calixto*, 2009 WL 3823390, at *16 ("in this Circuit, bad faith may be found on circumstantial evidence where all of the [aforementioned] hallmarks are present")).

Here, upon careful consideration, the Court finds that Plaintiff acted in bad faith as that term is used in the spoliation context.  Several circumstantial evidence factors support this finding, including the four hallmarks set out in *Penick* and *Calixto*.  First, the 144 engines that were returned after Mr. Kim's internal preservation email are material to the defense. While Plaintiff may be correct that these engines are not the only evidence in this case, the engines are undoubtedly critical physical evidence that could have had an important impact on resolving

matters in dispute.   Indeed, this entire case centers on core allegations that Defendants intentionally damaged hundreds of Theta II engines to fraudulently collect warranty funds from Plaintiff.   The engines themselves are at the heart of these allegations and constitute critical evidence which Defendants sought to examine and inspect but were prevented from doing so by Plaintiff's disposal of the engines when it had a clear duty to preserve them.

Available evidence offers insight into how and why the engines are material.   At his deposition on April 22, 2021, Plaintiff's designated expert, James W. Smith, stated that "of the eight [preserved engines that predated Mr. Kim's preservation email], two of them had evidence consistent with an engine that had been drained of oil and run to failure." [DE 162-2 at 3]. When asked if he would have liked to look at more engines, Mr. Smith did not indicate a preference in that regard but said that he "would have looked at more engines if they were available." [*Id.*]  In describing his in-person inspection of the eight available engines, Mr. Smith explained: "There were engines that looked like they did not fail as a result of the recall issue. There were engines that looked like they did fail as a result of the recall issue. There were engines that looked like they failed because oil was drained and the engines were run." [*Id.*].

In the final summary of his written expert report, dated March 5, 2021, Mr. Smith reports findings made "to a degree of reasonable engineering certainty" following his in-depth testing of the eight available engines, including that "[a]n intentional engine failure could be conducted without leaving a noticeable external trace that it had occurred" and "[a]n intentional engine failure performed in the manner described by Eddleman will leave evidence on the internal components of the engine that are distinct from the signs produced in a typical recall failure. **The evidence can be identified by careful internal component inspection."** [DE 157-4 at 36-37 (emphasis added)].   Without access to the 144 engines returned after Mr. Kim's

preservation email for further inspection and testing, Defendants are at an unfair disadvantage in defending against Plaintiff's claims of intentional damage.

Second and third, Plaintiff allowed the engines to go missing by not taking reasonable steps to ensure compliance with the detailed instructions in Mr. Kim's preservation email at a time when Plaintiff was under a clear duty to preserve the engines. At the hearing, Plaintiff's counsel admitted that there is no known history to Mr. Kim's email or any other evidence to explain how or why the 144 engines went missing. Plaintiff's counsel didn't "think anybody ever checked to see that [the engines] were being physically retained." [DE 172 at 39]. Plaintiff's counsel explained this as the "left hand" not knowing "what the right hand was doing." [*Id.* at 35]. However, the Court sees it more as Plaintiff throwing up its hands and not properly following its procedure, as instructed by in-house counsel Mr. Kim, to preserve and maintain the engines. The inexplicable failure by a large sophisticated corporation like Plaintiff to ensure compliance with Mr. Kim's preservation email was not merely negligent. It is far worse. Although the record does not reflect that Plaintiff specifically intended to harm Defendants or act with malice by allowing the engines to go missing, Defendants have demonstrated that the loss of the engines was solely caused by Plaintiff's inexplicable failure to ensure compliance with a preservation email reflecting its own internal policies. As the party with sole control over the engines, Plaintiff is the culpable party in this scenario and by "shirk[ing] its legal duty to preserve" the engines, Plaintiff has caused substantial prejudice to Defendants. *See Austrum*, 149 F. Supp. 3d at 1352. Plaintiff alone possessed the 144 returned engines and affirmatively failed to ensure compliance with Mr. Kim's preservation email, which caused the 144 engines to be forever lost.

Fourth, Plaintiff's loss of the engines cannot be credibly explained as not involving bad faith as that term is construed in the spoliation context. Indeed, Plaintiff fails to offer an excuse that places culpability on anyone other than Plaintiff or otherwise sets forth any explanation, let alone a valid one, for the loss of the engines. *Id.* at 1351-52 ("[T]he Court finds that Federal acted in bad faith as that term is defined in *Flury* . . . While the Court does not find that Federal acted deliberately to hinder Austrum's case, Federal had sole control over the application and shirked its legal duty to preserve it. Under the facts of this case, Federal is sufficiently culpable, and the prejudice to Austrum is sufficiently high, to warrant a finding of bad faith as defined in *Flury*"). In this case, Plaintiff and its parent, HMC, had possession, custody or control of the Theta II engines from the time they were picked up at Napleton #121 through and including when they were disposed of and lost.

Fifth, as to the eight preserved engines which were returned by Napleton #121 before June 9, 2020, an inspection initially determined that six of them showed no signs of being intentionally "blown" or damaged. And, in subsequent discovery, it turns out that the remaining two engines broke down on the road while being driven by their owners and were shown to have not been intentionally damaged [DE 131 at 13-16] (pending *Daubert* motion in which Defendants cite to attached deposition transcripts, repair orders, and video footage showing that the owners of the vehicles with the two remaining engines at issue separately experienced engine failure on the road while they were driving, and had their vehicles towed into the dealership for repairs). Thus, available evidence shows that the eight preserved engines do not support Plaintiff's allegations that Defendants intentionally damaged the engines. These facts may have provided some motivation for Plaintiff to not carefully and prudently follow Mr. Kim's preservation email policy and could explain why Plaintiff did not have anybody check

to see that the engines were being preserved.  The fact that the eight engines which Plaintiff preserved before its duty to preserve arose reflected no evidence of intentional damage by Defendants raises an inference that the 144 engines which Plaintiff failed to preserve after its duty to preserve arose were not preserved by Plaintiff to avoid having to face such negative evidence at trial.  That is, the circumstances infer an awareness by Plaintiff that the non-preserved 144 engines would likely not help its case, leading Plaintiff to perhaps be deliberately ignorant of whether the engines were, in fact, being preserved as required.

Sixth, the July 14, 2020 email from Mr. Robert Grafton, Plaintiff's Executive Director, to Mr. Jose Muñoz, Plaintiff's CEO and HMC's COO, is relevant to the bad faith issue as it arguably evinces a zeal by Plaintiff to destroy the Napleton entities. The Grafton email stated that there was an "agenda" and a "race to judgment" by Plaintiff's parent company, HMC, against "Napleton." [DE 113-6 at 3].  The Grafton email arguably evinces a goal of putting Napleton out of business, asserting that: "We have 1 shot at Napleton and if not managed correctly Napleton survives with all his stores." [*Id.*]. When the Grafton email is considered as circumstantial evidence in conjunction with Plaintiff's disposal of the 144 engines which are critical to the parties' litigation, it raises a further inference that Plaintiff had an improper motive in failing to insure that the Theta II engines were properly preserved.

Seventh, Legal Coordinator and in-house counsel Mr. Kim's June 9, 2020 email established a policy to preserve all the Theta II engines from that date forward.  Yet, that policy was not followed by Plaintiff and Plaintiff has failed to advance any cogent reason whatsoever as to how and why it failed to follow that policy. Failure to follow Mr. Kim's directions and policy caused the loss and disposal of the Theta II engines.

Eighth, during the discovery phase of this lawsuit, Defendants very promptly and repeatedly asked for production of the engines at issue and for their examination. However, it was not until the very last day of discovery, May 17, 2021, when Plaintiff's counsel belatedly responded to Defendants' discovery requests and stated that "all engines in the possession of [Plaintiff], or its experts, have been made available for inspection." [DE 157-18]. It has since been discovered that none of the 144 engines that Defendants returned to Plaintiff after Mr. Kim's preservation email from one year earlier, on June 9, 2020, were preserved. While the Court does not find that Plaintiff's counsel purposely misled Defendants with this response, and while the Court notes that Plaintiff's counsel has filed an affidavit stating that Plaintiff's counsel did not know the engines had been disposed of by their client until June 15, 2021 [DE 167-2 ¶ 6], the Court is nonetheless troubled by the fact that Defendants were led to believe all engines had been preserved up until the very last day of discovery, only to find out that only eight engines were available for inspection. Without ascribing any misconduct to Plaintiff's counsel, this factor is one that militates in favor of a finding of bad faith on the part of Plaintiff as it seems highly unusual that the loss of all 144 engines returned after Mr. Kim's preservation email would only be discovered by Plaintiff after the close of discovery. Moreover, the fact that Defendants were only advised after the close of discovery, and on the eve of an August 2021 trial, that 144 engines that were supposed to be preserved were inexplicably lost seems to increase the prejudice to Defendants.

Ninth, it is important to understand that this is not an unsophisticated "Mom and Pop" company that was unrepresented by counsel when the duty to preserve arose. Here, Plaintiff is an extremely large, sophisticated corporation represented by in-house and outside counsel when its duty to preserve the engines arose. Clearly, in-house and outside counsel have important

roles to play in ensuring a corporation's compliance with its preservation duties.  *EPAC Techs v. HarperCollins Publ'g*, 2018 WL 1542949, at *22 (M.D. Tenn. March 29, 2018) ("counsel must take an active and primary role in implementing a litigation hold").  In-house and outside counsel not only owe a duty to advise their clients to preserve relevant evidence, they also owe an independent duty to monitor and supervise or participate in a corporation's effort to comply with its duty to preserve evidence.  *See, e.g., Browder v. City of Albuquerque*, 187 F. Supp. 3d. 1288, 1295 (D.N.M. 2016) ("Counsel must go beyond mere notification and 'take affirmative steps to monitor compliance,'. . . to continually ensure that the party is preserving relevant evidence."); *Phoenix Four, Inc. v. Strategic Res. Corp.*, 2006 WL 1409413, at *5 (S.D.N.Y. May 23, 2006) ("Counsel has the duty to properly communicate with its client" to ensure adequate preservation, which "would involve communicating with information technology personnel and the key players in the litigation to understand how electronic information is stored."); *Zubulake v. UBS Warburg*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("A party's discovery obligations do not end with the implementation of a 'litigation hold'—to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents."); *Wynmoor Cmty. Council, Inc. v. QBE Ins. Corp.,* 2012 WL 12837287, at *16, 18 (S.D. Fla. Nov. 2, 2012) (Snow, M.J.) (recommending adverse inference jury instruction as spoliation sanction based in part on finding that spoliating party affirmatively caused 130 boxes of materials with relevant evidence destroyed while under a duty to preserve and finding that, even though the individuals responsible for the destruction were apparently not informed by their counsel of a litigation hold, "counsel were under a continuing obligation to impress upon their client the importance

of suspending any document destruction policy and retaining all arguably relevant information").

Tenth, Plaintiff's response to the Defendants' spoliation motion was inaccurate in certain respects. The response stated that Translead was an independent affiliate in Mexico that Plaintiff "does not control" [DE 153 at 4]. However, the later-produced email from Mr. Kim squarely refuted this assertion. And, it was established that both Plaintiff and Translead are wholly owned subsidiaries of HMC. Further, the response asserted that Plaintiff had no duty to preserve the engines until litigation was "imminent" [*Id.* at 3], which is not the correct standard in this circuit. *Barton & Assocs. v. Liska*, 2020 WL 8299750 at *1 (S.D. Fla. May 11, 2020) (Matthewman, M.J.) (citing *Graff*, 310 F. App'x 298, 301 (11th Cir. 2009) ("In the Eleventh Circuit, a duty to preserve evidence occurs when litigation is 'pending or reasonably foreseeable.'")). Further, the later-produced email from Mr. Kim established that Plaintiff itself knew it had a duty to preserve the engines from at least June 9, 2020, despite its response stating that it had no such duty to preserve until litigation was imminent. Finally, the Court does not understand how Mr. Kim's email only belatedly surfaced the week prior to the hearing on Defendants' motion for spoliation sanctions.

Plaintiff's conduct in this case is frankly shocking to this Court. It violates principles of fundamental fairness for a large sophisticated corporation like Plaintiff to file a lawsuit alleging that one of its dealers, Napleton #121, along with other Defendants, engaged in a fraudulent scheme to purposely damage and blow Theta II engines to obtain warranty monies from Plaintiff, and then fail to preserve any of the 144 of the engines which were returned by Defendants after its duty to preserve evidence arose. Those 144 engines were crucial evidence that were lost forever due to the conduct of Plaintiff.

The Court ultimately finds that the circumstances here are analogous to *Flury* and present additional facts in support of spoliation sanctions as envisioned by *Tesoriero*.   Just as in *Flury*, although Plaintiff was fully aware of the need to preserve the engines at issue as evidenced by Mr. Kim's preservation email and Defendants' repeated requests to examine the engines, Plaintiff apparently ignored its duty and allowed the engines to inexplicably go missing.  The 144 engines Defendants returned to Plaintiff after Mr. Kim sent his preservation email constitute critical physical evidence going to the heart of this case that should have been preserved.  Plaintiff's failure to preserve and ensure compliance with Mr. Kim's preservation email amounts to a "clear dereliction of duty."  *See Flury*, 427 F.3d at 945 (while "plaintiff was fully aware that defendant wished to examine the vehicle," he "ignored defendant's request and allowed the vehicle to be sold for salvage without notification to defendant of its planned removal. Even absent defendant's unambiguous request for its location, plaintiff should have known that the vehicle, which was the very subject of his lawsuit, needed to be preserved and examined as evidence central to his case. Plaintiff's failure to preserve the vehicle resulted in extreme prejudice to the defendant, and failure to respond to defendant's letter displayed a clear dereliction of duty").  Here, the circumstantial evidence factors described above lead to a strong inference that the engines were "destroyed to hide adverse evidence." *See Tesoriero*, 965 F.3d at 1186.  Plaintiff's conduct cannot go unsanctioned.

**C.**      **<u>Appropriate Sanctions</u>**

In determining an appropriate spoliation sanction, this Court has carefully considered the *Flury* factors.  *Flury*, 427 F.3d at 945.  The Court finds that Defendants have been severely prejudiced by the loss of the 144 engines.  Defendants have lost the ability to examine those engines and potentially have their expert testify that none of them showed any signs of being

intentionally "blown" as asserted by Plaintiff.  Unfortunately, the prejudice cannot be easily cured as the engines are forever lost.  The practical importance of the evidence is great as it is the type of evidence an expert would want to examine.  It is also the type of evidence that a jury would surely want to consider in reaching a decision.  The lost engines go to the very heart of this case of alleged engine warranty fraud.  And, as found above, the Plaintiff acted in bad faith in this case in failing to preserve the engines and in allowing the engines to be inexplicably lost while under a clear duty to preserve them.  Finally, the Court has considered the last *Flury* factor, that is, the potential for abuse if expert testimony about the evidence was not excluded; however, this Court does not find it necessary or prudent to exclude any expert testimony, as discussed further below.

The Court has broad discretion to fashion an appropriate remedy for spoliation and determining an appropriate sanction "is assessed on a case-by-case basis." *Bos. Boat III*, 310 F.R.D. at 523 (citations omitted).  Sanctions the Court may impose include, but are not limited to, default judgment, adverse inference or rebuttable presumption instructions to the jury, striking pleadings, and an award of fees and costs incurred by the injured party as a result of the spoliation.  *Id.*  "Factors to be considered when determining the seriousness of the sanctions to impose vary according to (1) the willfulness or bad faith of the party responsible for the loss or destruction of the evidence; (2) the degree of prejudice sustained by the opposing party; and (3) what is required to cure the prejudice." *Id.*

Here, Defendants seek the following sanctions: "(1) an adverse inference that the missing engines would have shown no evidence of intentional damage, and (2) a jury instruction that there is no physical evidence that Defendants intentionally damaged a single engine." [DE 113 at 15].  Notably, Defendants do not seek the severe sanction of dismissal.  Instead,

Defendants seek less punitive measures in the form of adverse inferences to cure the prejudice sustained by the loss of the engines.  Upon careful consideration, the Court finds that a fair and appropriate sanction here is an appropriately tailored adverse inference jury instruction, albeit not the precise ones requested by Defendants

An "adverse inference makes a finding or imposes a rebuttable presumption that the missing evidence would have been unfavorable to the party engaging in the misconduct." *Fed. Trade Comm'n v. First Universal Lending, LLC*, 773 F. Supp. 2d 1332, 1352 (S.D. Fla. 2011) (Rosenbaum, M.J.). "There are different types of adverse inferences: (1) a jury may be instructed that certain facts are deemed admitted and must be accepted as true; (2) the Court may impose a mandatory, albeit rebuttable, presumption; or (3) the jury must presume that the lost evidence is relevant and favorable to the innocent party, but also consider the spoliating party's rebuttal evidence, and then decide whether to draw an adverse inference." *Penick*, 481 F.Supp.3d at 1295-96; *Schultze*, 2018 WL 4859071, at *7.  The Court has carefully considered all relevant factors in determining the type of adverse inference instruction that should be given in this case to remedy the prejudice to Defendants caused by the spoliation of critical evidence. Consistent with the guidance provided by applicable case law, this Court has carefully balanced the degree of Plaintiff's culpability against the prejudice to Defendants.

Here, the Court finds that the following adverse inference jury instruction is warranted: The jury is to be instructed to presume that the lost engines were relevant and favorable to Defendants and unfavorable to Plaintiff, but that Plaintiff can attempt to rebut this presumption through its presentation of evidence, including expert testimony.  *See Penick*, 481 F.Supp.3d at 1295-96 (as spoliation sanction, jury would presume that the destroyed generator was relevant and favorable to moving party and unfavorable to spoliating party, but spoliating party could

rebut this presumption through presentation of evidence, including expert testimony); *Schultze*, 2018 WL 4859071 at *8 (determining that the sanction of a rebuttable "presumption that the lost evidence was relevant and favorable to Plaintiff, and disadvantageous to Defendant" is the "least harsh sanction to cure the prejudice"); *Austrum*, 149 F. Supp. 3d at 1351 (same). Through this carefully tailored sanction, the playing field is leveled and the prejudice to Defendants caused by the missing engines is sufficiently alleviated while Plaintiff's ability to benefit from the evidentiary problem created by its actions is lessened.

The Court does not find it appropriate to instruct the jury that there is no physical evidence that Defendants intentionally damaged a single engine. First, in light of the carefully tailored instruction allowed in the prior paragraph, Defendants can forcefully argue this point. Second, there may be other types of physical evidence admitted in this case, such as documents, and such an instruction as requested by Defendants could easily lead to jury confusion.

## V.   **CONCLUSION**

Based on the foregoing, Defendants' Motion for Sanctions for Spoliation of Evidence [DE 113] is **GRANTED IN PART AND DENIED IN PART** consistent with this Order.

**DONE AND ORDERED** in Chambers at West Palm Beach in the Southern District of Florida, this 22nd day of July, 2021.

WILLIAM MATTHEWMAN
U.S. MAGISTRATE JUDGE