UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

HYUNDAI MOTOR AMERICA CORPORATION,

       Plaintiff,

     v.

EFN WEST PALM MOTOR SALES, LLC,

       Defendant/Counterclaim
       Plaintiff/Third-Party Plaintiff

GENE KHAYTIN; ERNESTO REVUELTA;
EDWARD W. NAPLETON;  GEOVANNY PELAYO,
JORGE RUIZ,

       Defendants.


EFN WEST PALM MOTOR SALES, LLC;
for itself and in the name of the Department of Highway
Safety and Motor Vehicles of the State of Florida, for its
use and benefit,

       Counterclaim-Plaintiff/Third-Party
       Plaintiff,

     v.

HYUNDAI MOTOR AMERICA CORPORATION,

       Counterclaim-Defendant,

       AND

HYUNDAI MOTOR COMPANY and JOSÉ MUÑOZ

       Third-Party Defendants.

Case No. No. 9:20-cv-82102-DMM-DLB

**DEFENDANTS' ANSWER TO
PLAINTIFF'S SECOND AMENDED
COMPLAINT WITH
COUNTERCLAIMS AND THIRD-
PARTY COMPLAINT**

## ANSWER

Defendants file their Answer to Plaintiff Hyundai Motor America Corporation's ("HMA") Second Amended Complaint and state as follows:

## Jurisdiction, Venue, Parties

1.      Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 1 of the Second Amended Complaint, and thus deny those allegations.

2.      Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 2 of the Second Amended Complaint, and thus deny those allegations.

3.      The allegations of Paragraph 3 pertain to a Defendant dismissed from the case with prejudice by Order of the Court, August 9, 2021 (ECF #181) ("Dismissal Order"). As a result, no response is required. If a response is required, Defendants deny the allegations.

4.      Defendants admit the allegations in Paragraph 4 of the Second Amended Complaint.

5.      Defendants admit the allegations in Paragraph 5 of the Second Amended Complaint.

6.      Defendants admit the allegations in Paragraph 6 of the Second Amended Complaint.

7.      Defendants deny the allegations in Paragraph 7 of the Second Amended Complaint except admit that Edward W. Napleton is a citizen of the State of Illinois.

8.      Defendants admit the allegations in Paragraph 8 of the Second Amended Complaint.

9.      Defendants admit the allegations in Paragraph 9 of the Second Amended

2

Complaint.

10.     The allegations of Paragraph 10 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

11.     Paragraph 11 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

12.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 12 of the Second Amended Complaint, and thus deny those allegations.

13.     Defendants deny the allegations in Paragraph 13 of the Second Amended Complaint.

**Factual Background**

14.     Defendants admit the allegations in Paragraph 14 of the Second Amended Complaint.

15.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 15 of the Second Amended Complaint and thus deny those allegations.

16.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 16 of the Second Amended Complaint and thus deny those allegations.

17.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 17 of the Second Amended Complaint and thus deny those allegations.

18.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 18 of the Second Amended Complaint and thus deny those allegations.

19.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 19 of the Second Amended Complaint and thus deny those allegations.

20.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 20 of the Second Amended Complaint and thus deny those allegations.

21.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 21 of the Second Amended Complaint and thus deny those allegations.

22.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 22 of the Second Amended Complaint and thus deny those allegations.

23.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 23 of the Second Amended Complaint and thus deny those allegations.

24.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 24 of the Second Amended Complaint and thus deny those allegations.

25.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 25 of the Second Amended Complaint and thus deny those allegations.

26.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 26 of the Second Amended Complaint and thus deny those allegations.

27.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 27 of the Second Amended Complaint and thus deny those allegations.

28.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 28 of the Second Amended Complaint and thus deny those allegations.

29.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 29 of the Second Amended Complaint and thus deny those allegations.

30.     Defendants deny the allegations in paragraph 30 of the Second Amended Complaint.

31.     The allegations of Paragraph 31 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

32.     The allegations of Paragraph 32 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

33.     The allegations of Paragraph 33 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

34.     The allegations of Paragraph 34 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

35.     Defendants admit that Edward W. Napleton is the son of Edward F. Napleton, but deny the remaining allegations in Paragraph 35 of the Second Amended Complaint.

36.     The allegations of Paragraph 36 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

37.     The allegations of Paragraph 37 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

38.     The allegations of Paragraph 38 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

39.     The allegations of Paragraph 39 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

40.     Defendants deny the allegations in Paragraph 40 of the Second Amended Complaint.

41.     Defendants deny the allegations in Paragraph 41 of the Second Amended Complaint.

42.     Defendants deny the allegations in Paragraph 42 of the Second Amended Complaint.

43.     Defendants deny the allegations in Paragraph 43 of the Second Amended Complaint.

44.     Defendants deny the allegations in Paragraph 44 of the Second Amended Complaint.

45.     Defendants deny the allegations in Paragraph 45 of the Second Amended Complaint.

46.     Defendants deny the allegations in Paragraph 46 of the Second Amended Complaint.

47.     Defendants deny the allegations in Paragraph 47 of the Second Amended Complaint.

48.     Defendants deny the allegations in Paragraph 48 of the Second Amended Complaint.

49.     Defendants deny the allegations in Paragraph 49 of the Second Amended Complaint.

50.     Defendants deny the allegations in Paragraph 50 of the Second Amended Complaint.

51.     Defendants deny the allegations in Paragraph 51 of the Second Amended Complaint.

52.     Defendants deny the allegations in Paragraph 52 of the Second Amended Complaint.

53.     Defendants admit that the Dealership bought used Hyundai Sonata and Santa Fe vehicles from auction houses, including Manheim Palm Beach. Defendants deny the remaining allegations in Paragraph 53 of the Second Amended Complaint.

54.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 54 of the Second Amended Complaint and thus deny those allegations.

55.     Defendants deny the allegations in Paragraph 55 of the Second Amended Complaint.

56.     Defendants deny the allegations in Paragraph 56 of the Second Amended Complaint.

57.     Defendants deny the allegations in Paragraph 57 of the Second Amended Complaint.

58.     Defendants deny the allegations in Paragraph 58 of the Second Amended Complaint.

59.     Defendants deny the allegations in Paragraph 59 of the Second Amended Complaint.

60.     Defendants deny the allegations in Paragraph 60 of the Second Amended Complaint.

61.     Defendants deny the allegations in Paragraph 61 of the Second Amended Complaint.

62.     The allegations of Paragraph 62 pertain to a Defendant dismissed from the case

with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

63.     The allegations of Paragraph 63 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

64.     The allegations of Paragraph 64 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

65.     The allegations of Paragraph 65 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

66.     The allegations of Paragraph 66 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

67.     The allegations of Paragraph 67 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

68.     The allegations of Paragraph 68 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

69.     The allegations of Paragraph 69 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

70.     Defendants deny the allegations in Paragraph 70 of the Second Amended Complaint.

71.     Defendants deny the allegations in Paragraph 71 of the Second Amended Complaint.

72.     Defendants deny the allegations in Paragraph 72 of the Second Amended Complaint.

73.     Defendants deny the allegations in Paragraph 73 of the Second Amended Complaint.

74.     Defendants deny the allegations in Paragraph 74 of the Second Amended Complaint.

75.     The allegations of Paragraph 75 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

76.      The allegations of Paragraph 76 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

77.     Defendants deny the allegations in Paragraph 77 of the Second Amended Complaint.

78.     Defendants deny the allegations in Paragraph 78 of the Second Amended Complaint.

79.     Defendants deny the allegations in Paragraph 79 of the Second Amended Complaint.

80.     Defendants deny the allegations in Paragraph 80 of the Second Amended Complaint.

81.     Defendants deny the allegations in Paragraph 81 of the Second Amended Complaint.

82.     Defendants deny the allegations in Paragraph 82 of the Second Amended Complaint.

83.     Defendants deny the allegations in Paragraph 83 of the Second Amended Complaint.

84.     The allegations of Paragraph 84 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

85.     The allegations of Paragraph 85 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

86.     The allegations of Paragraph 86 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

87.     The allegations of Paragraph 87 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

88.     The allegations of Paragraph 88 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

89.     The allegations of Paragraph 89 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

90.     Defendants admit that Mark Eddleman filed a complaint against Edward W. Napleton and others on April 23, 2020. Defendants deny the remaining allegations in Paragraph 90.

91.     Defendants deny the allegations in Paragraph 91 of the Second Amended Complaint.

92.     Defendants deny the allegations in Paragraph 92 of the Second Amended Complaint.

93.     Defendants deny the allegations in Paragraph 93 of the Second Amended Complaint.

94.     Defendants deny the allegations in Paragraph 94 of the Second Amended Complaint.

95.     Defendants are without sufficient knowledge or information to form a belief as to the truth of when HMA first learned of any allegations against the Defendants. Defendants deny the remaining allegations in Paragraph 95 of the Second Amended Complaint.

96.     Defendants deny the allegations in Paragraph 96 of the Second Amended Complaint.

## <u>Count I: Fraud</u>

(Khaytin, Revuelta, Edward W. Napleton, Pelayo, and Ruiz)

97.     Defendants incorporate by reference the responses in paragraphs 1-96 of this Answer as if fully set forth herein.

98.     Defendants deny the allegations in Paragraph 98 of the Second Amended Complaint.

99.     Defendants deny the allegations in Paragraph 99 of the Second Amended Complaint.

100.     Defendants deny the allegations in Paragraph 100 of the Second Amended Complaint.

101.     Defendants deny the allegations in Paragraph 101 of the Second Amended Complaint.

102.     Defendants deny the allegations in Paragraph 102 of the Second Amended Complaint.

103.     Defendants deny the allegations in Paragraph 103 of the Second Amended Complaint.

104.     The allegations of Paragraph 104 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

105.     The allegations of Paragraph 105 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

106.     Defendants deny the allegations in Paragraph 106 of the Second Amended Complaint.

107.     Defendants deny the allegations in Paragraph 107 of the Second Amended Complaint.

108.     Defendants deny the allegations in Paragraph 108 of the Second Amended Complaint.

109.     Defendants deny the allegations in Paragraph 109 of the Second Amended Complaint.

110.     Defendants deny the allegations in Paragraph 110 of the Second Amended Complaint.

111.     Defendants deny the allegations in Paragraph 111 of the Second Amended Complaint.

112.     Defendants deny the allegations in Paragraph 112 of the Second Amended Complaint.

113.     Defendants deny the allegations in Paragraph 113 of the Second Amended Complaint.

114.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 114 of the Second Amended Complaint and thus deny those allegations.

115.     Defendants deny the allegations in Paragraph 115 of the Second Amended Complaint.

## Count II – Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)
### (All Defendants)

116.     Defendants incorporate by reference the responses in paragraphs 1-96 of this Answer as if fully set forth herein.

117.     Paragraph 117 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

118.     Paragraph 118 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

119.     Defendants deny the allegations in Paragraph 119 of the Second Amended Complaint.

120.     Defendants deny the allegations in Paragraph 120 of the Second Amended Complaint.

121.     Defendants deny the allegations in Paragraph 121 of the Second Amended Complaint.

122.     Defendants deny the allegations in Paragraph 122 of the Second Amended Complaint.

123.     Defendants deny the allegations in Paragraph 123 of the Second Amended Complaint.

124.     The allegations of Paragraph 124 pertain to a Defendant dismissed from the case with prejudice under the Dismissal Order. As a result, no response is required. If a response is required, the allegations are denied.

125.     Defendants deny the allegations in Paragraph 125 of the Second Amended Complaint.

126.     Defendants deny the allegations in Paragraph 126 of the Second Amended Complaint.

127.     Paragraph 127 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

128.     Paragraph 128 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

129.    Defendants deny the allegations in Paragraph 129 of the Second Amended Complaint.

130.    Paragraph 130 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

131.    Paragraph 131 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

132.    Defendants deny the allegations in Paragraph 132 of the Second Amended Complaint.

133.    Defendants deny the allegations in Paragraph 133 of the Second Amended Complaint.

## Count III – Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)
### (All Defendants)

134.    Defendants incorporate by reference the responses in paragraphs 1-96 and 117-133 of this Answer as if fully set forth herein.

135.    Paragraph 135 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

136.    Paragraph 136 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

137.    Paragraph 137 is a legal conclusion to which no response is required; if a response is required, Defendants deny these allegations.

138.    Defendants deny the allegations in Paragraph 138 of the Second Amended Complaint.

139.   Defendants deny the allegations in Paragraph 139 of the Second Amended Complaint.

## Count IV: Tortious Interference with a Contract
## and Business Relationship
### (Khaytin, Revuelta, Edward W. Napleton, Pelayo, and Ruiz)

140.   Defendants incorporate by reference the responses in paragraphs 1-96 of this Answer as if fully set forth herein.

141.   Defendants admit that HMA has a business relationship and a Dealer Sales and Service Agreement with the Dealership, but deny the rest of Paragraph 141 which is a legal conclusion to which no response is required.

142.   Defendants deny the allegations in Paragraph 142 of the Second Amended Complaint.

143.   Defendants deny the allegations in Paragraph 143 of the Second Amended Complaint.

144.   Defendants deny the allegations in Paragraph 144 of the Second Amended Complaint, and refer the Court to the reference document, which speaks for itself.

145.   Defendants deny the allegations in Paragraph 145 of the Second Amended Complaint, and refer the Court to the reference document, which speaks for itself.

146.   Defendants deny the allegations in Paragraph 146 of the Second Amended Complaint.

147.   Defendants deny the allegations in Paragraph 147 of the Second Amended Complaint.

## Count VI: Civil Conspiracy

### (Khaytin, Revuelta, Edward W. Napleton, Pelayo, and Ruiz)

17

148.    Defendants incorporate by reference their responses contained elsewhere in this Answer as if fully set forth herein.

149.    Defendants deny the allegations in Paragraph 149 of the Second Amended Complaint.

150.    Defendants deny the allegations in Paragraph 150 of the Second Amended Complaint.

151.    Defendants deny the allegations in Paragraph 151 of the Second Amended Complaint.

152.    Defendants deny the allegations in Paragraph 152 of the Second Amended Complaint.

<u>**AFFIRMATIVE DEFENSES**</u>

Without assuming any burden that it would not otherwise bear, Defendants assert the Affirmative Defenses set forth below.

<u>**FIRST AFFIRMATIVE DEFENSE**</u>
(Statute of Limitations)

Pursuant to the Fla. Stat. Ann. § 320.64(25), Plaintiff's claims are barred because Plaintiff failed to audit any alleged misconduct within the 12-month period immediately following payment of the warranty claims in question.

<u>**SECOND AFFIRMATIVE DEFENSE**</u>
(Failure to State a Claim)

The Second Amended Complaint and each claim contained therein fail to state claims upon which relief can be granted.

<u>**THIRD AFFIRMATIVE DEFENSE**</u>
(No Damages or Injury)

Plaintiff's claims are barred to the extent Plaintiff did not sustain any actual or legally

cognizable injury.

<u>**FOURTH AFFIRMATIVE DEFENSE**</u>
(Uncertain or Speculative Damages)

Plaintiff's claims are barred, in whole or in part, because the damages allegedly sustained

by Plaintiff are speculative and uncertain.

<u>**FIFTH AFFIRMATIVE DEFENSE**</u>
(Unclean Hands)

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

## COUNTERCLAIM/THIRD-PARTY COMPLAINT

### Introduction

1.      Defendant EFN West Palm Motor Sales LLC ("West Palm") brings these counterclaims and third-party claims against Hyundai Motor America Corporation ("HMA"), Hyundai Motor Company ("HMC" and together with HMA, "Hyundai") and José Muñoz. These claims stem from Hyundai's and Muñoz's concerted effort to destroy West Palm's business, when all West Palm has done is be an exceptional Hyundai dealer. Hyundai brought this action because of its desire to deflect attention from the Theta II engine debacle described below, and to harass West Palm, ruin its reputation, and damage its business. Hyundai is on a mission to take away all of the Napleton organization's Hyundai stores affiliated with West Palm.

2.      Hyundai also has engaged in unlawful business practices in connection with the flawed recall of its Theta II engines, including misleading government regulators, consumers and dealers.  Hyundai has also implemented unlawful sales, service, and facility standards and objectives and requirements; implementing unlawful incentive programs and imposing unlawful distribution requirements for Genesis vehicles in Florida. Through the Dealer Performance Bonus ("DPB 4.0") component of HMA's Accelerate Program, HMA conditions dealer margin on arbitrary and unreasonable monthly sales objectives and "sales efficiency" objectives. The Accelerate Program also requires dealers to comply with HMA's GDSI 2.0 facility requirements, including that dealers provide Hyundai-exclusive facilities to earn full margin ("Accelerate Exclusivity Requirement"). By tying dealer margin to these sales performance objectives and facility requirements, HMA's Accelerate Program effectively provides varying per-vehicle "incentives" to Florida Hyundai dealers that lower the effective wholesale price of vehicles for certain Florida Hyundai dealers but not others.

3.      The price discounts available under HMA's Accelerate Program are often made accessible to favored dealers but not West Palm, rendering HMA's Accelerate Program not functionally available to West Palm. Those favored dealers pay lower prices for Hyundai motor vehicles as a result of the Accelerate Program, and are thus able to offer lower retail prices because they have a lower effective wholesale cost relative to competing dealers. This creates unlawful price discrimination under the Robinson-Patman Act.

4.      HMA has also violated the Robinson-Patman Act by allocating additional cooperative advertising funds to certain favored dealers, which has the same effect and purpose of a secret discount.

5.      West Palm seeks declaratory and injunctive relief, as well as compensatory damages (including treble damages) and punitive damages resulting from Hyundai's unlawful actions.

## Parties

6.      West Palm is an Illinois limited liability company with its principal place of business in Palm Beach County, Florida. West Palm is a "motor vehicle dealer" as defined in Fl. Stat. § 320.60(11)(a). West Palm brings these claims for itself with respect to claims for damages, injunctive relief and declaratory relief, and in the name of the Department of Highway Safety and Motor Vehicle of the State of Florida for the use and benefit of West Palm with respect to claims for injunctive relief pursuant to Fl. Stat. § 320.695. West Palm is part of the Napleton Automotive Group of affiliated dealers ("Napleton" or the "Napleton organization").

7.      HMA is a California corporation with its principal place of business in California. HMA is registered to do business in Florida and is actively doing business in Palm Beach County,

21

Florida. HMA is a "distributor" as defined in Fl. Stat. § 320.60(5), a "manufacturer" as defined in Fl. Stat. § 320.60(9), and a "licensee" as defined in Fl. Stat. § 320.60(8).

8.      West Palm and HMA are parties to a Hyundai Dealer Sales and Service Agreement (the "Hyundai Dealer Agreement") pursuant to which West Palm operates a dealership for the sale and service of Hyundai Brand motor vehicles at 2301 Okeechobee Blvd, West Palm Beach, FL 33409 (the "Dealership Location"). The Hyundai Dealer Agreement is a "franchise agreement" as defined in Fl. Stat. § 320.60(1). "Genesis" is a luxury line make that was originally offered by Hyundai until it was severed from HMA and split its own company, which is administered in the United States by non-party Genesis Motor America Corp. ("GMA").

9.      HMC is a South Korean company. HMC is the parent company of HMA. HMC, through other subsidiaries, manufactures Hyundai and Genesis line-make motor vehicles. HMC conducts business in the State of Florida. HMC is liable under Fl. Stat. § 320.6405 for the all the acts and omissions of its distributor HMA. The Florida Dealer Act establishes that a "common entity of a manufacturer" or "distributor" [*i.e.*, HMA] is a manufacturer's [*i.e.*, HMC's] "agent" if the distributor or entity "by contractual arrangement or otherwise pursuant to the direction of the manufacturer, engages in the distribution in this state of line-make motor vehicles manufactured . . . by such manufacturer." Fl. Stat. § 320.6405. HMA as a manufacturer pursuant to Florida Statutes is subject to both: (1) the franchise agreement "as if [the manufacturer] and not the agent had executed the franchise agreement"; and (2) "all of the restrictions, limitations, remedies, and penalties of ss. 320.60-320.70 [the "Florida Dealer Act"] related to such franchise agreement, the performance thereof, or any cause of action pertaining thereto." *Id.*

10.      Defendant José Muñoz is the President and CEO of HMA and the Global COO of HMC and, upon information and belief, a resident of California.

**Jurisdiction and Venue**

11.     This Court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367 based on the same operative facts, and judicial economy, convenience and fairness to the parties will result if this Court assumes and exercises jurisdiction over the Counterclaim.

12.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Defendant/Counterclaim-Plaintiff, Plaintiff/Counterclaim-Defendant, and Third-Party Defendants are citizens of different states.

13.     West Palm's claims under the Robinson-Patman Act pose a federal question and therefore jurisdiction is also conferred on this Court pursuant to 28 U.S.C. § 1331.

14.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts giving rise to the claims occurred in this jurisdiction.

15.     José Muñoz has subjected himself to the personal jurisdiction of the courts of Florida by causing injury to West Palm, a Florida dealership. In addition to conspiring against West Palm and the Napleton organization, Muñoz authorized the filing of this lawsuit against West Palm in his capacity as CEO of HMA, and exerts direct control and influence over HMA's actions, all of which constitute Muñoz's having been engaged in substantial activity within the state of Florida. *See* Fl. Stat. § 48.193(1)(b)(2).

16.     HMC has subjected itself to the personal jurisdiction of the courts of Florida by, *inter alia*: exerting direct control and influence over HMA's actions against Florida dealers, including West Palm and by virtue of Fl. Stat. § 320.6405.

17.     HMA's actions represent a targeted assassination attempt on a Florida dealership that was encouraged, approved, and facilitated by HMC and Munoz.

18.     A foreign defendant can commit a tortious act in Florida "through telephonic, electronic, or written communications into Florida" so long as the cause of action arises from these communications" and the place of injury is within Florida." *Elandia Int'l, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1329 (S.D. Fla. 2010).

19.     HMC's and Munoz's unlawful actions targeting West Palm and the Napleton organization has caused injury to West Palm in Florida.

20.     HMC has purposefully availed itself of the United States automotive market by producing and selling Hyundai vehicles specifically intended to be sold in the United States. HMC uses its American subsidiary, HMA, as its means for selling, marketing, and warranting Hyundai vehicles in the United States and this District and has set up distribution chains and taken other affirmative measures to make its vehicles available to consumers in the United States and this District, thereby availing itself of the benefits and protections of conducting business in the United States.

21.     HMC's and Muñoz's purposeful availment of the privilege of doing business in Florida renders exercise of jurisdiction by this Court over it permissible under traditional notions of fair play and substantial justice.

22.     West Palm's claims arise out of HMC's and Muñoz's contacts with the United States, including within this District.

23.     HMA and HMC have subjected themselves to the personal jurisdiction of the courts of Florida by manufacturing and selling Hyundai vehicles in this state. *See* Fla. Stat. § 320.61(5).

**Factual Background**

A. **The Theta II Engine**

24.     The subject matter of this lawsuit, and many of the ensuing counterclaims, originate from Hyundai's defective and dangerous Theta II engine. HMA was aware of these defects for years, but decided to protect its bottom line instead of customer lives by concealing the dangers from the National Highway Traffic Safety Administration ("NHTSA"), the consuming public, and its dealers.

25.     At risk are any 2011–19 Hyundai Sonata, 2013–19 Hyundai Santa Fe and Santa Fe Sport, 2011–19 Kia Optima and Kia Sportage, and 2012–19 Kia Sorento or Kia Soul with 2.0 or 2.4-liter Theta II engines.

26.     Beginning in 2015, HMA recalled certain model year 2011-2012 Hyundai Sonatas with the Theta II 2.0 or 2.4 liter gasoline direct injection (GDI) engines to address a defect that could lead to bearing wear and engine failure.

27.     On September 10, 2015, Hyundai filed a Defect Information Report ("DIR") with NHTSA (recall 15V-568). This recall involved certain Model Year 2011-2012 Sonata vehicles equipped with a 2.4L and 2.0L Theta II GDI engines. The defect was described by Hyundai as "metal debris [that] may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during the subject production period." On information and belief, this DIR was materially misleading and incomplete.

28.     In August 2016, a whistleblower inside Hyundai (quality control manager Kim Gwang-ho) filed a complaint with the U.S. authorities, saying that Hyundai vehicles equipped with the Theta II engine have potential problems of noise and sudden loss of power. Kim had been a Hyundai employee for 25 years.

29.     Kim took the case to the U.S. authorities because Hyundai did not take any action after he first raised the issue internally with a compliance officer in 2015.

30.     Kim met with Otto Matheke, a director at NHTSA, and asked him to investigate Hyundai thoroughly because it was not adequately addressing the unsafe Theta II engines on the road.

31.     According to Kim, Hyundai knew the Theta II engine defect was more serious and widespread – the problem was not just with the manufacturing process but also engine design, meaning Hyundai would need to fix the engine in all the affected cars, which would be extremely costly.

32.     Kim said the 2015 recall of model year 2011-2012 Hyundai Sonatas was just the tip of the iceberg, claiming Hyundai knew the Theta II engine contained a serious design defect.

33.     The chair and CEO of Hyundai Motor Group at the time was Chung Mong-koo, who had been previously indicted for breach of trust and embezzlement. Chung allegedly siphoned $100 million into a slush fund for bribing officials. His three-year prison sentence was suspended by an appeals court because he was "too important" to South Korea's economy to go to jail for embezzlement. He received a full pardon from South Korean President Lee Myung Bak in 2008.

34.     Hyundai is one of South Korea's largest "chaebols" (literally translated as "rich family") along with Kia, Samsung, and LG. Chaebols are family-owned corporate conglomerates in South Korea. The top five chaebols, taken together, represent about half of the South Korean stock market's value. Many top executives of chaebols have been found guilty of corruption; their convictions, like that of Chung Mong-koo, rarely lead to prison time.[1] They usually pay a heavy fine instead, receive a presidential pardon, or have their jail sentence suspended by the courts.

---

[1] Sangin Park, *Too Big to Jail: How Powerful Korean Executives Escape Indictment or Conviction* (Promarket, Stigler Center University of Chicago School of Business, April 15, 2020 (discussing the "three-five rule": a three-

35.     In retribution for his whistleblowing on one of South Korea's government-protected companies, Kim was hauled in front of Hyundai's disciplinary committee and accused of leaking secret corporate information. Hyundai also filed a criminal complaint against him, alleging that he leaked trade secrets.[2]

36.     On March 31, 2017, Hyundai filed another DIR with NHTSA (recall 17V-226). This recall involved certain Model Year 2013-2014 Santa Fe Sport and 2013-2014 Sonata vehicles equipped with 2.4L and 2.0L Theta II GDI engines. Hyundai again attributed the defect to "debris from factory machining operations." On information and belief, this DIR was materially misleading and incomplete.

37.     On May 18, 2017, NHTSA opened Recall Query ("RQ") 17-004 to investigate both the timeliness and scope of Hyundai's Theta II GDI engine recalls (Recall Nos. 15V-568 and 17V-226), and Hyundai's compliance with reporting requirements.

38.     In June of 2017, HMA expanded the recall to include certain model year 2013-2014 Hyundai Sonatas and Santa Fe Sport vehicles with the 2.4L or 2.4L Theta II GDI engine.

39.     HMA issued a technical service bulletin to Hyundai dealers about the June 2017 recall campaign (referred to as "Campaign 162"). The recall inspection procedure consisted of using a Samsung tablet, called a GDS (Global Diagnostic System) that contains software used to detect abnormal knocking noise from the engine. If the word "PASS" shows up on the tablet after

---

year prison sentence whose execution is suspended for five years and then exempted if no further violations occur during the suspended period.) available at https://promarket.org/2020/04/15/too-big-to-jail-how-powerful-korean-executives-escape-indictment-or-conviction/; *see also* Reuters Staff, *South Korea Pardons Convicted Execs, Hyundai Boss,* Reuters, August 11, 2008 (Hyundai Motor Group Chairman Chung Mong-koo's three-year sentence suspended "over concerns about a management vacuum at the carmaker")  available at https://www.reuters.com/article/us-korea-pardon/south-korea-pardons-convicted-execs-hyundai-boss-idUSSEO8888420080812
[2] Hyunjoo Jin, *Blowing the Whistle in South Korea:  Hyundai Man Takes on Chaebol Culture*, Reuters, March 15, 2017, available at https://www.reuters.com/article/us-hyundai-whistleblower/blowing-the-whistle-in-south-korea-hyundai-man-takes-on-chaebol-culture-idUSKCN18B0J5

running the test, then an engine replacement is not required pursuant to HMA's technical service bulletin.

40.     However, this noise inspection test did not accurately diagnose defective engines. It was not uncommon for customers to receive a "PASS" result when they had a clearly defective, knocking engine that required replacement.  On information and belief, Hyundai knew its test was flawed, generated false negatives and allowed unsafe vehicles back on the roads.

41.     A service technician from a Napleton dealership took a video of the test being performed; in this video, one can hear the engine loudly knocking for roughly 90 seconds, and then the word "PASS" appear on the tablet.

42.     Brian Napleton, the director of Midwest Operations for Napleton, emailed a copy of this video to Scott Margason (Director of Product Planning at HMA), Andrew DiFeo (the Chairman of the Hyundai National Dealer Council) and several others. Napleton wrote, "162 Inspection. This was from one our FL Hyundai stores. We were supposed to tell the customer there was nothing wrong with the car per Hyundai. Listen to the first 10 seconds and then you can fast forward to last 10 seconds as you hear my techs laughing that this got a Pass."

43.     Andrew DiFeo responded, cc'ing Scott Margason: "Thanks for sharing Brian. We will be sure to play this for Barry Ratzlaff at the meeting." Ratzlaff was the Vice President of Customer Satisfaction at HMA at the time; his title at HMA is currently Chief Customer Officer.

44.     Hyundai's noise inspection test was both unreliable and inaccurate – and Hyundai knew it. And yet, Hyundai used this procedure to determine which cars would get an engine replacement, and which cars would not. It appears that Hyundai would rather risk a customer's vehicle suddenly stalling in the middle of the road than to offer an effective procedure for diagnosing the defect.

45.     In response to the NHTSA investigation, Hyundai retained an engineering firm, Exponent, to supplement technical resources and assist in the examination of the Theta II GDI engine failures to determine (1) causal factors for the engine failure; (2) predictive accuracy for inspection tools and procedures to detect potential engine failure prior to its occurrence; and (3) claims analysis.

46.     Exponent performed bench testing, which involves comparison of the performance of oil pumps and oil filters for warranty return engines against in-vehicle testing and new components.

47.     Bench testing helps determine if the oil pump contributed to the engine failure due to reduced performance. Bench testing is also used to evaluate pressure drop across the oil filter and determine if the filter was in bypass. Inspecting oil pumps and regulators for contamination is part of bench testing, as well as inspecting pressure regulator springs for potential variations in spring rate.

48.     Exponent also performed engine inspections. Engine teardown and inspection provides the data required to determine the root cause of the engine failures.

49.     Exponent reviewed assembly issues and evaluated potential crankshaft or connecting rod manufacturing issues. This includes metrology of crank, rods, bearings, and inspection of crankshafts.

50.     Exponent evaluated the bearing condition and failure mode, as well as assessing contaminants within the engine. In order to assess contaminants, Exponent employed SEM (Scanning Electron Microscopy) and EDS (Energy Dispersive X-Ray Spectroscopy). These analyses help identify the mechanism of engine failure as evidenced by damage to the bearing surfaces and also identify the composition of debris materials found within the engine.

51.     Assessing contaminants also included collecting oil samples from the engines.

52.     Exponent reviewed the inspection results with Dr. Lee Swanger, a Principal Engineer with Exponent and the Director of Exponent's Miami, Florida office. Dr. Swanger's experience includes the analysis of machinery dynamics and kinetics as exemplified by internal combustion engines of both piston and turbine configuration, as well as related compressor designs.

53.     Teardown inspection of engines from 2013-2014 Honda Accords were conducted for condition and manufacturing quality comparisons.

54.     Exponent also performed bearing inspections to determine construction of the bearings and changes through production. This involves analyzing bearing layers, overlay material, and surface profile and topology.

55.     Through bearing inspections, Exponent evaluated how the bearings progress toward failure and determined if the debris identified within the bearings were foreign or domestic.

56.     Exponent also compared performance of bearings from similar engines.

57.     Exponent summarized the results of its examination of the Theta II engine failures in a presentation for NHTSA. The presentation shows that Theta II engines fail in different ways, with failure conditions that are distinct from one another. Different reasons listed for engine failure include: manufacturing control, possible poor maintenance, DLC wrist pin coating, and high mileage.

58.     Exponent described the failure conditions experienced by 100 engines that it inspected. Specifically, Exponent stated that 97 out of 100 engines had rod bearing damage, 95 engines showed damage on multiple rod bearing locations, 75 showed abnormal wear on at least

one rod bearing, 71 had at least one spun rod bearing, and 26 showed signs of oil starvation on at least one rod bearing.

59.     Thus, 26% of the engines tested by Exponent showed signs of oil starvation. Notably, this is consistent with Exponent's inspection of Theta II engines replaced and returned by West Palm.  Specifically, the Exponent expert retained by HMA in this case opined that 25% of the West Palm engines he inspected exhibited signs of oil starvation.

60.     In 2017, South Korean civic group YMCA filed a complaint with prosecutors alleging Hyundai and Kia delayed fixing engine defects that prompted the massive recalls in Korea and the United States.

61.     In June 2018, the Center for Auto Safety (CAS) petitioned NHTSA to investigate hundreds of complaints of non-collision fires in certain Hyundai and Kia vehicles that resulted from defective engines.

62.     On November 15, 2018, Jerry Flannery, Executive Vice President and Chief Legal Counsel at HMA, made a presentation to the Hyundai National Dealer Advisory Council ("Dealer Council") in which he admitted that Hyundai was selling defective vehicles. Dozens of HMA employees, as well as representatives from HMC, were present.  Flannery was trembling and pale as he gave the presentation.  After the presentation, Flannery admitted to Brian Napleton that, because of the Theta II engine issues, he was the most scared he had ever been in his 25-plus years with HMA.

63.     In November 2018, the CEOs for HMA and Kia Motor America ("KMA")[3] refused to attend a congressional hearing before the Senate Committee on Commerce, Science and Transportation to explain why hundreds of their vehicles have spontaneously burst into flames.

---

[3] Kia is also a subsidiary of HMC, and certain Kia vehicles also used the Theta II engine platform.

64.     Also in November 2018, the U.S. Attorney's Office for the Southern District of New York, working with NHTSA, launched a criminal investigation into Hyundai and Kia.

65.     In January 2019, Hyundai flew members of the Dealer Council out to Hyundai's manufacturing plant in Alabama to discuss the Theta II engine issue. At this meeting, Hyundai presented no answers or timeline for fixing the engines, fixing the knock sensor and had no set plan for how to handle customers.

66.     Also in January 2019, the Highway Loss Data Institute (HLDI) analyzed the rates of non-crash fire claims for Hyundai and Kia vehicles and found that the Hyundai and Kia vehicles with a 2.0-liter turbocharged engine had the highest frequency — 4.2 claims per 10,000 insured vehicle years — compared with 1.7 for the control vehicles. Hyundai and Kia models with a 2.4-liter engine also had an elevated non-crash fire claim frequency of 2.7. In contrast, Hyundai and Kia vehicles with a 3.3- or 3.5-liter engine had about the same rate of fire claims as the control group. For vehicles with the 2.0-liter turbocharged and 2.4-liter engines, fire risk went up dramatically as the vehicles aged. Both the 2.0-liter and 2.4-liter engines are from the Theta II engine family.[4]

67.     In February 2019, South Korean prosecutors raided the office of Hyundai Motor's quality division in Seoul as part of a probe into how the manufacturer and affiliate Kia Motors handled the engine-related vehicle recalls.

68.     In April 2019, NHTSA launched a formal investigation into Hyundai and Kia over the engine recalls that would "assess the scope, frequency, and potential safety-related

---

[4] *Study of Hyundai/Kia fires points to small and turbocharged engines*, Insurance Institute for Highway Safety, Jan. 22, 2019, available at https://www.iihs.org/news/detail/study-of-hyundai-kia-fires-points-to-small-and-turbocharged-engines

consequences of alleged defects" related to "non-collision" fires in the vehicles.[5] This investigation followed reports of thousands of fires, more than 100 injuries, and one death.

69.     In May 2019, José Muñoz became the President and Chief Executive Officer of HMA and the Global Chief Operating Officer of HMC.

70.     Previously, Muñoz had worked at Nissan North America, Inc. as the Chief Performance Officer and the chair of Nissan's North American operations. Muñoz left Nissan in January 2019 following the arrest and indictment in Japan of Nissan's CEO and chairman, Carlos Ghosn, for the misuse of company funds.

71.     The Napleton organization had previous interactions with Muñoz while he worked at Nissan in connection with Napleton's Nissan dealerships.

72.     The friction between Muñoz and Napleton continued at Hyundai.

73.     For example, at a December 4, 2019 Hyundai Dealer Council in meeting Dallas, Texas, Muñoz asked the dealers to agree to the "Accelerate" program, a variable-margin program with facility requirements.

74.     Muñoz gave the dealers three options: 1) take his offer; 2) take his offer for a 90-day trial; or 3) reject his offer.

75.     Brian Napleton, an elected member of the Hyundai Dealer Council, was one of the most vocal advocates for rejecting the program, which would have taken significant margin away from dealers and "given" it back to them only if they spent millions renovating facilities.

76.     The Dealer Council voted to reject Muñoz's offer.

---

[5] Michael Brooks, *NHTSA Grants Center for Auto Safety Hyundai/Kia Petition; Government Will Investigate Thousands of Non-Crash Fires*, (*See* Statement of Jason Levine, Executive Director, Center for Auto Safety: "The evidence is now clear – Hyundai and Kia should have acted to recall these vehicles far earlier. We challenge Kia and Hyundai to use this moment to figure out what's causing these fires instead of pretending these engine issues can be addressed with knock sensors and forcing cars into limp home mode.") available at https://www.autosafety.org/nhtsa-approves-center-for-auto-safety-hyundai-kia-petition-goverment-will-investigate-thousands-of-non-crash-fires/

77.     Muñoz screamed at the members and demanded to know, one by one, how each person voted.

78.     The rejection likely cost HMA tens (if not hundreds) of millions of dollars in lost margin hold-back funds, and forced HMA to alter and delay the Accelerate program.

79.     In January 2020, the Dealer Council received a different (and much better) offer from HMA. This time, Muñoz did not allow any voting.

80.     Nine of the fifteen dealers that voted to reject Muñoz's initial proposal were ultimately kicked off the Dealer Council.

81.     On April 23, 2020, former Napleton employee Mark Eddleman brought a wrongful termination lawsuit against the Napleton organization. Eddleman's lawsuit alleged, *inter alia*, that certain West Palm employees had engaged in warranty fraud by intentionally blowing the engines of vehicles by "emptying their oil and running them at high RPMs until the engines malfunctioned."

82.     On May 11, 2020, HMA retained outside counsel to lead a warranty fraud investigation against West Palm.

83.     On May 28, 2020, HMA's outside counsel retained James W. Smith of Exponent, for consulting services related to the "Hyundai-Napleton" project.

84.     On June 9, 2020, Hyundai in-house counsel Alex Kim sent a "litigation hold" email requiring Hyundai and its relevant affiliates to preserve all replaced Theta II engines that had been returned by West Palm and other Napleton dealerships.

85.     Also on June 9, 2020, Muñoz attended a Dealer Council Zoom meeting. During the meeting, Muñoz told the dealers, "I am not here to build trust. I am here to build a company." Munoz also made a "live mike" comment to Brian Smith (the COO of HMA at the time) about

how "some people don't like us, and that's ok, they'll get theirs too." Upon information and belief, this comment was directed at Brian Napleton, who was present on the call.

86.     On or about June 29, 2020, Exponent engineer James W. Smith inspected eight (8) Theta II engines that West Palm had diagnosed with the recall condition and that were replaced and returned to Hyundai.  Mr. Smith's inspection revealed no credible evidence that any of the inspected West Palm engines were intentionally damaged.

87.     During the summer of 2020, HMA's outside counsel retained Urban Science Applications Inc., as a consulting expert, to analyze Theta II engine replacement statistics across the Hyundai dealer network and compare those to West Palm's statistics.  On information and belief, the Urban Science analysis revealed no credible evidence that West Palm's number or rate of engine replacements were statistical outliers.  In fact, HMA refused to produce almost the entirety of the Urban Science analysis and have represented to the Court that HMA will not rely on it at trial.

88.     HMA never conducted an industry-standard audit of West Palm's warranty practices and submissions concerning the Theta II engine recall.

89.     On July 14, 2020, Robert Grafton, HMA's Executive Director of Dealer Development & Strategy, emailed José Muñoz with the subject line "Engine Fraud Investigation: Weekly Status Report." Grafton wrote: "**I have no doubt there is a HMC agenda in play and there is a race to judgment on the Napleton decision before all the investigative facts have been secured**. I have rapidity [sic] asked Willy to lead the Napleton effort and to coordinate through me and DND governance – not happening …. **We have 1 shot at Napleton and if not managed correctly Napleton survives with all his stores**." (emphasis added).

90.    José Muñoz responded to Grafton as follows: "Please set up an extraordinary meeting on this topic and invite just Willy, Alex, Randy, Mark, Barry, you and I. **They won't be able to scape**." [sic] (emphasis added).

91.    On July 22, 2020, the extraordinary meeting took place.  At that meeting, Muñoz, with the concurrence of senior Hyundai executives, approved HMA filing this lawsuit.  Muñoz and Hyundai did so, notwithstanding the lack of physical evidence uncovered by Exponent, the lack of statistical evidence uncovered by Urban Science and the fact that HMA had not even bothered to conduct an industry-standard warranty audit.

92.    Four months later, on November 17, 2020, HMA filed its complaint in this action alleging, *inter alia*, fraud, RICO, and FDUTPA claims.  On information and belief, the timing of HMA's commencement of this lawsuit was intended to deflect from the imminent public announcement of Hyundai and Kia's massive $210 million settlement with NHTSA over the botched Theta II engine recalls.

93.    On November 20, 2020, Robert Grafton sent a notice of intention to terminate the West Palm's Dealer Agreement. The bases for the termination are identical to the allegations listed in Eddleman's Complaint.

94.    Shortly after the commencement of this action, Muñoz kicked Brian Napleton off of the Dealer Council. At the next council meeting, Muñoz read a statement about the alleged warranty fraud at issue in this lawsuit.

95.    On November 27, 2020, NHTSA announced a historic $210 million civil penalty against HMA and its sister company, KMA. NHTSA found that HMA and KMA failed to conduct timely recalls of over 1.6 million vehicles equipped with Theta II engines and did not accurately report certain information.

96.     Under the Consent Order, HMA was fined $140 million, which includes an upfront payment of $54 million, an extra $40 million to be spent on safety performance measures, and an extra $46 million deferred penalty payable if specific conditions are not satisfied.

97.     NHTSA imposed several "performance obligations" on Hyundai, including investing in "advanced data analytics capabilities to enhance its ability to detect and study emerging safety-related defect trends on its vehicles, and building and developing a fully-functioning United States-based outdoor test laboratory and vehicle tear down facilities that will focus on safety field issues, vehicle inspections, and defect investigations.

98.     Hyundai also agreed, as part of the Consent Order, to make certain corporate organization and process improvements, including having a fully functional Chief Safety Officer ("CSO") in the United States that reports to the CEO of the Hyundai entity directly responsible for the United States operations and Hyundai Motor North America ("HMNA"). The CSO will also report directly to an HMC corporate officer responsible for global safety. Hyundai also agreed to establish a dedicated safety office with sufficient staff and resources to execute investigations and launch effective remedies, an investigation department, a recall execution department, and a "re-imagined internal safety reporting program" that would "provide employees with the ability to report information anonymously, and guarantee that any employee reporting information will not face retaliation."

99.     The Consent Order states that NHTSA believed Hyundai's recalls were untimely and that Hyundai DIR's contained inaccurate information:

> Based on Hyundai's responses to NHTSA's RQ17-004 investigation, and other information provided to NHTSA by Hyundai beginning in 2015, NHTSA asserted that Hyundai may be liable for civil penalties under 49 U.S.C. §§ 30165(a)(1) and (3) on multiple grounds, **including the untimeliness of the recalls** (Recall Nos. 15V-568 and 17V-226), **inaccuracies in Hyundai's DIRs, and that a required**

**report describing potential safety-related issues contained certain inaccuracies or omissions…**

(emphasis added).

100.    The NHTSA investigation into non-crash engine fires remains open.

101.    On May 11, 2021, U.S. District Judge Josephine L. Staton approved a $1.3 billion settlement that consolidated several 2017 and 2018 nationwide class action lawsuits, alleging that HMA and KMA refused to recall vehicles with the Theta II GDI engine even though the automaker knew the engine was defective.

102.    Since 2015, HMA and KMA have launched 33 recalls involving at least 20 models and over 5 million vehicles, covering model years 2006-2021.

103.    Despite the overwhelming evidence that Hyundai knowingly manufactured and sold millions of vehicles with an inherently flawed engine; despite the evidence that Hyundai knowingly misled NHTSA, consumers and dealers about the nature of the problem, the investigation and the solutions; and despite the lack of credible physical and statistical evidence of wrongdoing, Hyundai has sued Defendants falsely accusing them of a grand scheme to intentionally blow engines to collect warranty money. Hyundai is using this lawsuit to smear the Napleton name and do tremendous damage to the reputation of Napleton's many stores.

## HMA's Accelerate Program

104.    In or about January 2020, HMA announced the Accelerate Performance Bonus Program ("Accelerate Program"), which unlawfully conditions a majority of dealers' gross margin on whether a dealer complies with or attains various unilaterally set objectives or criteria. More specifically, HMA conditions an amount equal to 8% of the Manufacturer's Suggested Retail Price ("MSRP") of each Hyundai sold.

105.     Dealers, including West Palm, that cannot or do not meet HMA's arbitrary and disparate demands forgo payment and suffer an increased effective wholesale cost, which places them at a distinct competitive disadvantage as compared to other dealers that meet HMA's demands. Complying dealers benefit from lower wholesale prices, which allow them to offer prospective customers far lower retail pricing, allowing them to lure customers away from noncomplying dealers.

106.     The Accelerate Program results in unlawful and anti-competitive price discrimination, with certain dealers paying thousands of dollars more than others for goods of like grade and quality, *i.e.* materially identical motor vehicles. West Palm and other noncomplying dealers to whom these so-called "incentive payments" are not functionally available cannot compete when neighboring complying dealers can sell materially identical vehicles at substantially lower prices.

107.     Among the conditions tied to dealer margin, the Accelerate Program unlawfully requires dealers to construct stand-alone Genesis facilities and to meet arbitrary and unreasonable sales performance objectives.

***Facility Requirements***

108.     The first Hyundai Genesis models debuted in 2008 and were sold by Hyundai dealers. In January 2018, HMA announced that the Genesis brand would be separated from Hyundai and sold as a separate line-make.  Initially, HMA intended to offer the now-separate Genesis franchise to only a select number of dealers. However, this plan was challenged  by Hyundai dealers and several state motor vehicle regulatory agencies, including the Florida Department of Highway Safety and Motor Vehicles, as a violation of state law and the Hyundai Dealer Sales and Service Agreement. Ultimately, in order to be licensed to sell Genesis brand

vehicles in various states including Florida, GMA relented and agreed to offer the Genesis franchise to all Hyundai dealers.

109.    GMA became licensed to distribute Genesis vehicles in the State of Florida on October 30, 2018.  At that time, Hyundai dealers who accepted the Genesis franchise were approved by HMA and GMA to combine the Genesis brand within dealers' existing Hyundai facilities with only minor changes to include Genesis branding elements. West Palm was offered and accepted a Genesis motor vehicle franchise which was added to its Hyundai facilities pursuant to HMA and GMA's stated requirements.

110.    Through the Accelerate Program seeks to change the status quo by imposing unreasonable facility requirements unlawfully intended to winnow the dealer body and to coerce Hyundai dealers to construct stand-alone Genesis facilities. HMA withholds from dealers so-called "incentive payments," amounting to 2% of MSRP of each Hyundai sold and 8% of MRSP of each Genesis sold, unless the dealer builds a new multi-million dollar stand-alone Genesis facility or invests additional millions of dollars to renovate their existing approved facilities from which they currently sell and service both Genesis and Hyundai. These facility requirements are not reasonable or justifiable given current and reasonably foreseeable projections of economic conditions, financial expectations, and West Palm's local market.

111.    Under the Accelerate Program, HMA conditions dealer margin on dealers' complying with HMA's GDSI 2.0 facility requirements. Among the costly GDSI 2.0 facility obligations is a requirement that dealers provide Hyundai-exclusive facilities to earn full margin under the Accelerate Program ("Accelerate Exclusivity Requirement"). The Accelerate Exclusivity Requirement obligates Hyundai dealers to remove other brands from their existing

facilities, including the Genesis line-make (which used to be a Hyundai brand vehicle). Complying dealers receive an amount equal to 2% of MSRP of each Hyundai sold.

112.    To earn full margin under the Accelerate Program, dealers must commit to renovating their facilities to meet GDSI 2.0 facility standards, with HMA expressly reserving the right to amend, cancel or revoke the Accelerate Program facility component at any time for any reason. While West Palm stated in writing its willingness to comply, HMA's renovation requirements are impossible or extremely onerous to achieve, meaning that West Palm was effectively denied the ability to receive or accrue margin that other Hyundai dealers have received or accrued.

113.    In withholding 2% of MSRP of each Hyundai sold, HMA is engaging in a form of coercion where West Palm and other dealers are forced to either build stand-alone Genesis facilities or decide to sell or terminate their Genesis franchise, which has always been HMC's goal.

114.    Hyundai is well-aware that the substantial costs of building stand-alone facilities are not justified by the market realities of the Genesis line-make. There are only five Genesis models currently, and West Palm already showcases each of these models in its existing showroom. The market for the low-volume Genesis line-make does not remotely support West Palm's construction of an unnecessary multi-million dollar facility.

115.    By tying a substantial portion of dealer margin to such unreasonable facility requirements, HMA intentionally imposes on West Palm and others an existential dilemma – sink millions of unrecoverable dollars into unjustifiable facility improvements or suffer from substantially higher effective wholesale costs that will render the dealer non-competitive and significantly impair the dealer's substantial investments.

116.     Upon information and belief, HMA has exempted certain favored dealers from its facility requirements, entitling those dealers to substantially reduced effective wholesale pricing even when they failed to meet the facility components of the Accelerate Program that other dealers like West Palm are held to.  These are, in effect, secret price discounts for favored dealers.

117.     HMA's lower wholesale pricing, conditioned on unreasonable and selectively applied facility requirements, is not functionally available to West Palm.

***Sales Performance Objectives***

118.     Aside from unlawfully tying dealer margin to unreasonable facility requirements, HMA unlawfully conditions margin on dealers meeting arbitrary and unreasonable sales performance objectives.

119.     The Dealer Performance Bonus ("DPB 4.0") component of HMA's Accelerate Program ties dealer margin to both arbitrary and unreasonable monthly sales objectives and "sales efficiency" objectives. Through DPB 4.0, HMA pays dealers amounts equal to between 0% and 3% of MSRP of each new vehicle the dealer sells, with the amount depending on the extent to which the dealer meets both its monthly sales volume and monthly sales efficiency objectives. The grid used by HMA for determining the per vehicle payments is as follows:

| DPB 4.0 | | | | |
|---|---|---|---|---|
| **Objective Attainment** | **Sales Efficiency** | | | |
|  | **< 100%** | **100-149%** | **150-199%** | **200%+** |
| 0%-99% | 0.0% | 1.5% | 2.25% | 2.5% |
| 100%-109% | 0.5% | 2.0% | 2.5% | 2.75% |
| 110%-119% | 1.0% | 2.25% | 2.75% | 3.0% |
| 120%+ | 3.0% | 3.0% | 3.0% | 3.0% |

120.     In other words, HMA ties a sliding scale of price discounts to dealers meeting sales volume objectives and hitting sales efficiency scores.  With respect to the sales objectives, HMA unilaterally establishes each dealer's sales objective arbitrarily, with reference to the dealer's past

performance and an aspirational, unreasonable, and non-localized "growth factor."   HMA's method of setting the sales volume objective is unfair, unreasonable and arbitrary.

121.    HMA assigns each dealer a geographic territory called a Primary Market Area ("PMA"). PMAs are comprised of census tracts defined by the U.S. Census Bureau. Census tracts are typically assigned to the closest dealer, with certain exceptions to account for road networks and natural barriers (such as rivers and lakes).Whenever a new motor vehicle is purchased or leased, that vehicle is registered with the state at the customer's address. This registration data is compiled by census tract and used by manufacturers like HMA for a variety of purposes, including measuring sales performance.

122.    HMA also divides the universe of motor vehicles into individual vehicle class segments (*e.g.,* mid-sized sedans, small SUVs, etc.), and luxury and non-luxury brands (BMW, Mercedes, Audi on one hand and Hyundai, Honda, Ford, Toyota on the other, etc.).

123.    Utilizing this registration and segmentation data, HMA measures a dealer's sales performance by a metric called sales efficiency. Sales efficiency is a fraction, expressed as a percentage, where the numerator is all of a dealer's retail sales, wherever made, and the denominator is the dealer's "expected" sales – as dictated according to HMA's unreasonable and inequitable criteria and assumptions:

$$\text{Sales efficiency} = \frac{\text{Actual Sales}}{\text{"Expected Sales"}} \times 100$$

124.    "Expected Sales", the sales efficiency denominator, is calculated by applying HMA's statewide market share, in each vehicle segment, to all of the competitive retail motor vehicle registrations in the dealer's PMA:

**"Expected" Sales = HMA's Statewide Market Share in   x   Segment Registrations in PMA Segment**

**(repeated for each vehicle segment in which HMA competes)**

125.   HMA's sales efficiency does not take into account all relevant and material criteria, data, and facts as a measure of West Palm's actual sales performance. Sales efficiency purports to adjust for the individual consumer preferences of vehicle type (small cars vs. large SUVs, etc.), but does not, for example, take into account whether there is a brand preference within a given area that the dealer has to overcome.

126.   Moreover, the definitions, assumptions, criteria, and targets that undergird the sales efficiency metric compare disparate dealers in an arbitrary and inequitable manner. Dealers across the state face different markets, different clienteles, and different local challenges. HMA ignores those local market differences in its sales efficiency measurement.

127.   A 100% sales efficiency score is merely average, with the absurd result that at any given time approximately half of all Hyundai dealers are technically failing to meet their objective and are subject to reduced or no DPB bonus, which means higher wholesale prices for those dealers.

128.   Through DPB 4.0, HMA established and implemented sales performance criteria for West Palm that are unfair, unreasonable, inequitable, and do not consider all relevant and material local and regional criteria, data, and facts; and that disregard the sales performance of dealerships of comparable size to West Palm in comparable markets. For example, DPB 4.0 ignores, among other material factors, that different dealers face different demographics, different consumer preferences beyond segment popularity, brand popularity, different lease penetration rates, different levels of competition, and different marketing budgets of competing line-makes.

### Q2 Wholesale Bonus Program

129.    As a result of the COVID-19 pandemic, in the second quarter of 2020, HMA modified its implementation of DPB 4.0. Specifically, HMA lowered the sales objectives for dealers in recognition of the negative impact that COVID-19 was having on sales, and implemented a "Wholesale Bonus Program" to help dealers with extra cash for taking inventory.

130.    Car sales and the economy rebounded faster than expected, and the dealers prospered as a result.

131.    In response, in May 2020, HMA attempted to alter the program to deprive the dealers of millions of dollars available under the program.

132.    With no prior notice, on May 6, 2020, HMA increased West Palm's May 2020 Hyundai sales objective, before partially reducing it on May 9, 2020.

133.    Not only did HMA unreasonably and unilaterally increase West Palm's May 2020 sales objectives, but they did so after the beginning of May and with insufficient time for West Palm to adequately react. In so doing, HMA effectively increased their actual effective wholesale prices to West Palm after the vehicles were already bought by West Palm and retailed by West Palm to customers.

134.    On June 4, 2020 John Cook (HMA's Director of Sales Operations) sent a letter notifying the Dealer Council dealers of the change in the bonus program.

135.    In response to the email, Brian Napleton "replied all" (including Muñoz) and said: "Thanks for the preview of the letter that cost Hyundai the trust of the dealer body throughout the United States…" *Id.*

136.    Muñoz "replied all" back: "Thanks for your feedback Brian. I am looking forward to the (Dealer Council) next week." *Id.*

137.     A few days later, on June 9, 2020, Edward F. ("Ed") Napleton sent a letter to Muñoz threatening legal action against HMA over the unilateral changes to the bonus program.

138.     In his letter, Ed Napleton wrote: "When questioned as to why and how HMA felt justified in moving the goalposts for dealers like us, who had literally risked their financial futures on their trust of HMA, we were simply told that HMA reserves the right to change 'any rules' at 'any time' for 'any reason.'" *Id.*

139.     Ed Napleton further stated: "I will not stand by and allow HMA or any other manufacturer to leverage its unequal bargaining position to disadvantage me and my family business." *Id.*

140.     HMA ultimately changed the Wholesale Bonus Program, likely in response to Brian Napleton's criticism and Ed Napleton's letter to Muñoz.

141.     HMA's constant sudden changes to the Accelerate Program, including DPB 4.0 and the Wholesale Bonus Program, are arbitrary and unreasonable.

142.     Based on the sales performance criteria imposed by HMA in the first and second quarters of 2020, West Palm failed to receive the maximum available conditional margin under DPB 4.0, increasing West Palm's effective wholesale cost as to vehicles bought months prior and putting West Palm at a competitive disadvantage.

143.     By conditioning dealer margin on sales performance objectives and facility requirements, the Accelerate Program means different dealers pay different wholesale prices to Hyundai for the same vehicle.

144.     Access to HMA's reduced effective wholesale pricing, conditioned on unreasonable, disparate, and manipulated sales performance criteria, is not functionally available to West Palm.

*Co-op Program*

145.    HMA has a dealer marketing program that provides per-vehicle price discounts to dealerships to incentivize dealership marketing efforts through the allocation of cooperative advertising funds ("co-op funds").

146.    The initial offer of co-op funds made to the dealers is currently based on a mathematical equation applicable to all dealers (i.e., each vehicle wholesaled to the dealership generates a certain amount of co-op advertising funds).

147.    The dealer has a right to request additional co-op funds, which West Palm always did. Sometimes West Palm received the additional funds, other times it did not. While West Palm was forced to put its hand out for these monies to survive, HMA has never provided an explanation as to why, nor any transparency as to which dealers get the additional funds or how much they get.

148.    The distribution of any additional co-op funds is not based on a fair and objective criteria. Rather, the allocation of additional co-op funds is based entirely on the whims of the HMA Regional General Manager.

149.    Upon information and belief, these "additional" co-op funds are consistently doled out to certain favored dealers.

150.    This co-op slush fund provides secret discounts that allow favored dealers to sell their cars at a lower effective price, giving them a competitive edge over dealers who do not receive any of the additional co-op funds or who receive a lower amount.

**<u>Maintenance and Warranty Reimbursement</u>**

151.    In 2019, HMA began including a complimentary maintenance plan, called Hyundai Complimentary Maintenance ("HCM"), with every purchase of a new Genesis model vehicle.

152.    On February 1, 2020, HMA began including HCM with every purchase of a new Hyundai vehicle. HCM covers certain maintenance services for three years or 36,000 miles.

153.    Under Fl. Stat. § 320.696, West Palm has established reimbursement rates with HMA for labor performed and for parts sold in connection with, *inter alia*, maintenance plans issued by HMA and its common entities.

154.    Under Fl. Stat. § 320.696, HMA must reimburse West Palm for labor performed and parts sold in connection with HCM at West Palm's established reimbursement rates.

155.    HMA has reimbursed and continues to reimburse West Palm for labor performed and parts sold in connection with HCM at flat rates unilaterally set by HMA that are substantially below West Palm's established statutory reimbursement rates.

156.    In addition, HMA has unilaterally reduced the amount of time a technician is paid for replacing an engine by 2 hours. An engine replacement cannot reasonably be completed in the time allotted, and paid for, by HMA. This is costing West Palm $250 per engine replacement, and is motivated by Hyundai's desire to take (more) money away from dealers.

**FIRST COUNTERCLAIM**
**Violation of the Florida Dealer Act, Fla. Stat. § 320.64(4)**
**(Against HMA and HMC)**

157.    The allegations of paragraphs 1 through 156 are re-alleged as if fully set forth herein.

158.    This Count is an action for damages under Fl. Stat. § 320.697, injunctive relief under Fl. Stat. § 320.695, and declaratory relief under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, Chapter 86, Florida Statutes (Declaratory Judgments), for HMA's violation of Fl. Stat. § 320.64(4).

159.    Under Fl. Stat. § 320.695, to the extent this action seeks injunctive relief, this action is brought by West Palm in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm.

160.    Fl. Stat. § 320.64(4) provides that a licensee such as HMA has violated the law if it has "indulged in any illegal act relating to his or her business."

161.    Hyundai's false NHTSA submissions and false and misleading statements to customers and dealers about the Theta II engine and the Theta II engine recalls are illegal acts related to its business.

162.    In addition to the false and misleading statements about the Theta II engine recalls, Hyundai also made false statements in connection with the non-collision fires that have affected millions of Hyundai vehicles. Non-crash fires continue to be an issue for certain Hyundai vehicles. Hyundai should have initiated these recalls far earlier, but made the decision not to do so.

163.    Hyundai's illegal actions in connection with the Theta II recall and the non-cash vehicle fires have resulted in reputational harm to the Hyundai brand, as well as lost sales and lost profits for Hyundai dealers, including West Palm.

164.    HMA's actions violate Fl. Stat. § 320.64(4).

165.    HMC is jointly and severally liable for the unlawful actions of HMA, their wholly owned subsidiary.

WHEREFORE, West Palm demands:

(a) under Fl. Stat. § 320.697, entry of a judgment against HMA and HMC for treble damages in an amount to be determined at trial;

(b) under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that HMA

made false submissions to NHTSA, and made false and misleading statements to customers and dealers, about the Theta II engine and the Theta II engine recalls in violation of Fl. Stat. § 320.64(4).

(c) an order awarding West Palm's attorney's fees, interest, costs; and

(d) such other relief as this Court deems just and equitable.

## SECOND COUNTERCLAIM – FRAUD
### (Florida Common Law)
### (Against HMA and HMC)

166.    West Palm repeats and re-alleges the allegations in paragraphs 1 - 156 of the Counterclaims as if fully set forth herein.

167.    Beginning in 2015, HMA recalled certain model year 2011-2012 Hyundai Sonatas equipped with the Theta II 2.0 liter or 2.4 liter Gasoline Direction Injection engine to address a defect that could lead to bearing wear and engine failure. This recall was expanded in 2017 to include additional model year vehicles with Theta II engines.

168.    As described above, in 2015, Hyundai knew the engine contained a design problem, but falsely stated that the problem was a result of the manufacturing process.

169.    HMA materially misrepresented the nature and seriousness of the defect in the Theta II engine, and HMA materially misrepresented its ability to diagnosis the recall condition, with the result that unsafe vehicles were returned to the road.

170.    In addition, HMA materially misrepresented the nature and seriousness of the defect causing the non-collision vehicle fires in Hyundai vehicles. HMA knew that certain models were more prone to catching on fire, they knew how dangerous it was to consumers who were driving their cars, but still delayed initiating recalls.

171.     HMA made these misrepresentations with knowledge of its falsity or with recklessness on whether it was true or false.

172.     HMA made these misrepresentations with an intention that customers and dealers, including West Palm, would rely and act on them.

173.     Indeed, West Palm justifiably relied on these misrepresentations when it continued to order vehicles from HMA and replacement engines as well as more parts under other qualifying federal safety recalls.

174.     West Palm has suffered reputational harm and reduced sales as a result of HMA's fraudulent behavior.

175.     As a result of HMA's conduct, West Palm has incurred substantial economic damages.

176.     HMA knew, or was reckless in not knowing, that the representations about the Theta II engines, as set forth above, were false, misleading, and likely to deceive West Palm when those representations were made.

177.     Punitive damages should be assessed against HMA.

178.     An award of punitive damages to the maximum level permitted should be imposed to deter such future conduct or punish HMA.

WHEREFORE, West Palm demands:

(a)     that judgment be entered in its favor and against HMA for compensatory damages, punitive damages, fees, and costs in an amount in excess of $75,000; and

(b)     any and all other relief that the Court considers just and equitable.

## THIRD COUNTERCLAIM - CIVIL CONSPIRACY
### (Florida Common Law)
### (Against HMA, HMC, and Muñoz)

179.    West Palm repeats and realleges the allegations contained in paragraphs 1 - 156 of the Counterclaims as if fully set forth herein.

180.    This count is for damages from Hyundai's unlawful conduct as part of a conspiracy to conceal from government regulators, dealers, and the public the facts and data on the negligent design and manufacture of Theta II engines, and the dangers those engines presented to the public.

181.    HMA and HMC agreed to enter into a conspiracy to commit an unlawful act to defraud West Palm by knowingly concealing, through false statements, omissions, and other illegal acts, the negligent design and manufacture of Theta II engines, and the dangers those engines presented to the public, such as engine failure and non-crash fires.

182.    HMA and HMC committed overt acts in furtherance of the conspiracy by: (1) blaming the Theta II engine issues on manufacturing problems with Hyundai's plant in Alabama; (2) stating that they had resolved the issue; and (3) failing to timely issue recalls for affected vehicles when HMA and HMC knew that the problem stemmed from an inherent design flaw with the Theta II engine and not a manufacturing problem connected to a specific plant.

183.    HMA and HMC misled NHTSA, customers and dealers and their unlawful actions have caused reputational harm to the Hyundai brand, resulting in lost sales and lost profits for Hyundai dealers, including West Palm.

184.    As a result of the acts of HMA and HMC performed in furtherance of the conspiracy, West Palm suffered damages.

185.    Additionally, José Muñoz conspired with Hyundai against West Palm.

186.     In or around July 2020, José Muñoz and other Hyundai executives conspired to defame West Palm by suing it for warranty fraud to punish the Napleton organization for refusing to be one of Muñoz's many submissive pawns.

187.     The email chain with the subject "Engine Fraud Investigation: Weekly Status Report" shows that the "extraordinary meeting" was at least one overt act in furtherance of the conspiracy.

188.     West Palm suffered damages as a result of the conspiratorial acts of HMA, HMC, and José Muñoz.

WHEREFORE, West Palm demands:

(a)     judgment be entered in their favor and against HMA, HMC and Muñoz for compensatory damages, fees, and costs in an amount to be determined at trial in excess of $75,000;

(b)     and any and all other relief that the Court considers fit and necessary.

### FOURTH COUNTERCLAIM – TORTIOUS INTERFERENCE WITH  A CONTRACT
### (Florida Common Law)
### (Against Muñoz and HMC)

189.     West Palm repeats and re-alleges the allegations in paragraphs 1 - 156 of the Counterclaims as if fully set forth herein.

190.     West Palm has a valid contract with HMA, the Dealer Sales and Service Agreement, under which West Palm has legal rights.

191.     This Agreement is essential to West Palm's ability to exist as a Hyundai dealership.

192.     José Muñoz and HMC are aware of West Palm's business relationship and Dealer Sales and Service Agreement with HMA.

193.     José Muñoz and HMC intentionally and unjustifiably interfered with West Palm's business relationship and Agreement with HMA.

194.    Generally, for interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship. *See Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So.2d 381, 386 (Fla. Dist. Ct. App. 1999). However, "the 'privilege to interfere' enjoyed by an officer or employee of a contracting party is not absolute. The privilege is destroyed where an employee acts solely with ulterior purposes, without an honest belief that his actions would benefit the employer, and the employee's conduct concerning the contract or business relationship is not in the employer's best interest." *Id.*

195.    "Courts of other jurisdictions have uniformly held that (assuming all other elements are present) where an individual acts without an honest belief that his action will benefit his employer, liability for unlawful interference with his employer's contract with another may be imposed against him." *Sloan v. Sax*, 505 So.2d 526, 528 (Fla. 3d DCA 1987); *see also Burger King Corp. v. Ashland Equities, Inc.,* 161 F. Supp. 2d 1331, 1336 (S.D. Fla. 2001) ("The right to interfere in contractual relations, as granted to interested parties, is qualified by the obligation to proceed in good faith.")

196.    "Parties are disqualified from asserting the privilege if they act maliciously or with conspiratorial motives because 'the privilege does not encompass the purposeful causing of a breach of contract.'" *CSDS Aircraft Sales & Leasing, Inc. v. Lloyd Aereo Boliviano Airlines*, 2011 WL 1559823, at *5 (S.D. Fla. April 22, 2011) (internal citation omitted); *see also Dick's Sporting Goods, Inc. v. Forbes/Cohen Florida Properties, L.P.*, 2020 WL 1536443, at *4 (S.D. Fla. March 30, 2020) ("Whether a defendant acted maliciously is generally determined by examining the defendant's acts in light of the totality of the circumstances.")

197.    José Muñoz did not act in good faith; he acted maliciously and with conspiratorial motives against West Palm and the Napleton organization. His goal was to take away "all of" Napleton's stores.

198.    HMC did not act in good faith; it had an "agenda" and a "race to judgment" against Napleton with the goal to eliminate the Napleton Organization as a Hyundai dealer.

199.    José Muñoz and HMC embraced and adopted the baseless allegations of Mark Eddleman against West Palm, and peddled these allegations to impugn West Palm and the Napleton organization.

200.    José Muñoz and HMC intentionally and unjustifiably endorsed these false allegations to provide a basis for HMA to terminate its Agreement with West Palm.

201.    Muñoz and HMC's interference with West Palm's Dealer Sales and Service Agreement was not in the best interests of HMA.

202.    José Muñoz's and HMC's actions have proximately hurt West Palm, in an amount to be proven at trial.

203.    As José Muñoz's and HMC's conduct has been willful, wanton, and malicious, West Palm is entitled to punitive damages.

WHEREFORE, West Palm demands:

(a)     that judgment be entered in its favor and against Muñoz and HMC for compensatory damages, punitive damages, fees, and costs in an amount in excess of $75,000;

(b)     punitive damages in an amount to be determined at trial; and

(c)     any and all other relief that the Court considers just and equitable.

## FIFTH COUNTERCLAIM
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(42)(a)
### (Against HMA and HMC)

204. West Palm repeats and realleges paragraphs 1 - 156 as if fully set forth herein.

205. This is an action for an injunction pursuant to Fl. Stat. § 320.695 for HMA's violation of Fla. Stat. § 320.64(42)(a).

206. Under Fl. Stat. § 320.64(42)(a), a manufacturer is prohibited from establishing, implementing, or enforcing criteria for measuring the sales or service performance of any of its franchised motor vehicle dealers which have a "material or adverse effect on any motor vehicle dealer" and which "are unfair, unreasonable, arbitrary, or inequitable," or "do not include all the relevant and material criteria, data, or facts," which "include, but are not limited to, those of motor vehicle dealerships of comparable size in comparable markets."

207. As discussed above, DPB 4.0 as established, implemented, and enforced by HMA contains sales performance criteria that are unfair, unreasonable, inequitable, and do not consider all relevant and material local and regional criteria, data, and facts.

208. The DPB 4.0 sales volume objectives and sales efficiency metric, *inter alia*, do not accurately reflect the sales opportunities available to West Palm; rely on a percentage of growth that is arbitrarily established by HMA; use averages that by definition impose unequal standards on dealers; fail to consider relevant and material local criteria, data, and facts specific to the market served by West Palm; and fail to consider the performance of other motor vehicle dealers of comparable size to West Palm located in comparable markets.

209. Establishment, implementation and enforcement of HMA's sales efficiency metric adversely affects West Palm, as West Palm has been unlawfully denied the full amount of bonus money and price discounts available under DPB 4.0.

210.    Sales efficiency compares a dealer's actual sales to the sales "expected" by HMA for that dealer to meet statewide market share but adjusted only for the popularity of individual vehicle segments and as determined solely by HMA.

211.    Sales efficiency is an outdated and discredited sales performance metric of the type that was outlawed by the highest court in the State of New York in *Beck Chevrolet Co. Inc. v. General Motors LLC*, 27 N.Y.3d 379 (N.Y. 2016), because it was found to be unfair, unreasonable, and arbitrary on the ground that it did not account for local market conditions and consumer preferences other than segment popularity.

212.    In 2017, the Florida Legislature amended the Florida Dealer Act, adding Fl. Stat. 320.64(42)(a) which, like *Beck*, outlawed sales performance standards like sales efficiency that "do not include all the relevant and material criteria, data, or facts."

213.    HMA's sales efficiency metric does not include all relevant and material criteria, data, or facts, and does not fairly compare West Palm to dealerships of comparable size in comparable markets. Rather, it only adjusts for segment popularity and no other market conditions or consumer preferences.

214.    HMA's sales efficiency metric is unlawful and unenforceable under Florida law.

215.    West Palm, therefore, seeks a permanent injunction barring HMA from implementing and enforcing its sales efficiency performance metric in violation of the Florida Dealer Act.

216.    HMC is jointly and severally liable for the unlawful actions of HMA, their wholly owned subsidiary.


WHEREFORE, West Palm demands:

(a) under Fl. Stat. § 320.697, entry of a judgment against HMA and HMC for treble damages in an amount to be determined at trial;

(b) under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that: (1) DPB 4.0 contains unfair, unreasonable, arbitrary or inequitable criteria for measuring the performance of West Palm; and (2) HMA's establishment, implementation, or enforcement of DPB 4.0 and the sales efficiency performance metric violates Fl. Stat. § 320.64(42)(a);

(c) under Fl. Stat. § 320.695, in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm, entry of an injunction requiring HMA to cease using any unfair, unreasonable, and inequitable criteria for measuring the performance of West Palm for any purposes whatsoever, including, but not limited to, DPB 4.0 and sales efficiency;

(d) an order awarding West Palm's attorney's fees, interest, costs; and

(e) such other relief as this Court deems just and equitable.

### SIXTH COUNTERCLAIM
### Violation of Robinson-Patman Act, 15 U.S.C. § 13(a)
### (Against HMA and HMC)

217.    West Palm repeats and realleges the allegations of paragraphs 1 through 156 are re-alleged as if fully set forth herein.

218.    This Count is a claim arising under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for Hyundai's violations of the Robinson-Patman Act, 15 U.S.C. § 13(a).

219.   At all times relevant to this action, West Palm, HMA, and HMC were, and are, persons engaged in commerce within the meaning of 15 U.S.C. § 13(a).

220.   HMA is a motor vehicle distributor engaged in the sale of motor vehicles in interstate commerce. The HMA vehicles sold to West Palm and its competitors are manufactured outside the state of Florida and transported across state lines to West Palm and its competitors for resale to consumers.

221.   Through the Accelerate Program, HMA has sold motor vehicles of like grade and quality in contemporaneous interstate sales to competitors of West Palm at lower prices than the prices at which those motor vehicles are sold to West Palm.

222.   West Palm competes with other Hyundai dealers in the South Florida market and elsewhere. Those dealers pay lower prices for Hyundai motor vehicles as a result of the Accelerate Program.

223.   As a result of the price differences referenced above, HMA has, in the course of commerce, discriminated in price in contemporaneous and consummated sales of commodities (*i.e.*, Hyundai vehicles) of like grade and quality to different purchasers (*i.e.*, one price to West Palm, another to the favored dealers).

224.   The effect of HMA's unlawful discrimination has been substantially to lessen competition between and among West Palm and the other Hyundai dealers with which it competes. Upon information and belief, the favored dealers who receive discounts through the Accelerate Program have lowered their retail prices to reflect their lower effective wholesale cost, forcing West Palm to lose sales, reduce its margins, or both.

225.   The discounts provided to competing Hyundai dealers through the Accelerate Program are not functionally available to West Palm.

226.     The favored dealers who receive discounts through the Accelerate Program provide no service or savings to HMA which are not provided in identical kind by West Palm. Each affected dealer maintains an inventory of bought vehicles on dealership property and competes to sell and service Hyundai vehicles in accordance with Hyundai Sales and Service Agreements.

227.     HMA exempts certain favored dealers from its facility requirements, entitling those dealers to slashed effective wholesale pricing even when they fail to meet the facility components of the Accelerate Program that other dealers like West Palm are held to.  These are, in effect, secret price discounts for favored dealers.

228.     HMA has also violated RPA through its allocation of cooperative advertising funds ("co-op funds") in a discriminatory manner. The distribution of additional co-op funds is based entirely on the whims of the HMA Regional General Manager. Favored dealers get the extra funds. Additional co-op funds are a form of secret discount. This puts West Palm at a competitive disadvantage.

229.     HMA's above-alleged price discrimination violates 15 U.S.C. § 13(a) of the Robinson-Patman Act.

230.     As a direct and proximate result of HMA's violation of 15 U.S.C. § 13(a) of the Robinson-Patman Act, West Palm has suffered injury to its business and property as (a) lost sales to favored competitors and (b) lost profit margin to help prevent the loss of such sales. West Palm's injury is of the kind the Robinson-Patman Act was designed to prevent and flows from that which makes HMA's conduct unlawful.

231.     HMC is jointly and severally liable for the unlawful actions of HMA, their wholly owned subsidiary.

WHEREFORE, West Palm demands entry of a judgment:

(a) declaring that HMA has violated the Robinson-Patman Act, 15 U.S.C. § 13(a), by and through its continued implementation of discriminatory price discounts under the Accelerate Program and its discriminatory allocation of co-op funds;

(b) treble damages in an amount to be proven at trial,

(c) enjoining, under 15 U.SC. § 26, HMA's continued implementation of discriminatory pricing through the Accelerate Program or otherwise;

(d) enjoining, under 15 U.SC. § 26, HMA's continued implementation of discriminatory allocation of co-op funds;

(e) awarding West Palm attorney's fees and costs under 15 U.S.C. § 15(a) and 15 U.S.C. § 26; and

(f) granting such other relief this Court deems just and equitable.

## SEVENTH COUNTERCLAIM
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(38)
**(Against HMA and HMC)**

232.   West Palm repeats and re-alleges the allegations in paragraphs 1 through 156 as if fully set forth herein.

233.   This Count is an action for damages under Fl. Stat. § 320.697, injunctive relief under Fl. Stat. § 320.695, and declaratory relief under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, Chapter 86, Florida Statutes (Declaratory Judgments), for HMA's violation of Fl. Stat. § 320.64(38).

234.   Under Fl. Stat. § 320.695, this claim is brought by West Palm in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm.

235.    Florida law provides that a licensee such as HMA may "offer a bonus, rebate, incentive, or other benefit program to its dealers in this state which is calculated or paid on a per vehicle basis and is related in part to a dealer's facility or the expansion, improvement, remodeling, alteration or renovation of a dealer's facility." Fl. Stat. § 320.64(38). If such a program is implemented, "[a]ny dealer who does not comply with the facility criteria . . . is entitled to receive a reasonable percentage of the . . . incentive . . . offered by the licensee under that program by complying with the criteria or eligibility requirements unrelated to the dealer's facility under that program." § 320.64(38), Fla. Stat.

236.    Fl. Stat. § 320.64(38) elaborates on what is to be considered a reasonable percentage, and creates a presumption that it would be reasonable for a licensee to pay eighty percent (80%) of the amount available under an incentive program to a dealer that complies with all incentive criteria other than the facility-related criteria.

237.    HMA has refused to pay its dealers who comply with all non-facility criteria a reasonable percentage of the incentives available under the Accelerate Program.

238.    West Palm has complied with all lawful Accelerate Program criteria other than GDSI 2.0.

239.    HMA's refusal to pay West Palm a reasonable percentage of the incentives available under the Accelerate Program violates Fl. Stat. § 320.64(38), and West Palm has been damaged as a result.

240.    Fl. Stat. § 320.64(38) also provides that a licensee such as HMA has violated the law if it has offered a bonus or incentive programs to a dealer or dealers in Florida that it does not offer to all other dealers in Florida.

241.    HMA's refusal to make the incentives payments available under the Accelerate Program available to West Palm on the same terms as it does to other dealers violates Fl. Stat. § 320.64(38), and West Palm has been damaged thereby.

242.    HMA has also violated Fl. Stat. § 320.64(38) by offering secret discounts to certain dealers, such as the additional co-op slush fund, and West Palm has been damaged due to the thumb HMA has placed on the scale in favor of West Palm's competition.

243.    Fl. Stat. § 320.695 provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of ss. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

244.    An injunction restraining HMA from continuing to violate Fl. Stat. § 320.64(38) by failing to pay West Palm a reasonable amount of the incentives available under the Accelerate Program and by failing to make the Accelerate Program incentives available to West Palm on the same terms as all other dealers is appropriate.

245.    HMC is jointly and severally liable for the unlawful actions of HMA, its subsidiary.

WHEREFORE, West Palm demands:

(a)    under Fl. Stat. § 320.697, entry of a judgment against HMA and HMC for treble damages;

(b)    under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that: (1) HMA fails to pay West Palm a reasonable percentage of the bonuses, incentives, rebates, or other benefits available under the

Accelerate Program in violation of Fl. Stat. § 320.64(38); and (2) in implementing unfair, unreasonable, arbitrary, inequitable and otherwise unlawful performance objectives and facility requirements, HMA fails or refuses to offer to West Palm all bonuses and incentives available under the Accelerate Program in violation of Fl. Stat. § 320.64(38);

(c)      under Fl. Stat. § 320.695, in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm, entry of an injunction: (1) requiring that HMA pay West Palm a reasonable percentage of the incentives available under the Accelerate Program for so long as HMA continues to offer the Accelerate Program or comparable program to all other dealers in Florida; and (2) requiring that HMA make equally available to West Palm all incentives available under the Accelerate Program by ceasing the application of unfair, unreasonable, arbitrary, and inequitable sales objectives and sales efficiency calculations;

(d)      damages no less than $75,000 in an amount to be proven at trial;

(e)      an order awarding West Palm attorney's fees, interest, costs; and

(f)      such other relief as this Court deems just and equitable.

## EIGHTH COUNTERCLAIM
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(37)
#### (Against HMA and HMC)

246.    West Palm repeats and re-alleges the allegations in paragraphs 1 through 156 as if fully set forth herein.

247.    This Count is an action for damages under Fl. Stat. § 320.697, injunctive relief under Fl. Stat. § 320.695, and declaratory relief under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, Chapter 86, Florida Statutes (Declaratory Judgments), for HMA's violation of Fl. Stat. § 320.64(37).

248.     Under Fl. Stat. § 320.695, to the extent this action seeks injunctive relief, this action is brought by West Palm in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm.

249.     Fl. Stat. § 320.64(37) provides that a licensee such as HMA has violated the law if it has:

> refused to allow or has limited or restricted a motor vehicle dealer from acquiring or adding a sales or service operation for another line-make of motor vehicle at the same or expanded facility unless . . . the licensee can demonstrate that such refusal, limitation, or restriction is justified by consideration of reasonable facility and financial requirements and the dealer's performance for existing line-make.

250.     Through the Accelerate Program and GDSI 2.0, including the Accelerate Exclusivity Requirement, HMA has limited or restricted West Palm's ability to operate its Genesis sales and service operation at the dealership location without lawful justification.

251.     HMA's actions violate Fl. Stat. § 320.64(37).

252.     Fl. Stat. § 320.695 provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of ss. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

253.     As a result, an injunction restraining HMA from implementing GDSI 2.0, including the Accelerate Exclusivity Requirement, in violation Fl. Stat. §  320.64(37), is appropriate.

254.     HMC is jointly and severally liable for the unlawful actions of HMA, its subsidiary.

WHEREFORE, West Palm demands:

(a) under Fl. Stat. § 320.697, entry of a judgment against HMA and HMC for treble damages;

(b) under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that HMA, through the Accelerate Program and GDSI 2.0, refused to allow or has limited or restricted West Palm from acquiring or adding another line-make sales or service operation at its Hyundai facility in violation of Fl. Stat. § 320.64(37);

(c) under Fl. Stat. § 320.695, in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm, entry of an injunction restraining HMA from implementing the Accelerate Exclusivity Requirement and GDSI 2.0;

(d) an order awarding West Palm attorney's fees, interest, costs; and

(e) such other relief as this Court deems just and equitable.

## NINTH COUNTERCLAIM
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(6)
#### (Against HMA and HMC)

255. West Palm repeats and re-alleges the allegations in paragraphs 1 through 156 as if fully set forth herein.

256. This Count is an action for damages under Fl. Stat.§ 320.697, injunctive relief under Fl. Stat.§ 320.695, and declaratory relief under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, Chapter 86, Florida Statutes (Declaratory Judgments), for HMA's violation of Fl. Stat.§ 320.64(6).

257. Under Fl. Stat.§ 320.695, to the extent this action seeks injunctive relief, this action is brought by West Palm in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm.

66

258.    Fl. Stat. § 320.64(6) provides that a licensee such as HMA has violated the law if it has "coerced or attempted to coerce any motor vehicle dealer to enter into any agreement with the licensee."

259.    By tying incentives in the Accelerate Program to GDSI 2.0 and the Accelerate Exclusivity Requirement, and by placing dealers who do not comply with such requirements at a cost disadvantage relative to dealers who receive full Accelerate Program incentives, HMA has coerced or tried to coerce West Palm and others to enter into an agreement with HMA to create a GDSI 2.0-compliant Hyundai-exclusive sales and service facility.

260.    HMA's actions violate Fl. Stat. § 320.64(6).

261.    Fl. Stat. § 320.695 provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of ss. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

262.    An injunction restraining HMA from implementing the Accelerate Exclusivity Requirement in violation Fl. Stat. § 320.64(6) is appropriate.

263.    HMC is jointly and severally liable for the unlawful actions of HMA, its wholly owned subsidiary.

WHEREFORE, West Palm demands:

(a) under Fl. Stat. § 320.697, entry of a judgment against HMA and HMC for treble damages;

(b) under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida

Statutes (Declaratory Judgments), a declaration, order, or judgment that HMA,

through the Accelerate Program, has coerced or attempted to coerce West Palm

to enter into an agreement with HMA in violation of Fl. Stat. § 320.64(6);

(c) under Fl. Stat. § 320.695, in the name of the Florida Department of Highway

Safety and Motor Vehicles and the State of Florida for the use and benefit of

West Palm, entry of an injunction restraining HMA from implementing the

Accelerate Program and GDSI 2.0, including the Accelerate Exclusivity

Requirement;

(d) an order awarding West Palm attorney's fees, interest, costs; and

(e) such other relief as this Court deems just and equitable.

### TENTH COUNTERCLAIM
### Violation of the Florida Dealer Act, Fla. Stat. § 320.64(10)(b)
### (Against HMA and HMC)

264.   West Palm repeats and re-alleges the allegations in paragraphs 1 through 156 as if fully set forth herein.

265.   This Count is an action for damages under Fl. Stat. § 320.697, injunctive relief under Fl. Stat. § 320.695, and declaratory relief under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, Chapter 86, Florida Statutes (Declaratory Judgments), for HMA's violation of Fl. Stat. § 320.64(10)(b).

266.   Under Fl. Stat. § 320.695, to the extent this action seeks injunctive relief, this action is brought by West Palm in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm.

267.   Fl. Stat. § 320.64(10)(b) provides that a licensee such as HMA:

may not require a motor vehicle dealer, by agreement, program, policy, standard or otherwise, to make substantial changes, alterations, or remodeling to, or to replace a motor vehicle dealer's sales or service facilities unless the licensee's requirements are reasonable and justifiable in light of the current and reasonable foreseeable projections of economic conditions, financial expectations, and the motor vehicle dealer's market for the licensee's motor vehicles.

268.     By tying incentives in the Accelerate Program to GDSI 2.0 and the Accelerate Exclusivity Requirement, and by placing dealers who do not comply with such requirements at a substantial cost disadvantage relative to dealers who receive full Accelerate Program incentives, HMA has required West Palm to make substantial changes to its facilities and to create a GDSI 2.0-compliant Hyundai-exclusive sales and service facility. These requirements are not reasonable and justifiable given current and reasonably foreseeable projections of economic conditions, financial expectations, and West Palm's market.

269.     HMA's actions violate Fl. Stat. § 320.64(10)(b).

270.     Fl. Stat. § 320.695 provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of ss. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

271.     An injunction restraining HMA from implementing the Accelerate Exclusivity Requirement in violation of Fl. Stat. § 320.64(10)(b) is appropriate.

272.     HMC is jointly and severally liable for the unlawful actions of HMA, its wholly owned subsidiary.

WHEREFORE, West Palm demands:

69

(a) under Fl. Stat. § 320.697, entry of a judgment against HMA and HMC for treble damages;

(b) under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that: (1) HMA, through the Accelerate Program, requires West Palm to make substantial changes, alterations, or remodeling to its sales or service facilities; and (2) the substantial changes, alterations, or remodeling to West Palm's sales or service facilities required by HMA are not reasonable and justifiable given the current and reasonable foreseeable projections of economic conditions, financial expectations, and West Palm's market for HMA's motor vehicles, in violation of Fl. Stat. § 320.64(10)(b);

(c) under Fl. Stat. § 320.695, in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm, entry of an injunction restraining HMA from implementing the Accelerate Program and GDSI 2.0, including the Accelerate Exclusivity Requirement;

(d) an order awarding West Palm's attorney's fees, interest, costs; and

(e) such other relief as this Court deems just and equitable.

## ELEVENTH COUNTERCLAIM
### Violation of the Florida Dealer Act, Fla. Stat. § 320.696
(Against HMA and HMC)

273.    West Palm repeats and re-alleges the allegations in paragraphs 1 through 156 as if fully set forth herein.

274.     This Count is an action for damages under Fl. Stat. § 320.697, injunctive relief under Fl. Stat. § 320.695, and declaratory relief under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, Chapter 86, Florida Statutes (Declaratory Judgments), for HMA's violation of Fl. Stat. § 320.696.

275.     Under Fl. Stat. § 320.695, to the extent this action seeks injunctive relief, this action is brought by West Palm in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of West Palm.

276.     Fl. Stat. § 320.696 requires that a licensee such has HMA must compensate a dealer for parts and labor included in work performed by a motor vehicle dealer "to maintain or repair a licensee's product under a warranty or maintenance plan . . . issued by the licensee or its common entity . . . ."

277.     HCM is a maintenance plan issued by HMA or its common entity.

278.     Under Fl. Stat. §§ 320.696(3) and (4), West Palm has established reimbursement rates with HMA for labor performed and for parts sold in connection with all covered work under Florida law.

279.     Despite these established rates, HMA has reimbursed and continues to reimburse West Palm for labor performed and parts sold under HCM at rates substantially below what HMA owes West Palm for that work under West Palm's established statutory reimbursement rates.

280.     HMA has also unilaterally reduced the amount of time a technician is paid for replacing an engine by 2 hours. Thus, HMA is refusing to pay West Palm the full amount they are owed for their labor.

281.     HMA's refusal to reimburse West Palm at West Palm's established statutory rates for labor performed and parts sold under HCM violates Fl. Stat. § 320.696.

282.     Fl. Stat. § 320.695 provides that "notwithstanding the existence of any adequate remedy at law, . . . any motor vehicle dealer in the name of the department and state and for the use and benefit of the motor vehicle dealer" may obtain an injunction "restraining any person . . . from violating or continuing to violate any of the provisions of ss. 320.60-320.70 . . . . A single act in violation of the provisions of ss. 320.60-320.70 shall be sufficient to authorize the issuance of an injunction."

283.     An injunction requiring HMA to reimburse West Palm at its established rates for labor performed and parts sold under HCM as required by Fl. Stat. § 320.696 is appropriate.

284.     HMC is jointly and severally liable for the unlawful actions of HMA, its wholly owned subsidiary.

WHEREFORE, West Palm demands:

(a) under Fl. Stat. § 320.697, entry of a judgment against HMA and HMC for treble damages;

(b) under 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, and Chapter 86, Florida Statutes (Declaratory Judgments), a declaration, order, or judgment that: (1) labor West Palm performs and parts West Palm sells under HCM is covered under Fl. Stat. § 320.696; (2) HMA must reimburse West Palm for labor performed and parts sold under HCM at West Palm's established statutory reimbursement rates; and (3) HMA failed to reimburse West Palm for labor performed and parts sold under HCM at West Palm's established statutory reimbursement rates in violation of Fl. Stat. § 320.696;

(c) under Fl. Stat. § 320.695, in the name of the Florida Department of Highway Safety and Motor Vehicles and the State of Florida for the use and benefit of

West Palm, entry of an injunction requiring HMA to reimburse West Palm at its

established rates for labor performed and parts sold under HCM, as required by

Fl. Stat. § 320.696;

(d)  an order awarding West Palm attorney's fees, interest, costs; and

(e)  such other relief as this Court deems just and equitable.

### DEMAND FOR JURY TRIAL

EFN West Palm Motor Sales LLC hereby demands trial by jury on all issues so triable.

Dated: August 23, 2021

Respectfully, submitted,

ARENT FOX LLP

By: ___*/s/Charles A. Gallaer*___
     Russell P. McRory, Esq. (*pro hac vice*)
     Michael P. McMahan, Esq. (*pro hac vice*)
     Charles A. Gallaer, Esq.
     1301 Avenue of the Americas, Fl. 42
     New York, NY 10019
     Tel: 212-484-3900
     Fax: 212-484-3990

     Taniel E. Anderson (*pro hac vice*)
     1717 K Street, NW
     Washington, DC 20006
     Tel: (202) 857-6000
     taniel.anderson@arentfox.com

     *Attorneys for Defendants*