UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

---

HYUNDAI MOTOR AMERICA CORPORATION,

        Plaintiff,

          v.

EFN WEST PALM MOTOR SALES, LLC,

            Defendant/Counterclaim
            Plaintiff/Third-Party Plaintiff

GENE KHAYTIN; ERNESTO REVUELTA;
EDWARD W. NAPLETON; GEOVANNY PELAYO,
JORGE RUIZ,

          Defendants.

EFN WEST PALM MOTOR SALES, LLC;
for itself and in the name of the Department of Highway
Safety and Motor Vehicles of the State of Florida, for its
use and benefit,

            Counterclaim-Plaintiff/Third-Party
            Plaintiff,

          v.

HYUNDAI MOTOR AMERICA CORPORATION,

            Counterclaim-Defendant,

            AND

HYUNDAI MOTOR COMPANY,

            Third-Party Defendants.

Case No. No. 9:20-cv-82102-WM

---

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

## TABLE OF CONTENTS

Table of Authorities .................................................................................................. iii

PRELIMINARY STATEMENT ................................................................................ 1

BRIEF SUMMARY OF MATERIAL FACTS ......................................................... 4

LEGAL STANDARD................................................................................................ 11

ARGUMENT ............................................................................................................ 12

I.      HMA Cannot Establish a Civil RICO Violation (Count II) ........................... 12

      A.      HMA cannot establish a "pattern" of "racketeering activity." ........................... 13

            1.      There is no evidence that Defendants committed predicate acts of mail and wire fraud. ......................................................................... 13

      B.      HMA cannot establish the existence of an "enterprise." ..................................... 15

            1.      The "association-in-fact" enterprise fails as a matter of law. ................. 16

            2.      HMA cannot prove the structure of the alleged enterprise. .................... 18

            3.      The Complaint fails to allege each Defendant's participation in the purported enterprise's affairs. .................................................. 20

II.      Because HMA cannot establish its substantive RICO claim, the RICO conspiracy claim necessarily fails (Count III)................................................................... 22

III.      HMA's state law claims damages are barred, because HMA failed to conduct an audit as required by state law. ........................................................................ 23

IV.      In the alternative, HMA's damages should be limited to one year from the date the lawsuit was filed............................................................................................ 23

V.      There is no issue of material fact regarding West Palm's first counterclaim. ................. 24

      A.      Hyundai's discretionary allocation system is unfair as it excludes dealers in litigation with Hyundai and dealer who choose to opt out of Hyundai's "voluntary" programs............................................................................ 25

      B.      Hyundai's discretionary allocation system goes against the legislative intent of the Dealer Act............................................................................ 26

## TABLE OF CONTENTS
(continued)

**Page**

VI.   There is no issue of material fact concerning liability onWest Palm's second and third counterclaims...........................................................................................................26

CONCLUSION....................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Almanza v. United Airlines, Inc.*,
  851 F.3d 1060 (11th Cir. 2017) ...................................................................15, 19

*Am. Dental Ass'n. v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ...........................................................................22

*Ambrosia Coal & Const. Co. v. Pages Morales*,
  428 F.3d 1309 (11th Cir. 2007) ...........................................................................11

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...............................................................................................11

*Brooks v. Blue Cross and Blue Shield of Florida, Inc.*,
  116 F.3d 1364 (11th Cir. 1997) ...........................................................................12

*Burger King Corp. v. Ashland Equities, Inc.*,
  217 F. Supp. 2d 1266 (S.D. Fla. 2002) ...............................................................11

*Catano v. Capuano*,
  Case No. 18-20223-Civ-TORRES, 2019 WL 3035752 (S.D. Fla. July 11,
  2019) ........................................................................................................................17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...............................................................................................11

*Cisneros v. Petland, Inc.*,
  972 F.3d 1204 (11th Cir. 2020) ................................................................. *passim*

*Cont'l 332 Fund, LLC v. Kozlowski*,
  No. 2:17-CV-41-FtM-38MRM, 2020 WL 1234808 (M.D. Fla. Mar. 13, 2020),
  *reconsideration denied*, No. 2:17-CV-41-FtM-38MRM, 2020 WL 2573292
  (M.D. Fla. May 21, 2020) ......................................................................................12

*Crawford v. Franklin Credit Mgmt. Corp.*,
  758 F.3d 473 (2d Cir. 2014) ................................................................................13

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013) ................................................................................18

*Drummond v. Zimmerman*,
  454 F. Supp. 3d 1210 (S.D. Fla. 2020) .................................................12, 21, 22

iii

*Ellis v. Warner*,
No. 15-10134-CIV-GOODMAN, 2017 WL 634287 (S.D. Fla. Feb. 16, 2017)...............13, 14

*Fitzgerald Motors, Inc. v. FCA US LLC*,
2020 WL 10359983 (M.D. Fla. June 26, 2020)........................................................................26

*Fitzgerald v. Chrysler Corp.*,
116 F.3d 225 (7th Cir. 1997) ....................................................................................................18

*Fox Motors, Inc., v. Mazda Distribs., Inc.*,
806 F.2d 953 (10th Cir. 1986) ..................................................................................................26

*Jackson v. BellSouth Telecomms.*,
372 F.3d 1250 (11th Cir. 2004) ...........................................................................12, 13, 17, 22

*Lewis v. Mercedes-Benz USA, LLC*,
No. 19-CIV-81220-RAR, 2021 WL 1216897 (S.D. Fla. Mar. 30, 2021)..........................19, 20

*Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*,
530 F.3d 1339 (11th Cir. 2008) ................................................................................................22

*Lockheed Martin Corp. v. Boeing Co.*,
314 F. Supp. 2d 1198 (M.D. Fla. 2004)....................................................................................18

*Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am., Inc.*,
32 F.3d 528 (11th Cir. 1994) ....................................................................................................26

*Ray v. Spirit Airlines*,
836 F.3d 1340 (11th Cir. 2016) .........................................................................16, 17, 18, 19

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)...........................................................................................................12, 21

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
30 F.3d 339 (2d Cir. 1994)........................................................................................................18

*Sterling Nat'l Mortg. Co. v. Infinite Title Sols., LLC*,
No. 10-22147-CIV, 2011 WL 13220625 (S.D. Fla. Mar. 3, 2011) .....................11, 12, 21, 22

*United States v. Browne*,
505 F.3d 1229 (11th Cir. 2007) ................................................................................................22

*United States v. Maxwell*,
579 F.3d 1282 (11th Cir. 2009) ................................................................................................14

*United States v. Ward*,
486 F.3d 1212,1222 (11th Cir. 2007) .......................................................................................14

**Statutes**

18 U.S.C. § 1343 ................................................................................................................14

18 U.S.C. § 1961(4) ...........................................................................................................15

18 U.S.C. § 1962(c) ...............................................................................................12, 17, 18

Fed. R. Civ. P. 56 ................................................................................................................1

Fed. R. Civ. P. 56(a) .........................................................................................................11

Fed. R. Civ. P. 56(c)(1) .....................................................................................................11

Fla. Stat. Ann. § 320.64(18) (2017) ..........................................................................4, 24, 25

Fla. Stat. Ann. § 320.64(19) (2017) ...............................................................................4, 26

Fla. Stat. Ann. § 320.64(22) (2017) ....................................................................................4

Fla. Stat. Ann. § 320.64(25) (2017) ...........................................................................2, 6, 23

Defendant EFN West Palm Motor Sales, LLC d/b/a Napleton's West Palm Beach Hyundai ("West Palm"), Edward W. Napleton ("Napleton"), Gene Khaytin ("Khaytin"), Ernie Revuelta ("Revuelta"), Jorge Ruiz ("Ruiz"), and Geovanny Pelayo ("Pelayo") (the "Individual Defendants", and together with West Palm, the "Defendants"), move under Federal Rule 56 for an order granting summary judgment in favor of the Defendants on: 1) Counts II and III of Plaintiff Hyundai Motor America's ("HMA" or "Hyundai") Second Amended Complaint; 2) Defendants' First Affirmative Defense; and 3) Defendant West Palm's First, Second, and Third Counterclaims.

## PRELIMINARY STATEMENT

HMA brought a spurious lawsuit based on the hearsay allegations of a disgruntled former employee and has all but come up empty. Two years after filing, HMA has the following "evidence": (1) hearsay text messages between two people from another dealership; (2) double hearsay testimony of an employee of another dealership; (3) sloppy paperwork surrounding repair orders and inspections; (4) duplicate oil pan photos in a few instances across almost 2,000 submissions; (5) the testimony of a former mechanic who saw another mechanic "rev" an engine in a parking lot <u>one time</u>; and (6) a statistical analysis of engine replacement and seizure rates at West Palm versus state and national averages. That's it. That's all the evidence that HMA will try to present at trial. Meanwhile, the best evidence of intentional damage to engines—the engines themselves—were destroyed in bad faith by HMA, resulting in an adverse jury instruction. Defendants, therefore, enjoy a rebuttable presumption that those engines would have shown that no fraud occurred. And the only engines HMA did analyze and claimed may have been intentionally blown—a mere two engines—were sworn under oath by their owners to have died on the road before being towed in. In fact, one of those owners took a video of the event.

HMA's circumstantial evidence and innuendo is insufficient as a matter of law to make out a federal RICO claim against any of the Defendants. To satisfy RICO, HMA must prove that <u>each</u>

Defendant participated in the scheme and <u>how</u> they participated. HMA must also prove that a criminal enterprise exists or existed, and that each Defendant was a member of that enterprise for the purpose of committing criminal activity—and not simply employees of the same organization. Finally, HMA must tie every predicate act to a particular Defendant, and prove that each act was solely in furtherance of the criminal enterprise and not ordinary business activity.

HMA has no such proof, and no reasonable jury could find that it does. After two years, there is <u>no</u> evidence that the Individual Defendants conspired together in a criminal enterprise with West Palm to defraud HMA. There is no evidence that Napleton, Khaytin, Revuelta, or Pelayo ever touched an engine, let alone damaged one intentionally, nor is there any evidence that they knew service technicians were intentionally damaging engines for warranty fraud.

At best, there is a disputed issue of fact about whether a rogue technician put a thumb on the scale of a handful of defective engines, at the margins of the over 1,800 engines that West Palm replaced. That might be enough for a garden variety fraud claim (we do not believe it is), but that is not enough to send federal RICO charges to a jury. HMA's second and third RICO counts must be dismissed with prejudice.

Furthermore, HMA's fraud-based claims are barred by the statute of limitations set forth in the Florida Dealer Act. HMA claims that it is entitled to damages for payments made to West Palm from January 2016 through December 2021 for allegedly fraudulent warranty repairs. Despite learning of this alleged warranty fraud in April 2020, HMA failed to conduct an audit of West Palm. Florida Statute Section 320.64(25) bars recovery of warranty, maintenance, and other service-related payments if an audit is not conducted within 12 months of such payment. Because HMA failed to conduct an audit of West Palm as required by Florida Law, it is precluded from seeking damages for its fraud-based claims.

In addition to bringing this baseless lawsuit against Defendants, HMA has been

intentionally withholding vehicle allocation from West Palm. This intensified after West Palm filed its Counterclaims against HMA in August 2021 (Answer Affirm. Defenses Am. Compl. Jury Demand, ECF No. 191). Hyundai admits that it holds a discretionary pool of vehicles—15% of its total inventory—that its regions may hand out to dealers however they see fit. Hyundai executives have admitted they kept the methodology of distributing these vehicles a secret. For the past several years, without disclosure to the dealer body at large, Hyundai has nationally implemented a policy of refusing to give discretionary vehicles to any dealer that it deems is "not a good partner." Dealers who have litigated with Hyundai or have not signed up for Hyundai's "voluntary" facility program are considered "not good partners" worthy of discretionary allocation. Instead, these dealers have ended up on a secret blacklist of dealers who will not receive discretionary allocation.

In the Southern Region, where West Palm is located, Hyundai executives Bob Kim and Tim Turbyfield were the ones who enforced Hyundai's discriminatory allocation policy against West Palm. Hyundai's actions have starved West Palm of vehicles, causing it to have little to no inventory at times and putting it at a distinct disadvantage with its competitors. West Palm cannot sell vehicles it does not have, and as a result of Hyundai's policy, West Palm's sales continue to suffer.

There are no material facts in dispute. Hyundai admitted the policy exists in its Tenth Affirmative Defense. According to Hyundai, Florida law permits it to withhold critical discretionary allocation based on secret policies that punish dealers who don't toe the line. West Palm disagrees, and whether it or Hyundai is right is a question of law. The Florida Dealer Act prohibits any manufacturer from establishing "a system of motor vehicle allocation or distribution" which "reduces or alters allocations or supplies of new motor vehicles to the dealer to achieve, directly or indirectly, a purpose that is prohibited by [the Dealer Act], or which is otherwise unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after

considering the equities of the affected motor vehicle dealer[s]." Fla. Stat. Ann. § 320.64(18) (2017). Whether Hyundai's admitted secret policy of withholding inventory from disfavored dealers (including those it chooses to sue) violates the Florida Dealer Act is a question of law that should be decided by the Court. The only matter left for the jury would be damages, of which there is ample proof.

Hyundai admits it implemented this allocation policy, admits dealers were not told about it, and admits that West Palm was refused discretionary allocation because of this policy. This policy is facially unlawful under the Florida Dealer Act, which prohibits manufacturers from implementing any unfair system of allocation. Fla. Stat. Ann. § 320.64(18) (2017). By implementing this unfair system of allocation Hyundai has further violated the Florida Dealer Act, because Hyundai has refused or failed to provide and deliver a reasonable quantity of motor vehicles to West Palm. Fla. Stat. Ann. §§ 320.64(19) and (22) (2017). No reasonable fact-finder could conclude otherwise, and therefore West Palm is entitled to summary judgment as to HMA's liability on its First, Second, and Third Counterclaims.

<u>**BRIEF SUMMARY OF MATERIAL FACTS**</u>

The undisputed material facts supporting summary judgment are provided in Defendants' Rule 56.1 Statement, which is incorporated by reference. Below is a short summary.

This case arises out of Hyundai's botched recalls in 2015 and 2017 of certain vehicles that had dangerously defective Theta II engines.[1] According to the National Highway Traffic Safety Administration ("NHTSA"), engine failure and fire problems affected more than 6 million Hyundai and Kia vehicles since 2015 and continue to affect them to this day. The Highway Loss

---

[1] *See* www.cbsnews.com/news/national-highway-traffic-safety-administration-probes-hyundai-and-kia-noncrash-fires/. Potentially at risk are any 2011–19 Hyundai Sonata, 2013–19 Hyundai Santa Fe and Santa Fe Sport, 2011–19 Kia Optima and Kia Sportage, and 2012–19 Kia Sorento or Kia Soul with 2.0 or 2.4-liter Theta II engines.

Data Institute reported that Theta II engines were far more likely to catch on fire than engines in any other similar-sized vehicle on U.S. roads.[2] The Center for Auto Safety ("CAS") sent a letter to Congress, stating that Kia and "Hyundai are refusing to fix a potentially deadly problem with their vehicles, despite independent analysis confirming that this is not a common occurrence for other manufacturers."[3] CAS called for a full recall of all impacted vehicles, and petitioned NHTSA to open an investigation. After 3,100+ reported fires, 103+ injuries, and one fatality, NHTSA launched a formal investigation in April 2019.[4] On November 27, 2020, NHTSA announced a consent order with a historic $210 million civil penalty against HMA and Kia.[5]

As part of the recall process, HMA pays dealers like West Palm to repair vehicles under warranty or recall after they submit claims via an online portal. *See* Statement of Material Facts "SMF" at ¶ 29. On April 23, 2020, former employee Mark Eddleman brought a wrongful termination lawsuit against Napleton's North Palm Auto Park, Inc., Edward W. Napleton, and others. *See* ECF No. 144-10. The lawsuit alleged, among other things, that certain employees at West Palm had engaged in warranty fraud by intentionally blowing engines by "emptying their oil and running them at high RPMs until the engines malfunctioned." *See* ECF No. 144-10 at ¶ 41. HMA first learned of this when it received a copy of Eddleman's Complaint. This occurred in April 2020. SMF ¶ 11. Six months later, on October 26, 2020, HMA notified West Palm that it wanted to conduct an audit of the dealership. SMF ¶ 12. HMA only gave West Palm three business days' notice seven months into the Covid-19 pandemic to provide a considerable number of documents for the audit which was to begin on November 9, 2020. SMF ¶¶ 12-13. HMA provided no explanation as to why they were conducting an audit. SMF ¶ 18. Given the short notice of the

---

[2] *See* https://apnews.com/article/9af1b1efeb674258b4398ebd42cfeeb6.
[3] *See* www.autosafety.org/center-for-auto-safety-it-is-time-for-congress-to-take-action-on-kia-and-hyundai-fires/.
[4] *See* www.npr.org/2019/04/02/708986625/federal-auto-regulator-to-investigate-hyundai-kia-vehicle-fires.
[5] *See* https://www.nhtsa.gov/press-releases/nhtsa-announces-consent-orders-hyundai-and-kia-over-theta-ii-recall

audit and the difficulties of the Covid-19 pandemic, West Palm rejected HMA's suggested timeframe for the audit. SMF ¶ 15. HMA rescheduled the audit to commence on January 18, 2021. SMF ¶ 16.

But, instead of conducting the audit as scheduled, HMA filed this lawsuit against West Palm and other defendants on November 17, 2020. SMF ¶ 19. Among other claims, HMA alleged that West Palm committed warranty fraud. SMF ¶ 19. HMA alleges it suffered damages from January 2016 through December 2021 amounting to between $1,153,097 and $2,029,462. SMF ¶¶ 22 and 23. These damages consist of payments made to West Palm for allegedly fraudulent warranty repairs. ¶ 22.

Despite HMA becoming aware of Defendants' alleged warranty fraud in 2020, HMA never conducted an audit. SMF ¶ 19. Florida Statute Section 320.64(25) bars recovery of warranty, maintenance, and other service-related payments if an audit is not conducted within 12 months of such payment. Since HMA never conducted an audit, it is barred from recovering any of the payments for warranty claims made to West Palm. As such, HMA is precluded from recovering damages on its fraud-based claims.

Instead of conducting an audit, HMA forged ahead with its spurious case, alleging that West Palm began buying used Hyundai Sonata and Santa Fe vehicles from auction houses that qualified for the Recall Campaign as far back as 2016, and that service technicians, at Revuelta's direction, "would intentionally 'blow' the engines by draining the oil and running the engine until it failed." *See* HMA's Second Am. Compl. (ECF No. 144) ¶¶ 53-56. This information came via double hearsay, which Defendants are separately moving to exclude (*see* Defendants' Omnibus Motion). Robb Minier, an employee at another dealership (Napleton's North Palm Hyundai), supposedly told Eddleman about the engine blowing after hearing it from Revuelta. *See* ECF No. 144 ¶ 78; SMF ¶ 31. Minier does not work with Revuelta, and admitted that Revuelta never told

6

him that engines were blown. SMF ¶ 32. Rather, Minier admits he made a wrongful inference based on office gossip concerning a disciplinary action involving Revuelta from 2017, which also had nothing to do with blowing engines. *Id.*

Under oath, Eddleman confirmed that he has no firsthand knowledge of any of the allegations in HMA's complaint, and is relying completely on Minier's hearsay, which is double hearsay for Eddleman. SMF ¶ 33.

HMA also relies on the deposition testimony of John Diaz, a technician who briefly worked at West Palm. Diaz claimed that, while he was working at West Palm, he <u>thinks</u> he <u>once</u> heard Ruiz revving an engine with no oil in it. SMF ¶ 34. Diaz testified that he knew that engine had no oil "because it sounded extremely loud." *Id.* But he never actually heard the engine lock up or "blow." *Id.* He merely heard Ruiz revving the engine in a nearby parking lot. This is part of the rickety foundation upon which HMA's RICO claim depends. Even if Diaz was right about what he heard, it was one time and involved only one Defendant. This does not prove a pattern of racketeering.

HMA is also relying on its expert, Jim Smith. Smith claims that sometimes the same photograph of an oil pan was used for multiple warranty authorization submissions (*i.e.*, for more than one vehicle). SMF ¶ 35. HMA assumes that the existence of duplicate oil pan pictures proves warranty fraud. The far more likely explanation is that technicians accidentally reused the same photo. They are, after all, pictures of used oil pans, and it may be difficult to distinguish from one another on a phone. A more likely explanation is that the technicians were simply pressed for time and sent a photo already in their phone. Even Diaz, the former technician that HMA is relying upon, acknowledged that technicians could be submitting the same photo for multiple submissions out of sheer laziness. SMF ¶ 36. These photographs are not proof of a vast warranty fraud conspiracy, and do not extend beyond the service technicians that submitted them.

7

The final piece of "evidence" is Smith's replacement and seizure rate analysis. Smith claims that West Palm is a statistical outlier when compared to other Florida stores. SMF ¶ 37. The failure rate is the chance that a car brought in for warranty evaluation fails the recall test and requires a new engine. *Id.* HMA theorizes that if no fraud had occurred at West Palm, then the failure rate would be consistent with other Hyundai stores in Florida.[6] *Id.* HMA claims that the high engine failure rate at West Palm proves fraud. Even if true (it is not), the warranty analysis is at best circumstantial evidence of garden variety fraud—but it does not tie to any particular Defendant or reveal the cause of the fraud. It is not evidence of a pattern of racketeering, nor is it evidence of a conspiracy. HMA is merely identifying potentially suspicious statistics and branding them as indicia of fraud. Nothing is linked to a particular Defendant, an enterprise or a specific act of racketeering activity.

In the current market, motor vehicles are being sold faster than they are being restocked. If a dealer has a car in the lot, they will sell it. West Palm has continuously sold cars that they are allocated at a rapid pace. Despite the high rate that West Palm sells vehicles, it received substantially less allocation than other Florida dealers from 2020 to 2022. SMF ¶¶ 68, 69, 74, 76. This is because HMA has implemented an unlawful system of allocation of motor vehicles (the "Allocation System"). SMF ¶ 57.

Hyundai allocates a portion of its vehicles based on a mathematical formula called Balanced Days' Supply. SMF ¶ 47. However, 15% of the vehicles Hyundai allocates are discretionary (referred to as "discretionary allocation"); meaning they do not follow the Balanced Days' Supply formula. SMF ¶ 50. Instead, discretionary allocation is decided by the Regional General Manager, in consultation with the Regional Sales Manager. SMF ¶ 51. For the Southern

---

[6] HMA previously represented to this Court "that it would not be proper for it to use this [warranty rate] analysis in the prosecution of its case in chief." ECF No. 132 at 13.

Region those individuals are Bob Kim and Tim Turbyfield, respectively. SMF ¶¶ 52-53. Hyundai implemented a policy where dealers who were not participating in Hyundai's programs or who were in litigation with Hyundai received little or no discretionary allocation. SMF ¶ 57. Despite the enforcement of this policy, senior Hyundai executive Robert Grafton, who was the Executive Director of Dealer Network and Strategy, claimed that Hyundai programs are voluntary and that there are no consequences for dealers who fail to participate. SMF ¶ 61.

Bob Kim implemented Hyundai's policy against West Palm. SMF ¶ 56. Hyundai and West Palm have been in ongoing litigation with each other since November 17, 2020, when Hyundai commenced this action. SMF ¶ 18. West Palm's allocation of motor vehicles suffered prior to the commencement of this litigation, and it experienced large reductions in allocation after filing its Counterclaims in August 2021. SMF ¶¶ 21 and 68. For example, in January 2022, ███████████ ████████████████████████████████████████████ SMF ¶ 76. ██████████████ ████████████████████████████████████████████

*Id.* While West Palm qualified for discretionary allocation, Hyundai refused to give West Palm any vehicles because Hyundai sued West Palm. SMF ¶ 77.

Compared to other Hyundai dealers in the South Florida District, during the July 2020 through March 2022 period, West Palm has received substantially fewer vehicles: SMF ¶¶ 78.



West Palm has continued to request more inventory from Hyundai and an explanation as to why it receives substantially less allocation than its competitors. SMF ¶¶ 63, 80. Hyundai has refused to provide West Palm with either. SMF ¶¶ 64, 73. On multiple occasions, West Palm had zero vehicles on the ground of certain models. SMF ¶¶ 81, 82, 83. This lack of inventory has negatively affected West Palm's sales, because it cannot sell vehicles it does not possess. SMF ¶ 84. Instead of disclosing Hyundai's discretionary allocation policy to West Palm (or any other dealer), Hyundai refused to give a reason for its low vehicle allocation. SMF ¶ 64. In fact, Hyundai

did not tell any of the dealers in the Southern Region about their discretionary allocation policy. SMF ¶¶ 65, 66.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may cite the record, including depositions, documents, and declarations. Fed. R. Civ. P. 56(c)(1). Once the moving party shows the absence of a genuine issue of material fact, the burden shifts to the party opposing the motion to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the plaintiff has failed to "'make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof', then the court must enter summary judgment for the moving party." *Burger King Corp. v. Ashland Equities, Inc.*, 217 F. Supp. 2d 1266, 1273 (S.D. Fla. 2002) (quoting *Celotex*, 477 U.S. at 323).

When a plaintiff asserts RICO claims based on mail and wire fraud, the allegations must comply with the heightened pleading standard in Federal Rule 9(b). *Nat'l Mortg. Co. v. Infinite Title Sols., LLC*, 2011 WL 13220625 at *6 (S.D. Fla. Mar. 3, 2011). "The heightened standard requires that a party state with particularity the circumstances constituting fraud." *Id.* "To satisfy the Rule 9(b) standard, RICO complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements mislead the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Ambrosia Coal & Const. Co. v. Pages Morales*, 428 F.3d 1309, 1316-

1317 (11th Cir. 2007). The plaintiff cannot simply "lump together" all of the defendants in their allegations of fraud. *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1281 (11th Cir. 1997).

## ARGUMENT

## I.   HMA Cannot Establish a Civil RICO Violation (Count II)

Count II alleges that Defendants violated Section 1962(c) of the RICO Act, which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "A civil RICO claim, therefore, requires a demonstration of the following elements: '"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to business or property."' *Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1217 (S.D. Fla. 2020) (quoting *Ace Pro Sound and Recording, LLC v. Albertson*, 512 F. Supp. 2d 1259, 1266 (S.D. Fla. 2007). HMA must prove each element under Section 1962(c) as to ***each Defendant***. *See Cont'l 332 Fund, LLC v. Kozlowski*, No. 2:17-CV-41-FtM-38MRM, 2020 WL 1234808, at *3 (M.D. Fla. Mar. 13, 2020) ("§ 1962(c) requires a RICO claimant to prove that each Defendant committed predicate acts."), *reconsideration denied*, No. 2:17-CV-41-FtM-38MRM, 2020 WL 2573292 (M.D. Fla. May 21, 2020); *Sterling Nat'l Mortg. Co. v. Infinite Title Sols., LLC*, No. 10-22147-CIV, 2011 WL 13220625, at *5 (S.D. Fla. Mar. 3, 2011) ("[N]ot only must a RICO claimant allege that each defendant meets the operation or management test established in *Reves*, but he must also establish each element under section § 1962(c) **as to each individual defendant** without exception.").

Though each of the four substantive violations of the RICO Act contain slightly different elements, "[e]ssential to any successful RICO claim are the basic requirements of establishing a

12

RICO enterprise and a 'pattern of racketeering activity.'" *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004). Because HMA cannot prove even the most fundamental elements of its RICO claim, this Court should grant summary judgment in Defendants' favor on Count II.

>    **A.      HMA cannot establish a "*pattern*" of "*racketeering activity*."**

To establish a pattern of racketeering activity, HMA must prove: "(1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson*, 372 F.3d at 1264. HMA's RICO claim fails for lack of evidence.

>    **1.      There is no evidence that Defendants committed predicate acts of mail and wire fraud.**

HMA has alleged a pattern of racketeering activity consisting ***entirely*** of the predicate acts of mail and wire fraud. *See* ECF No. 144 at ¶¶ 126, 135; HMA Opp'n to Mot. to Dismiss (ECF No. 28) 2. "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014). HMA can offer no evidence to prove that Defendants committed at least two acts of mail and wire fraud.

"A plaintiff must put forward enough facts with respect to each predicate act to make it independently indictable as a crime." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1215 (11th Cir. 2020). To prove the predicate acts of mail or wire fraud, HMA must establish that Defendants: "(1) intentionally participate[d] in a scheme to defraud another of money or property and (2) use[d] the mails or wires in furtherance of that scheme." *Ellis v. Warner*, No. 15-10134-CIV-GOODMAN, 2017 WL 634287, at *7 (S.D. Fla. Feb. 16, 2017).

The first element, "[a] scheme to defraud[,] requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). "As for the second element, a person 'causes' … wires to be used within the meaning of 18 U.S.C. § 1343, when he acts 'with knowledge that the use of the [wires] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *United States v. Ward*, 486 F.3d 1212,1222 (11th Cir. 2007) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954)).

In addition, for mail and wire fraud, HMA must prove that each Defendant "'***had a conscious, knowing intent to defraud***' HMA and "that a reasonably prudent person would have been deceived by [the defendant's] misrepresentation[]."*Ellis*, 2017 WL 634287 at \*7 (emphasis added); *see also Ward*, 486 F.3d at 1222 ("[A] defendant may be convicted of mail fraud without personally committing each and every element of mail fraud, ***so long as the defendant knowingly and willfully joined the criminal scheme***, and a co-schemer used the mails for the purpose of executing the scheme." (emphasis added)).

HMA cannot prove that each Defendant knowingly and intentionally participated in the alleged fraudulent warranty scheme. The only evidence HMA has presented is Eddleman's hearsay testimony and a text message between Eddleman and Minier. The sole basis for any of the allegations against Napleton are Eddleman's hearsay accusations. SMF ¶ 33. For Revuelta, Khaytin, and Pelayo, HMA has put forth no evidence that suggests they knowingly and intentionally participated in any scheme. And the only evidence HMA has against Ruiz is the testimony of John Diaz. Even assuming Diaz was correct about what he heard <u>one time</u>, it does not prove Ruiz knowingly and willfully participated in wire fraud or a fraudulent scheme.

HMA alleges that there were two phases of the underlying fraud scheme: (1) between 2016 and mid-to-late 2017, Defendants fraudulently submitted warranty claims for vehicles bought at auction that were never repaired so that West Palm could get free engines in inventory (the "inventory scheme");[7] and (2) in mid-to-late 2017, the Individual Defendants "blew" engines (the "engine-blowing scheme"). SMF ¶ 39; ECF No. 144 at ¶¶ 62, 77.

There is no evidence that West Palm knew about either scheme, let alone failed to disclose or conceal a scheme from HMA (that's because the scheme didn't exist). The evidence is equally lacking for the Individual Defendants. Indeed, HMA cannot point to a single shred of evidence that *any* of the Individual Defendants had a conscious, knowing intent to defraud HMA, or that they knowingly or willingly joined a criminal scheme. HMA cannot point to a single incriminating document, because none exists. Since there is no evidence that each Defendant acted with the requisite criminal intent to participate in the alleged fraudulent warranty scheme, the Court should grant summary judgment in favor of Defendants on HMA's RICO claim.

### B.    HMA cannot establish the existence of an "enterprise."

A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "In the simple case, the enterprise is an 'individual, partnership, corporation, association, or other legal entity.'" *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (quoting 18 U.S.C. § 1961(4)). "The more challenging case occurs when the enterprise is alleged to be a 'union or group of individuals associated in fact although not a legal entity.'" *Id.*

---

[7] HMA intentionally confuses an internal accounting issue with warranty fraud. After discovering that the warranty receivables were unusually high at West Palm in mid-to-late 2017, West Palm's corporate parent investigated and put an end to the practice, which involved the early booking of and employee payment for engine repairs. The early booking did not impact HMA or customers—it was an internal accounting discrepancy. SMF ¶ 41.

HMA claims that all Defendants formed an "association-in-fact" enterprise. *See* ECF No. 144 at ¶¶ 122-23; HMA Opp'n to Mot. Dismiss (ECF No. 28) 12. HMA cannot establish the existence of a purported association-in-fact enterprise as a matter of law.

> ### 1.    The "association-in-fact" enterprise fails as a matter of law.

HMA alleges that, beginning in or prior to 2016, Defendants West Palm, Khaytin, Revuelta, Pelayo, Ruiz, and Napleton, formed an enterprise to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity." ECF No. 144 at ¶ 122.

Khaytin was the General Manager at West Palm from 2015 to 2019. SMF ¶ 41. Revuelta is the service manager at West Palm, and has been in that role since 2011. SMF ¶ 42. Pelayo is service advisor at West Palm, and has been in that position for approximately six years. SMF ¶ 43. Ruiz is a mechanic at West Palm, and has been there for approximately 15 years. SMF ¶ 44. Napleton was the Director of Southeast Operations from approximately 2015-2018, and he supervised West Palm during his time in that role. SMF ¶ 45. In approximately June of 2018, Napleton became a director of the Napleton Automotive Group. *Id.* His role in connection with West Palm has always been in an executive or supervisory capacity. SMF ¶ 46. The only reason Napleton interacts with West Palm is for the betterment of the dealership. *Id.* Thus, at all times, Napleton was an agent of West Palm acting within the scope of his employment. *See Ray v. Spirit Airlines,* 836 F.3d 1340, 1357 (11th Cir. 2016) ("...[W]hile RICO was intended to be interpreted broadly, permitting plaintiffs to plead an enterprise consisting of a defendant corporation and its officers, agents, and employees acting within the scope of their employment would broaden RICO beyond any reasonable constraints. Because every corporation acts through its own employees as a matter of course, allowing such pleadings to go forward would turn every claim of corporate fraud into a RICO violation.")

16

The alleged association-in-fact enterprise cannot exist as a matter of law for two reasons.

<u>First</u>, a RICO enterprise exists only "where a group of persons associates, formally or informally, with the purpose of conducting illegal activity." *Jackson*, 372 at 1264. But a RICO enterprise must be an "entity separate and apart from the pattern of activity in which it engages." *Catano v. Capuano*, Case No. 18-20223-Civ-TORRES, 2019 WL 3035752, at *6 (S.D. Fla. July 11, 2019) (quoting *U.S. v. Turkette*, 452 U.S. 576, 583 (1981)). Here, there is zero evidence that the enterprise existed for anything other than sole purpose of committing the alleged predicate acts of mail and wire fraud. *See* ECF No. 144 at ¶ 126 (alleging that Defendants conducted and participated in the conduct of the enterprise's affairs "through a pattern of racketeering activity for the purposes of intentionally defrauding HMA since at least 2016"). Without proof that the enterprise is an entity separate and apart from the alleged racketeering conduct, the alleged association-in-fact enterprise cannot exist as a matter of law. *See Catano*, 2019 WL 3035752, at * 7 (dismissing case where "there is zero evidence that this enterprise committed anything other than the predicate acts"). Here, all the Individual Defendants are either employees, former employees, managers, or executives of the dealership.

<u>Second</u>, the RICO Defendants are not sufficiently distinct from the members of the alleged enterprise—they are one and the same. To prevail under Section 1962(c), a RICO "plaintiff must establish a distinction between the defendant 'person' and the 'enterprise' itself. The Supreme Court has made it crystal clear that the racketeering enterprise and the defendant must be two separate entities." *Ray,* 836 F.3d at 1355 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161-62 (2001)). For this reason, a plaintiff cannot establish "the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees. . . . [T]here is no distinction between the corporate person and the alleged enterprise."

17

*Ray*, 836 F.3d at 1357; *see also Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1215 (11th Cir. 2020).

Here, HMA alleges the Defendants are both the RICO persons ***and*** the enterprise, which is improper. The members of the alleged enterprise are: West Palm and some of its current or former employees/agents/executives (the Individual Defendants). Thus, the person/enterprise distinction cannot be established as a matter of law. *See Ray*, 836 F.3d at 1357; *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (noting that the required person/enterprise distinction "cannot be evaded by alleging that a corporation has violated the statute by conducting an enterprise that consists of itself plus all or some of its officers or employees"); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) (affirming dismissal where the alleged enterprise consisted of the corporation, subsidiaries of the corporation, franchised dealers, and trusts controlled by the corporation); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 343-45 (2d Cir. 1994) (corporation and its employees cannot be both the defendants and the enterprise); *Lockheed Martin Corp. v. Boeing Co.,* 314 F. Supp. 2d 1198, 1216-17 (M.D. Fla. 2004) (dismissing RICO claims against Boeing under § 1962(c), concluding that Boeing could not be held liable as a RICO "person" because it was not sufficiently distinct from alleged association-in-fact "enterprise" consisting of employees and former employee of competitor who allegedly stole competitor's trade secrets).

HMA's RICO enterprise therefore fails for lack of distinctness. Summary judgment is appropriate for this reason alone.

### 2.    *HMA cannot prove the structure of the alleged enterprise.*

Even if the members of the enterprise were sufficiently distinct, HMA's RICO claim still fails because HMA cannot prove the structure of the enterprise. To prove the existence of an association-in-fact enterprise, HMA must also show "three 'structural features': (1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to

permit these associates to pursue the enterprise's purpose.'" *Almanza*, 851 F.3d at 1067 (quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009)). Although the concept "of an association in fact is expansive, these requirements make [establishing] an association-in-fact enterprise 'more challenging." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citations omitted). HMA cannot prove these elements.

For starters, HMA cannot establish that the participants of the association-in-fact enterprise (*i.e.*, the Defendants) acted with a common purpose, much less a fraudulent one. "The purpose prong contemplates 'a common purpose of engaging in a course of conduct' among the enterprise's alleged participants. An abstract common purpose, such as a generally shared interest in making money, will not suffice." *Id.* at 1211 (citation omitted). Instead, "where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct." *Id.* "Establishing a shared purpose requires more than alleging that all members of an enterprise acted in parallel and independently harbored a common improper motive." *Lewis v. Mercedes-Benz USA, LLC*, No. 19-CIV-81220-RAR, 2021 WL 1216897, at *16 (S.D. Fla. Mar. 30, 2021). Rather, HMA must establish that "the members of the enterprise were actively collaborating to achieve that improper motive." *Id.* Dismissal of a RICO claim is appropriate where, like here, "there [is] no evidence that the defendants acted together to accomplish a fraudulent purpose, as opposed to acting independently according to the terms of a normal business relationship." *Id.*; *see also Cisneros*, 972 F.3d at 1212 (affirming RICO dismissal because plaintiff "has alleged no facts that plausibly support the inference that the defendants were collectively trying to make money in pet sales by fraud, which is a common purpose sufficient to find a RICO enterprise, as opposed to the 'obvious alternative explanation,' that they were simply trying to make money in pet sales, which is not" (citations omitted)); *Ray*, 836 F.3d at 1354-55 (11th Cir.

19

2016) (affirming RICO dismissal for failure to allege a common purpose among the members of the association-in-fact enterprise where "[o]n this bare record. . . [the members of the enterprise] were engaged in no more than a series of legitimate commercial transactions"); *Lewis*, 2021 WL 1216897, at *18 (dismissing RICO claim because plaintiffs failed to adequately plead the existence of a RICO enterprise where there was no "evidence of collective conduct outside the regular course of Defendants' businesses").

HMA has offered nothing to prove that Defendants were ***collectively*** trying to make money through the submission of ***fraudulent*** warranty claims, "which is a common purpose sufficient to find a RICO enterprise, as opposed to the obvious alternative explanation, that they were simply trying to make money [by participating in HMA's warranty program], which is not." *Cisneros*, 972 F.3d at 1212. Indeed, there is ***no*** evidence that even remotely suggests that Defendants actively worked together to defraud HMA. There are ***no*** communications between the purported members of the enterprise from which a reasonable juror could infer that the enterprise's participants had knowledge of any false warranty claims.

Instead, the record confirms that, at all relevant times, Defendants acted within the regular course of their normal business relationship. The only documents that HMA points to are various repair orders and prior approval/authorizations. *See* HMA Amended Responses to Interrogatories. These are regular business records, and there is no proof that they were submitted for any reason other than in the ordinary course of business. This is a far cry from the evidence necessary to carry HMA's high burden of showing a common, fraudulent purpose.

> ### 3.  *The Complaint fails to allege each Defendant's participation in the purported enterprise's affairs.*

Finally, even if HMA could establish the structural elements of an association-in-fact enterprise (it cannot), it offers no proof that Defendants "participated in operating or managing the

20

enterprise itself," which is required to establish RICO liability. *Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1219 (S.D. Fla. 2020). Defendants must have "conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quotation omitted). This requires showing "'affirmative and deliberate participation' **by *each* defendant in 'the conduct of the affairs of the enterprise' by 'knowingly implement[ing] and ma[king] decisions' concerning the alleged racketeering activity pattern**." *Sterling Nat'l Mortg. Co. v. Infinite Title Sols., LLC,* 2011 WL 13220625, at \*5 (S.D. Fla. Mar. 3, 2011) (emphasis added)(citation omitted). HMA can offer no evidence that establishes each Defendant played a role in directing the affairs of the enterprise.

With respect to Napleton and Revuelta, HMA has not identified, with any detail, how and when they participated in the affairs of the alleged enterprise. The only evidence that HMA has that they were involved at all is the hearsay (or double hearsay) from Eddleman, and a hearsay text message between Eddleman and Minier. The same goes for Khaytin; HMA has not identified how he was involved in managing the enterprise, and has no admissible evidence that he deliberately participated in a vast warranty fraud enterprise. With respect to Pelayo, HMA assumes that he was involved because his name appears on some repair orders. HMA has zero evidence that Pelayo knowingly implemented or made decisions concerning any racketeering activity. With respect to Ruiz, HMA likewise points to his name on certain repair orders, as well as Diaz's testimony that he once heard Ruiz revving an engine (but never heard it seize).

HMA has no email, text message, or any kind of communication between the Individual Defendants that suggests they deliberately participated in the conduct of the affairs of a racketeering enterprise. Finally, HMA has not shown how West Palm operated or managed the enterprise's affairs. In sum, HMA has failed to provide the requisite detail as to how each Defendant affirmatively and deliberately participated in the conduct of the enterprise's affairs.

## II.   Because HMA cannot establish its substantive RICO claim, the RICO conspiracy claim necessarily fails (Count III).

In Count III, HMA alleges that all Defendants conspired to violate the RICO Act. Because HMA's underlying substantive RICO "cause of action is not viable, the conspiracy claim must also fail." *Jackson*, 372 F.3d at 1269; *see also Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1220 (11th Cir. 2020) ("Because [plaintiff] has failed to adequately allege an association-in-fact enterprise or a pattern of racketeering activity, [plaintiffs] RICO conspiracy claim must also fail.").

Even if the substantive RICO claim were viable (it is not), HMA offers no evidence to establish a RICO conspiracy claim. A plaintiff "must allege *facts* to support each defendant's willingness and intent to participate in a conspiracy." *Sterling*, at *11 (dismissing RICO conspiracy because there were "no plausible allegations that reference or detail any communications or interaction, much less an agreement, to commit a substantive RICO violation"). "A RICO conspiracy requires either showing: (1) an agreement with the overall objective of the conspiracy; or (2) an agreement to commit two predicate acts." *Drummond*, 454 F. Supp. 3d at 1218. It can be found through direct evidence of an agreement among co-conspirators, conduct of the alleged participants, or circumstantial evidence of the scheme. *See Cisneros*, 972 F.3d at 1220; *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007).

HMA cannot prove the requisite meeting of the minds between the alleged conspirators on either of these two elements. *See Am. Dental Ass'n. v. Cigna Corp.*, 605 F.3d 1283, 1294-955 (11th Cir. 2010); *see also Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1353 (11th Cir. 2008). There is no direct or circumstantial evidence that the Defendants agreed on an overall objective (*i.e.*, to defraud HMA) or to commit two predicate acts in furtherance of the purported scheme. Summary judgment in favor of Defendants on Count III is therefore appropriate.

**III.     HMA's state law claims damages are barred, because HMA failed to conduct an audit as required by state law.**

Damages for HMA's state law claims are barred by Fla. Stat. Ann. § 320.64(25) (2017) which provides that: "[a]udits of warranty… shall be performed only during the 12-month period immediately following the date the incentive was paid[,] [and] [a]fter such time periods have elapsed, all warranty, maintenance, and other service-related payments and incentive payments shall be deemed final and incontrovertible for any reason notwithstanding any otherwise applicable law, and the motor vehicle dealer shall not be subject to any chargeback or repayment."

HMA is alleging damages of up to $2,029,462 for payments made to West Palm for allegedly fraudulent warranty repairs. SMF ¶ 22. According to HMA, these damages accrued from January 2016 through December 2021. SMF ¶ 24. Under Florida law, HMA is required to perform an audit during the 12-month period immediately following the date an incentive was paid in order to recover that payment. To date, HMA has conducted no audit. SMF ¶ 18. As such, any payments made to West Palm more than 12 months ago are final and West Palm shall not be subject to repayment.

October 11, 2021, through December 2021 is the only time period not barred by this 12-month window. If Plaintiff were to conduct an audit today, the only recoverable payments would be from this short three-month window. However, Plaintiff cannot recover until an audit is performed, therefore Plaintiffs should be precluded from recovering damages for their fraud-based claims.

**IV.     In the alternative, HMA's damages should be limited to one year from the date the lawsuit was filed.**

HMA's filing of this lawsuit did not substitute its obligation to conduct an audit. Nowhere in the statute is a franchisee permitted to forgo their duty of conducting an audit. The statute clearly states that after a 12-month period has elapsed, all warranty, payments are "final and

23

incontrovertible for any reason notwithstanding any otherwise applicable law." Therefore, HMA is not entitled to damages.

West Palm did not prevent HMA from conducting its audit, therefore HMA was not relieved of their statutory obligation. West Palm rejected only the timing of the audit, due to the Covid-19 pandemic and extremely short notice given by HMA. SMF ¶ 14. In response, HMA rescheduled the audit for January 18, 2021. SMF ¶ 16. Instead of conducting the audit as scheduled, HMA filed this lawsuit, never conducted the audit, and thus failed to comply with the statute. SMF ¶ 18.

Should the Court find that HMA was relieved of its statutory obligation to conduct an audit, HMA's damages should at least be limited. Since the statute limits recovery of paid warranty claims to a twelve-month lookback, at most HMA's fraud-based damages are limited to those accruing after one year prior to the commencement of this action: November 17, 2019 through December 31, 2021.

## V.    There is no issue of material fact regarding West Palm's first counterclaim.

West Palm's First Counterclaim is brought under Fla. Stat. Ann. § 320.64(18) (2017), which provides that it is illegal for HMA to:

> . . . establish[] a system of motor vehicle allocation or distribution or . . .
>
> implement[] a system of allocation or distribution of motor vehicles to one or more of its franchised motor vehicle dealers which reduces or alters allocations or supplies of new motor vehicles to the dealer . . . which otherwise is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicle dealer or dealers . . . . As used in this subsection, "unfair" includes, without limitation, the refusal or failure to offer to any dealer an equitable supply of new vehicles under its franchise, by model, mix, or colors as the licensee offers or allocates to its other same line-make dealers in the state.

Hyundai's discretionary allocation system violates the Florida Dealer Act, because it is unfair and contradicts the legislative intent of the Act.

24

A.     **Hyundai's discretionary allocation system is unfair as it excludes dealers in litigation with Hyundai and dealer who choose to opt out of Hyundai's "voluntary" programs.**

Hyundai's discretionary allocation system is unfair, because it "refus[es] or fail[s] to offer . . . an equitable supply of new vehicles" Fla. Stat. Ann. § 320.64(18) (2017), to West Palm as it does to other Hyundai dealers in the state. The record shows that Hyundai has refused to allocate discretionary vehicles to West Palm, because they are in litigation with Hyundai. SMF ¶ 67. Hyundai Executives Bob Kim and John Fratianni have admitted that Hyundai refused to give discretionary allocation to West Palm, because West Palm was in litigation and not participating in certain Hyundai Programs. SMF ¶¶ 56, 57, 67.

The unfairness of this policy is evidenced by the secrecy surrounding it. On numerous occasions West Palm informed Hyundai that it was not receiving its fair share of allocation and demanded a reason why. SMF ¶ 63. Instead of telling West Palm the truth, Hyundai gave it vague answers, stating Hyundai continues to "allocate fairly and equally," making no mention of the real policy behind discretionary allocation. SMF ¶ 64. Regional General Manager Bob Kim admitted that Hyundai as a company never communicated to West Palm or any of the dealers in the Southern Region that discretionary allocation would be withheld if they refused to enter into Hyundai's programs or if they were in litigation with Hyundai. SMF ¶¶ 65-67.

Hyundai's policy stifles competition and hinders West Palm's ability to adequately compete with other Florida dealers. Consumers are harmed when dealers cannot compete fairly for their business. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████ SMF ¶¶ 78-79. West Palm cannot adequately compete with other Florida dealers without proper allocation and consumers suffer. SMF ¶ 84. West Palm's sales have continued to decline as discretionary allocation has been

continuously withheld from 2020 through 2022.

**B.    Hyundai's discretionary allocation system goes against the legislative intent of the Dealer Act.**

Hyundai's policy of withholding allocation from secretly blacklisted dealers goes against the very core of the Florida Dealer Act, which was enacted "to ensure fair dealing at all levels among all participants in the distribution and sale of motor vehicles, and to redress the economic imbalance which naturally exists between national manufacturers and local dealers." *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am., Inc.*, 32 F.3d 528, 533 (11th Cir. 1994) (citation omitted); *Fitzgerald Motors, Inc. v. FCA US LLC*, 2020 WL 10359983, at *5 (M.D. Fla. June 26, 2020). Hyundai's discretionary allocation policy places the power squarely in the hands of the manufacturer by punishing dealers for exercising their right to litigate. This type of retaliation is prohibited. *See Fox Motors, Inc., v. Mazda Distribs., Inc.*, 806 F.2d 953, 960 (10th Cir. 1986) (finding a manufacturer liable of dealing in bad faith for threatening to retaliate against dealers if they continued contemplating legal action in response to an allocation system).

**VI.    There is no issue of material fact concerning liability on West Palm's second and third counterclaims.**

West Palm's Second and Third Counterclaims are brought under Fla. Stat. Ann. § 320.64(19) (2017) and (22). Under Section 320.64(19) it is illegal for Hyundai to "delay[], refuse[], or fail[] to provide a supply of motor vehicles by series in reasonable quantities, including the models publicly advertised by the applicant or licensee as being available" to a franchised dealer "without good and fair cause" so long as such failure is not caused by acts outside of Hyundai's control. Further, under Section 320.64(22) it is illegal for Hyundai to "refuse[] to deliver" these vehicles in "reasonable quantities and within a reasonable time."

Hyundai has failed to provide and deliver a reasonable supply of motor vehicles to West

Palm. Undisputed record evidence demonstrates that on numerous occasions West Palm was left with little to no vehicles in their lot. West Palm has continued to have little to no supply of Elantras, Santa Fes, and Palisades. SMF ¶¶ 81-83. In November 2021, West Palm had zero Elantras, zero Palisades, and only one Santa Fe, while its competitors had a greater number of each of these vehicles SMF ¶ 81. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. SMF ¶ 84. Therefore Hyundai's failure and refusal to provide and deliver vehicles to West Palm puts it at a distinct disadvantage to other dealers who are receiving this allocation. **Again, consumers are harmed when dealers cannot compete fairly for their business.**

This failure is not caused by acts outside of Hyundai's control but is a result of Hyundai's discretionary allocation policy. ████████████████████████████████████

██████████████████████████████████████. SMF ¶ 79. Discretionary allocation in the Southern Region is decided by the General Manager, Bob Kim. SMF ¶ 56. At any point, he could decide how discretionary allocation vehicles are distributed. SMF ¶ 56. Instead of implementing a policy that is fair, Hyundai chose to implement a policy that discriminates against dealers who don't join supposedly "voluntary" programs or who are in litigation with Hyundai. SMF ¶ 27. Blacklisted dealers are not told they are on the list, or even that there is list. As a result of this policy Hyundai has failed to provide and deliver a reasonable supply of motor vehicles to West Palm as a matter of law.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court grant their Motion and enter summary judgment for Defendants on Counts II and III of HMA's Second

Amended Complaint. In addition, HMA's damages for its fraud-based claims should be precluded as HMA failed to conduct an audit as required by Florida law. Defendant West Palm requests that the Court enter summary judgment in its favor on the first, second and third Counterclaims.

Respectfully submitted on October 11, 2022.

ARENTFOX SCHIFF LLP

By:   */s/ Charles Gallaer*

    Russell P. McRory, Esq. (*pro hac vice*)
    Michael P. McMahan, Esq. (*pro hac vice*)
    Charles A. Gallaer, Esq.
    Daisy M. Sexton, Esq. (*pro hac vice*)
    1301 Avenue of the Americas, Fl. 42
    New York, NY 10019
    Tel: (212) 484-3900

    Taniel E. Anderson, Esq. (*pro hac vice*)
    1717 K Street, NW
    Washington, DC 20006
    Tel: (202) 857-6000

    *Attorneys for Defendants/Counterclaim-Plaintiff/Third-Party Plaintiff*

    **GRAY ROBINSON, P.A.**

    Mayanne Downs (FLB#754900)
    Jason A Zimmerman (FLB#104392)
    301 E. Pine Street, Suite 1400
    Orlando, FL 32801
    Tel: (407) 843-8880

    *Counsel for Counterclaim Plaintiff/Third-Party Plaintiff*

Of Counsel:

Leslie Stracher, Esq. (Fla. Bar No. 340091)
General Counsel
Napleton Automotive Group

28

1 Oakbrook Terrace, Suite 600
Oakbrook Terrace, IL 60181
Tel: (630) 530-3955

*Counsel for Defendants EFN West Palm Motor Sales, LLC and Edward W. Napleton (misnamed in the Complaint as Edward Napleton Jr.)*

**CERTIFICATE OF GOOD FAITH CONFERENCE: CONFERRED BUT UNABLE TO RESOLVE ISSUES PRESENTED IN THE MOTION**

Under Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good-faith effort to resolve the issues but has been unable to resolve the issues.

By: _/s/ *Charles A. Gallaer*_

Charles A. Gallaer, Esq.