UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil No. 20-82102-Civ-MATTHEWMAN

HYUNDAI MOTOR AMERICA
CORPORATION,

      Plaintiff,

vs.

EFN WEST PALM MOTOR SALES, LLC, et al.,

      Defendants.

_____/

FILED BY _____KJZ_____ D.C.

Nov 16, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## ORDER ON DEFENDANTS' MOTION FOR PARTIAL
## SUMMARY JUDGMENT [DE 357]

**THIS CAUSE** is before the Court upon Defendants, EFN West Palm Motor Sales, LLC d/b/a Napleton's West Palm Beach Hyundai ("West Palm"), Edward W. Napleton ("Napleton"), Gene Khaytin ("Khaytin"), Ernie Revuelta ("Revuelta"), Jorge Ruiz ("Ruiz"), and Geovanny Pelayo's ("Pelayo") (the "Individual Defendants," and together with West Palm, the "Defendants"), Motion for Partial Summary Judgment [DE 357].[1]  The Motion is fully briefed. *See* DEs 380, 390. The Court held a lengthy hearing on the Motion via Zoom video teleconference on November 7, 2022, and heard argument from counsel for the parties. The matter is now ripe for review, and the Court has carefully considered the filings and attachments thereto, the arguments of counsel, and the entire docket in this case.

---

[1] The sealed, unredacted version of the motion is at DE 363-1.

1

## I.      THE PENDING SUMMARY JUDGMENT MOTION

Defendants have moved for summary judgment against Hyundai Motor America Corporation ("HMA") on Counts II and III of HMA's Second Amended Complaint [Second Am. Compl. ("SAC"), DE 144]. Count II alleges violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, against Defendants. *Id.* Count III alleges conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), against Defendants. *Id.*[2]

Defendant West Palm has also moved for summary judgment on its own Counterclaims I, II, and III as alleged in the Amended Third-Party Complaint [DE 318]. Counterclaim I alleges violation of the Florida Dealer Act, Fla. Stat. § 320.64(18), against HMA. *Id.* Counterclaim II alleges violation of the Florida Dealer Act, Fla. Stat. § 320.64(19), against HMA. *Id.* Counterclaim III alleges violation of the Florida Dealer Act, Fla. Stat. § 320.64(22), against HMA. *Id.*[3]

All Defendants—West Palm and the Individual Defendants—have also moved for summary judgment on their first affirmative defense, which states, "[p]ursuant to the Fla. Stat. § 320.64(25), Plaintiff's claims are barred because Plaintiff failed to audit any alleged misconduct within the 12-month period immediately following payment of the warranty claims in question." [DE 318 at 18].

---

[2] The other remaining claims in the SAC are fraud against the Individual Defendants (Count I); tortious interference with a contract and business relationship against the Individual Defendants (Count V); and civil conspiracy against the Individual Defendants (Count VI). [DE 144]. No summary judgment motion has been filed by any party as to these counts and they shall proceed to trial.

[3] The other remaining Counterclaims in the Amended Third-Party Complaint are violation of Robinson-Patman Act, 15 U.S.C. § 13(a), against HMA and Hyundai Motor Company ("HMC") (Counterclaim IV); violation of the Florida Dealer Act, Fla. Stat. § 320.64(38), against HMA and HMC (Counterclaim V); violation of the Florida Dealer Act, Fla. Stat. § 320.64(37), against HMA and HMC (Counterclaim VI); violation of the Florida Dealer Act, Fla. Stat. § 320.64(6), against HMA and HMC (Counterclaim VII); and violation of the Florida Dealer Act, Fla. Stat. § 320.64(10)(b), against HMA and HMC (Counterclaim VIII). [DE 318]. No summary judgment motion has been filed by any party as to these counts and they shall proceed to trial.

Neither HMA, which is both the Plaintiff and a Counter-Defendant in this case, nor Hyundai Motor Company ("HMC"), a Third-Party Defendant in this case, has filed a motion for summary judgment.

## II.   UNDISPUTED FACTS

The following facts are drawn from the uncontested portions of the record together with the parties' respective statements of material facts ("SMF") [DEs 358, 363-2, 381, 382, 391][4] and supporting affidavits and declarations [DEs 358-1, 363-3, 391-1].[5]

### Background

EFN West Palm Motor Sales, LLC is an Illinois limited liability company with its principal place of business in Palm Beach County, Florida. [Def.'s SMF ¶ 1]. Hyundai Motor America is a corporation with its principal place of business in California and is authorized to do business in Florida. [Def.'s SMF ¶ 2]. Hyundai Motor Company is the parent company of HMA. [Def.'s SMF ¶ 2]. North American Automotive Services, Inc. ("NAAS" or "NAG") is majority-owned by two trusts, of which Edward W. Napleton is a beneficiary. [Pl.'s SMF ¶ 94]. West Palm is a "motor vehicle dealer" as defined in Fla. Stat. § 320.60(11)(a). [Def.'s SMF ¶ 3]. HMA is a "distributor" as defined in Fla. Stat. § 320.60(5), a "manufacturer" as defined in Fla. Stat. § 320.60(9), and a "licensee" as defined in Fla. Stat. § 320.60(8). [Def.'s SMF ¶ 4].

---

[4] Defendants' Statement of Material Facts ("Def.'s SMF") is in public, redacted form at DE 358 and in sealed, unredacted form at 363-2. HMA's Response to Defendants' Statement of Material Facts ("Pl.'s SMF") is in public, redacted form at DE 382 and in sealed, unredacted form at DE 381.

[5] The Court will not take into consideration the facts contained within paragraphs 148–155 of Docket Entry 391, which are facts that Defendants added for the first time in their reply. Those facts were added in violation of Local Rule 56.1, HMA had no opportunity to respond to them, and Defendants' counsel stated in open court that Defendants do not intend to rely on those additional facts.

<u>The Dealer Agreement</u>

West Palm and HMA are parties to a Hyundai Dealer Sales and Service Agreement ("Hyundai Dealer Agreement") under which West Palm operates a dealership for the sale and service of Hyundai brand motor vehicles at 2301 Okeechobee Blvd., West Palm Beach, FL 33409. [Def.'s SMF ¶ 5]. The Hyundai Dealer Agreement is a "franchise agreement" as defined in Fla. Stat. § 320.60(1). [Def.'s SMF ¶ 5]. HMA is the sole source of new Hyundai vehicles for West Palm. [Def.'s SMF ¶ 6]. HMA refers to West Palm as FL121. [Def.'s SMF ¶ 6].

<u>No Audit Was Conducted</u>

Mark Eddleman was the General Manager of a different Napleton Hyundai dealership known as North Palm Hyundai and referred to by HMA as FL123 ("North Palm"), in 2017. [Def.'s SMF ¶ 7; Pl.'s SMF ¶ 100].[6] On April 23, 2020, Eddleman filed a complaint against North Palm, Edward W. Napleton and others (the "Eddleman Complaint") alleging wrongful termination. [Def.'s SMF ¶ 8]. The Eddleman Complaint also alleged that West Palm was engaging in warranty fraud. [Def.'s SMF ¶ 9]. HMA became aware of the alleged warranty fraud as a result of the Eddleman Complaint. [Def.'s SMF ¶ 10]. Upon learning of these allegations, HMA informed West Palm of its intention to conduct an audit during the Covid-19 pandemic. [Def.'s SMF ¶ 11]. HMA scheduled the audit of West Palm for November 9, 2020. [Def.'s SMF ¶ 13]. On November 6, 2020, HMA canceled the audit previously scheduled to begin on November 9, 2020. [Def.'s SMF ¶ 15]. HMA rescheduled the audit for January 18, 2021. [Def.'s SMF ¶ 16]. HMA refused to provide West Palm with an explanation for the audit. [Def.'s SMF ¶ 17].

---

[6] Neither Mark Eddleman nor FL123 are parties to this lawsuit.

4

<u>The Commencement of This Lawsuit</u>

Instead of conducting the audit, HMA commenced this action against West Palm and other defendants on November 17, 2020, alleging that West Palm had committed warranty fraud, among other claims. [Def.'s SMF ¶ 18]. On June 4, 2021, HMA filed its First Amended Complaint. [Def.'s SMF ¶ 19]. On June 14, 2021, HMA filed its Second Amended Complaint. [Def.'s SMF ¶ 20]. According to HMA, its damages accrued from January 1, 2016, through December 2021. [Def.'s SMF ¶ 23]. On August 23, 2021, Defendants filed their answer, affirmative defenses, and counterclaims against HMA. [Def.'s SMF ¶ 21]. On January 19, 2022, West Palm filed a Supplemental Counterclaim. [Def.'s SMF ¶ 21]. On July 8, 2022, West Palm filed its Amended Counterclaims and Third-Party Complaint, which combined its Supplemental Counterclaim with its original Counterclaims and third-party claims. [Def.'s SMF ¶ 21].

<u>The Theta II Engine Recall</u>

Recalls were issued in 2015 and 2017 for 2011–14 Hyundai Sonatas and 2013–14 Santa Fe Sports equipped with Theta II engines. [Pl.'s SMF ¶ 85]. The recalls require dealers to perform diagnostic tests on vehicles pursuant to methods prescribed by HMA in order to identify affected vehicles. [Pl.'s SMF ¶ 86]. Hyundai dealers are paid by HMA to replace the engines in the affected vehicles. [Pl.'s SMF ¶ 86]. As part of the recall process, HMA compensates dealers like West Palm for repairing vehicles under warranty or recall by paying them after submitting claims via an online portal. [Def.'s SMF ¶ 28]. Prior to replacing an engine under recall or warranty, dealers submit a claim through an online portal to HMA's Prior-Approval (PA) Department. [Pl.'s SMF ¶ 88]. This payment is made by way of an online bank transfer. [Pl.'s SMF ¶ 88]. HMA requires dealers to submit an "Engine Diagnostic Work Sheet" signed by the service manager with each warranty

claim, summarizing why engine replacement is required. [Pl.'s SMF ¶ 108]. West Palm was paid by HMA for the engines it replaced in connection with recalls. [Pl.'s SMF ¶ 125].

<u>The Eddleman Lawsuit and the Fraud Allegations Against HMA</u>

On April 23, 2020, Mark Eddleman brought a wrongful termination lawsuit against several individuals and entities in the Napleton organization. The lawsuit alleged, among other things, that certain employees at West Palm had engaged in warranty fraud by intentionally blowing engines by "emptying their oil and running them at high RPMs until the engines malfunctioned." [Def.'s SMF ¶ 29]. HMA first learned of this when it received a copy of Eddleman's Complaint. [Def.'s SMF ¶ 30].

HMA's expert, Jim Smith, supplemented his report in June 2022. [Def.'s SMF ¶ 35]. In the updated report, Smith has included information showing that sometimes the same photograph of an oil pan was used for multiple warranty authorization submissions (i.e., for more than one vehicle). [Def.'s SMF ¶ 35]. HMA has identified this as a "category of evidence" that is "consistent with and supportive of the testimony and claims made by the whistleblowers Mark Eddleman and John Diaz concerning the large-scale warranty fraud against Hyundai." [Def.'s SMF ¶ 35]. HMA alleges that there were two phases of the underlying fraud scheme: (1) between 2016 and mid-to-late 2017, Defendants fraudulently submitted warranty claims for vehicles bought at auction that were never repaired so that West Palm could get free engines (the "inventory scheme"); and (2) in mid-to-late 2017, the Individual Defendants "blew" engines (the "engine-blowing scheme"). [Def.'s SMF ¶ 39].

<u>The Individual Defendants</u>

Gene Khaytin was the general manager at West Palm from 2015 to 2019. [Def.'s SMF ¶ 41; Pl.'s SMF ¶ 102].

Ernie Revuelta is the service manager at West Palm and has been in that role since 2011. [Def.'s SMF ¶ 42; Pl.'s SMF ¶ 106]. He has management responsibility for the dealership's service department and its personnel, including Defendants Pelayo and Ruiz, and West Palm's parts department. [Pl.'s SMF ¶ 106].

Geovanny Pelayo is a service advisor or "service writer" at West Palm and has been in that position for approximately six years. [Def.'s SMF ¶ 43; Pl.'s SMF ¶ 111]. He completed the repair orders associated with engine claims. [Pl.'s SMF ¶ 111]. Pelayo's compensation is based on the gross amount of all of the repair orders he completes. [Pl.'s SMF ¶ 112].

Jorge Ruiz is a mechanic or "service technician" at West Palm and has been there for approximately 15 years. [Def.'s SMF ¶ 44; Pl.'s SMF ¶ 116]. He performs engine diagnoses and replacements. [Pl.'s SMF ¶ 116]. This includes taking photographs of oil pans. [Pl.'s SMF ¶ 116]. Ruiz fills out the Engine Diagnosis Worksheets that are signed by Revuelta. [Pl.'s SMF ¶ 117]. He is paid a flat rate for each of the repairs he performs. [Pl.'s SMF ¶ 118].

Edward W. Napleton was the director of southeast operations from approximately 2015-2018, and he supervised West Palm. [Def.'s SMF ¶ 45]. In June 2018, Napleton became a director of the Napleton Automotive Group. [Def.'s SMF ¶ 45].

<u>Allocation and Distribution of Motor Vehicles</u>

HMA purports to allocate vehicles based on a mathematical formula called Balanced Days' Supply. [Def.'s SMF ¶ 47]. Under Balanced Days' Supply, allocation is based on the number of days to sell the dealer's current new car inventory according to the dealer's current rate of retail sales. [Def.'s SMF ¶ 48]. There is also a discretionary element to HMA's allocation system, by which up to 15% of each region's monthly allocation of vehicles is discretionary. [Def.'s SMF ¶ 50]. Discretionary allocation for South Florida is decided by the general manager and regional

sales manager. [Def.'s SMF ¶ 51]. Bob Kim was the general manager of the Southern Region from 2020 to 2022. [Def.'s SMF ¶ 52]. Tim Turbyfield was the general sales manager of the Southern Region from 2018 to 2022. [Def.'s SMF ¶ 53]. Bob Kim and Tim Turbyfield communicated their discretionary allocation decisions to the distribution manager, Todd Geotze, who executed those decisions. [Def.'s SMF ¶ 54]. The terms discretionary allocation, supplemental allocation, and GM pool units are used interchangeably. [Def.'s SMF ¶ 55]. West Palm and six other Napleton Automotive Group dealerships were not enrolled in HMA's Accelerate Program as of March 2020. [Def.'s SMF ¶ 62]. HMA never told West Palm or any other dealer that discretionary allocation was being withheld from dealers in litigation with HMA and/or dealers who did not participate in Hyundai programs. [Def.'s SMF ¶ 65]. Dealers were never told that if they were in litigation with HMA they would not receive any discretionary allocation. [Def.'s SMF ¶ 66].

Bob Kim stated that HMA refused to give West Palm discretionary allocation because West Palm did not participate in Hyundai programs and because West Palm was in litigation with HMA. [Def.'s SMF ¶ 67]. Since HMA commenced this case in November 2020, West Palm's allocation of inventory has suffered. [Def.'s SMF ¶ 68]. Even more so, after the filing of its Counterclaim, West Palm experienced a dramatic reduction in allocation of motor vehicles. [Def.'s SMF ¶ 68]. John Fratianni, the district sales manager for South Florida, started receiving complaints from West Palm about allocation at the end of 2021 and beginning of 2022. [Def.'s SMF ¶ 70]. In these complaints, West Palm would list the dealer stock and inventory of other stores in the district compared to West Palm. [Def.'s SMF ¶ 71]. HMA determined that dealers with 12 or fewer vehicles in their day supply would receive discretionary allocation. [Def.'s SMF ¶ 76]. Despite West Palm having a days' supply of fewer than 12 vehicles, it did not receive any discretionary allocation. [Def.'s SMF ¶ 77]. West Palm asserts it has not received extra discretionary vehicles

8

from July 2020–March 2022. [Pl.'s SMF ¶ 136]. HMA has continuously received complaints from West Palm about lack of inventory from 2020 through 2022. [Def.'s SMF ¶ 80]. The Covid-19 Pandemic resulted in a scarcity of available vehicles. [Pl.'s SMF ¶ 137]. Many dealers have complained about their inventory during the Pandemic. [Pl.'s SMF ¶ 138].

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states in relevant part that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of demonstrating to the court by reference to the record that there are no genuine issues of material fact that need to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a moving party has discharged its initial burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," identify specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences in the light most favorable to the party opposing the motion. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998) (citations and quotations omitted). Any doubts regarding whether a trial is necessary must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

So long as the non-moving party has had an ample opportunity to conduct discovery, the non-movant must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the nonmoving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50.

## IV.   DISCUSSION AND ANALYSIS

### A.   Count II of Second Amended Complaint: Violation of Section 1962(c) of the RICO Act

#### a.   The Parties' Arguments

In their Motion, Defendants contend that HMA cannot establish a "pattern" of "racketeering activity" as there is no evidence that Defendants committed predicate acts of mail and wire fraud and there is no evidence of the existence of an "enterprise." [DE 357 at 13–21]. Defendants also make several sub-arguments that the "association-in-fact" enterprise fails as a matter of law, that HMA cannot prove the structure of the alleged enterprise, and that the Second Amended Complaint fails to allege each specific defendant's participation in the purported enterprise's affairs. *Id.* at 16–21.

In response, HMA first contends that the record evidence, including testimony, contemporaneous text messages, repair orders, other dealer records, and pictures, is sufficient to establish a pattern of racketeering activity and intent to defraud. [DE 380 at 1–9]. Second, HMA asserts that the significantly elevated rates of engine replacements and seizure rates provide additional circumstantial evidence of fraud. *Id.* at 9. Third, HMA describes the specific evidence

10

supporting each Defendant's role in the conduct of the affairs of the enterprise. *Id.* at 9–15. Fourth, HMA claims that the existence and structure of the enterprise is a disputed issue of material fact. *Id.* at 15–21. Finally, HMA explains that the association-in-fact exists separately from its racketeering conduct and is distinct from its members and also that the members of the enterprise were guided by the common purpose of making money through the submission of fraudulent warranty claims. *Id.*

In reply, Defendants contend that HMA "has failed to show how West Palm is distinct from its agents for purposes of a RICO enterprise." [DE 390 at 1]. Defendants also argue that "West Palm cannot be held liable as a RICO 'person' because it is not sufficiently distinct from the alleged association-in-fact enterprise that HMA has described." *Id.* at 2. They explain that, in this case, unlike the Termination Case[7], "all of the actions HMA asserts [Edward W.] Napleton took in connection with the alleged scheme were in his management capacity at the dealership." *Id.* Defendants assert that HMA has also failed to show the "requisite distinctiveness for a RICO enterprise because there is no admissible evidence that Napleton was aware of the alleged scheme, and therefore, he could not have been working toward the common purpose of committing fraud." *Id.* at 3. Next, Defendants maintain that HMA has not set forth sufficient evidence that each Defendant committed predicate acts or had a knowing intent to defraud. *Id.* at 3–7. Finally, they assert that "[e]ven assuming arguendo that HMA has offered admissible evidence that some service technicians submitted questionable paperwork and photos, this is insufficient for a RICO claim, and certainly doesn't implicate Napleton, Khaytin, or West Palm itself." *Id.* at 7. According

---

[7] The "Termination Case" is *EFN West Palm Motor Sales, LLC d/b/a Napleton's West Palm Beach Hyundai, et al., v. Hyundai Motor America Corporation*, Case No. 21-80348-CIV-Cannon/Matthewman.

to Defendants, HMA has "not put forth any evidence of collective conduct whatsoever" and "provides no detail as to the origin of this alleged warranty fraud." *Id.* at 7–8.

### b.  Applicable Law

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity," under § 1961(1)(B), includes "any act which is indictable under [18 U.S.C. § 2314] (relating to interstate transportation of stolen property)." *Id.* § 1961(1)(B). To assert a RICO claim, a plaintiff must prove "that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citing *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016)).

Section 1961(4) broadly defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A] RICO enterprise need not possess an 'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1274-75 (11th Cir. 2000). The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Therefore, "the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes,

that is, the pattern of racketeering activity requisite to the RICO violation." *Goldin Indus., Inc.*, 219 F.3d at 1275.

An enterprise, as defined within the RICO statute, includes associations in fact. *Boyle v. United States*, 556 U.S. 938, 944 (2009). "[T]he Supreme Court has 'succinctly' defined an association-in-fact enterprise as any 'group of persons associated together for a common purpose of engaging in a course of conduct.'" *Al-Rayes v. Willingham*, 914 F.3d 1302, 1307 (11th Cir. 2019) (citing *Boyle*, 556 U.S. at 944; *Turkette*, 452 U.S. at 583). While the "'concept of an association in fact is expansive,' the Supreme Court has nevertheless found that an association-in-fact enterprise must have three 'structural features': (1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (quoting *Boyle*, 556 U.S. at 944). In order for a plaintiff to establish the "common purpose" requirement for a RICO enterprise, the plaintiff must establish "not only that there was some commonly shared purpose among [the alleged associates], but also that they associated together for that purpose." *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1362 (M.D. Fla. 2005). In order to prove an associated-in-fact enterprise, "the group must function as a continuing unit," not merely through independent, parallel conduct. *Boyle*, 556 U.S. at 948 (emphasis added); *Almanza*, 851 F.3d at 1068; *Aim Recycling of Fla., LLC v. Metals USA, Inc.*, No. 18-CV-60292, 2020 WL 209860, at *15 (S.D. Fla. Jan. 13, 2020).

"To conduct or participate, directly or indirectly, in the conduct of such [an] enterprise's affairs," as required under 18 U.S.C. § 1962(c), "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "A plaintiff in a civil RICO action must identify and prove a pattern of racketeering activity, defined

as at least two 'predicate acts' of racketeering activity, the last of which occurred within the last ten years." *Tucker v. Morris State Bank*, 154 F. App'x 183, 185 (11th Cir. 2005) (citing 18 U.S.C. § 1961(5)). "An act of racketeering activity, commonly known as a 'predicate act,' includes any of a long list of state and federal crimes." *Cisneros*, 972 F.3d at 1215 (citing 18 U.S.C. § 1961(1)). "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Trump v. Clinton*, No. 22-CV-14102, 2022 WL 4119433, at *19 (S.D. Fla. Sept. 8, 2022) (quoting *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004) (citations omitted)).

Additionally, "[a] civil plaintiff must also show '(1) the requisite injury to "business or property," and (2) that such injury was "by reason of" the substantive RICO violation.'" *Ray*, 836 F.3d at 1348 (11th Cir. 2016) (quoting *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282–83 (11th Cir. 2006), *abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 714–15 (11th Cir. 2014)).

c.  <u>Analysis</u>

The Court has carefully considered the above law, the parties' arguments in their briefs and at the hearing, and the material facts and documents cited by the parties.[8]

---

[8] The Court rejects each and every one of Defendants' arguments in the Motion and reply as to Count II and finds that there are material facts in dispute as to each element of civil RICO. However, this Order highlights the primary arguments asserted by Defendants.

14

*1. Enterprise Issue*

Section 1962(c) prohibits any person "employed by or associated with any enterprise" from conducting the affairs of the enterprise through a pattern of racketeering." 18 U.S.C. § 1962(c). Therefore, in a 1962(c) case, a party cannot be both the defendant "person" and the enterprise. *Goldin Indus.., Inc.,* 219 F.3d at 1271. Since a corporation is included in the statutory definition of "person" under 18 U.S.C. 1961(3), a bone of contention in 1962(c) cases is often whether the corporate person is separate and distinct from individuals who operate the corporation. In the instant case, the parties vigorously dispute the distinctiveness issue. Defendants argue that HMA has failed to show how West Palm is distinct from its employees, officers or agents for purposes of a RICO enterprise. The Court has carefully considered this issue and notes that the parties seem to agree that the requisite distinctness here hinges primarily on Edward W. Napleton, who is undisputedly not an employee or officer of West Palm. However, the parties make diametrically opposed arguments as to whether Napleton is an agent of West Palm and rely on different evidence to support their positions. The Court cannot decide this issue on summary judgment as there exist material issues of fact which must be resolved by a jury.

Further, "[a]n enterprise is not, for instance, the same as a pattern of racketeering activity. Instead, an enterprise "is an entity separate and apart from the pattern of activity in which it engages." *Catano v. Capuano*, No. 18-20223-CIV, 2019 WL 3035752, at *6 (S.D. Fla. July 11, 2019) (citing *Turkette*, 452 U.S. at 580) ("The existence of an enterprise at all times remains a separate element which must be proved.")). The Court finds that there are genuine issues of material fact in this case as to the existence of an enterprise and whether the enterprise is an entity separate and apart from the pattern of activity in which it engages.

15

In sum, there are genuine issues of material fact as to the existence of an enterprise-in-fact—a common purpose, relationships among those associated with the enterprise, longevity sufficient to permit these associates to pursue the enterprise's purpose—so summary judgment must be denied on this issue. In light of the foregoing, the Court finds that the enterprise-in-fact issue is one that must go to a jury.

### 2.   *Predicate Acts and Each Defendant's Participation*

Defendants argue that there is no evidence that Defendants committed predicate acts of mail and wire fraud or that each specific defendant participated in the purported enterprise's affairs. However, the Court finds that there are genuine issues of material fact regarding each of these elements of civil RICO. The evidence presented by HMA includes, but is not limited to, the testimony of Mark Eddleman,[9] repair orders, text messages, the testimony of additional witnesses, expert witness opinions, the claim rate analysis, the seizure rate analysis, and duplicate oil pan photographs. *See* Pl.'s SMF ¶¶ 90–106. Defendants acknowledge in their reply that HMA has set forth evidence that each defendant committed predicate acts or had a knowing intent to defraud; Defendants simply argue that this evidence is insufficient and so summary judgment must be granted against HMA. [DE 390 at 4–7]. The Court disagrees and finds that, in light of the existence of genuine issue of material fact as the predicate acts and knowing intent to defraud, summary judgment must be denied on these issues.

---

[9] The Court finds that it is not appropriate for the Court to make evidentiary rulings in a vacuum prior to trial about the admissibility of Mark Eddleman's deposition testimony at this stage in the proceedings and without even knowing if Eddleman will be testifying live at trial. The admissibility of Eddleman's testimony at trial is a nuanced issue which can only be decided in the crucible of trial based upon the questions posed and objections made, as well as the other evidence and testimony admitted. Regardless, HMA relies on evidence in addition to Eddleman's deposition testimony to demonstrate the elements of civil RICO.

Furthermore, for Section 1962(c) claims based on predicate acts of mail and wire fraud, the Eleventh Circuit has made clear that "[a] jury may infer an intent to defraud from the defendant's conduct" and that "[e]vidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in the fraud." *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011) (citing *United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011)). "A person's knowledge or intent can rarely be proven with direct evidence, so juries may determine these issues by drawing inferences from the factual circumstances . . . ." *Cont'l 332 Fund LLC v. Kozlowski*, No. 2:17-CV-41-FTM-38MRM, 2020 WL 1492784, at *3 (M.D. Fla. Mar. 27, 2020). In light of this body of law, the Court finds that the intent issue should be determined by the jury.

### 3.   *Collective Purpose*

Defendants argue that there is a lack of evidence that the defendants acted together to accomplish a fraudulent purpose. The Court disagrees and finds that the record evidence, discussed above, sufficiently establishes genuine issues of material fact that each defendant (or member of the enterprise) was aware of, and worked toward, defrauding HMA to financially enrich himself or itself. HMA has also presented evidence that the common purpose here is independent from the enterprise's legitimate business activities, which are to lease and sell cars and perform legitimate repairs.

### 4.   *Conclusion*

The Court has very carefully considered the facts and law in deciding whether or not summary judgment should be granted in Defendants' favor on HMA's RICO claim. As other courts have noted, it is an abuse of the RICO statute to try to squeeze garden-variety business disputes into civil RICO actions. *See, e.g., Carr v. Tillery,* 591 F.3d 909, 918 (7th Cir. 2010);

*Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1025 (7th Cir. 1992)*; Robert Suris General Contractor Corp. v. New Metropolitan Federal Sav. & Loan Ass'n,* 873 F.2d 1401, 1404 (11th Cir. 1989); *ePlus Technology, Inc. v. Aboud,* 313 F.3d 166, 181 n. 15 (4th Cir. 2002); *Oceanside Lauderdale, Inc. v. Ocean 4660, LLC*, No. 10-60025-CIV, 2010 WL 2044893, at *1 (S.D. Fla. May 24, 2010). Moreover, this Court is mindful that civil RICO claims should not be used to transition ordinary business disputes into federal RICO actions. However, the claims made here by HMA are quite serious and the allegations involve much more than just a business dispute—or a dealership dispute—gone sour.

The Court disagrees with Defendants' assessment that the evidence, at best, establishes garden variety fraud amongst low-level employees. HMA has provided direct and circumstantial evidence in its Statement of Material Facts and filings that Defendants operated or managed an enterprise through a pattern of racketeering activity that included at least two predicate acts of racketeering (mail or wire fraud), which caused injury to the business or property of HMA. While Defendants argue that HMA's RICO claim is insufficient as a matter of fact and law, the Court is required to consider the facts in the light most favorable to HMA. After doing so, and considering the applicable law, the Court simply cannot grant summary judgment in Defendants' favor on HMA's civil RICO count. Any doubts this Court has regarding whether a trial is necessary must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. at 157. Thus, in light of the genuine issues of material fact that exist as to Count II, the Court finds that a jury should consider and determine whether HMA can prove its civil RICO claim. HMA has met its burden to show affirmative evidence to support its RICO claim, and it will be up the jury to accept or reject HMA's civil RICO claim.

Accordingly, the Motion is DENIED as to Count II.[10]

**B.   <u>Count III of Second Amended Complaint: RICO Conspiracy</u>**

a.   <u>The Parties' Arguments</u>

Defendants argue in their Motion that, since HMA's underlying substantive RICO claim (Count II) is without merit, the RICO conspiracy claim (Count III) necessarily fails. [DE 357 at 22]. Defendants additionally assert that there is "no direct or circumstantial evidence that the Defendants agreed on an overall objective (*i.e.*, to defraud HMA) or to commit two predicate acts in furtherance of the purported scheme." *Id.*

In response, HMA asserts that the record evidence is more than sufficient to defeat summary judgment as to Count III. [DE 380 at 22]. HMA argues that "[t]he evidence summarized above—direct evidence from Eddleman of the actual agreement to commit fraud and extensive additional evidence that each Defendant worked together in a specific role to accomplish the warranty fraud—is more than sufficient for the jury to find an agreement to the objective of the conspiracy." *Id.* at 22–23.

In reply, Defendants contend that HMA relies on the same facts for its RICO claim and RICO conspiracy claim, so since "HMA has failed to state a claim for civil RICO under § 1962(c), HMA's RICO conspiracy claim necessarily fails." [DE 390 at 8]. They argue that "HMA has set forth no facts to show or create a reasonable inference that Defendants made an agreement to defraud HMA by intentionally damaging engines and submitting fraudulent warranty repairs. HMA's conclusory allegations that Defendants conspired with each other, without more, are insufficient." *Id.*

---

[10] Of course, this ruling does not preclude Defendants from moving for directed verdict at the close of HMA's case, or at the close of all the evidence.

b.   <u>Applicable Law</u>

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the [RICO]

provisions." 18 U.S.C. § 1962(d). "A plaintiff can establish a RICO conspiracy claim in one of

two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or

(2) by showing that the defendant agreed to commit two predicate acts." *In re Managed Care*

*Litig.*, 430 F. Supp. 2d 1336, 1344 (S.D. Fla. 2006), *aff'd sub nom. Shane v. Humana, Inc.*, 228 F.

App'x 927 (11th Cir. 2007) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,

119 F.3d 935, 950 (11th Cir. 1997)). "In addition to predicate crimes, a RICO conspiracy charge

requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's

knowledge of, agreement to, and participation in the conspiracy." *United States v. Gonzalez*, 921

F.2d 1530, 1546 (11th Cir. 1991).

c.   <u>Analysis</u>

At the November 7, 2022 hearing, counsel for HMA and counsel for Defendants agreed

that the RICO conspiracy count (Count III) rises and falls with the substantive RICO count (Count

II). The applicable law cited above states this as well. The Court has carefully considered the

parties' papers and arguments, as well as the undisputed facts and applicable law. The Court finds

that there are material issues of fact which preclude a grant of summary judgment in Defendants'

favor as to Count III. Just as Defendants' Motion is being denied as to Count II in light of the

genuine issues of material fact that have been presented, Defendants' Motion is DENIED as to

Count III of the Second Amended Complaint for the same reasons.

C. **Damages for HMA's State Law Claims and Defendants' First Affirmative Defense**

a. The Parties' Arguments

In the Motion, Defendants assert that damages for HMA's state law claims are barred by section 320.64(25), Florida Statutes. [DE 357 at 23]. Defendants explain that HMA is alleging damages of up to $2,029,462.00 for payments made to West Palm for allegedly fraudulent warranty repairs, which damages accrued from January 2016 through December 2021. *Id.* Defendants argue that, under Florida law, HMA was required to perform an audit during the 12-month period immediately following the date an incentive was paid in order to recover that payment; however, HMA has never conducted any audit. While Defendants argue that HMA should be precluded from recovering any damages for their fraud-based claims, they also alternatively argue that HMA's damages should be limited to one year from the date the lawsuit was filed. *Id.* Defendants maintain that "[s]hould the Court find that HMA was relieved from its statutory obligation to conduct an audit, HMA's damages should at least be limited" to the time period of November 17, 2019, through December 31, 2021. [DE 24].

In response, HMA contends that section 320.64(25), Florida Statutes, "neither bars nor limits HMA's state law claims." [DE 380 at 23]. HMA asserts that the state law claims are only asserted against the Individual Defendants and not the dealership entity, and the Dealer Act does not apply to individual employees or executives of dealership entities. *Id.* HMA next argues that, even if Section 320.64(25) were applicable to the Individual Defendants, Defendants' argument still fails because, "[u]nder Defendants' interpretation of Section 320.64(25), if a dealer or its employees are devious enough to conceal fraudulent conduct for at least 12 months, they are immune from liability. This cannot possibly be what the legislature intended when it enacted

21

Section 320.64(25)." *Id.* According to HMA, a more reasonable interpretation of the statute is that it "permits causes of action for intentional fraud when dealers have fraudulently obtained warranty payments from manufacturers, such as alleged by HMA here." *Id.* at 24. Finally, HMA contends that "a reading of section 320.64(25) that permits causes of action for fraud is consistent with the statute's purpose." *Id.*

In reply, Defendants assert that HMA has admitted that it is statutorily barred from seeking a chargeback so it has instead "trie[d] to find a loophole in the statute by claiming the statute does not apply to individual defendants." [DE 390 at 8]. Defendants argue that "[a]llowing a manufacturer to shirk their duty of conducting an audit and then collect the chargeback from dealership employees would defeat the purpose of the statute. Had HMA conducted an audit, any chargeback of the Dealer would have resulted from the conduct of West Palm's employees. HMA cannot skirt this by seeking its chargeback from West Palm's employees." *Id.* Next, Defendants maintain that the Florida Legislature did intend for the 12-month audit requirement to apply to fraudulent conduct in section 320.64(25), Florida Statutes. *Id.* at 8–9. Finally, Defendants point out that, in the Termination Case, HMA admitted that the statute "prevents HMA from collecting any payments for chargebacks beyond 12 months." *Id.* at 9.

The parties' arguments became clearer at the November 7, 2022 hearing. Defendants' counsel argued that section 320.64(25), Florida Statutes, only allows a manufacturer like HMA to recover 12 months' worth of chargebacks if the manufacturer has conducted an audit. And, here, HMA did not conduct an audit, so it is not entitled to money for fraudulent warranty submissions. Defendant's counsel asserted that the Dealer Act is to be broadly construed, that the statute must apply to individuals since dealerships function through their employees, and that HMA is trying to circumvent the Dealer Act by alleging common law fraud against individual employees.

HMA's counsel argued that the statute at issue does not apply to individual employees, and the common law fraud count was only alleged against individual employees (and not West Palm), so the statute of limitations of four years for fraud applies here. HMA's counsel also pointed out that Gene Khaytin and Ernie Revuelta are no longer employed by West Palm, and it is undisputed that Edward W. Napleton never was employed by West Palm. Thus, the relevant statute cannot possibly apply to these individuals. HMA's counsel explained that HMA did attempt to conduct an audit in this case in October 2020, and HMA interpreted Les Stracher's letter in response as a refusal to comply with the audit request. HMA's counsel further explained that it is not seeking a chargeback here, but rather is seeking damages against the individuals under common law fraud. Counsel stated that it is also a factual dispute whether HMA could have uncovered the alleged fraud with an audit, and the legislature could not have intended to incentivize dealerships to hide fraud for more than 12 months. Finally, HMA's counsel asserted that it is appropriate for the Court to make a decision on this damages issue post-verdict.

b.  <u>Applicable Law</u>

Defendants have moved for summary judgment on their first affirmative defense, which states, "[p]ursuant to the Fla. Stat. Ann. § 320.64(25), Plaintiff's claims are barred because Plaintiff failed to audit any alleged misconduct within the 12-month period immediately following payment of the warranty claims in question." [DE 318 at 18].

The relevant statute states as follows:

The applicant or licensee has undertaken or engaged in an audit of warranty, maintenance, and other service-related payments or incentive payments, including payments to a motor vehicle dealer under any licensee-issued program, policy, or other benefit, which were previously paid to a motor vehicle dealer in violation of this section or has failed to comply with any of its obligations under s. 320.696. An applicant or licensee may reasonably and periodically audit a motor vehicle dealer to determine the validity of paid claims as provided in s. 320.696. Audits of

warranty, maintenance, and other service-related payments shall be performed by an applicant or licensee only during the 12-month period immediately following the date the claim was paid. Audits of incentive payments shall be performed only during the 12-month period immediately following the date the incentive was paid. As used in this section, the term "incentive" includes any bonus, incentive, or other monetary or nonmonetary consideration. After such time periods have elapsed, all warranty, maintenance, and other service-related payments and incentive payments shall be deemed final and incontrovertible for any reason notwithstanding any otherwise applicable law, and the motor vehicle dealer shall not be subject to any chargeback or repayment. An applicant or licensee may deny a claim or, as a result of a timely conducted audit, impose a chargeback against a motor vehicle dealer for warranty, maintenance, or other service-related payments or incentive payments only if the applicant or licensee can show that the warranty, maintenance, or other service-related claim or incentive claim was false or fraudulent or that the motor vehicle dealer failed to substantially comply with the reasonable written and uniformly applied procedures of the applicant or licensee for such repairs or incentives, but only for that portion of the claim so shown. Notwithstanding the terms of any franchise agreement, guideline, program, policy, or procedure, an applicant or licensee may deny or charge back only that portion of a warranty, maintenance, or other service-related claim or incentive claim which the applicant or licensee has proven to be false or fraudulent or for which the dealer failed to substantially comply with the reasonable written and uniformly applied procedures of the applicant or licensee for such repairs or incentives, as set forth in this subsection. An applicant or licensee may not charge back a motor vehicle dealer subsequent to the payment of a warranty, maintenance, or service-related claim or incentive claim unless, within 30 days after a timely conducted audit, a representative of the applicant or licensee first meets in person, by telephone, or by video teleconference with an officer or employee of the dealer designated by the motor vehicle dealer. At such meeting the applicant or licensee must provide a detailed explanation, with supporting documentation, as to the basis for each of the claims for which the applicant or licensee proposed a chargeback to the dealer and a written statement containing the basis upon which the motor vehicle dealer was selected for audit or review. Thereafter, the applicant or licensee must provide the motor vehicle dealer's representative a reasonable period after the meeting within which to respond to the proposed chargebacks, with such period to be commensurate with the volume of claims under consideration, but in no case less than 45 days after the meeting. The applicant or licensee is prohibited from changing or altering the basis for each of the proposed chargebacks as presented to the motor vehicle dealer's representative following the conclusion of the audit unless the applicant or licensee receives new information affecting the basis for one or more chargebacks and that new information is received within 30 days after the conclusion of the timely conducted audit. If the applicant or licensee claims the existence of new information, the dealer must be given the same right to a meeting and right to respond as when the chargeback was originally presented. After all internal dispute resolution processes provided through the applicant or licensee

24

have been completed, the applicant or licensee shall give written notice to the motor vehicle dealer of the final amount of its proposed chargeback. If the dealer disputes that amount, the dealer may file a protest with the department within 30 days after receipt of the notice. If a protest is timely filed, the department shall notify the applicant or licensee of the filing of the protest, and the applicant or licensee may not take any action to recover the amount of the proposed chargeback until the department renders a final determination, which is not subject to further appeal, that the chargeback is in compliance with the provisions of this section. In any hearing pursuant to this subsection, the applicant or licensee has the burden of proof that its audit and resulting chargeback are in compliance with this subsection.

Section 320.64(25), Fla. Stat.

c.  <u>Analysis</u>

The parties agree that the interpretation of above statute that they seek is an issue of first impression. There is simply no case law on this issue. HMA's counsel agreed at the hearing that this issue could easily be dealt with post-trial. Defendants' counsel asserted that a court ruling on this issue would greatly reduce the length of the trial. The Court disagrees with Defendants' position that a court ruling will greatly reduce the length of trial since the trial will proceed on the civil RICO and civil RICO conspiracy counts, which will require overlapping evidence to the common law fraud count. Moreover, the Court agrees with HMA's argument that the statute and related affirmative defense will not, at the very least, affect fraud damages against Edward W. Napleton, who was never an employee of the dealership (West Palm).

Since the trial's scope will not be dramatically reduced by a ruling on this damages issue, and in light of the other pending claims that will proceed to trial, it will not prejudice Defendants for the Court to decide this damages issue at a later point, with the benefit of a full and complete trial record. Further, it is clearly more prudent for this Court to decide this damages issue after a verdict on liability has been reached. The Court believes that this procedure will promote judicial economy. Thus, the Court will DENY Defendants' Motion as to its First Affirmative Defense and

will not, at this time, limit HMA's damages for its state law claims. However, this ruling is without prejudice to Defendants renewing their arguments at the conclusion of the jury trial, or post-verdict, if appropriate.

### D. Defendant West Palm's Counterclaim I: violation of the Florida Dealer Act, Fla. Stat. § 320.64(18)

#### a. The Parties' Arguments

In the Motion, Defendant West Palm[11] argues that there is no issue of material fact regarding its first counterclaim. [DE 357 at 34]. Defendant West Palm further argues that HMA's discretionary allocation system is unfair as it excludes dealers in litigation with HMA and dealers who choose to opt out of HMA's voluntary programs. *Id.* at 25–26. According to Defendant West Palm, HMA's discretionary allocation system "goes against the very core of the Florida Dealer Act." *Id.* at 26.

In response, HMA contends that, for many years, it "has used an industry-standard allocation method to distribute Hyundai vehicles to all of its dealers that includes both an 'earned' formulaic and a (much smaller) discretionary component." [DE 380 at 24]. HMA emphasizes that Defendant West Palm does not take issue with HMA's non-discretionary allocation of vehicles and only takes issue with how HMA has chosen to use its discretion to allocate a smaller pool of vehicles (10-15% of vehicles). *Id.* HMA explains how it decides to allocate the discretionary pool and that it had a very limited supply of vehicles during the pandemic and that it "would not allocate the very limited additional discretionary vehicles to dealers that were not participating in its HDAA

---

[11] The Motion and reply were filed by all Defendants. However, Counterclaims I–III were filed only by Defendant West Palm. As confirmed by Defendants' counsel at the November 7, 2022 hearing, it was inappropriate for all Defendants to seek summary judgment on Counterclaims I–III. In order to avoid confusion and ensure clarity, the Court will only discuss Defendant West Palm with regard to the counterclaims.

program and were also in litigation with them." *Id.* at 25–26. According to HMA, "[s]imply put, manufacturers have flexibility to allocate from their limited discretionary pool as long as they treat similarly-situated dealers the same." *Id.* at 27. HMA also argues that "[n]umerous courts that have addressed the issue have recognized a manufacturer's right to use its business judgment to determine how it will distribute its discretionary vehicles." *Id.* Finally, HMA asserts that "the record fully supports the fairness of its decisions, at the very least, these issues present a dispute of material fact." *Id.*

In Defendant West Palm's reply, it argues that "HMA's now admitted (but formerly secret) policy that withholds discretionary allocation from dealers it deems to be not good partners is unlawful under the Dealer Act." [DE 390 at 9]. It next contends that the vehicle shortage resulting from the Covid-19 pandemic "does not negate the fact that there were 5,987 discretionary vehicles doled out to South Florida dealers from July 2020 through March of 2022" and that HMA had control over those vehicles and chose what dealers to give these vehicles to." *Id.* at 10. Defendant West Palm argues that HMA's reliance on the Dealer Agreement is misplaced since the Florida Dealer Act governs over the Dealer Agreement and requires that allocation be "fair and equitable." *Id.* Defendant West Palm distinguishes the two out-of-state cases and the outdated Eleventh Circuit case relied on by HMA to support its assertion that it may withhold allocation from dealers it is in litigation with and who do not participate in its programs. *Id.* at 10–11. Defendant West Palm maintains that, "[a]side from the admitted secrecy, HMA's discretionary allocation policy facially violates Section 320.64(18), because it is unfair and not supportable by reason or good cause." *Id.* at 11. It argues that there is no issue of genuine material fact here since "[b]oth parties agree that HMA has implemented a discretionary allocation policy which excludes dealers it is in litigation

with and dealers who fail to join HMA's programs. It is undisputed that West Palm was denied discretionary allocation for these very reasons." *Id.*

b.   Applicable Law

The statutory provision which serves as the basis for Counterclaim I states the following:

> The applicant or licensee has established a system of motor vehicle allocation or distribution or has implemented a system of allocation or distribution of motor vehicles to one or more of its franchised motor vehicle dealers which reduces or alters allocations or supplies of new motor vehicles to the dealer to achieve, directly or indirectly, a purpose that is prohibited by ss. 320.60-320.70, or which otherwise is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicles dealer or dealers. An applicant or licensee shall maintain for 3 years records that describe its methods or formula of allocation and distribution of its motor vehicles and records of its actual allocation and distribution of motor vehicles to its motor vehicle dealers in this state. As used in this subsection, "unfair" includes, without limitation, the refusal or failure to offer to any dealer an equitable supply of new vehicles under its franchise, by model, mix, or colors as the licensee offers or allocates to its other same line-make dealers in the state.

Section 320.64(18), Fla. Stat.

"The language of [Section 320.64(18)] instructs the Court to consider the equities of dealers affected and decide whether the system of distribution [of motor vehicles] is 'unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause.'" *Fitzgerald Motors, Inc. v. FCA US LLC*, No. 819-CV-02661-MSSAAS, 2020 WL 10359983, at *7 (M.D. Fla. June 26, 2020) (quoting *Action Nissan, Inc. v. Hyundai Motor Am.*, 617 F. Supp. 2d 1177, 1201 (M.D. Fla. 2008)).

c.   Analysis

Upon careful review of the parties' arguments in their papers and at the November 7, 2022 hearing, as well as a careful review of the material facts asserted by the parties, it is clear that there are genuine issues of material fact with regard to Counterclaim I. The Court rejects Defendant

West Palm's argument that HMA's alleged secret policy regarding withholding vehicles from dealers that are involved in litigation with HMA and/or dealers who do not participate in Hyundai programs, is, on the present record, *per se* unreasonable.

HMA's Statement of Material Facts establishes that HMA only distributes 10% to 15% of its vehicles outside the non-discretionary computer calculated allocation process, through a discretionary pool, and that discretionary allocation programs are standard in the industry. Pl.'s SMF ¶¶ 129–130. HMA also lays out the various ways it uses its discretionary pool and explains that some vehicles are distributed within the good judgment of HMA's regional management. Pl.'s SMF ¶¶ 131–132. According to HMA, HMA met with West Palm several times to explain the importance of the Hyundai Dealer Advertising Association program, but West Palm refused to participate. Pl.'s SMF ¶ 141. Thus, there are issues of material fact regarding whether HMA had nefarious intent and whether its discretionary allocation was unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause. These are issues which must be decided by the jury. Defendant West Palm's Motion is therefore DENIED as to Counterclaim I.

### E.   Defendant West Palm's Counterclaims II and III: violation of the Florida Dealer Act, Fla. Stat. § 320.64(19) and 320.64(22)

#### a.   The Parties' Arguments

Defendant West Palm argues in its Motion that "Hyundai has failed to provide and deliver a reasonable supply of motor vehicles to West Palm. Undisputed record evidence demonstrates that on numerous occasions West Palm was left with little to no vehicles in their lot." [DE 357 at 26–27]. Thus, due to HMA's discretionary allocation policy, "Hyundai's failure and refusal to provide and deliver vehicles to West Palm puts it at a distinct disadvantage to other dealers who

are receiving this allocation. Again, consumers are harmed when dealers cannot compete fairly for their business." *Id.* at 27.

In response, HMA argues that the "Dealer [is] cherry-pick[ing] a snapshot of two specific days in November 2021 and in March 2022 and compar[ing] the number of vehicles on the Dealer's lot to those on other dealers' lots." [DE 380 at 28]. HMA asserts that Defendant West Palm's argument "ignores the numerous factors that could explain why on any given day one dealership may have more vehicles on its lot than the Dealer, including such factors as how fast a dealership sells its inventory, whether a dealership has turned down vehicle allocation, and when the next shipment of new vehicles is expected to arrive at a dealership (deliveries of new vehicles to dealers are not all made at the same time)." *Id.* HMA also argues that Defendant West Palm's claim "further ignores whether HMA even had the specific mix of discretionary vehicles available to provide to the Dealer (had HMA wanted to) based on the industrywide supply chain constraints that existed. And, finally, the Dealer ignores the fact that HMA's formulaic allocation system takes into account each dealer's inventory." *Id.* HMA further argues that the evidence shows that during the relevant time period "the Dealer turned down hundreds of vehicles that HMA offered the Dealer through its regular formulaic allocation." *Id.*

In reply, Defendant West Palm explains that there is no dispute that West Palm "often had little to no inventory of certain models" and "had little to no supply of certain models compared to other dealers." [DE 390 at 12]. Defendant West Palm, however, disputes HMA's claims that "West Palm's lack of inventory can be attributed to the following factors: how fast a dealership sells its inventory, when the next shipment of new vehicles is expected to arrive at the dealership, and whether a dealership turned down vehicle allocation." *Id.* It argues that these factors are actually "irrelevant to discretionary allocation." *Id.* Defendant West Palm emphasizes that the

"discretionary component of HMA's allocation system does not follow the Balanced Days' Supply model" and that "[e]ach dealer's inventory is not 'trued up' as HMA claims, because HMA picks and chooses which dealerships receive discretionary allocation and which dealerships are left with empty lots." *Id.*

b.   <u>Applicable Law</u>

The relevant statutes state as follows:

> The applicant or licensee, without good and fair cause, has delayed, refused, or failed to provide a supply of motor vehicles by series in reasonable quantities, including the models publicly advertised by the applicant or licensee as being available, or has delayed, refused, or failed to deliver motor vehicle parts and accessories within a reasonable time after receipt of an order by a franchised dealer. However, this subsection is not violated if such failure is caused by acts or causes beyond the control of the applicant or licensee.

Section 320.64(19), Fla. Stat.

> The applicant or licensee has refused to deliver, in reasonable quantities and within a reasonable time, to any duly licensed motor vehicle dealer who has an agreement with such applicant or licensee for the retail sale of new motor vehicles and parts for motor vehicles sold or distributed by the applicant or licensee, any such motor vehicles or parts as are covered by such agreement. Such refusal includes the failure to offer to its same line-make franchised motor vehicle dealers all models manufactured for that line-make, or requiring a dealer to pay any extra fee, require a dealer to execute a separate franchise agreement, purchase unreasonable advertising displays or other materials, or relocate, expand, improve, remodel, renovate, recondition, or alter the dealer's existing facilities, or provide exclusive facilities as a prerequisite to receiving a model or series of vehicles. However, the failure to deliver any motor vehicle or part will not be considered a violation of this section if the failure is due to an act of God, work stoppage, or delay due to a strike or labor difficulty, a freight embargo, product shortage, or other cause over which the applicant or licensee has no control. An applicant or licensee may impose reasonable requirements on the motor vehicle dealer, other than the items listed above, including, but not limited to, the purchase of special tools required to properly service a motor vehicle and the undertaking of sales person or service person training related to the motor vehicle.

Section 320.64(22), Fla. Stat. Section 320.64(19), Florida Statutes, "provides that a manufacturer is prohibited from delaying, refusing or failing, 'without good and fair cause,' to provide a supply

31

of motor vehicles by series in reasonable quantities.'" *Bert Smith Oldsmobile, Inc. v. Gen. Motors Corp.*, No. 8:04CV2666T-27EAJ, 2005 WL 1210993, at *4 (M.D. Fla. May 20, 2005).

c.   Analysis

The same analysis for Counterclaim I applies here as to Counterclaims II and III. There are genuine issues of material fact that preclude the granting of summary judgment in Defendant West Palm's favor as to Counterclaims II and III. The determination as to "good and fair cause" and whether HMA "refused" to deliver vehicles in reasonable quantities without cause are clearly jury questions. Moreover, in their reply, Defendant West Palm partially relies on an additional fact from its Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment [DE 390 at 12], and the Court previously ruled at the November 7, 2022 hearing that it would not be considering those improperly filed additional facts.

Thus, summary judgment must be DENIED as to Counterclaims II and III.

## V.   **CONCLUSION**

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion for Partial Summary Judgment [DE 357] is **DENIED**. However, the Motion is denied without prejudice as to Defendants' First Affirmative Defense and the scope of damages HMA can recover for its common law claims. As stated above, Defendants can renew this argument if appropriate after the jury has reached its verdict. And, of course, nothing in this Order precludes Defendants from moving for a directed verdict during trial, or post-trial.

All pending issues of fact shall be resolved at the upcoming trial where the trier of fact will have an opportunity to hear and consider all the relevant and probative evidence and make credibility determinations.

This case is specially set for a jury trial beginning on Tuesday, January 3, 2023, at 9:00 a.m. before United States Magistrate Judge William Matthewman at the U.S. Courthouse located at 701 Clematis Street, Courtroom Six, Third Floor, West Palm Beach, Florida. The parties and their counsel shall be ready and present in-person for the jury trial at that time. The parties are also reminded that a calendar call is set for 10:00 a.m. on December 20, 2022, before the Undersigned via Zoom VTC.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 16th day of November, 2022.

WILLIAM MATTHEWMAN
United States Magistrate Judge